Richard Heimann (CA State Bar # 063607)
Nimish R. Desai (CA State Bar # 244953)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery St., 29th Fl.
San Francisco, CA 94111-3339
Telephone: 415-956-1000
Facsimile: 415-956-1008
rheimann@lchb.com
ndesai@lchb.com

David S. Stellings (*pro hac vice*)
Katherine I. McBride (*pro hac vice*)
Jessica A. Moldovan (*pro hac vice*)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: 212.355.9500
Facsimile: 212.355.9592
dstellings@lchb.com
kmcbride@lchb.com
jmoldovan@lchb.com

*Attorneys for Plaintiffs*

*[Additional counsel listed on signature page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ELOISE ACKISS, ET AL., | Case No. 4:21-cv-06338-JST |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT AND TO TRANSFER THE CASE TO THE EASTERN DISTRICT OF MICHIGAN** |
| v. | |
| GENERAL MOTORS LLC, ET AL., | |
| Defendants. | The Hon. Jon S. Tigar |
| | Date: April 21, 2022 |
| | Time: 2:00 p.m. |
| | Courtroom: 6 |
| | Complaint Filed: August 17, 2021 |
| | Amended Complaint Filed: October 26, 2021 |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................... 1

STATEMENT OF ISSUES TO BE DECIDED ............................................... 2

BACKGROUND ............................................................................................ 2

    A.    The Class Vehicles have a hidden and dangerous safety defect............................ 2

    B.    Old GM ignored clear warnings when it used the defective calibration. ............... 4

    C.    GM has long known about the SDM Calibration Defect. ..................................... 5

    D.    GM's failure to disclose the defect caused Plaintiffs to suffer damages............... 7

RULE 12(B)(6) STANDARD OF REVIEW ................................................... 7

    A.    Non-fraud claims need only state plausible grounds for relief............................. 7

    B.    Fraud claims require particularity for misrepresentations but not for
knowledge. ........................................................................................................ 8

ARGUMENT & AUTHORITIES ................................................................... 9

I.    Plaintiffs' allegations about the SDM Calibration Defect are plausible and well-
supported........................................................................................................... 9

    A.    Plaintiffs plausibly allege the SDM Calibration Defect affects *all* Class
Vehicles. ........................................................................................................... 9

    B.    Public records of hundreds of crashes with airbag and seatbelt failures in
the Class Vehicles are also probative of the defect and of GM's knowledge....... 13

    C.    Defendants' crash reports are not properly before the Court, and regardless,
do not mean what Defendants say....................................................................... 16

    D.    The SDM Calibration Defect impacts a critical safety feature and supports
consumer fraud claims. ...................................................................................... 17

II.    The California Plaintiffs plead their claims with the specificity required....................... 20

    A.    The California Plaintiffs adequately allege their fraud claims. ........................... 20

        1.    Plaintiffs adequately allege their fraud-by-omission claims................... 20

            a.    Plaintiffs plausibly allege that they would have learned the
truth about the Class Vehicles had GM disclosed it. ................... 21

            b.    Plaintiffs adequately allege the content of GM's omissions......... 23

        2.    GM's affirmative misrepresentation arguments do not undermine
Plaintiffs' omissions claims. ..................................................................... 25

        3.    The Complaint notifies each Defendant of the claims against it.............. 26

    B.    Plaintiffs adequately allege claims for equitable relief....................................... 28

    C.    Plaintiffs adequately plead Breach of Express Warranty.................................... 29

        1.    The SDM Calibration Defect was present in all Class Vehicles at
the point of sale. ....................................................................................... 29

        2.    Plaintiffs were not required to present their Class Vehicles to GM
for a non-existent repair. ......................................................................... 30

    D.    Plaintiffs adequately allege Breach of Implied Warranty. .................................. 30

1. The SDM Calibration Defect was present at purchase............................ 31

2. Plaintiff Vargas adequately alleges a Song-Bervely Claim. .................... 31

3. Plaintiffs' implied warranty claims are tolled by GM's fraudulent concealment and the discovery rule....................................................... 31

III. This Court has specific personal jurisdiction over GM and Plaintiffs' claims are properly venued in this District.................................................................... 34

A. The Court has jurisdiction over the California Plaintiffs' nationwide fraudulent concealment and unjust enrichment claims......................................... 35

B. BMS does not impact the Court's jurisdiction over claims brought on behalf of absent class members from outside of California. ............................... 37

C. The Court should exercise pendent party jurisdiction over the out-of-state Plaintiffs' claims arising from identical facts as the California claims............... 39

D. GM has not met its "heavy burden" to transfer this case to Michigan................ 42

CONCLUSION.......................................................................................................... 45

# TABLE OF AUTHORITIES

**Page**

<u>Cases</u>

*Aberin v. Am. Honda Motor Co., Inc.*,
   No. 16-CV-04384-JST, 2021 WL 1320773 (N.D. Cal. Mar. 23, 2021) ............................... 12

*Action Embroidery Corp. v. Atlantic Embroidery, Inc.*,
   368 F. 3d 117 (9th Cir. 2004) ................................................................................... 39, 40, 42

*Allen v. ConAgra Foods, Inc.*,
   No. 3:13-CV-01279-WHO, 2018 WL 6460451 (N.D. Cal. Dec. 10, 2018) ......................... 41

*Allen v. Conagra Foods, Inc.*,
   No. 3:13-CV-01279-WHO, 2019 WL 5191009, (N.D. Cal. Oct. 15, 2019) ......................... 41

*Anderson v. Hyundai Motor Co. Ltd.*,
   No. SA CV 131842 DMG RNBX , 2014 WL 12579305 (C.D. Cal. July 24,
   2014) ...................................................................................................................................... 18, 19

*Applied Elastomerics, Inc. v. Z-Man Fishing Prods, Inc.*,
   No. 06-2469, 2006 WL 2868971 (N.D. Cal. Oct. 6, 2006) .................................................. 44

*Arroyo v. AJU Hotel Silicon Valley, LLC*,
   No. 20-08218, 2021 WL 2350813 (N.D. Cal. Mar. 16, 2021) ............................................. 43

*Asghari v. Volkswagen Grp. of Am., Inc.*,
   42 F. Supp. 3d 1306 (C.D. Cal. 2013) ..................................................................................... 9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................................................. 7

*Azoulai v. BMW of N. Am. LLC*,
   2017 WL 1354781 (N.D. Cal. Apr. 13, 2017) ...................................................................... 18

*Baggett v. Hewlett-Packard Co.*,
   582 F. Supp. 2d 1261 (C.D. Cal. 2007) .................................................................................... 9

*Batista v. Irwin Nats.*,
   No. CV 20-10737-DMG (EX), 2021 WL 6618543 (C.D. Cal. Sept. 27, 2021) ................... 35

*Becerra v. Gen. Motors LLC*,
   241 F. Supp. 3d 1094 (S.D. Cal. 2017) .................................................................................. 18

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................................ 7, 29

*Birdsong v. Apple, Inc.*,
   590 F.3d 955 (9th Cir. 2009) ............................................................................................ 17, 18

*Bly-Magee v. Cal.*,
   236 F.3d 1014 (9th Cir. 2001) .................................................................................................. 8

*Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cty.*,
   137 S. Ct. 1773 (2017) ........................................................................................ 35, 38, 40, 41

3

*Brown v. Dynamic Pet Prods. & Frick's Meat Prods., Inc.*,
No. 17-cv-0659, 2017 WL 4680125 (S.D. Cal. Oct. 18, 2017) .......................................... 27

4

5

*Bunn v. Ford Motor Co.*,
No. 5:19-cv-03590, 2020 WL 991529 (N.D. Cal. Mar. 2, 2020)......................................... 32

6

*Burchfield v. Prestige Consumer Healthcare, Inc.*,
534 F. Supp. 3d 1192 (C.D. Cal. 2021).............................................................................. 35

7

8

*Byton N. Am. Co. v. Breitfeld*,
No. 19-cv-10563, 2020 WL 3802700 (C.D. Cal. Apr. 28, 2020)......................................... 28

9

*Cafasso v. Gen. Dynamics C4 Sys.*,
637 F.3d 1047 (9th Cir. 2011)...................................................................................... 8, 20

10

*Cahill v. Liberty Mut. Ins. Co.*,
80 F.3d 336 (9th Cir. 1996)................................................................................................ 29

11

12

*Canal A Media Holding, LLC v. U.S. Citizenship & Immigr. Servs.*,
No. 17-6491, 2018 WL 7297829 (C.D. Cal. Sept. 30, 2018)............................................... 44

13

*Cardinal Health 301, Inc. v. Tyco Elec. Corp.*,
169 Cal. App. 4th 116 (Cal. Ct. App. 2008)....................................................................... 32

14

15

*Carlson v. Colorado Ctr. for Reprod. Med., LLC*,
No. 21-06133, 2021 WL 5494273 (N.D. Cal. Nov. 23, 2021)............................................. 44

16

*Chipley v. Ford Motor Co.*,
No. 18-cv-01161, 2018 WL 1965029 (N.D. Cal. Apr. 26, 2018)........................................ 32

17

18

*Choi v. Kimberly-Clark Worldwide, Inc.*,
No. SA CV 190468 DOC ADSX, 2019 WL 4894120 (C.D. Cal. Aug. 28,
2019) ................................................................................................................................ 18

19

20

*Cirulli v. Hyundai Motor Co.*,
No. 08-cv-0854, 2009 WL 4288367 (C.D. Cal. Nov. 9, 2009)............................................ 26

21

*Cmty. Cause v. Boatwright*,
124 Cal. App. 3d 888 (Cal. Ct. App. 1981)........................................................................ 33

22

*Collazo v. Wen by Chaz Dean, Inc.*,
No. 15-cv-01974, 2015 WL 4398559 (C.D. Cal. July 17, 2015) ........................................ 27

23

24

*Conti v. Am. Honda Motor Co.*,
No. CV1902160CJCGJSX, 2019 WL 10371067 (C.D. Cal. Oct. 17, 2019)........................ 15

25

*Cooper v. Pickett*,
137 F.3d 616 (9th Cir. 1998).............................................................................................. 8

26

*Cortina v. Goya Foods, Inc.*,
94 F. Supp. 3d 1174 (S.D. Cal. 2015)................................................................................ 12

27

28

*Daniel v. Ford Motor Co.*,
806 F.3d 1217 (9th Cir. 2015)..................................................................................... 21, 32

*Davis v. U.S.*,
642 F.2d 328 (9th Cir. 1981)............................................................................34

*Deras v. Volkswagen Grp. of Am., Inc.*,
No. 17-CV-05452-JST, 2018 WL 2267448 (N.D. Cal. May 17, 2018)................................15

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014)............................................................................17

*Falcone v. Vitamin Shoppe Indus., Inc.*,
No. 07-957, 2008 WL 11336200 (C.D. Cal. June 13, 2008) ................................44

*Falk v. Gen. Motors Corp.*,
496 F. Supp. 2d 1088 (N.D. Cal. 2007)................................................................21

*Finney v. Ford Motor Co.*,
2018 WL 2552266 (N.D. Cal. June 4, 2018)........................................................26

*Fisher v. Honda N. Am., Inc.*,
No. 13-cv-9285, 2014 WL 2808188 (C.D. Cal. June 12, 2014)..........................15

*Focus 15, LLC v. NICO Corp.*,
No. 21-CV-01493-EMC, 2022 WL 267441 (N.D. Cal. Jan. 28, 2022) ................16

*Freedline v. O Organics*,
No. 19-CV-01945-JD, 2020 WL 6290352 (N.D. Cal. Oct. 27, 2020)..................37

*Frias v. Aetna Life Ins. Co.*,
No. 14-CV-03146-THE , 2014 WL 5364105 (N.D. Cal. 2014)..........................44

*Gonzales v. Charter Commc'ns, LLC*,
No. 20-02689, 2020 WL 5074024 (N.D. Cal. Aug. 24, 2020)............................43

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011) ......................................................................................38

*Granfield v. NVIDIA Corp.*,
No. C 11-05403 JW, 2012 WL 2847575 (N.D. Cal. July 11, 2012) ...................12

*Greenwood v. Compucredit Corp.*,
No. CIV. 08-04878 CW, 2010 WL 4807095 (N.D. Cal. Nov. 19, 2010) ............12

*Grodzitsky v. Am. Honda Motor Co., Inc.*,
No. 12–cv–1142–SVW, 2013 WL 2631326 (C.D. Cal. June 12, 2013)..............16

*Gutierrez v. Carmax Auto Superstores Cal.*,
248 Cal. Rptr. 3d 61 (Cal. Ct. App. 2018)........................................................30

*Hendricks v. StarKist Co.*,
No. 13-729, 2014 WL 1245880 (N.D. Cal. Mar. 25, 2014)................................42

*Hoang v. Bank of Am., N.A.*,
910 F.3d 1096 (9th Cir. 2018)..........................................................................45

*In re Arris Cable Modem Consumer Litig.*,
327 F.R.D. 334 (N.D. Cal. 2018)................................................................. 19, 25

*In re Bang Energy Drink Marketing Litigation*,
No. 18-cv-5758, 2020 WL 4458916 (N.D. Cal. Feb. 6, 2020)........................ 39, 40

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*,
295 F. Supp. 3d 927 (N.D. Cal. 2018) .....................................................21, 22, 26

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008).......................................................... 14, 23

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
334 F.R.D. 96 (E.D. Mich. 2019) .................................................................. 30, 31

*In re MyFord Touch Consumer Litig.*,
46 F. Supp. 3d 936 (N.D. Cal. 2014) .................................................................. 30

*In re Sanofi–Aventis Sec. Litig.*,
774 F.Supp.2d 549 (S.D.N.Y. 2011)................................................................... 16

*In re Takata Airbag Prod. Liab. Litig.*,
193 F. Supp. 3d 1324 (S.D. Fla. 2016).............................................................. 30

*In re Toyota RAV4 Hybrid Fuel Tank Litig.*,
534 F. Supp. 3d 1067 (N.D. Cal. 2021).............................................................. 36

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
No. MDL 2672, 2017 WL 4890594 (N.D. Cal. Oct. 30, 2017) ............................. 8

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
467 F. Supp. 3d 849 (N.D. Cal. 2020) ................................................................ 20

*In re Volkswagen Timing Chain Prod. Liab. Litig.*,
No. 16-2765, 2017 WL 1902160 (D.N.J. May 8, 2017)....................................... 27

*Ivie v. Kraft Foods Glob., Inc.*,
No. C-12-02554-RMW, 2013 WL 685372 (N.D. Cal. Feb. 25, 2013) ................. 12

*James ex rel. James Ambrose Johnson, Jr. 1999 Tr. v. UMG Recordings*,
No. 11-1613, 2011 WL 5192476 (N.D. Cal. Nov. 1, 2011) ................................. 45

*Jimenez v. Haxton Masonry, Inc.*,
No. 18-7109, 2019 WL 9573762 (N.D. Cal. May 10, 2019)................................. 43

*Johnson v. Trumpet Behav. Health, LLC*,
No. 21-cv-03221, 2022 WL 74163 (N.D. Cal. Jan. 7, 2022)................................ 28

*Julian v. TTE Tech., Inc.*,
No. 20-CV-02857-EMC, 2020 WL 6743912 (N.D. Cal. Nov. 17, 2020)............. 37

*Junhan Jeong v. Nexo Financial LLC, et. al.*,
No. 21-cv-02392, 2022 WL 174236 (N.D. Cal. Jan. 19, 2022) ........................... 28

*Kanan v. Thinx Inc.*,
No. 20-cv-10341, 2021 WL 4464200 (C.D. Cal. June 23, 2021)........................................ 39

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009)........................................................................................ 20

*Kincheloe v. American Airlines, Inc.*,
No. 21-515, 2021 WL 4339198 (N.D. Cal. Sept. 23, 2021) ............................................. 44

*Knievel v. ESPN*,
393 F.3d 1068 (9th Cir. 2005)..................................................................................... 8, 10

*Kosta v. Del Monte Corp.*,
No. 12-CV-01722-YGR, 2013 WL 2147413 (N.D. Cal. May 15, 2013)............................ 12

*La Fosse v. Sanderson Farms, Inc.*,
No. 19-CV-06570-RS, 2020 WL 3617786 (N.D. Cal. July 2, 2020) .................................. 41

*Larsen v. Vizio, Inc.*,
No. SA CV 1401865 CJC JCGX, 2015 WL 13655757
(C.D. Cal. Apr. 21, 2015)................................................................................................ 37

*Lassen v. Nissan N. Am., Inc.*,
211 F. Supp. 3d 1267 (C.D. Cal. 2016)........................................................................... 18

*Love v. M W G J LLC*,
No. 21-CV-01471-JD, 2021 WL 4975102 (N.D. Cal. Oct. 26, 2021)................................ 16

*Lyngaas v. Curaden AG*,
992 F.3d 412 (6th Cir. 2021)........................................................................................... 38

*MacDonald v. Ford Motor Co.*,
37 F. Supp. 3d 1087 (N.D. Cal. 2014) ....................................................................... 15, 22

*MacDonald, Gerstle v. Am. Honda Motor Co., Inc.*,
No. 16-CV-04384-JST, 2017 WL 2797810 (N.D. Cal. June 28, 2017).............................. 32

*Marcus v. Apple Inc.*,
No. C 14-03824 WHA, 2015 WL 151489 (N.D. Cal. Jan. 8, 2015)................................... 32

*Melendres v. Arpaio*,
784 F.3d 1254 (9th Cir. 2015)................................................................................... 12, 35

*Mexia v. Rinker Boat Co., Inc.*,
174 Cal. App. 4th 1297, 1301 (2009)........................................................................ 31, 32

*Midkiff v. Prudential Ins. Co. of Am.*,
No. 19-01656, 2019 WL 12469793 (N.D. Cal. Dec. 6, 2019) ........................................... 45

*Molock v. Whole Foods Market Group, Inc.*,
952 F.3d 293 (D.C. Cir. 2020).......................................................................................... 38

*Moore v. Kayport Package Express, Inc.*,
885 F.2d 531 (9th Cir. 1989)................................................................................... 8, 26, 27

*Mosqueda v. Am. Honda Motor Co., Inc.*,
443 F. Supp. 3d 1115 (C.D. Cal. 2020)..................................................................9

*Munning v. Gap, Inc.*,
No. 16-cv-3804, 2016 WL 6393550 (N.D. Cal. Oct. 28, 2016)...........................27

*Mussat v. IQVIA, Inc.*,
953 F.3d 441 (7th Cir. 2020)..............................................................................38

*Nava v. Kobe Steel, Ltd.*,
No. 18-CV-01423-VC, 2019 WL 4729540 (N.D. Cal. July 18, 2019).................11

*Nguyen v. Nissan N. Am., Inc.*,
932 F.3d 811 (9th Cir. 2019)...............................................................................31

*Phan v. Sargento Foods, Inc.*,
No. 20-CV-09251-EMC, 2021 WL 2224260 (N.D. Cal. June 2, 2021) ...............36

*Pravetz v. Fed. Ret. Thrift Inv. Bd.*,
No. 18-1081, 2018 WL 8058843 (C.D. Cal. Dec. 28, 2018) ...............................44

*Reitz v. FCA US LLC*,
No. 20-cv-687, 2021 WL 1905049 (C.D. Cal. May 11, 2021) ............................32

*Roberts v. Electrolux Home Prods., Inc.*,
No. CV 12-1644 CAS VBKX , 2013 WL 7753579 (C.D. Cal. Mar. 4, 2013) .....34

*Robinson Unilever U.S., Inc.*,
No. 17-cv-3010, 2018 WL 6136139 (C.D. Cal. June 25, 2018)..........................36

*Sater v. Chrysler Grp., LLC*,
No. EDCV 14-00700-VAP , 2015 WL 736273 (C.D. Cal. Feb. 20, 2015)...........33

*Sec. & Exch. Comm'n v. Christian Stanley, Inc.*,
No. 11-7147, 2012 WL 13012496 (C.D. Cal. Apr. 4, 2012) ...............................42

*Sharma v. Volkswagen AG*,
524 F. Supp. 3d 891 (N.D. Cal. 2021) ....................................................22, 28, 29

*Short v. Hyundai Motor Co.*,
444 F. Supp. 3d 1267 (W.D. Wash. 2020) ....................................................15, 19

*Shultz v. Hyatt Vacation Mktg. Corp.*,
No. 10-04568, 2011 WL 768735 (N.D. Cal. Feb. 28, 2011) .........................42, 43

*Sims v. Kia Motors Am., Inc.*,
No. SA CV 131791 AGD FMX, 2014 WL 12558251 (C.D. Cal. Oct. 8, 2014)............24, 25

*Sloan v. Gen. Motors LLC*,
287 F. Supp. 3d 840 (N.D. Cal. 2018) ...........................................22, 23, 25, 33

*Sloan v. Gen. Motors LLC*,
No. 16-CV-07244-EMC,
2019 WL 6612221 (N.D. Cal. Dec. 5, 2019).......................................................39

*Sloan v. Gen. Motors LLC*,
    438 F. Supp. 3d 1017 (N.D. Cal. 2020)...............................................................40

*Sloan v. Gen. Motors LLC*,
    No. 16-CV-07244-EMC, 2017 WL 3283998 (N.D. Cal. Aug. 1, 2017)...............................15

*Smith v. Ford Motor Co.*,
    No. 19-cv-05170, 2020 WL 609864 (N.D. Cal. Feb. 4, 2020)...............................32

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834, 839 (9th Cir. 2020) ...............................................................28

*Sotomayor v. Bank of Am., N.A.*,
    377 F. Supp. 3d 1034 (C.D. Cal. 2019)...............................................................38

*Staley v. Gilead Sciences, Inc.,*
    446 F. Supp. 3d 578 (N.D. Cal. 2020) ...............................................................36

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011)...............................................................8

*Sussex Fin. Enterprises, Inc. v. Bayerische Hypo-und Vereinsbank AG*,
    No. 08-cv-4791, 2010 WL 94272 (N.D. Cal. Jan. 6, 2010)...............................27

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007)...............................................................8

*Swearingen v. Late July Snacks LLC*,
    No. 13-cv-04342-EMC, 2017 WL 4641896 (N.D. Cal. Oct. 16, 2017)...............................12

*Tabak v. Apple, Inc.*,
    19-cv-2455, 2020 WL 9066153 (N.D. Cal. Jan. 30, 2020)...............................29

*Tanner v. Ford Motor Co.*,
    424 F. Supp. 3d 666 (N.D. Cal. 2019) ...............................................................32

*Todd v. Tempur-Sealy Int'l, Inc.*
    No. 13-CV-04984-JST, 2016 WL 344479 (N.D. Cal. Jan. 28, 2016) ...............................36

*U.S. v. United Healthcare Ins. Co.*,
    848 F.3d 1161 (9th Cir. 2016)...............................................................8

*Villanueva v. Am. Honda Motor Co., Inc.*,
    No. 19-cv-1390, 2019 WL 8112467 (C.D. Cal. Oct. 10, 2019)...............................25

*Waldrup v. Countrywide Fin. Corp.*,
    No. 13-cv-8833, 2015 WL 93363 (C.D. Cal. Jan. 5, 2015)...............................9

*Williams v. Tesla, Inc.*,
    No. 20-cv-08208, 2021 WL 2531177 (N.D. Cal. June 21, 2021) ...............................32

*Williams v. Yamaha Motor Co. Ltd.*,
    851 F.3d 1015 (9th Cir. 2017)...............................................................16

PLAINTIFFS' OPPOSITION TO
DEF.'S MOTION TO DISMISS
4:21-CV-06338-JST

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Wilson v. Hewlett-Packard Co.*,
    668 F.3d 1136 (9th Cir. 2012) ............................................................................................ 15

*Wolf v. Hewlett Packard Co.*,
    No. CV 1501221 BRO GJSX, 2016 WL 8931307 (C.D. Cal. Apr. 18, 2016) ...................... 36

*Yearby v. Am. Nat'l Ins. Co.*,
    No. 20-09222, 2021 WL 3855833 (N.D. Cal. Aug. 30, 2021).............................................. 44

## Statutes

28 U.S.C. § 1631.................................................................................................................... 42

## Other Authorities

Fed. R. Civ. P. 8(a)(2) ..................................................................................................... 7, 29

Fed. R. Civ. P. 9(b) .....................................................................................................8, 11, 20

## Rules

Newberg on Class Actions (5th ed.) ................................................................................ 36, 37

## PRELIMINARY STATEMENT

When Plaintiffs researched, shopped for, and purchased their Class Vehicles, they reasonably expected that the airbags and seatbelts would protect them in the unfortunate event of a crash severe enough to need them.[1] They did not know, however, that the software calibration that controls the airbags and seatbelts in their vehicles had a serious safety defect. But GM did.

More than 22 years ago, the group responsible for development of GM trucks and SUVs made a reckless, and unjustified, decision to alter a software program designed by engineers from Delco Electronics. This software program controls the vehicles' computer, also known as the SDM, which governs when and how the airbags and seatbelts deploy in a crash. Alterations to the software calibration in the Class Vehicles—which were implemented over the objection of the engineers who created it—can prevent frontal airbag and seatbelt deployment 45 milliseconds ("ms") into certain kinds of crashes (the "SDM Calibration Defect"). This decades-old decision has had lasting repercussions, including for the consumers who paid for, and continue to drive, Class Vehicles with airbags and seatbelts that can fail them when they are needed most.

Plaintiffs' well-pled allegations find factual support from multiple, independent sources. This includes automotive crash systems expert Chris Caruso, who worked directly on the SDM software at issue. ACAC ¶¶ 148-155. After leaving Delco, Mr. Caruso has gone on to serve as an expert witness in personal injury lawsuits involving crashes where airbags should have deployed to prevent serious injury or death but—consistent with the SDM Calibration Defect—did not. *Id.* ¶¶ 146-154. Similarly, another forensic crash investigator, Sal Fariello, raised related concerns about the flawed calibration directly to GM's CEO. *Id.* ¶¶ 155-159. And finally, public databases—monitored by GM—include *hundred*s of crashes with airbag and seatbelt failures consistent with the defect. *Id.* ¶¶ 160-171 and Exhibit A. Taken together, and taken as true, Plaintiffs' allegations handily satisfy their obligations at the pleading stage.

---

[1] Capitalized terms refer to terms defined in the Amended Class Action Complaint, ECF 12, ("Complaint" or "ACAC") unless otherwise indicated.

In the main, GM's arguments for dismissal either aim to contest, or ignore, the allegations in the Complaint in favor of their own purportedly contravening evidence.[2] But GM's efforts to introduce a competing narrative are not well-taken in a pleading challenge. Defendants' other arguments are scattershot and rest on overstating the law and misreading the Complaint. As to fraud, the Complaint readily satisfies Rule 9(b)'s pleading standard for fraudulent omissions: it clearly identifies the "who" (Defendants), the "what" (knowledge of the SDM Calibration Defect and its effect on performance), the "when" (prior to the sale or lease of Class Vehicles), the "where" the omission occurred and where Plaintiffs' would have seen a disclosure (the channels through which GM marketed and sold the Class Vehicles), and the "how" (by hiding the defect from regulators and the public). GM's arguments to the contrary do not stand up against these well-pled allegations. The challenges to Plaintiffs' breach of warranty claims are similarly deficient, as Plaintiffs need not endure a collision with airbag failures to invoke the terms of their warranties. Finally, Plaintiffs' claims were properly and appropriately filed in this Court, including because three named Plaintiffs purchased their defective Class Vehicles in the state of California, and should not be transferred to Michigan.

In sum, Plaintiffs allege a plausible—and, indeed, well supported—fraud on consumers about a serious safety defect that gave rise to the properly pled claims in the Complaint.

## STATEMENT OF ISSUES TO BE DECIDED

Whether Plaintiffs' well-pled allegations of GM's enduring efforts to conceal a known and dangerous safety defect from consumers, taken as true, state plausible, cognizable claims for relief, and whether Plaintiffs should be forced to litigate those claims—which were properly filed in this Court—in the Eastern District of Michigan.

## BACKGROUND

### A. The Class Vehicles have a hidden and dangerous safety defect.

Driving a car is usually a safe, reliable, and mundane part of a routine. Until the split second that it is not. Car crashes happen in an instant, and can be serious, traumatic, and even

---

[2] As explained further in the Opposition to GM's Request for Judicial Notice ("RJN Opp."), filed herewith, GM's improper evidence does not actually contradict Plaintiffs' defect allegations.

1    deadly events. Given this unfortunate reality, federal law requires that automobiles have seatbelts

2    and airbags ready to protect vehicle occupants should an accident occur. ACAC ¶¶ 1, 94.

3    The "brain" that runs this technical operation is a component part known as the airbag

4    control unit or "ACU," which GM refers to as the "Sensing and Diagnostic Module" or "SDM."

5    *Id*. ¶¶ 3-4, 98. SDMs are effectively computers that use sensors to monitor vehicle operation and

6    control the vehicle's safety systems. *Id.* ¶¶ 94-98. Where necessary to prevent or mitigate injury

7    in a crash, the SDM should tighten seatbelts to hold vehicle occupants in place and inflate airbags

8    to buffer impact. *Id.* ¶ 98. Without the airbags or seatbelts, slamming into hard structures (such as

9    the steering wheel) during a crash can cause serious injuries or death. *Id.* ¶ 94.

10   SDMs use software to interpret signals from sensors and to decide to "deploy" (or not to

11   deploy) the safety systems based on how severe a crash is. *Id.* ¶ 104. Not all accidents require

12   airbags, but airbag deployment should occur in frontal crashes that are "moderate to severe"—the

13   equivalent of hitting a solid barrier at 8-14 mph or higher. *Id.* ¶¶ 96, 105, 188-189. The threshold

14   values that indicate deployment is necessary (i.e., that a crash is "moderate to severe") are

15   programmed into the SDM software when engineers "calibrate" it for use in a vehicle. *Id.* ¶ 105.

16   In the Class Vehicles, the software calibration that controls the SDM contains a serious

17   defect. *Id.* ¶ 106. This defect is rooted in the three basic phases of SDM operation: normal mode,

18   wake-up/standby mode, and reset. *Id.* ¶¶ 99-103. From its default operation in normal mode, the

19   SDM enters wake-up mode after an irregular input (like the onset of a crash event, or a curb

20   impact). *Id.* In wake-up mode, the SDM is on alert and searches for confirmatory signals of an

21   ongoing accident. From there, the SDM can deploy the airbags and seatbelts if needed, or will

22   "reset" to normal mode if it determines they are not. *Id.* ¶¶ 99-102, 105, 114-115. In the Class

23   Vehicles, the thresholds sufficient to trigger deployment increase to unattainable levels after the

24   SDM spends 45 ms in wake-up mode. *Id.* ¶ 106. As a result, the airbags and seatbelts are disabled

25   45 ms into certain kinds of crash sequences because the SDM can no longer deploy them prior to

26   resetting. *Id.* This becomes a serious issue in frontal accidents with complex crash dynamics that

27   trigger wakeup mode and then require airbag deployment after 45 ms. This includes frontal

28   crashes with multiple points of impact—known as "concatenated" events—like a vehicle that first

hits a curb and then, more 45 ms later, hits a tree. Similarly, it implicates "prolonged" crashes that increase in severity after an initial, "soft" impact, such as into a bumper. *Id.* ¶¶ 108-113.

Plaintiffs contend that this calibration is unreasonable and dangerous, particularly because a foreseeable frontal crash event lasts for 80-150 ms—up to more than three times the 45-ms window for deployment in the Class Vehicles. *Id.* ¶ 103. In light of this, other major vehicle manufacturers—and tellingly, *other vehicles manufactured by GM*—include a significantly longer window to detect a potential accident and deploy the airbags and seatbelts. *Id.* ¶¶ 127-128.

**B.** **Old GM ignored clear warnings when it used the defective calibration.**

Plaintiffs' Complaint recounts in *specific* detail just how this unjustified and dangerous strategy came to be used in the Class Vehicles. In sum, the defective calibration was included by design, albeit an ill-considered and unsafe one. On the heels of unfavorable press and widespread concern about "late" and "aggressive" airbag deployments, airbag technology underwent significant modernization in the late 1990s. *Id.* ¶¶ 132-136. Federal rule changes led to an "industry-wide changeover" to redesigned airbags in model years 1998-1999 and onward. This new technology featured less force, dual-stage capabilities, and changes to airbag positioning to make airbag deployments safer. *Id.* ¶¶ 135-136.

During this time period, Old GM worked with Delco Electronics (later called Delphi) on the passenger safety systems for its vehicles. *Id.* ¶ 124.[3] As part of this work, an engineering team from Delco developed a software program to control airbag and seatbelt deployment. In the software (which Delco designated as the "ALGO" programs, including "ALGO-S"), the SDM could deploy airbags and tighten seatbelts up to at least 150 ms into an accident. *Id.* ¶ 128. In response to Delco's proposal, the trucks group wanted to calibrate the software to limit the deployment window to just 45 ms—i.e., the SDM Calibration Defect. *Id.* ¶ 125.[4]

As Plaintiffs allege, the trucks group was intent on this limit given the negative public opinion about "late" deployments, and insisted that 45 ms was sufficient based on crash test

---

[3] "Old GM" filed for bankruptcy in 2009, which led to the creation of the contemporary GM entities named as Defendants in this case. ACAC ¶ 89.

[4] Old GM divided design and development work into groups—one for smaller cars and sedans, and one for trucks and SUVs. *Id.* ¶ 125.

results. *Id.* ¶¶ 125, 131. Delco objected that this strategy could fail to trigger safety systems in real-world crashes, which are more complex and variable than laboratory crash test conditions, which usually entail a collision with an immovable wall. *Id.* ¶¶ 123, 128. Further, a 45 ms limit was not justified in light of the technological changes—which Old GM knew about and used— that mitigated the risks of late deployments from the earlier generation of airbags. *Id.* ¶ 137.

The trucks group ignored these warnings and added the 45 ms parameters in the SDM software calibrations for GM trucks and SUVs. *Id.* ¶ 126. The cars group, conversely, used the Delco designed software with a much longer calibration, up to 150 ms, an approach consistent with that of other major vehicle manufacturers. *Id.* ¶¶ 127-28.[5] Shortly after the Class Vehicles first entered the market, consumers started to publicly report to NHTSA that their airbags failed to deploy during a crash. *Id.* ¶ 167a, b, c (crashes in 2000 and 2001).

### C. GM has long known about the SDM Calibration Defect.

When the new GM companies formed in 2009, they inherited both knowledge and records of the history with Delco outlined above, *and* an already-robust public record of crashes in the Class Vehicles consistent with the defect. *Id.* ¶¶ 7, 89, 116. Thereafter, GM continued to accrue knowledge about the SDM Calibration Defect from personal injury lawsuits and still *hundreds* more suspicious accidents involving airbag and seatbelt failures in serious frontal crashes.

*First*, GM has litigated and settled personal injury lawsuits following airbag and seatbelt failures consistent with the SDM Calibration Defect. At least two such lawsuits have detailed information available on the public docket, and span multiple model years; one involved a crash in a model year 2005 Trailblazer owned by James Nossar, and another in a model year 2014 Silverado owned by Chad Vaith. After the airbags and seatbelts in their GM vehicles failed in serious crashes, Mr. Nossar "fracture[ed] practically every bone in his face and [sustained] brain injuries" and Mr. Vaith suffered "severe" injuries. *Id.* ¶¶ 147-154.

In both of these cases, the plaintiffs retained Chris Caruso, an automotive crash systems expert. Critically, Mr. Caruso was a member of the Delco engineering team that developed the

---

[5] Plaintiffs further allege that the New GM entities learned through books, records, and personnel of its bankrupt predecessors about the use of this defective software calibration in the Class Vehicles despite clear warnings of the risk of doing so. *Id.* ¶ 215.

SDM software at issue, giving him direct knowledge of the defect's origins and the risks it entailed, which he described in a report that is publicly available in the Nossar case. *Id.* ¶¶ 150-151. While Mr. Caruso's opinions from the Vaith case are not similarly public, public information confirms Mr. Caruso's role in the case and that GM settled with Mr. Vaith after a non-deployment crash in his GM truck. *Id.* ¶ 154.

*Second*, and unrelated to Mr. Caruso, another automotive crash expert, Sal Fariello, wrote to GM's CEO in December 2016 to raise concerns about the airbag deployment thresholds in a 2006 Trailblazer. *Id.* ¶ 156. Mr. Fariello's letter describes the SDM Calibration Defect in technical detail. Specifically, he lists concerns about the ALGO S-H software (the program Delco developed), including that the airbag deployment thresholds were "set too high" such that they "did not meet GM's and generally accepted standards for when an airbag should deploy." *Id. See also id.* ¶ 110 (description of the SDM Calibration Defect mirroring Mr. Fariello's concerns that the thresholds are set too high).

*Third*, Plaintiffs' Complaint details more than *eight hundred* crashes in which the airbags and seatbelts failed in the Class Vehicles. *Id.* ¶¶ 160-169 and Exhibit A; *e.g.*, *id.* ¶ 167c (1999 Suburban hit head on at 40 mph, veered off the road and hit telephone pole without airbag deployment); *Id.* ¶ 167h (no airbag deployment when 2002 Silverado crashed into furniture on the highway, lost control, and crashed into concrete wall); *Id.* ¶ 167t (2012 Cadillac SRX driver fell asleep, jumped a levee and crashed through a fence, suffering a broken nose from hitting the steering wheel when no airbags deployed). A separate NHTSA dataset reveals a recurring pattern of airbag nondeployments in frontal crashes—and reinforces the extremely high stakes of such incidents—reflecting 1,298 injuries and deaths for occupants in a Class Vehicle following an accident in which the airbags did not deploy. *Id.* ¶ 171.

Plaintiffs allege that GM—particularly in light of its obligations to report safety defects—monitors these NHTSA reports. *Id.* ¶ 161. Further, many of these summaries explicitly state that GM was informed of and/or investigated the accidents in question. *Id.* ¶ 168; *e.g.*, ¶ 168.a (model year 2008 GMC Acadia struck a utility pole and then large dirt embankment, driver broke her

sternum after hitting the steering column and passenger broke her back in two places; after

downloading the crash data, GM informed that "everything was working properly").

### D. GM's failure to disclose the defect caused Plaintiffs to suffer damages.

For many consumers, including Plaintiffs, safety is one of the most important factors

when deciding to buy or lease a vehicle. *Id.* ¶ 172. When they chose and paid for their Class

Vehicles, Plaintiffs reasonably expected—including based on GM's misleading omissions and

statements—that the airbag and seatbelt systems would serve their fundamental purpose: to

protect them when necessary in a crash. *See id.* ¶¶ 175-185 and Exhibit B (in-vehicle

certifications and window stickers describing safety features and not disclosing the SDM

Calibration Defect); ¶¶ 186-190 (Class Vehicle owners' manuals describing airbag functionality

in detail, but omitting information about the SDM Calibration Defect); ¶¶ 191-194 (press

releases, brochures, and marketing materials touting vehicle safety without disclosing the defect).

Had GM disclosed the defect, Plaintiffs would have received that information and not

bought or leased the impacted vehicles. *Id.* ¶¶ 174, 185. Or, they would have paid a lower price to

purchase or lease them because the price of Class Vehicles with defective calibrations would have

been lower. *Id.* ¶¶ 62, 68, 81, 237. By causing Plaintiffs to overpay for Class Vehicles, GM

wrongfully obtained money directly or indirectly from Plaintiffs and Class Members. To date,

GM has taken no action to recall or repair the vehicles on the road. *Id.* ¶¶ 10, 116-121.

### RULE 12(b)(6) STANDARD OF REVIEW

### A. Non-fraud claims need only state plausible grounds for relief.

Generally, a complaint need only provide "a short and plain statement of the claim

showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). It "does not need detailed

factual allegations," but must include "enough facts to state a claim . . . that is plausible on its

face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A claim is plausible "when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A

court should uphold a claim if the plaintiff provides "enough fact to raise a reasonable expectation

that discovery will reveal evidence to support the allegations." *Starr v. Baca*, 652 F.3d 1202,

1217 (9th Cir. 2011) (quotations omitted). In determining whether a plaintiff has met this standard, the court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). Plaintiffs' state law breach of warranty claims and allegations of scienter require merely facially plausible allegations.[6] They are not subject to Rule 9(b).

### B. Fraud claims require particularity for misrepresentations but not for knowledge.

Rule 9(b) requires fraud claims be pled "with particularity" as to "the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id*. Allegations of fraud must be "specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge." *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (citation omitted); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. MDL 2672, 2017 WL 4890594, at *11 (N.D. Cal. Oct. 30, 2017) (citing *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007)). Rule 9(b) "does not require absolute particularity or a recital of the evidence." *U.S. v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) (citation omitted). Rather, a plaintiff should "identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about [the purportedly fraudulent conduct], and why it is false." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (citation omitted).

Rule 9(b) "may be relaxed as to matters within the opposing party's knowledge." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989); *see also Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1998) ("[W]e cannot make Rule 9(b) carry more weight than it was meant to bear."). "[I]n cases of corporate fraud, plaintiffs will not have personal knowledge of all of the underlying facts," especially as to which defendant did what. *Moore*, 885 F.2d at 540. In such cases, a plaintiff may allege "the misrepresentations themselves with particularity and, *where possible*, the roles of the individual defendants in the misrepresentations." *Id.* (emphasis

---

[6] For the California Plaintiffs, this includes the California counts listed as VII, VIII, IX, and X.

added); *see also Waldrup v. Countrywide Fin. Corp.*, No. 13-cv-8833, 2015 WL 93363, at *8 (C.D. Cal. Jan. 5, 2015) (denying motion to dismiss even though "[a]bsent discovery . . . , plaintiff cannot point to the specific fraudulent misrepresentations or omissions allegedly made by the four parent company defendants").

Rule 9(b) is also "somewhat relaxed" where, as here, a claim rests on an omission, because "a plaintiff cannot plead either the specific time of [an] omission or the place, as he is not alleging an act, but a failure to act." *Mosqueda v. Am. Honda Motor Co., Inc.*, 443 F. Supp. 3d 1115, 1124 (C.D. Cal. 2020) (citing *Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1325 (C.D. Cal. 2013)). For this reason, "a fraud by omission or fraud by concealment claim 'can succeed without the same level of specificity required by a normal fraud claim." *Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1267 (C.D. Cal. 2007).

## ARGUMENT & AUTHORITIES

**I.** **Plaintiffs' allegations about the SDM Calibration Defect are plausible and well-supported.**

**A.** **Plaintiffs plausibly allege the SDM Calibration Defect affects *all* Class Vehicles.**

Plaintiffs' allegations—*i.e.*, that their vehicles have a dangerous, undisclosed safety defect that can cause airbags and seatbelts to fail—are more than plausibly pled. Indeed, the Complaint describes in *specific* detail: **what exactly the SDM Calibration Defect is** (a calibration to the Delco-designed SDM software program that prematurely limits airbag and seatbelt deployment during front-end crashes with certain characteristics, ACAC ¶¶ 106-108); **the technical detail of how it works** (by increasing thresholds that will trigger airbag deployment to unattainable values 45 ms into a crash sequence, *id.* ¶¶ 99-103, 106-114); **how and when it came to be included in the Class Vehicles** (the trucks group's brash disregard of changes to airbag technology and insistence, over Delco's objection, to alter the calibration of the SDM software as designed, *id.* ¶¶ 6, 124-127, 203); **what vehicles are impacted** (all vehicles under the direction of the GM trucks group—trucks and SUVs—starting in model year 1999, *id.* ¶¶ 124-126); and **why GM has failed to address this defect to date** (to avoid the significant expense and reputational harms of a massive safety recall, *id.* ¶¶ 117-121, 145, 157, 228).

1      GM does not meaningfully engage with these allegations, but rather argues that Plaintiffs

2      have not plausibly pled a defect, essentially because it was not "rational" for GM to use the

3      defective calibration at issue. ECF 150 ("Mem.") at 9. On the latter point, the parties agree—

4      GM's use of the defective calibration was unjustified and dangerous. But whether GM's conduct

5      was "rational" or not, Plaintiffs' allegations—taken as true—are that GM *did* use the defective

6      calibration. *See Knievel*, 393 F.3d at 1072 (plaintiffs' allegations are accepted as true in a

7      pleading challenge). As such, GM's efforts to challenge these well-pled allegations fall flat.

8      First, Defendants take issue that the Complaint does not expressly allege that the three

9      California Plaintiffs' vehicles (a 2010 Silverado, a 2012 Avalanche, and a 2012 Suburban) have

10     the SDM Calibration Defect. Without these allegations, Plaintiffs ostensibly "do not *know*"

11     whether these three vehicles include the defect. Mem. at 9. This argument fails because it outright

12     ignores Plaintiffs' allegations. The Complaint states clearly that the SDM Calibration Defect was

13     included in *every vehicle within the GM trucks group*—i.e. trucks and SUVs—starting in model

14     year 1999. Of course, this includes the California Plaintiffs' vehicles, which fall squarely within

15     that group. This also flows logically from Plaintiffs' allegations that the defective software

16     strategy was set at the "group" level, with the same calibration applying to all vehicles therein.

17     Plaintiffs are not also obligated to separately plead that each individual make and model year

18     within that group is affected, and GM offers no authority suggesting otherwise.

19     Second, GM complains that Plaintiffs have not explained a "*rational*" reason why it

20     continued to use the defective calibration after 1999 (including for the California Plaintiffs'

21     model year 2010 and 2012 vehicles), or explained why it did not apply the safer calibration used

22     in GM cars to the Class Vehicles. Mem. at 9. The Court should likewise reject these arguments—

23     for which GM again cites no authority—because they are not valid pleading challenges. Plaintiffs

24     are not obligated to plead that GM acted "rationally" in its misconduct. To be clear, Plaintiffs

25     contend that the defective calibration was *never* safe (or rational), but that it was used—

26     knowingly—in GM trucks and SUVs starting in model year 1999 and onward. *See*, *e.g*., ACAC

27     ¶¶ 122-143. Allegations of continued use well past 1999 are supported by, for example: the Vaith

28     lawsuit (and settlement) for a model year 2014 Class Vehicle (*id.* ¶¶ 153-154), GM's use of Delco

1
2
SDMs in vehicles up through at least model year 2015 (*id.* ¶ 142), and *hundreds* of crashes with suspicious non-deployments for every model year up through 2014 (*id.* ¶¶ 160-171).[7]

3
4
5
6
7
8
9
And contrary to GM's argument, Plaintiffs *do* explain why GM has not applied a safer calibration to the millions of impacted vehicles on the road—as even a simple software recalibration at this scale would be *hugely* expensive, not to mention the potential reputational harms in admitting, through recall, that this defect exists. *Id.* ¶¶ 117-121, 145, 157, 228. Indeed, GM has aimed to delay expensive safety recalls in its vehicles in other cases too. *Id.* ¶¶ 118-121, 159. This is more than sufficient to state a claim. *Cf.* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

10
11
12
13
14
15
16
Finally, Defendants endeavor to undermine Chris Caruso and Sal Fariello because they are "paid" experts, and because their cited conclusions were not about the California Plaintiffs' specific vehicles. Mem. at 9. These premature challenges to their credibility do not pass muster. Both Mr. Caruso's and Mr. Fariello's opinions pertain to GM trucks and SUVs—a group that includes the California Plaintiffs' vehicles—and cover model years 2005, 2006, and 2014. ACAC ¶¶ 147-159. Plaintiffs need not offer expert opinions about each individual make and model year Class Vehicle in their pleading to state their claims.

17
18
19
20
21
22
23
24
25
Defendants' authority does not counsel otherwise. *Nava v. Kobe Steel, Ltd.* dealt with claims that Toyota Priuses may have included a type of defective Kobe steel. No. 18-CV-01423-VC, 2019 WL 4729540, at *1 (N.D. Cal. July 18, 2019). The complaint cited conclusions from plaintiff's expert about malfunctions in four vehicles—*none of them Priuses*—that were potentially consistent with use of substandard materials like Kobe steel. *Id.* Unsurprisingly, these observations about malfunctions in non-Priuses did not help plaintiffs to plead that Priuses included the steel. There is no analog to this case, which deals with a uniform, defective software calibration present in all GM trucks and SUVs, and in which Mr. Caruso's and Mr. Fariello's cited past testimony related to the vehicle population at issue.

26

27
28
[7] In compiling the NHTSA dataset, Plaintiffs reviewed crashes for model years through 2014 as a representative sample that captures five years after the new GM entities were formed. Plaintiffs' review of data through 2014 does not suggest a lack of suspicious accidents for later model years.

Defendants' two other cases—both of which involved plaintiffs who sued about products that were separate from the products they purchased—are similarly not persuasive. *See Ivie v. Kraft Foods Glob., Inc*., No. C-12-02554-RMW, 2013 WL 685372, at *3 (N.D. Cal. Feb. 25, 2013); *Granfield v. NVIDIA Corp.*, No. C 11-05403 JW, 2012 WL 2847575, at *6 (N.D. Cal. July 11, 2012) (similar). In any event, both of these cases were decided before *Melendres*, in which the Ninth Circuit held that once a plaintiff establishes standing, any differences between the claims of the named plaintiffs and absent class members should be addressed in the context of class certification. *Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015).[8] Defendants' argument should also be rejected under the "substantially similar" test, which analyzes whether the products plaintiff purchased are "substantially similar" to the non-purchased products. *See*, *e.g.*, *Swearingen v. Late July Snacks LLC*, No. 13-cv-04342-EMC, 2017 WL 4641896, at *5 (N.D. Cal. Oct. 16, 2017); *Cortina v. Goya Foods, Inc.,* 94 F. Supp. 3d 1174, 1198 (S.D. Cal. 2015) (holding that beer and sangria beverages are substantially similar because they contained the same carcinogenic ingredients and the labels all omitted the presence of the carcinogens).[9]

At bottom, Plaintiffs allege that GM trucks and SUVs starting in model year 1999 include the defective software calibration at issue. ACAC ¶ 203. That there may be different vehicle makes and models within this group—including the 2005 and 2006 Trailblazers and 2014 Silverado on which Mr. Caruso and Mr. Fariello have publicly opined, and the California Plaintiffs' model year 2010 and 2012 vehicles—is simply beside the point.

---

[8] Even before *Melendres*, "most" federal courts adopted the class certification approach. *See Melendres*, 784 F.3d. at 1262 (collecting cases); *see also Kosta v. Del Monte Corp*., No. 12-CV-01722-YGR, 2013 WL 2147413, at * 15 (N.D. Cal. May 15, 2013) ("[A]ny concerns regarding the differences among products at issue are better resolved at the class certification stage."). To these courts, "[r]epresentative parties who have a direct and substantial interest have standing; the question whether they may be allowed to present claims on behalf of others who have similar, but not identical, interests depends . . . on an assessment of typicality and adequacy of representation." *Greenwood v. Compucredit Corp.*, No. CIV. 08-04878 CW, 2010 WL 4807095, at *3 (N.D. Cal. Nov. 19, 2010).

[9] *See also*, *e.g.*, *Aberin v. Am. Honda Motor Co., Inc.*, No. 16-CV-04384-JST, 2021 WL 1320773, at *6 (N.D. Cal. Mar. 23, 2021) (Tigar, J.) ("Plaintiffs have satisfied their burden at this [class certification] stage to support their allegation of a common defect, which the Court also finds to present a 'substantially similar' injury between the claims of named plaintiffs and those of unnamed class members").

**B.** **Public records of hundreds of crashes with airbag and seatbelt failures in the Class Vehicles are also probative of the defect and of GM's knowledge.**

Plaintiffs' well-pled allegations about the trucks group's insistence on using the 45 ms calibration over Delco's objection, and technical detail about the way in which it causes dangerous safety risks, plausibly plead the existence of the SDM Calibration Defect. Further bolstering these allegations are NHTSA reports of more than *eight hundred* crashes where airbags and/or seatbelts failed in the Class Vehicles *and* the crash conditions and other indicators reasonably implicate the defective calibration. Many of the reports describe crashes occurring at high speeds and with significant injuries, which are the kinds of "moderate to severe" conditions that *should* trigger deployment, but troublingly, did not do so here.[10] In addition, many reports describe crash sequences that are particularly implicated by the SDM Calibration Defect, such as concatenated events, *i.e.*, with multiple impacts, and prolonged onset or "soft" impacts.[11]

---

[10] *See, e.g.*, **NHTSA ID No. 11143613** (2008 GMC Envoy: "head-on collision" resulting in vehicle being totaled) (Ex. A at 13); **NHTSA ID No. 1186171** (2014 Chevrolet Equinox: 50 mph front end collision) (Ex. A at 1); **NHTSA ID No. 1138938** (2012 Cadillac SRX: 45 mph frontal collision causing severe injury, expressly noting lack of deployment and pretensioning) (Ex. A at 4); **NHTSA ID No. 10289962** (2007 Chevrolet Trailblazer: 60mph "frontal crash") (Ex. A at 15); **NHTSA ID No. 10137033** (2003 Chevrolet Silverado: "front end crash that pushed the motor in the dash") (Ex. A at 36); **NHTSA ID No. 10216640** (2003 Chevrolet Tracker: vehicle "hit a grove of trees head on" causing vehicle to be totaled and driver to be cut out of vehicle and airlifted to hospital) (Ex. A at 37); **NHTSA ID No. 10915508** (2007 GMC Envoy: hit guardrail at 67 MPH and "had to pry bumber off rail" and "car frame went through [the] radiator," but no deployment) (Ex. A at 16); **NHTSA ID No. 10279951** (2006 Chevrolet Equinox) ("hydroplaned and hit an embankment with the front end…not the first time this vehicle has had an impact to the front bumper and the air bag has never deployed," even though it should have based on the "damage sustained.") (Ex. A at 17).

[11] *See, e.g.*, **NHTSA ID No. 10599029** (2014 Chevy Silverado: vehicle "went up a ditch & hit a colvurt [sic]. The seatbelts did not lock in place & airbags did not inflate") (Ex. A at 1); **NHTSA ID No. 10477166** (2012 GMC Terrain: vehicle "went airborne, approximately 20 feet, landing on all four tires. The vehicle then traveled approximately 200 feet and crashed into an embankment. The airbags failed to deploy. The contact sustained a fractured back as a result.") (Ex. A at 5); **NHTSA ID No. 10944639** (2009 Trailblazer: vehicle rear-ended another at 70 MPH, and was in turn struck by a semi-truck …"the contact sustained injuries to the head, knees, and arms, which required medical attention.") (Ex. A at 10); **NHTSA ID No. 10550276** (2006 Trailblazer: vehicle "nose dived into an embankment and then crashed into a boulder," resulting in injury to the driver and passenger) (Ex. A at 18); **NHTSA ID No. 11066850** (2008 GM Acadia: vehicle "ran off the road struck a utility pole and a large dirt embankment," and neither the airbags nor pretensioners deployed) (Ex. A at 12); **NHTSA ID No. 10639641** (successive impacts with vehicle, brick wall, and telephone pole) (Ex. A at 16); **NHTSA ID No. 10915473** (2014 Buick Enclave: struck a vehicle and then ditch causing severe frontal damage, both airbag and pretensioner failed) (Ex. A at 1); **NHTSA ID No. 10695408** (2014 Chevrolet Silverado went off road, into a ditch, then a telephone pole cable, but "the seat belt failed to restrain…and the air bags failed to deploy") (Ex. A at 1); **NHTSA ID No. 10583703** ("the impact of vehicle against foliage, trees shrubs, should have forced air bags to deploy") (Ex. A at 5); **NHTSA ID No. 10503970** (2006 Chevrolet

Plaintiffs also detail a separate data reporting system, FARS, which indicates that more than 1,298 occupants have been killed or injured in a Class Vehicle in a frontal crash in which the airbags did not deploy—exactly the risk the airbags are designed to prevent when functioning properly. ACAC ¶¶ 170-171.

These reports are relevant, probative, and suspicious, particularly when they are read—as they should be—together with Plaintiffs' allegations about a defect *in these very vehicles*, that causes *this specific issue* (deployment failure), under the *very crash conditions* in these accounts. GM unsuccessfully attempts to cast doubt on the relevance of these crash descriptions. Notably, GM highlights only a tiny fraction of the hundreds of incidents summarized in the Complaint. For example, GM cherry picks three crashes because they involved rollovers and thus, according to GM, deployment was not required. Mem. at. 23. At the outset, each of the three "rollover" reports describes complex crash dynamics (including frontal impacts) that could require airbag deployment regardless of the ultimate rollover. GM also raises three crashes that it claims do not provide "relevant details," but these too describe collisions with deployment failures. In any event, GM's attorneys' interpretations in Rule 12 briefing as to whether three or six of the hundreds of crashes Plaintiffs describe may have implicated the defect are immaterial.[12]

Nor can GM seriously contend that the number of incidents is somehow too small to be probative. Mem. at 11-12. Here, even with the filtering criteria described above, the number of implicated incidents is over *eight hundred*, with examples from every single year after introduction of the Defect through 2014 (the model year up through which Plaintiffs compiled the

---

Equinox ran off the road, into a guardrail and then embankment) (Ex. A at 17); **NHTSA ID No. 11129851** (2014 Traverse: 45 mph crash into the rear passenger quarter panel of a Honda Accord resulting in injuries.) (Ex. A at 2); **NHTSA ID No. 10608599** (2014 Yukon: front end collision with a parked car resulting in injuries and severe damage to vehicle) (Ex. A at 2); **NHTSA ID No. 10494771** (2005 Tahoe: "In an accident and hit front drivers side into dirt embankment at 35-40 MPG push drivers side tire back about 3" and buckled hood and fender and the airbags didn't go off.") (Ex. A at 21).

[12] To the extent GM contends the cited crashes must be conclusively proven to be caused by the alleged defect, it ignores the relevant standards at the Rule 12 stage. Plaintiffs cite these crashes as a robust, relevant dataset that tends to show the existence and prevalence of the defect in the vehicles at issue, and GM's knowledge of the same. *Cf. In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1145 (C.D. Cal. 2008) (complaints should be read as a whole rather than isolating allegations and taking them out of context).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

dataset, ACAC ¶ 169 n. 45).[13] This is in stark contrast to the cases GM cites, in which the number of complaints was an order of magnitude lower. *See Deras v. Volkswagen Grp. of Am., Inc.*, No. 17-CV-05452-JST, 2018 WL 2267448, at *1 (N.D. Cal. May 17, 2018) (56 NHTSA complaints over seven years); *Sloan v. Gen. Motors LLC*, No. 16-CV-07244-EMC, 2017 WL 3283998, at *7 (N.D. Cal. Aug. 1, 2017) (81 complaints over seven years); *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136 (9th Cir. 2012) (allegations of just fourteen consumer complaints, without details of when and how they were made, did not put defendants on notice).

Moreover, GM's cited cases go to a *distinct* question of whether these small number of complaints could serve as a sufficient basis for pleading the defendant's knowledge of a defect. *See Deras*, 2018 WL 2267448, at *1; *Sloan*, 2017 WL 3283998, at *7. In fact, courts regularly find NHTSA database reports to be probative of a defendant's knowledge. *See Short v. Hyundai Motor Co.*, 444 F. Supp. 3d 1267, 1281–82 (W.D. Wash. 2020) ("Plaintiffs' allegations that consumers complained to NHTSA" about the defect at issue "buttress[ed] the inference of Defendants' knowledge"); *Conti v. Am. Honda Motor Co.*, No. CV 1902160 CJC GJSX, 2019 WL 10371067, at *5 (C.D. Cal. Oct. 17, 2019) (finding knowledge in part based on allegations that "customers submitted numerous complaints through the [NHTSA] and third-party websites"); *Fisher v. Honda N. Am., Inc.*, No. 13-cv-9285, 2014 WL 2808188, at *5 (C.D. Cal. June 12, 2014) ("[A]llegations that a manufacturer tracks the NHTSA database on which reports were posted regarding the defect, taken together with other allegations with respect to knowledge, may be sufficient to plead scienter."); *MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1095 (N.D. Cal. 2014) (consumer complaints "may help support other evidence of knowledge"); *Grodzitsky v. Am. Honda Motor Co., Inc.*, No. 12–cv–1142–SVW, 2013 WL 2631326, at *6

[13] Had Plaintiffs continued past 2014, the number could reasonably be even larger.

(C.D. Cal. June 12, 2013) (similar).[14] This case is no exception.[15] In addition, here, GM's knowledge is adequately pleaded even without the consumer complaints. *See supra* § I.C.

### C. Defendants' crash reports are not properly before the Court, and regardless, do not mean what Defendants say.

Because GM cannot undercut the detailed allegations in the Complaint, GM resorts to looking outside of it to support its motion. To that end, Defendants submit a handful of reports from NHTSA's website that are purportedly "contrary" to or "incompatible" with Plaintiffs' defect theory because they, in GM's telling, "indisputably" establish airbag deployments *after* 45 ms. Mem. at 12. These efforts should be rejected out of hand because they offer and rely on GM's (incorrect) interpretations of external evidence not cited in the Complaint. *See* RJN Opp. at 4-8. *See also Love v. M W G J LLC*, No. 21-CV-01471-JD, 2021 WL 4975102, at *2 (N.D. Cal. Oct. 26, 2021) (the sufficiency of a complaint "is determined in the first instance within the four corners of the complaint.") (citation omitted); *Focus 15, LLC v. NICO Corp.*, No. 21-CV-01493-EMC, 2022 WL 267441, at *6 (N.D. Cal. Jan. 28, 2022) (similar).

And even if the Court *were* to consider the crash reports, the Court would need to elicit expert testimony to do so. These technical summaries are not amenable to objective conclusions without guidance on how to read and interpret them. *See In re Sanofi–Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 567 & n.20 (S.D.N.Y. 2011) ("Reasonable persons may disagree over how to analyze data and interpret results, and neither lends itself to objective conclusions."). At the very least, the Court should not credit GM's self-serving characterization of what these reports show, and certainly cannot, at the pleading stage, draw inferences from these reports in GM's favor. At the appropriate juncture, Plaintiffs will demonstrate that GM's incomplete reports do not undercut Plaintiffs' defect allegations.[16] Finally, *even* indulging GM's argument, a handful of reports of

---

[14] GM also cites *Williams*, where the Ninth Circuit acknowledged that consumer complaints *can* provide plausible evidence of the defendants' knowledge of a defect, particularly where they are coupled with dates of the complaints that preceded sale of the product, details on how they were lodged, and information to support that the defendant saw them. *Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1027 (9th Cir. 2017). All of those criteria are met here.

[15] Plaintiffs allege that GM monitors these public databases for reports about its vehicles, and thus would have been aware of them. ACAC ¶ 161. Many of the reports specifically state that GM knew about and/or investigated an accident. *See, e.g.*, ACAC ¶ 168(a)-(i).

[16] *See* RJN Opp. at 4-8. For example, the report in Exhibit D (ECF 150-2 at 93-98) lists *multiple* time measurements that do not readily lend themselves to laymen's interpretation. GM

airbags deploying does not somehow explain the hundreds of others where airbags failed. Thus, while Plaintiffs disagree that GM's reports "conflict" with their defect theory, *even if they did*, it would not merit dismissal. *See Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 n.8 (9th Cir. 2014) (the "tie goes to the plaintiffs").

For present purposes, Plaintiffs respectfully submit that the Court should not indulge GM's improper attempts to convert a pleading challenge into a premature, expert-driven evidentiary battle.

### D. The SDM Calibration Defect impacts a critical safety feature and supports consumer fraud claims.

Each Plaintiff alleges that when they paid for a Class Vehicle, they reasonably expected that the airbags and seatbelts would function where needed in a crash. Instead, they received and drive vehicles with safety systems that *will not* protect them in certain conditions *where they should*. *See, e.g.*, ACAC ¶¶ 62, 68, 81. Defendants overlook these straightforward allegations to argue that Plaintiffs propose merely an "alternate" calibration that "may make the product safer." Mem. at 12-13. In Defendants' view, because the SDM calibration is a "non-bargained for" safety feature, Plaintiffs cannot bring claims for the defect. These arguments do not hold water.

Defendants' primary authority, *Birdsong*, is inapposite. In that case, the plaintiffs alleged that the Apple iPod *could* cause hearing loss *when listened to it at high volumes* for extended periods. *Birdsong v. Apple, Inc.*, 590 F.3d 955, 961 (9th Cir. 2009). In affirming dismissal, the circuit court observed that these allegations, taken as true, "suggest[ed] only that users *have the option* of using an iPod in a risky manner, not that the product lacks any minimum level of quality." *Id.* at 958 (emphasis added). Further, plaintiffs conceded that Apple warned "against listening to music at loud volumes." *Id.* at 959, 961. Therefore, the plaintiffs had not established

---

emphasizes the reported time between non-deployment and deployment event of 1.8 seconds, but this measurement does not lead to the conclusion GM argues that it does (*i.e.*, that deployment occurred *after* a 45 ms cutoff). Rather, this 1.8 second interval would indicate that a complete algorithm "reset" occurred. Once the algorithm resets, a subsequent new event will have another 45ms time window for deployment to occur. Tellingly, the same indicates a *25 ms trigger time* for the Driver and Passenger "First Stage Enable to Deployment Command"—well within the 45 ms cutoff. The same is true for the report in Exhibit J (ECF 150-2 at 128-133) (4.7 seconds cited by GM versus 17.5 ms listed for First Stage Enable to the Deployment Command).

injury in fact, because their allegations of a defect "rest[ed] on a hypothetical risk" and plaintiffs had not alleged "the iPods failed to do anything they were designed to do." *Id.* at 958, 961.

Many of Defendants' other cases similarly involved alleged defects that arose only through misuse or error, and could be avoided with proper use of the product. *See Azoulai v. BMW of N. Am. LLC*, Case No. 16-cv-00589-BLF, 2017 WL 1354781, at *6 (N.D. Cal. Apr. 13, 2017) (car door not a safety defect where "any person, by the time they are old enough to get near a car door, knows that you do not put your finger in a door"); *Lassen v. Nissan N. Am., Inc.*, 211 F. Supp. 3d 1267, 1283 (C.D. Cal. 2016) ("[The] risk depends entirely on Plaintiffs' parking their vehicles in an enclosed space and walking away from their vehicles without turning them off.").

Unlike in *Birdsong*, *Azoulai*, and *Lassen*, it is not Plaintiffs' use (or misuse) that renders the vehicles defective. Rather, the SDM Calibration Defect is inherent and will arise *whenever* certain foreseeable crash conditions trigger it. Where an alleged defect causes an inherent safety risk, as in this case, courts have distinguished *Birdsong*. *See Becerra v. Gen. Motors LLC,* 241 F. Supp. 3d 1094, 1105 (S.D. Cal. 2017) (distinguishing *Birdsong*, stating that "[p]laintiffs have no choice but to utilize the allegedly dim headlights"); *see also Choi v. Kimberly-Clark Worldwide, Inc.,* No. SA CV 190468 DOC ADSX, 2019 WL 4894120, at *9 (C.D. Cal. Aug. 28, 2019) ("Unlike an iPod, a person using K-C's tampons would not choose to use the product in a 'risky manner.'"). This Court should do the same because Plaintiffs have no choice but to utilize the vehicles with the SDM Calibration Defect. Indeed, the only way Plaintiffs could mitigate the risks from the defect would be to limit the kinds of crashes they get in to less than 45 ms—which is, of course, impossible.

Defendants also cite to *Anderson v. Hyundai Motor Co. Ltd*., which pertained to an alleged defect regarding the placement of sensors to detect impacts for the side airbags, which allegedly caused a weak signal to the sensors resulting in late or non-deployments. No. SA CV 131842 DMG RNBX, 2014 WL 12579305 (C.D. Cal. July 24, 2014). That case was dismissed under Rule 12(b)(1) due to numerous deficiencies in plaintiffs' pleadings that are not present here. Notably, in *Anderson*, the *only* sources plaintiffs offered in support of their claim were two studies conducted by the defendants. The court reviewed the studies directly and concluded they

did not support plaintiffs' assertions. *Id.* at \*6. Given that the plaintiffs' *sole* basis for alleging a defect did not support their allegations, the court dismissed their claims.

Here, in contrast, Plaintiffs allege that the very engineers who designed the software program expressly warned about the dangers of the 45 ms calibration, that GM's cars group used a longer, safer window for deployment, and that other major vehicle manufacturers likewise use a longer window for deployment. *See* ACAC ¶¶ 124-126; 146-159. These allegations distinguish this case from *Anderson* in which the allegations of a defect were merely speculative. *Cf. Short*, 444 F. Supp. 3d at 1278 (distinguishing *Anderson* on similar grounds).[17]

Finally, GM wrongly argues that Plaintiffs "do not claim that the product fails to do anything it was designed to do." Mem. at 25. Plaintiffs allege that they purchased the Class Vehicles reasonably expecting—based on omissions and misleading statements from GM—that the airbags would *properly deploy when necessary*. *See* ACAC ¶¶ 62, 68, 81. Put another way, Plaintiffs allege that airbags and seatbelts are designed to protect them, and should do so in "moderate to severe" frontal collisions, but, that they can fail to do so because of the SDM Calibration Defect. *Id.* ¶ 96. And to the contrary, Defendants marketed the "Class Vehicles as possessing a functional, safe, and defect-free passenger safety system." *Id.* ¶¶ 172-194, 372.

As in *Becerra*, "the threat of injury in this case is not hypothetical" because there is always a risk of accidents when operating a vehicle, and the SDM Calibration Defect will cause the airbags not to deploy in real-world collisions. *Id.* ¶¶ 109-112. Plaintiffs are not alleging that there is merely an arguably safer design to the SDM software in Defendants' Class Vehicles, but rather that the current design is defective, unsafe, and wholly unjustified due to the risk of airbag nondeployment in various frontal collisions that require it.

---

[17] Nor must Plaintiffs have bargained for any specific SDM calibration for their claims to be actionable, as GM cursorily implies. Rather, Plaintiffs' well-pled claims turn on their reasonable expectations that the safety systems in their vehicles function to protect them when necessary. *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 354 (N.D. Cal. 2018) ("[A]lthough Plaintiffs did not explicitly bargain for any particular level of latency, Plaintiffs did bargain for speed and reliability . . . [and] contend that they bought Modems that they would not have otherwise bought, or paid more for Modems than they otherwise would have if they had understood the Modems' true capabilities.").

Finally, Defendants recycle the argument that Plaintiffs have not pled a "rational" reason for GM's conduct and thus that their allegations of a defect are "illogical," but those arguments are no more persuasive the second time around. Mem. at 15. Plaintiffs allege that GM concealed the SDM Calibration Defect, as it has with other safety defects, to avoid recall costs, liability, and reputational damage, which is more than sufficient. ACAC ¶¶ 118, 145.

## II. The California Plaintiffs plead their claims with the specificity required.
### A. The California Plaintiffs adequately allege their fraud claims.

Rule 9(b) governs elements of Plaintiffs' statutory and common law fraud claims and requires pleading "with particularity" as to "the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Intent, however, "may be alleged generally." *Id*. Plaintiffs plead their consumer protection and fraud claims with the necessary specificity because they clearly "identify the who, what, when, where, and how of the misconduct charged." *Cafasso*, 637 F.3d at 1055.

Indeed, Plaintiffs provide detailed allegations of Defendants' failure to disclose that the Class Vehicles have a dangerous SDM Calibration Defect that can cause the airbags and seatbelts to fail in accidents where they are needed. *See, e.g*., ACAC ¶¶ 199; 116-171 (describing GM's knowledge). Contrary to their knowledge, Defendants marketed and sold the Class Vehicles as safe and reliable, and featured specific details about the airbag capabilities that would supposedly protect Plaintiffs and class members where necessary. ACAC ¶¶ 173-194. These allegations provide Defendants with ample "notice of the particular misconduct . . . so that they can defend against the charge." *Kearns v. Ford Motor Co*., 567 F.3d 1120, 1124 (9th Cir. 2009).

### 1. Plaintiffs adequately allege their fraud-by-omission claims.

GM asks the Court to dismiss Plaintiffs' fraudulent omissions claims for two reasons: that Plaintiffs do not sufficiently allege reliance on the omissions or the facts that GM failed to disclose. Mem. at 18-22.[18] Both arguments fail.

---

[18] Notably, GM does not separately challenge whether it owed Plaintiffs and the class a duty of disclosure. GM did have a duty to disclose for at least three reasons: they (1) "had exclusive knowledge of material facts not known to the plaintiff[s]," (2) "actively conceal[ed] a material fact from the plaintiff[s]," and (3) "ma[de] partial representations but also suppress[ed] some material facts." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig*., 467 F. Supp. 3d 849, 860 (N.D. Cal. 2020) (citation omitted).

**a.**    **Plaintiffs plausibly allege that they would have learned the truth about the Class Vehicles had GM disclosed it.**

Each Plaintiff alleges that they relied on GM's material omissions in that they "would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration." ACAC ¶¶ 13-89; *see also id.* ¶¶ 228, 237, 374, 385. Omissions claims like these do not require allegations of individual reliance. *In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Pracs., & Prod. Liab. Litig.,* 295 F. Supp. 3d 927, 988 (N.D. Cal. 2018) (*citing Daniel v. Ford Motor Co.,* 806 F.3d 1217, 1225 (9th Cir. 2015)). Reliance "can be presumed, or at least inferred, when the omission is material." *Daniel,* 806 F.3d at 1225; *see also see also Falk v. Gen. Motors Corp.,* 496 F. Supp. 2d 1088, 1099 (N.D. Cal. 2007) ("The justifiable reliance element of the fraud by omission claim is easily satisfied.").

Plaintiffs expressly allege that if GM had "disclose[d] the truth about the SDM Calibration Defect—including at dealerships, on its website, in brochures, press releases or in other promotional materials—Plaintiffs and Class members *would have seen those disclosures*." ACAC ¶ 174 (emphasis added); *see also id.* ¶ 185 ("Had GM disclosed the defective nature of the SDM software calibration on the Monroney labels or other labels or in marketing for the Class Vehicles, Plaintiffs and Class members would have seen that disclosure."). Plaintiffs' allegations plainly plead reliance. *See Daniel,* 806 F.3d at 1225 (allegations that disclosure of a defect would have reached Plaintiffs and caused them to act differently suffice to plead reliance).

GM's argument to the contrary principally focuses on the "where" for 9(b) purposes— from where did GM omit information, and where would Plaintiffs have seen it if they had not done so? GM argues that the California Plaintiffs do not adequately plead reliance because none "alleges that he would have been aware of a hypothetical disclosure [of omitted facts]." Mem. at 19.[19] But Plaintiffs allege *exactly* that. *See* ACAC ¶¶ 174, 185. This is more than enough to

---

[19] GM advances this argument only as to Plaintiffs Milstead and Pereda who purchased their vehicles from third-parties. GM does not raise this argument as to Plaintiff Vargas, and thereby concedes his sufficient allegations. This is likely because Mr. Vargas visited a GM dealership, and it is therefore presumed that he would have received a disclosure. ACAC ¶ 81. *See Daniel,* 806 F.3d at 1226 (a plaintiff's awareness of appropriate disclosures is presumed where a plaintiff "interacted with and received information from sales representatives at authorized . . . dealerships"); *EcoDiesel,* 295 F. Supp. 3d at 1015 (similar).

1    satisfy Rule 9(b). *See*, *e.g.*, *Sharma v. Volkswagen AG*, 524 F. Supp. 3d 891, 910 (N.D. Cal.

2    2021) (Tigar, J.) ("The standard for pleading reliance on account of an omission is low, and there

3    are, of course, various ways in which a plaintiff can demonstrate that she would have been aware

4    of a defect, had disclosure been made.") (internal quotations omitted).

5         GM cites to Judge Chen's opinion in *Sloan I* to argue that Plaintiffs Milstead and Vargas

6    have not sufficiently alleged reliance because they purchased from a third-party. But that decision

7    does not support such a bright-line rule. Instead, the court noted varying ways in which a plaintiff

8    could become aware of a defendant's disclosure, including through defendant's affiliated

9    dealership network, and explained that "[w]hat matters . . . is whether the plaintiff had an

10   *opportunity* to receive and therefore rely on the omitted information." *Sloan v. Gen. Motors LLC*,

11   287 F. Supp. 3d 840, 875 (N.D. Cal. 2018), order clarified, No. 16-CV-07244-EMC, 2018 WL

12   1156607 (N.D. Cal. Mar. 5, 2018), and on reconsideration, 438 F. Supp. 3d 1017 (N.D. Cal.

13   2020) ("*Sloan I*"). "Although the actual receipt of some information from a defendant at a

14   dealership might tend to demonstrate that the plaintiff had an opportunity to receive additional

15   information, *it is not necessarily the only way to establish such an opportunity*." *Id.* (emphasis

16   added). Thus, "[t]he proper focus [is on] what channels of information customers depend upon

17   and whether the defendant could have taken action to disseminate information through those

18   channels." *Id.*; *see also MacDonald*, 37 F. Supp. 3d at 1096 ("[T]he 'where' [of the omission] is

19   the various channels of information through which Ford sold Class Vehicles."); *see also In re*

20   *EcoDiesel*, 295 F. Supp. 3d at 1015 (reasoning that, given newsworthiness, plaintiffs could

21   plausibly have learned of emissions cheating defect through national news).

22        The Complaint identifies multiple channels through which GM distributed information

23   about the Class Vehicles to consumers, including Milstead and Pereda—and in which GM could

24   have, but did not, disclose the truth. This includes Monroney stickers, in-vehicle labeling,

25   advertising campaigns, brochures, press releases, and manuals, among other places. ACAC

26   ¶¶ 175-194. Both Milstead and Pereda allege they were exposed to GM's television, radio, and

27   internet marketing, further supporting their plausible allegations that they would have seen GM's

28   disclosures. *Id.* ¶¶ 62, 68, 81. And, unlike in *Sloan I*, Plaintiffs *specifically* allege that if GM had

1 disclosed accurate information, they would have learned of it. *See id.* ¶¶ 174, 185. *Cf. Sloan I*,

2 287 F. Supp. 3d at 876 (observing that "brochures, online, television, radio, and print

3 advertisements, annual reports, and so on" could be plausible "channels for GM to disclose the

4 omitted information" to consumers, but granting motion to dismiss absent allegation that

5 plaintiffs "would have received the disclosed information if it had been disclosed through those

6 mediums."). Plaintiffs clearly meet their burden here.[20]

7 <center>**b.**     <u>**Plaintiffs adequately allege the content of GM's omissions.**</u></center>

8 GM's next argument—that Plaintiffs have not identified what fact was omitted—falls flat

9 against the detailed information in the Complaint. Plaintiffs' allegations are straightforward: GM

10 failed to disclose that the Class Vehicles contain a defect that can prevent seatbelt tightening and

11 airbag deployment during serious crashes where it is necessary and expected because of accident

12 severity. ACAC ¶ 2. More specifically, in "accidents that involve multiple impacts, or that

13 increase in severity over a period of time," or "in a prolonged frontal crash," the defective

14 calibration in the Class Vehicles "disregards signals that would otherwise trigger airbag

15 deployment" and "makes it impossible for the airbags to deploy and seatbelts to tighten in the

16 'dead zone' in which a crash may still be underway." *Id.* ¶¶ 5, 9, 113, 115. Along with explaining

17 just how this defect manifests, Plaintiffs provide exemplar descriptions of crash conditions (like

18 hitting a curb, and then a tree). *See id.* ¶¶ 109–112. These allegations provide further clarity as to

19 the material nature of the defect and why GM should have disclosed it. *See*, *e.g.*, *id.* ¶¶ 224, 227.

20 GM emphasizes the technical nature of the defect in an effort to create confusion where

21 there is none. Ignoring the allegations above, GM cherry picks two paragraphs to suggest that

22 Plaintiffs allege only that GM omitted "that the Class Vehicles contained a software program that

23 was calibrated to prevent seatbelt tightening and airbag deployment during certain types of frontal

24 crashes." Mem. at 20 (citing ACAC ¶¶ 124-125). *Cf. Countrywide*, 588 F. Supp. 2d at 1145

25 (complaint allegations are properly read in context). GM then argues that this quoted statement is

---

26 [20] Defendants also cursorily argue that Plaintiffs have not alleged they would have behaved

27 differently because they have not established what "fact" was not disclosed. Mem. at 21. Given the overlap, GM's arguments about the contents of the omission are addressed in the section that

28 follows. As to different behavior, each Plaintiff alleges they "would not have purchased the Class Vehicle, or would have paid less for it" had they known the truth. ACAC ¶¶ 13-89.

"contradicted" because Plaintiffs "endorsed" a 150 ms cutoff elsewhere. Plaintiffs' allegation that a longer window is better does not somehow "contradict" their claim that a 45 ms window is unsafe. The issue with the calibration in the Class Vehicles is not that there is generally a cutoff regardless of its duration; it is that the 45 ms cutoff results in airbags failing *in real-world frontal crashes that need them*. Conversely, the "150 ms window allows for airbag and seatbelt deployment in real-world frontal crashes." ACAC ¶ 129. It is this real-world implication of the cutoff, and not its technical specifications, that was wrongly concealed from consumers.

GM also suggests that it has disclosed the defect (which Plaintiffs contest) because some of its Owners' Manuals explain in general terms that airbags "might or might not deploy depending on various factors, including but not limited to the duration of the crash sequence." Mem. at 21. As GM argues, no further information is necessary, because it has stated that deployment has some relation to crash duration, and it need not further disclose whether the calibration window is 45, 150, 1000 ms, or some other length.[21] Setting aside that whether any disclosure was adequate would be a question of fact not amenable to resolution on a pleading challenge, Plaintiffs' omissions claims do not hinge on GM disclosing the specific 45 ms window, a 150 ms window, or any other time cutoff. Plaintiffs' discussion of these numbers and their relevance describes the technical functioning of the SDM Calibration Defect, while Plaintiffs allege that GM should have disclosed the *practical effects* of the defect to consumers.

GM's authority does not counsel otherwise. In *Sims*, plaintiffs alleged that the gas tank in Kia vehicles could dislodge and ignite in a collision. After *three* amendments to the complaint, the plaintiffs did not sufficiently describe what information the defendant failed to disclose. Instead, the complaint vaguely alleged that the defendant should have disclosed "the gas tank defects described herein." *Sims v. Kia Motors Am., Inc.,* No. SA CV 131791 AGD FMX, 2014 WL 12558251, at *1 (C.D. Cal. Oct. 8, 2014). This did not make clear whether the defendants

---

[21] That the Owners' Manuals vaguely state that various factors determine whether the airbag will deploy does not insulate GM from any claim that the SDM is defectively calibrated—otherwise, even if GM programmed the SDM to deploy the airbags and seat pretensioners only when the vehicle was traveling in excess of 100 miles per hour and hit a stationary object, GM could successfully argue that the Manuals "explicitly" disclosed that fact to consumers as well. Obviously that argument would not be taken seriously, but is analogous to what GM argues here.

had to disclose design choices, including the use of plastic covers, or whether they also had to disclose that these design choices created risks, or something else. *Id.* at *4. Importantly, these allegations further suffered because the complaint did not even mention where the omitted information should have been disclosed, and/or whether the plaintiffs would have seen it. *Id*.

Here, in contrast, Plaintiffs allege in detail that GM should have disclosed the risks of non-deployment in real-world crash conditions presented by the SDM Calibration Defect. This clear allegation—coupled with Plaintiffs' further allegations that they would have seen such a disclosure—differentiates this case from *Sims,* where the defendant had "to guess exactly what information it was obliged to disclose." *Id; see also Villanueva v. Am. Honda Motor Co., Inc*., No. 19-cv-1390, 2019 WL 8112467, at *12 (C.D. Cal. Oct. 10, 2019) (distinguishing *Sims* where plaintiff "allege[d] that Defendant should have disclosed that 'the vehicles' autonomous braking systems are defective and may malfunction including by abruptly braking when there is otherwise no risk of a collision,'" which "does not leave Defendants guessing").

At bottom, Plaintiffs bargained for safe vehicles that would protect them and their occupants where necessary in a crash, irrespective of technical thresholds or software calibrations. *See*, *e.g.*, *Arris*, 327 F.R.D. at 354 ("[A]lthough Plaintiffs did not explicitly bargain for any particular level of latency, Plaintiffs did bargain for speed and reliability."). They allege that they did not get that, and that GM wrongly hid it from them, which is sufficient.

### 2. GM's affirmative misrepresentation arguments do not undermine Plaintiffs' omissions claims.

Defendants also advance several arguments that attempt to reframe Plaintiffs' claims to be about "affirmative misrepresentations." *See* Mem. at 16-17. These arguments are inapposite because, as explained above, GM's liability in this case is rooted in *what they did not say.*[22]

First, Plaintiffs need not allege that they saw and relied upon any specific advertisements to plead their omissions claims. *See Sloan I*, 287 F. Supp. 3d at 878 ("Plaintiffs would likely meet their burden under Rule 9(b) even without specifically identifying a particular advertisement in which the omitted information should have been included, so long as they provide plausible

---

[22] To be clear, Plaintiffs are not asserting stand-alone claims for affirmative misrepresentations.

allegations, consistent with *Daniel*, that they would have received the information in some way had Defendant exercised reasonable care."). Defendants' next argument that certain statements in the brochure for the 2010 Silverado are puffery is equally off point. Mem. at 17. The concept of puffery does not apply to fraudulent concealment claims. *Finney v. Ford Motor Co*., 2018 WL 2552266, at *8 (N.D. Cal. June 4, 2018); *see also In Re Eco-Diesel*, 295 F. Supp. 3d at 1004 (Defendants' "puffery" argument can apply to "Plaintiffs' affirmative misrepresentation theory only, and not any theory of fraudulent concealment").[23]

Finally, GM's cursory argument that Plaintiffs must identify which GM entity created the commercials and reviews cited in the Complaint (Mem. at 17) imposes obligations well beyond what Rule 9(b) requires. As discussed below as to GM's "group pleading" arguments, Rule 9(b) "may be relaxed as to matters within the opposing party's knowledge." *Moore*, 885 F.2d at 540. Of course, GM will know which entity, teams, and personnel were responsible for its own advertisements and statements directly cited in the Complaint.

### 3. The Complaint notifies each Defendant of the claims against it.

Plaintiffs allege that General Motors LLC, General Motors Holdings LLC, and General Motors Company, together as "GM," are responsible and liable for the misconduct in the Complaint.[24] GM contends this is "impermissible" group pleading. Mem. at 22. To the contrary, collective pleading of related corporate entities is sufficient so long as the complaint puts the defendants on notice of the claims against them. *See Cirulli v. Hyundai Motor Co.*, No. 08-cv-0854, 2009 WL 4288367, at *4 (C.D. Cal. Nov. 9, 2009) (grouping of defendants Hyundai Motor America and Hyundai Motor Company was permissible because the complaint put defendants on notice of claims against them); *In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. 16-2765,

---

[23] While Plaintiffs have alleged a duty to disclose based on the Defendants' partial misrepresentations in marketing for the Class Vehicles (in addition to a duty based on exclusive knowledge and active concealment), Defendants do not advance arguments challenging Plaintiffs' allegations of half-truths and the disclosure obligations triggered. Regardless, "whether a statement is deemed puffery is generally considered a question of fact, not law," and thus inappropriate for a motion to dismiss. *EcoDiesel*, 295 F. Supp. 3d at 1004-05.

[24] Plaintiffs have further identified specific corporate groups, including the GM Trucks Group and Cars Group, implicated in the history of the defect. ACAC ¶¶ 6, 125.

2017 WL 1902160, at \*9 (D.N.J. May 8, 2017) ("Plaintiffs cannot be expected to know the exact corporate structure . . . at this stage in the litigation and prior to discovery.").[25]

Grouping allegations for related corporate entities is appropriate in this case because GM corporations operate and hold themselves out to consumers as undifferentiated brands.[26] *See Brown v. Dynamic Pet Prods. & Frick's Meat Prods., Inc*., No. 17-cv-0659, 2017 WL 4680125, at \*3 (S.D. Cal. Oct. 18, 2017) (permitting grouping of multiple defendants where the defendants "worked in concert as parent and subsidiary entities in the marketing and selling" of the allegedly defective product); *Collazo v. Wen by Chaz Dean, Inc.*, No. 15-cv-01974, 2015 WL 4398559, at \*6 (C.D. Cal. July 17, 2015) (similar). GM's advertisements and marketing materials identify the parent company's or individual brand's colloquial name (e.g., "GM" or "Chevy"); *see e.g.* ACAC ¶ 182 (Monroney label by "Chevrolet"). Further, on its website (GM.com) which is copyright "General Motors," GM holds itself out as one company by stating, for example, "Headquartered in Detroit, Michigan . . . General Motors is a company with global scale and capabilities."[27]

Further, courts have permitted group pleading in cases, as here, where the defendants are related entities and share the same counsel. *See*, *e.g.*, *Munning v. Gap, Inc.*, No. 16-cv-3804, 2016 WL 6393550, at \*3 (N.D. Cal. Oct. 28, 2016) ("[B]ecause the [d]efendants all share a parent-subsidiary relationship with . . . the parent company and because all the [d]efendants are represented by the same counsel, frustration of notice of the claims to each defendant is unlikely."); *Sussex Fin. Enterprises, Inc. v. Bayerische Hypo-und Vereinsbank AG*, No. 08-cv-4791, 2010 WL 94272, at \*3 (N.D. Cal. Jan. 6, 2010) (similar).

The Complaint puts each of the Defendants on notice of the claims against it, and the specific employees and corporate entities responsible for the conduct at issue (such as approving software calibrations) is unquestionably within Defendants' knowledge. *Cf. Moore*, 885 F.2d at 540 (Rule 9(b) "may be relaxed as to matters within the opposing party's knowledge"). Accordingly, GM's group-pleading argument fails.

---

[25] All three cases cited by GM are inapposite because in each, the "grouped" defendants were separate, unrelated entities and/or individuals, unlike the entities here. *See* Mem. at 22-23.

[26] Of note, GM refers to all three entities as "GM" in its briefing. ECF 150 at 2.

[27] *See* https://www.gm.com/company/about-us, last accessed February 19, 2022.

## B. Plaintiffs adequately allege claims for equitable relief.

Plaintiffs also pursue claims for equitable relief under the UCL, CLRA, and for unjust enrichment, and allege specifically that they "do not have an adequate remedy at law." ACAC ¶ 238. Directly contrary to this allegation, GM argues that Plaintiffs' claims in equity should be dismissed because "Plaintiffs do not allege an inadequate remedy at law," citing to *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 839 (9th Cir. 2020). ). Mem. at 23. In *Sonner*—after four years of litigation and on the eve of trial—the plaintiff strategically dropped her CLRA claims to secure a bench trial. *Id.* at 837. By that time, the CLRA claim had already survived a motion for summary judgment. *Id.* This case is at the pleading stage and involves no such gamesmanship.

Here, Plaintiffs' allegations of an inadequate remedy at law are sufficient to avoid dismissal under *Sonner* at the pleading stage. "The fundamental thing that *Sonner*, by its own terms, requires at the pleading stage is that the complaint allege that [the plaintiff] lacks an adequate legal remedy." *Johnson v. Trumpet Behav. Health, LLC*, No. 21-cv-03221, 2022 WL 74163, at *3 (N.D. Cal. Jan. 7, 2022) (quoting *Sonner*, 971 F.3d at 844). Judge Freeman similarly addressed this issue in a recent decision in *Junhan Jeong v. Nexo Financial LLC, et. al.*, No. 21-cv-02392, 2022 WL 174236 (N.D. Cal. Jan. 19, 2022). The court distinguished *Sonner*, noting that "[c]ourts in the Ninth Circuit are divided on how exacting a standard *Sonner* imposes . . . at the pleading stage." *Id.* at *27 (citing *Byton N. Am. Co. v. Breitfeld*, No. 19-cv-10563, 2020 WL 3802700, at *9 (C.D. Cal. Apr. 28, 2020)). Similarly, Judge Orrick held that "because *Sonner* was decided at a later posture, I agree with the plaintiffs that, if a plaintiff pleads that she lacks an adequate legal remedy, *Sonner* will rarely (if ever) require more this early in the case . . . [and that] it is too early to determine whether the plaintiffs' legal remedies will ultimately be adequate, so it makes sense to defer this determination." *Johnson*, 2022 WL 74163, at *3.

Given the early posture—and particularly where GM argues that Plaintiffs' claims for legal relief fail—*Sonner* should not bar Plaintiffs' claims for equitable relief.[28] In any event,

---

[28] Plaintiffs acknowledge that this Court's decision in *Sharma*, 524 F. Supp. 3d at 907 required those plaintiffs to "demonstrate the inadequacy of a legal remedy" in their pleading. Should the Court find Plaintiffs' allegations of an inadequate remedy insufficient, Plaintiffs respectfully request leave to amend to address the adequacy of legal remedies, including for example as to injunctive relief and the potential for future injuries under the facts of this case. *Id.* at 908-99.

1 Plaintiffs' CLRA claims should proceed as to the available legal remedies.[29] *See Sharma*, 524 F.

2 Supp. 3d at 909 ("[B]oth damages and equitable relief are available under the CLRA.").

3 Finally, GM briefly argues that Plaintiffs' unjust enrichment claims fail under California

4 law because no California Plaintiff alleges that he purchased a new vehicle from a GM

5 dealership. Mem. at 24. Not so. Plaintiff Vargas alleges that he purchased a 2012 Chevrolet

6 Suburban *from a Chevrolet dealership* in 2012. ACAC ¶ 81. The reasonable inference is that this

7 was a new vehicle. *Cf. Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir.1996)

8 (reasonable inferences must be drawn in Plaintiffs' favor on a Rule 12 motion). The Court should

9 find that Plaintiff Vargas conferred a benefit on GM when he purchased a new vehicle from a GM

10 dealership and therefore adequately alleged a claim for unjust enrichment.

11 **C.** **Plaintiffs adequately plead Breach of Express Warranty.** [30]

12 Plaintiffs' breach of warranty claims are not subject to Rule 9's heightened pleading

13 standards. For these claims, Plaintiffs must provide "a short and plain statement of the claim

14 showing that [they are] entitled to relief." Fed. R. Civ. P. 8(a)(2). They need not offer "detailed

15 factual allegations" but must include "enough facts to state a claim to relief that is plausible on its

16 face." *Twombly*, 550 U.S. at 545-47. The SDM Calibration Defect in the Class Vehicles is

17 covered by GM's express warranty. ACAC ¶ 195. Plaintiffs allege that despite GM's warranty

18 obligations—and notwithstanding GM's knowledge of the defect—GM refused to recalibrate or

19 replace the SDM software in the Class Vehicles during the warranty period.

20 **1.** **The SDM Calibration Defect was present in all Class Vehicles at the point of sale.**

21 As GM recognizes, its express warranty covers defects "*occurring during the warranty*

22 *period.*" Mem. at 26. This squarely applies to the SDM Calibration Defect, which Plaintiffs allege

23 was present in every Class Vehicle when built and sold.[31] ACAC ¶¶ 5-6. In its motion, GM

24

25 [29] An amended complaint will pursue compensatory and monetary damages following Defendants' notice of claims. ACAC ¶ 367.

26 [30] Plaintiffs concede that Plaintiffs Milstead and Pereda cannot state claims for breach of express warranty because they purchased from third-party sellers.

27 [31] GM's citation to *Tabak v. Apple, Inc.*, 19-cv-2455, 2020 WL 9066153 (N.D. Cal. Jan. 30, 2020) is unavailing. The plaintiffs in *Tabak* alleged a latent defect in a cellular phone—

28 inadequate protection of an audio chip—that they *conceded* did not manifest in the form of damage to the audio chip during the warranty period. *Id.* at *1, 12.

wrongly conflates the *occurrence* of the defect with its *effects*, arguing that the SDM Calibration Defect only occurs if there is "airbag or seatbelt nondeployment during the warranty period." *Id.* Not so. As pled throughout the Complaint, it is the *calibration itself*—and the constant risk of deployment failures it inherently entails—that constitutes the defect. *See*, *e.g.*, ACAC ¶¶ 2-7.

GM's contrary argument that Plaintiffs cannot state a breach of warranty claim unless and until they get into a serious accident and the airbags and seatbelts fail is wrong. Plaintiffs need not suffer physical injuries, or worse, before they can invoke the terms of GM's warranty. *See*, *e.g.*, *In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d 1324, 1335 (S.D. Fla. 2016) ("If Takata had installed grenades in its airbags that may or may not explode on impact a court would not require an explosion to demonstrate manifestation of a defect.").

### 2. Plaintiffs were not required to present their Class Vehicles to GM for a non-existent repair.

GM's concealment of the hidden defect in the Class Vehicles obviated any need for Plaintiffs to present them to GM for warranty repair. Indeed, any efforts to seek repair would have been in vain because Defendants already knew that each Class Vehicle could not perform as warranted at the time of sale, but nonetheless failed to rectify the situation and/or disclose the defect. ACAC ¶¶ 6-9, 116, 146-154. Further, Plaintiffs sent letters to put GM on notice of their breaches of warranty (*see*, *e.g.*, *id.* ¶ 303) but GM has still not offered any repair. Accordingly, requiring Plaintiffs to present their Class Vehicles for repair, only to be denied a remedy, would be futile. *See In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 970 (N.D. Cal. 2014) (futility may be a basis for an excuse from the presentment requirement).

### D. Plaintiffs adequately allege Breach of Implied Warranty.

GM does not dispute that Plaintiffs have sufficiently alleged that GM breached its implied warranties by selling Class Vehicles that are not "merchantable" and not suitable for their ordinary or intended use—the touchstone of any implied warranty claim.[32] Nor could it, as a vehicle is not fit for its ordinary purpose or "merchantable" if it does not provide safe, reliable transportation. *See also In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. 96,

---

[32] *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. 96, 111 (E.D. Mich. 2019) (citing *Gutierrez v. Carmax Auto Superstores Cal.*, 248 Cal. Rptr. 3d 61, 74 (Cal. Ct. App. 2018).

1    112-13 (E.D. Mich. 2019), *clarified on denial of reconsideration*, No. 16-MD-02744, 2022 WL

2    34675 (E.D. Mich. Jan. 4, 2022) (citing cases). Instead, GM raises scattershot arguments

3    regarding Plaintiffs' purchases, none of which support dismissal.

### 1.    The SDM Calibration Defect was present at purchase.

5         Analogous to its express warranty arguments, GM argues that "[t]o establish a breach of

6    implied warranty claim, Plaintiffs must allege either 'a current malfunction' or 'that the defect 'is

7    substantially certain to manifest in a future malfunction.'" Mem. at 27. This argument fails for the

8    same reasons above, (*supra* § II.C.1), because Plaintiffs have alleged a defect present at the point

9    of sale. Notwithstanding GM's contrary arguments, the Ninth Circuit has recognized that when

10   the defect is inherent, manifestation is not required. *See Nguyen v. Nissan N. Am., Inc.*, 932 F.3d

11   811, 822 (9th Cir. 2019) (finding that manifestation is required in "cases where a defect *causes* an

12   injury, [but not in cases] like this one, where the defect itself *is* the injury"); *Mexia v. Rinker Boat

13   Co., Inc.*, 174 Cal. App. 4th 1297, 1301 (2009) ("[E]xistence of the unseen defect" and not "its

14   subsequent discovery" renders a product unmerchantable). Plaintiffs properly alleged their

15   implied warranty claims for their unmerchantable vehicles.

### 2.    Plaintiff Vargas adequately alleges a Song-Beverly Claim.

17        GM's effort to dismiss Plaintiffs Vargas' Song-Beverly claim similarly fails. [33] Mr.

18   Vargas plainly alleges that he purchased his 2012 Chevrolet Suburban in 2012 *from an authorized

19   Chevrolet dealer*. ACAC ¶ 81. As discussed above, the reasonable—and accurate—inference is

20   that this refers to a new vehicle, and Mr. Vargas need not also include the specific word "new" to

21   make that clear. In fact, GM is undoubtedly aware that Plaintiff Vargas purchased his vehicle new

22   because it differentiated his claims from those of Plaintiffs Pereda and Milstead, who purchased

23   used vehicles. *See* Mem. at 28. Accordingly, Plaintiff Vargas states a valid Song-Beverly claim.

### 3.    Plaintiffs' implied warranty claims are tolled by GM's fraudulent concealment and the discovery rule.

25        The discovery rule and doctrine of fraudulent concealment toll the statute of limitations

26   for Plaintiffs' claims. *See* ACAC ¶¶ 215–219. GM's arguments to the contrary are not persuasive.

---

[33] Plaintiffs Milstead and Pereda withdraw their Song-Beverly claim based on their purchase of used vehicles.

First, Plaintiffs sufficiently allege tolling under the discovery rule, asserting that, among other things "Plaintiffs and Class members were unable to independently discover [the defect] using reasonable diligence." *Id.* ¶ 218. GM does not challenge Plaintiffs' allegations, but instead argues that the discovery rule is inapplicable. Mem. at 28–29. GM is incorrect.

In *Daniel*, the Ninth Circuit examined whether plaintiffs' late discovery of a latent defect barred their Song-Beverly claims. 806 F.3d at 1222–23. After acknowledging disagreement among district courts, the court concluded that "we must adhere to state court decisions—not federal court decisions—as the authoritative interpretation of state law," and that state court precedent permits implied warranty claims based on a latent defect discovered outside of the durational limit. *Id.* at 1223 (discussing *Mexia*, 174 Cal. App. 4th at 1297 ). Subsequently, in *Tanner v. Ford Motor Co.*, Judge Davila examined the conflicting case law on whether the discovery rule applied to Song-Beverly implied warranty claims, including four cases cited by GM. 424 F. Supp. 3d 670-72 (N.D. Cal. 2019).[34] Ultimately, Judge Davila concluded that "applicable California law . . . holds that the statute of limitations begins to run once a defect is discovered, not when a product is delivered," *id.* at 671, and that the district court cases holding to the contrary improperly rely on "other federal court precedent." *Id.* at 672.[35] Notably, *Williams v. Tesla, Inc.*, No. 20-cv-08208, 2021 WL 2531177 (N.D. Cal. June 21, 2021), another of GM's cases, only briefly addresses the issue and, like *Gerstle*, *Marcus*, and *MacDonald*, exclusively relies on federal court decisions. *Id.* at *6. Accordingly, the Court should disregard GM's unpersuasive authority and find that the discovery rule applies.

Second, Plaintiffs sufficiently allege fraudulent concealment tolling. This doctrine requires a plaintiff to plead: "(1) the substantive elements of fraud, and (2) an excuse for late

---

[34] *See Gerstle v. Am. Honda Motor Co., Inc.*, No. 16-CV-04384-JST, 2017 WL 2797810 (N.D. Cal. June 28, 2017); *Marcus v. Apple Inc.*, No. C 14-03824 WHA, 2015 WL 151489 (N.D. Cal. Jan. 8, 2015); and *Cardinal Health 301, Inc. v. Tyco Elec. Corp.*, 169 Cal. App. 4th 116 (Cal. Ct. App. 2008).

[35] *Accord Bunn v. Ford Motor Co.*, No. 5:19-cv-03590, 2020 WL 991529, at *3 (N.D. Cal. Mar. 2, 2020); *Smith v. Ford Motor Co.*, No. 19-cv-05170, 2020 WL 609864, at *3–5 (N.D. Cal. Feb. 4, 2020); *Chipley v. Ford Motor Co.*, No. 18-cv-01161, 2018 WL 1965029, at *3 (N.D. Cal. Apr. 26, 2018); *Reitz v. FCA US LLC*, No. 20-cv-687, 2021 WL 1905049, at *3 (C.D. Cal. May 11, 2021).

discovery of the facts." *Cmty. Cause v. right*, 124 Cal. App. 3d 888, 900 (Cal. Ct. App. 1981). With respect to the substantive elements of fraud, "(w)here there is a duty to disclose, the disclosure must be full and complete, and any material concealment or misrepresentation will amount to fraud sufficient to entitle the party injured thereby to an action." *Id.* (citations omitted). Plaintiffs' allegations easily meet that standard in alleging that GM had a duty to disclose the Defect, but instead of doing so, "made incomplete representations about the safety and reliability of the Class Vehicles and their passenger safety systems, while purposefully withholding material facts about a known safety defect." *See* ACAC ¶ 226; *see also id.* ¶ 216; n. 11, *supra.*

Next, to explain an excuse for late discovery of facts, "the complaint must allege: (1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of facts sufficient to put him on inquiry." *Boatwright*, 124 Cal. App. 3d at 900 (citation omitted). Plaintiffs' allegations also satisfy this requirement, because in addition to the numerous allegations regarding GM's active concealment of the defect from consumers and NHTSA (*e.g.*, ACAC ¶¶ 116–17, 144–45; 195–98, 215–217), and the fact that GM has not recalled the Class Vehicles for this issue, Plaintiffs allege that "[d]ue to the highly technical nature of the SDM Calibration Defect, Plaintiffs and Class members were unable to independently discover it using reasonable diligence. Prior to the retention of counsel and without third-party experts, Plaintiffs and Class members lack the necessary expertise to analyze the software algorithm for the SDMs and to understand its defective nature." ACAC ¶ 218.

Courts have found similar allegations sufficient to toll the statute of limitations under the fraudulent concealment doctrine. *See, e.g.*, *Sloan I*, 287 F. Supp. 3d at 886 (allegations sufficient where plaintiffs alleged that the defendant had knowledge of the defect and "[i]t is plausible that Plaintiffs' delayed discovery, in the absence of any manufacturer recall and given the active concealment by Defendant of the alleged defect, was reasonable"); *Sater v. Chrysler Grp., LLC*, No. EDCV 14-00700-VAP, 2015 WL 736273, at *9 (C.D. Cal. Feb. 20, 2015) (fraudulent concealment adequately pled where defendant "intentionally kept" plaintiff ignorant of information, "continued to manufacture" product without disclosing defect, and delay in

discovery was reasonable at least until vehicle was recalled); *see also Roberts v. Electrolux Home Prods., Inc.*, No. CV 12-1644 CAS VBKX, 2013 WL 7753579, at *8 (C.D. Cal. Mar. 4, 2013) (fraudulent concealment adequately pled where manufacturer failed to disclose dryer defect within its exclusive knowledge and late discovery was excused by such exclusive knowledge).

GM's argument that Plaintiffs do not allege affirmative deceptive conduct is simply wrong. Mem. at 30. Along with the allegations regarding GM's concealment of the SDM Calibration Defect, the Complaint contains numerous allegations regarding (and provides examples of) GM's affirmative misrepresentations regarding the safety of its vehicles and its airbags. *See* ACAC ¶¶ 175-185 and Exhibit B (certifications and window stickers describing safety features and not disclosing defect); ACAC ¶¶ 186-190 (manuals describing airbag functionality in detail and not disclosing defect); ACAC ¶¶ 191-194 (press releases, brochures, and marketing materials).

Finally, GM's argument that Plaintiffs Milstead and Pereda cannot claim fraudulent concealment tolling because the statute of limitations expired before they purchased their vehicles is frivolous. The sole case GM cites, *Davis v. U.S.*, 642 F.2d 328, 331 (9th Cir. 1981), is inapposite. In *Davis*, the alleged fraudulent concealment did not take place until *after* the statute of limitations ran, which was two years *after* the appellant was injured. *Id.* at 331. Here, GM's fraudulent concealment began during the development of the SDM software in the late 1990s— over a decade before Plaintiffs Milstead and Pereda purchased their vehicles—and continues today. ACAC ¶¶ 6–10. Further, GM's argument simply fails the logic test, because if GM fraudulently concealed the defect from the public and thereby tolled the statute of limitations, the statute of limitations could not have expired before Plaintiffs purchased their vehicles.

Accordingly, Plaintiffs adequately allege tolling under the discovery rule and the fraudulent concealment doctrine, and Plaintiffs' claims are not barred by the statute of limitations.

**III.     This Court has specific personal jurisdiction over GM and Plaintiffs' claims are properly venued in this District.**

GM concedes, as it must, that the Court has personal jurisdiction as to the claims brought by the California Plaintiffs. However, it argues that the analogous state law claims brought by non-California Plaintiffs—which arise from the *very same* SDM Calibration Defect—are not

within the Court's personal jurisdiction under *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cty.*, 137 S. Ct. 1773 (2017) (hereinafter "*BMS*"). Alternatively, GM argues that the *entire* action, even the claims over which it concedes this Court's jurisdiction, should be transferred to the Eastern District of Michigan. Both arguments fail, as the Court has specific personal jurisdiction and, given the undeniable efficiencies, can and should exercise its discretion to hear all overlapping claims pertaining to the same defect in this litigation.

Put another way, because the California Plaintiffs plead nationwide claims for common law fraudulent concealment and unjust enrichment, which will inherently implicate conduct and claims extending beyond California, the Court's exercise of pendent party jurisdiction as to non-California Plaintiffs' related state law claims (state statutory consumer protection and warranty claims) is appropriate, efficient, and well-supported.

### A. The Court has jurisdiction over the California Plaintiffs' nationwide fraudulent concealment and unjust enrichment claims.

Plaintiffs, including the California Plaintiffs for whom GM does not contest jurisdiction, bring claims on behalf of a putative nationwide class for common law fraudulent concealment and unjust enrichment. As Plaintiffs will demonstrate at class certification on a more developed record, there are no true conflicts among various states' laws and a nationwide (and/or multi-state) class is appropriate for these claims. ACAC ¶¶ 221, 232. At this stage, the Court has jurisdiction over these nationwide claims given the California Plaintiffs' standing to bring them.

Because the California Plaintiffs have standing to sue and have properly pled their claims, a decision as to whether they may represent a nationwide class should be deferred to the class certification stage. *See Melendres*, 784 F.3d at 1254. Indeed, courts in this circuit routinely defer resolution of "nationwide" class allegations to Rule 23 proceedings. *See Batista v. Irwin Nats.*, No. CV 20-10737-DMG (EX), 2021 WL 6618543, at *2 (C.D. Cal. Sept. 27, 2021) ("Representative parties who have a direct and substantial interest have standing; the question whether they may be allowed to present claims on behalf of others who have similar, but not identical, interests depends . . . on an assessment of typicality and adequacy of representation"); *Burchfield v. Prestige Consumer Healthcare, Inc*., 534 F. Supp. 3d 1192, 1206–07 (C.D. Cal. 2021) ("If and when Plaintiff moves for class certification, the Court will determine whether

1 dissimilarities between Plaintiff's California law claims and those of non-resident putative class

2 members preclude Plaintiff from asserting the latter in a representative capacity."); Newberg on

3 Class Actions § 2:6 (5th ed.) ("[W]hen a class plaintiff shows individual standing, the court

4 should proceed to Rule 23 criteria to determine whether, and to what extent, the plaintiff may

5 serve in a representative capacity on behalf of the class.").[36] This authority provides clear support

6 for the Court to do so in this case as well.

7      GM's authority does not compel a different conclusion, as many of the decisions arose on

8 a much more developed record, and those at the pleading stage are distinguishable. *Mazza*, for

9 example, arose at the class certification stage and involved a request by plaintiffs to apply

10 California law extraterritorially—i.e., to apply California law to a nationwide consumer class. *See*

11 *Wolf v. Hewlett Packard Co.*, No. CV 1501221 BRO GJSX, 2016 WL 8931307, at *8 (C.D. Cal.

12 Apr. 18, 2016) (distinguishing *Mazza* on these grounds and deferring decision on nationwide

13 class allegations to the class certification stage). Likewise, this Court recognized in *Todd v.*

14 *Tempur-Sealy Int'l, Inc.* that "[m]any courts reserve choice-of-law analysis and dismissal of

15 nationwide class claims for the class certification stage." No. 13-CV-04984-JST, 2016 WL

16 344479, at *6 (N.D. Cal. Jan. 28, 2016). In that case, however, the court chose to decide the issue

17 on a motion to dismiss, given "the advanced stage of litigation and the extensive discovery that

18 has already been completed." *Id.* The same does not apply to the first pleading challenge lodged

19 in this case, in which no discovery has occurred.

20      GM next cites to Judge Chen's decision in *In re Toyota RAV4 Hybrid Fuel Tank Litig.*, in

21 which the court dismissed a nationwide count of unjust enrichment under California law.

22 Importantly, in the very same decision and apart from the unjust enrichment claim, Judge Chen

23 opted to "defer ruling on Plaintiffs' nationwide class allegations until a later stage of the

24 proceedings." 534 F. Supp. 3d 1067, 1125 (N.D. Cal. 2021). This distinction—as between the

25 ---

26 [36] *See also Robinson Unilever U.S., Inc.*, No. 17-cv-3010, 2018 WL 6136139, at *4 (C.D. Cal. June 25, 2018) (similar); *Staley v. Gilead Sciences, Inc.,* 446 F. Supp. 3d 578, 622 (N.D. Cal. 2020) (similar); *Wolf v. Hewlett Packard Co.*, 2016 WL 8931307, at *8 (C.D. Cal. Apr. 18, 2016) (similar); *Phan v. Sargento Foods, Inc.*, No. 20-CV-09251-EMC, 2021 WL 2224260, at *12 (N.D. Cal. June 2, 2021) (surveying case law and acknowledging a "'growing consensus' among lower courts . . . that class certification should indeed be decided first" but nonetheless resolving at the Rule 12 phase as to state law statutory consumer protection claims).

nationwide unjust enrichment claim the court dismissed on the one hand, and the nationwide class allegations for which the court deferred ruling on the other—is an important one. The balance of GM's cited cases each turn on the former: plaintiffs who sought to apply *California law nationwide*. This runs into conflict with California's choice of law rules, which look to the law of the state of purchase. *See Julian v. TTE Tech., Inc.*, No. 20-CV-02857-EMC, 2020 WL 6743912, at *10 (N.D. Cal. Nov. 17, 2020) (plaintiffs argued that "California law can apply to all class members nationwide"); *Freedline v. O Organics*, No. 19-CV-01945-JD, 2020 WL 6290352, at *3 (N.D. Cal. Oct. 27, 2020) (same); *Larsen v. Vizio, Inc*., No. SA CV 1401865 CJC JCGX, 2015 WL 13655757, at *3 (C.D. Cal. Apr. 21, 2015) (same).

Here, in contrast, Plaintiffs do not seek extraterritorial application of California (or any other state) law. Rather, Plaintiffs plead nationwide counts for common law fraudulent concealment and unjust enrichment, and contend there are no true conflicts among states' laws that would preclude proceeding on a classwide basis.[37] On a more developed record, Plaintiffs will demonstrate to the Court why—particularly under the facts of this case about a uniform defect and pervasive scheme to conceal it—any minor variations in the relevant states' laws of fraudulent concealment and unjust enrichment will not stand in the way of certifying classes throughout the country *under those laws*, and why the named Plaintiffs will be typical and adequate representatives in those efforts.[38] As with the many cases cited above, the Court should exercise its discretion to defer a decision on the nationwide claims to the class certification stage, where it will have the benefit of a more mature record and briefing focused on this issue.

### B. BMS does not impact the Court's jurisdiction over claims brought on behalf of absent class members from outside of California.

Notwithstanding the Court's jurisdiction as to the California claims—and the common facts underlying all claims in the Complaint—GM argues that it is not subject to personal

---

[37] As in some cases that have decided this issue on a motion to dismiss, there is not a record before the Court at this time as to whether any state law variations will preclude certification, which further counsels for deferring a decision here.

[38] *See* 2 Newberg on Class Actions (5th ed.) § 4:61. Recurring issues in the predominance analysis—Choice of law/multiple jurisdictions ("The forum state's choice of law rules might mandate application of each plaintiff's home state law, but the substantive laws of the various states might be capable of being organized into groups of states with similar legal regimes.").

1    jurisdiction as to any claims arising outside of California.[39] Mem. 30-32. On these points, GM

2    relies on *BMS*, which held that the California state courts lacked personal jurisdiction over the

3    claims of non-resident plaintiff-consumers who did not purchase or use the product at issue in the

4    state. *See BMS*, 137 S. Ct. at 1781. However, *BMS* was not a class action, nor was it filed in

5    federal court. Rather, *BMS* was a mass tort action in state court asserting a variety of state-law

6    claims based on injuries allegedly caused by its drug Plavix. *Id.* at 1777. The majority opinion did

7    "not confront the question whether its opinion . . . would also apply to a class action in which a

8    plaintiff injured in the forum State seeks to represent a nationwide class of plaintiffs, not all of

9    whom were injured there." *Id.* at 1789 n.4 (Sotomayor, J., dissenting); *see also id.* at 1783–84.

10        While the Ninth Circuit has yet to consider the issue, the overwhelming majority of

11   federal courts (including three Courts of Appeals) that have considered whether *BMS* applies to

12   preclude claims brought on behalf of non-resident *absent* class members have answered the

13   question in the negative—either because the rule from *BMS* does not apply in class actions, or

14   because absent putative class members are not, for purposes of personal jurisdiction, parties to the

15   case before a class is certified. *See, e.g.*, *Mussat v. IQVIA, Inc.*, 953 F.3d 441, 448 (7th Cir. 2020)

16   ("[A] class action may extend beyond the boundaries of the state where the lead plaintiff brings

17   the case. And nothing in the Rules [of Civil Procedure] frowns on nationwide class actions, even

18   in a forum where the defendant is not subject to general jurisdiction"); *see also Lyngaas* v.

19   *Curaden AG*, 992 F.3d 412, 433 (6th Cir. 2021); *Molock v. Whole Foods Market Group*, *Inc*., 952

20   F.3d 293, 298 (D.C. Cir. 2020).

21        Numerous courts within the Ninth Circuit have reached the same conclusion and declined

22   to dismiss claims brought on behalf of non-resident class members for lack of personal

23   jurisdiction. *See, e.g.*, *Sotomayor v. Bank of Am., N.A.*, 377 F. Supp. 3d 1034, 1038 (C.D. Cal.

24   2019) (rejecting argument that nonresident putative class members' claims be dismissed and

25   explaining that "[e]xtending [*BMS*] to class actions, as Defendant suggests, would radically alter

26   the existing universe of class action law," and that nationwide class actions "enable[] both courts

27

28   _____

     [39] Plaintiffs do not contend that GM is "essentially at home" in California. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

and parties to save resources by permitting an issue potentially affecting every class member to be litigated in an economical fashion under Rule 23"); *Kanan v. Thinx Inc.*, No. 20-cv-10341, 2021 WL 4464200, at \*9 (C.D. Cal. June 23, 2021).

Thus, *BMS* is not an obstacle to Plaintiffs' nationwide fraudulent concealment and unjust enrichment claims, including as to the absent class members outside of California.[40]

### C. The Court should exercise pendent party jurisdiction over the out-of-state Plaintiffs' claims arising from identical facts as the California claims.

As explained above, Plaintiffs contend that the Court can and should exercise jurisdiction over the nationwide counts of fraudulent concealment and unjust enrichment through to the class certification stage. While those nationwide claims are pending, the Court can and should also exercise its discretion to extend pendent personal jurisdiction over the state law statutory consumer protection and breach of warranty claims of the non-California Plaintiffs. These claims arise out of an identical set of facts—i.e., that GM knew about and concealed a dangerous SDM Calibration Defect in the Class Vehicles.

As this Court has recognized, the Ninth Circuit has affirmed a court's discretion "to exercise pendent personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *In re Bang Energy Drink Marketing Litig.*, No. 18-cv-5758, 2020 WL 4458916, at \*6 (N.D. Cal. Feb. 6, 2020); *see also Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F. 3d 1174, 1181 (9th Cir. 2004) (explaining that the doctrine of pendent personal jurisdiction serves the interests of "judicial economy, avoidance of piecemeal litigation, and overall convenience of the parties," because "[w]hen a defendant must appear in a forum to defend against one claim, it is often reasonable to compel that defendant to answer other claims in the same suit arising of out a common nucleus of operative facts"). That is exactly the situation here.

---

[40] Courts have found that *BMS* applies to *named Plaintiffs* in class actions in federal court, as distinct from absent class members. *Sloan v. Gen. Motors LLC*, No. 16-CV-07244-EMC, 2019 WL 6612221, at \*9 (N.D. Cal. Dec. 5, 2019). However, as discussed below, jurisdiction is proper over the non-California Plaintiffs' claims under the pendent party jurisdiction doctrine.

1    GM does not (and cannot) dispute that all Plaintiffs' claims arise out of the same "nucleus

2    of operative facts" as the California Plaintiffs' claims. Instead, GM argues that the doctrine of

3    pendent personal jurisdiction is inapplicable because Plaintiffs do not bring federal claims. To the

4    contrary, *In re Bang Energy*—in which this Court applied the doctrine of pendent personal

5    jurisdiction—also involved only state law claims. Nevertheless, GM aims unsuccessfully to

6    distinguish *In re Bang Energy*, noting that the Court did not consider *Sloan v. Gen. Motors LLC*,

7    438 F. Supp. 3d 1017 (N.D. Cal. 2020) (*Sloan II*) and relied on an earlier decision in that

8    litigation. *Sloan II* reasoned that pendent party personal jurisdiction cannot be exercised by a

9    federal court whose sole basis for subject matter jurisdiction is diversity jurisdiction (i.e., where

10   plaintiffs do not plead federal claims). *See* Mem. at 33 & n.21.

11       To be sure, *Sloan II* and other courts have limited pendent jurisdiction to cases with a

12   federal claim. But nothing about the doctrine of pendent *personal* jurisdiction itself renders it

13   applicable only in situations where the case involves federal question *subject matter*

14   jurisdiction.[41] And further, the Ninth Circuit has observed that "[p]endant personal jurisdiction is

15   *typically* found where one or more federal claims for which there is nationwide personal

16   jurisdiction are combined in the same suit with one or more federal claims for which there is not

17   nationwide personal jurisdiction." *Action Embroidery*, 368 F.3d at 1180–81. In noting that is

18   "*typically*" the case, the Ninth Circuit did not so limit the doctrine, and there is no reason to do so

19   here. This Court in *In re Bang Energy* correctly made no such distinction, concluding that the

20   application of pendent personal jurisdiction in this situation (involving overlapping state law

21   claims and no federal claim) served the interests of "judicial economy" and "avoidance of

22   piecemeal litigation," and did not prejudice a defendant already subject to personal jurisdiction in

23   the forum. *See* 2020 WL 4458916 at *6 (quoting *Action Embroidery*, 368 F.3d at 1181).

24       This is particularly true where, as here, a *nationwide* count is pending. For example, in

25   *Allen v. ConAgra Foods, Inc.*, the court concluded it was appropriate to assert pendent

26   jurisdiction over the state law claims of nonresident named plaintiffs while a putative nationwide

---

27   [41] As the *Sloan I* court correctly observed, the concerns that restricted California state courts from
28   exercising jurisdiction over the nonresident plaintiffs in *BMS* are rooted in federalism—concerns
     that are not at issue in federal court. *See Sloan*, 287 F. Supp. 3d at 857 (citation omitted).

class claim was pending. No. 3:13-CV-01279-WHO, 2018 WL 6460451, at *8 (N.D. Cal. Dec. 10, 2018).[42] *Cf. La Fosse v. Sanderson Farms, Inc.*, No. 19-CV-06570-RS, 2020 WL 3617786, at *4 (N.D. Cal. July 2, 2020) (declining to exercise pendent jurisdiction where the court had already dismissed the plaintiffs' nationwide class claims).

The interests of judicial economy, avoidance of piecemeal litigation, and the lack of prejudice to Defendants—who are already defending California claims before this Court— likewise favor the common-sense exercise of pendent jurisdiction in this case. *See BMS*, 137 S. Ct. at 1780 (the primary concern for personal jurisdiction is "the burden on the defendants"). Indeed, if the Court were to credit GM's arguments and dismiss the non-California claims, the non-California Plaintiffs could then each file suit in their states of purchase for a single-state class, litigating the *exact* same defect as in this action. *See also Allen*, 2018 WL 6460451, at *8 (N.D. Cal. Dec. 10, 2018) (exercising pendent jurisdiction could prevent "the need for multiple such actions in other states and potentially subjecting ConAgra to inconsistent obligations."). Transfer of these single-state actions to this Court through an MDL or through § 1404 would be almost inevitable, given the more advanced posture of the claims before this Court. As such, thousands of hours and many more dollars later, the parties would end up right back where they started: with all claims about the SDM Calibration Defect pending before this Court.

In sum, GM cannot reasonably dispute that the California Plaintiffs' claims and the non-California Plaintiffs' claims address common (if not identical) operative facts. GM will not be prejudiced in defending against other claims analogous to those of the California Plaintiffs—for which the scope of discovery (including into the origins and effects of the defect, and GM's knowledge of the same) would *wholly* overlap. Indeed, the fraud alleged in this case did not stop at the California border, and any discovery into that fraud will inherently look to the same

---

[42] Later, on reconsideration *after* denying certification of a nationwide class to pursue unjust enrichment claims, the court in *ConAgra* declined to continue to exercise pendent jurisdiction over the out-of-state named plaintiffs' claims. The court made clear, however, that this decision was appropriate because there had been "subsequent developments" in the case, i.e., the denial of class certification on the nationwide counts. *See Allen v. Conagra Foods, Inc.*, No. 3:13-CV-01279-WHO, 2019 WL 5191009, at *2-3 (N.D. Cal. Oct. 15, 2019). Thus, while the *Conagra* plaintiffs did not ultimately convince that court that nationwide certification was warranted, the exercise of pendent jurisdiction was appropriate until that decision was made.

nationwide misconduct, regardless of the state law under which it is prosecuted. Accordingly, the Court can and should exercise pendent jurisdiction over the non-California Plaintiffs' claims here.[43] *See Action Embroidery*, 368 F.3d at 1181 ("[T]he actual exercise of personal pendent jurisdiction in a particular case is within the discretion of the district court.").

## D. GM has not met its "heavy burden" to transfer this case to Michigan.

GM alternatively argues that the Court should transfer all claims, including those brought by the California Plaintiffs in their home state, to the Eastern District of Michigan under 28 U.S.C. § 1404. GM bears a "heavy burden" to demonstrate that transfer is proper, and it has not carried that burden here. *Sec. & Exch. Comm'n v. Christian Stanley, Inc.*, No. 11-7147, 2012 WL 13012496, at *1 (C.D. Cal. Apr. 4, 2012).

GM first errs by arguing that Plaintiffs' choice of forum should be given little weight because this is a putative class action. Mem. at 37. GM fails to recognize that courts within this District have frequently held that plaintiffs' choice of forum deserves deference in a class action, particularly where, as here, named plaintiffs have a connection to the forum. *See Shultz v. Hyatt Vacation Mktg. Corp.*, No. 10-04568, 2011 WL 768735, at *3 (N.D. Cal. Feb. 28, 2011) ("[T]he forum choice of a class action plaintiff may still be entitled to some deference."); *see also Hendricks v. StarKist Co.*, No. 13-729, 2014 WL 1245880, at *3 (N.D. Cal. Mar. 25, 2014) ("The court there, like other courts in this district, expressly deferred to the plaintiff's choice of forum in a class action context because the plaintiff had substantial contacts to the forum. . . .").

The Complaint describes more than sufficient connections to require deference to Plaintiffs' forum choice, as it: has three named Plaintiffs who live and purchased their vehicles in California, asserts seven causes of action arising under California law on behalf of California residents, and alleges that venue is proper, in part, because "GM conducts substantial business, including through numerous dealerships, and marketed, advertised, sold, and leased Class Vehicle in this District." *See* ACAC ¶¶ 62, 68, 81, 93, 107-119. As such, even if the Court affords lesser weight to this factor, it decidedly weighs against transfer. These same allegations also defeat

---

[43] And, of course, because there is personal jurisdiction over these claims, transfer of the claims under 28 U.S.C. § 1631 is inappropriate.

GM's second argument, as there are clearly operative facts that occurred within this District, and California therefore has a strong interest in the claims at issue here. *See id.* Given these connections, Plaintiffs' choice of forum weighs substantially against transfer. *See Shultz*, 2011 WL 768735, at *3 ("Plaintiff alleges that her claims arose within the Northern District of California in the office that Hyatt maintains there, and that she is a resident of this district. . . . the Court finds that Plaintiff's choice of forum is due some weight.").

GM next argues that the convenience of the parties favors transfer because GM is a citizen of Michigan, its principal places of business are in Michigan, and "with the exception of the three California plaintiffs, virtually all the other named plaintiffs . . . are located closer to Michigan than California." Mem. at 37. At the outset, this argument ignores the Plaintiffs from Alaska, Colorado, Idaho, Nevada, Oregon, Utah, and Washington who are located closer to California than Michigan. GM also fails to mention that it has extensive contacts with the state of California, touting on its website that it has 215 dealerships, 15 facilities, and 398 employees in the state, and that it delivered 179,275 vehicles to California in 2020 alone.[44] And again, GM's argument ignores that the non-California Plaintiffs could also file suit in the states in which they purchased their vehicles, rather than litigate this case in Michigan, which could multiply the number of pending lawsuits about this defect. GM has accordingly failed to show that transfer to Michigan would be more convenient for the parties. *See, e.g.*, *Jimenez v. Haxton Masonry, Inc.*, No. 18-7109, 2019 WL 9573762, at *4 (N.D. Cal. May 10, 2019) ("This regular presence in California mitigates at least some of the inconvenience of litigating outside Haxton's home state.").

GM similarly contends that the convenience of witnesses favors transfer because "[s]ignificant events occurred in Michigan" and because current and former GM employees reside there. Mem. at 37. Because GM employees can be compelled to testify, their location is not relevant. *See Gonzales v. Charter Commc'ns, LLC*, No. 20-02689, 2020 WL 5074024, at *3 (N.D. Cal. Aug. 24, 2020) ("Courts accord less weight to the inconvenience of party witnesses

---

[44] *See Operations by State*, General Motors, https://www.gm.com/company/usa-operations#top-operations (last visited March 7, 2022). "Courts may take judicial notice of websites and their contents." *Arroyo v. AJU Hotel Silicon Valley, LLC*, No. 20-08218, 2021 WL 2350813, at *2 (N.D. Cal. Mar. 16, 2021).

1  whom the parties can compel to testify."); *Applied Elastomerics, Inc. v. Z-Man Fishing Prods,*

2  *Inc.*, No. 06-2469, 2006 WL 2868971, at *4 (N.D. Cal. Oct. 6, 2006) (similar). This factor is also

3  weakened given that GM's employees may be deposed by videoconference or near their

4  residences in some instances. *See Kincheloe v. American Airlines, Inc.*, No. 21-515, 2021 WL

5  4339198, at *7 (N.D. Cal. Sept. 23, 2021). GM has therefore failed to show why this factor

6  weighs in favor of its "heavy burden" to justify transfer.[45]

7  While GM also argues that the "[f]easiblity of consolidation with other claims favors

8  transfer" (Mem. at 38), this factor does not support transfer because GM has not pointed to any

9  other pending related lawsuits in the Eastern District of Michigan (Plaintiffs are not aware of

10  any).[46] *See Frias v. Aetna Life Ins. Co.*, No. 14-CV-03146-THE, 2014 WL 5364105, *5 (N.D.

11  Cal. 2014) ("Similarly, because there are no related claims, the feasibility of consolidation is

12  irrelevant, and is therefore a neutral factor."); *see also Pravetz v. Fed. Ret. Thrift Inv. Bd.*, No. 18-

13  1081, 2018 WL 8058843, at *4 (C.D. Cal. Dec. 28, 2018); *Canal A Media Holding, LLC v. U.S.*

14  *Citizenship & Immigr. Servs.*, No. 17-6491, 2018 WL 7297829, at *3 (C.D. Cal. Sept. 30, 2018).

15  GM's argument regarding access to evidence is similarly unconvincing because, aside

16  from Plaintiffs' vehicles, the majority of the documents and evidence in this case will be available

17  electronically. *See Carlson v. Colorado Ctr. for Reprod. Med., LLC*, No. 21-06133, 2021 WL

18  5494273, at *2 (N.D. Cal. Nov. 23, 2021) (ease of access to evidence "is a factor carrying little

19  weight" in an age of electronic records); *Yearby v. Am. Nat'l Ins. Co.*, No. 20-09222, 2021 WL

20  3855833, at *6 (N.D. Cal. Aug. 30, 2021) (similar). This factor does not support transfer.

21  GM lastly contends that the familiarity with governing law factor is neutral. Mem. at 38.

22  "Neutral" factors do not help GM meet its "heavy burden" to justify transfer. *See*, *e.g.*, *James ex*

23

24  [45] Additionally, given its vast financial resources compared to those of the individual Plaintiffs,
   GM is better able to bear costs of transporting witnesses. *See Falcone v. Vitamin Shoppe Indus.,*

25  *Inc.*, No. 07-957, 2008 WL 11336200, at *6 (C.D. Cal. June 13, 2008) ("Defendant here is a
   national corporation with the financial means to extend its business presence to California.
   Accordingly, Defendant appears better situated than Plaintiff to absorb these costs.").

26  [46] While GM spills a lot of ink describing an earlier-filed lawsuit in Michigan by some (but not

27  all) of the Plaintiffs' counsel in this case as supportive of a transfer to Michigan, *none* of the
   Plaintiffs in this litigation filed suit in Michigan. And in any event, the fact that Plaintiffs' counsel

28  previously filed lawsuits in other jurisdictions prior to properly filing this one on behalf of these
   Plaintiffs in this district has no relevance to the standard for transfer under §1404.

*rel. James Ambrose Johnson, Jr. 1999 Tr. v. UMG Recordings*, No. 11-1613, 2011 WL 5192476, at *3 (N.D. Cal. Nov. 1, 2011). Moreover, given the myriad legal and factual deficiencies in GM's arguments with respect to the other factors, it is clear that Plaintiffs' forum preference should be respected here and this matter should not be transferred.[47]

## CONCLUSION

For the reasons set forth above, the Court should deny Defendants' motion to dismiss in full. In the alternative, Plaintiffs respectfully request leave to amend, which is to be granted with "extreme liberality." *Hoang v. Bank of Am., N.A.*, 910 F.3d 1096, 1102 (9th Cir. 2018).

---

[47] GM only addresses six of eight factors, failing to discuss "any local interest in the controversy" and "court congestion and time to trial in each forum," Mem. at 37. These factors weigh against transfer as California has a strong interest in protecting its residents from safety defects, and the median time from filing to disposition of civil cases was 6.3 months in this district versus 10.2 months in the Eastern District of Michigan as of September 2021. *See U.S. District Courts–Median Time Intervals From Filing to Disposition of Civil Cases Terminated*; https://www.uscourts.gov/sites/default/files/data_tables/jb_c5_0930.2021.pdf, at 3, 5. The Court may take judicial notice of these statistics. *See Midkiff v. Prudential Ins. Co. of Am.*, No. 19-01656, 2019 WL 12469793, at *5 (N.D. Cal. Dec. 6, 2019).

Dated: March 8, 2022                          Respectfully Submitted,

By: */s/ David S. Stellings*_____
    Richard Heimann (CA Bar # 063607)
    Nimish R. Desai (CA Bar # 244953)
    **LIEFF CABRASER HEIMANN**
    **& BERNSTEIN, LLP**
    275 Battery St., 29th Fl.
    San Francisco, CA 94111-3339
    Telephone: 415-956-1000
    Facsimile: 415-956-1008
    rheimann@lchb.com
    ndesai@lchb.com

    David S. Stellings (*pro hac vice*)
    Katherine I. McBride (*pro hac vice*)
    Jessica A. Moldovan (*pro hac vice*)
    **LIEFF CABRASER HEIMANN**
    **& BERNSTEIN, LLP**
    250 Hudson Street, 8th Floor
    New York, NY 10013
    Telephone: 212.355.9500
    Facsimile: 212.355.9592
    dstellings@lchb.com
    kmcbride@lchb.com
    jmoldovan@lchb.com

    Roland Tellis (CA Bar #186269)
    David Fernandes (CA Bar #280944)
    Adam Tamburelli (CA Bar #301902)
    **BARON & BUDD, P.C.**
    15910 Ventura Boulevard, Suite 1600
    Encino, California 91436
    Telephone: (818) 839-2333
    Facsimile: (818)-986-9698
    rtellis@baronbudd.com
    dfernandes@baronbudd.com
    atamburelli@baronbudd.com

    Christopher A. *See*ger (*pro hac vice*)
    Christopher L. Ayers (*pro hac vice*)
    **SEEGER WEISS LLP**
    55 Challenger Road, 6th Floor
    Ridgefield Park, NJ 07660
    Telephone: (973) 639-9100
    Facsimile: (973) 639-9393
    cseeger@seegerweiss.com
    cayers@seegerweiss.com

Shauna Brie Itri (*pro hac vice*)
**SEEGER WEISS LLP**
1515 Market Street, Suite 1380
Philadelphia, PA 19102
Telephone: (215) 564-2300
Facsimile: (215) 851-8029
sitri@seegerweiss.com

W. Daniel "Dee" Miles, III (*pro hac vice*)
H. Clay Barnett, III (*pro hac vice*)
J. Mitch Williams (*pro hac vice*)
Rebecca D. Gilliland (*pro hac vice*)
Dylan T. Martin (*pro hac vice*)
**BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C**.
272 Commerce Street
Montgomery, AL 36104
Telephone: (334) 269-2343
Dee.Miles@beasleyallen.com
Clay.Barnett@beasleyallen.com
Mitch.Williams@beasleyallen.com
Rebecca.Gilliland@beasleyallen.com
Dylan.Martin@beasleyallen.com

David M. Birka-White (CA Bar # 85721)
**BIRKA-WHITE LAW OFFICES**
178 E. Prospect Avenue
Danville, CA 94526
Telephone: (925) 362-9999
dbw@birka-white.com

James E. Cecchi (*pro hac vice*)
Caroline F. Bartlett (*pro hac vice*)
Jordan M. Steele (*pro hac vice to be filed*)
Zachary Jacobs (*pro hac vice to be filed*)
**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
cbartlett@carellabyrne.com
jsteele@carellabyrne.com
zjacobs@carellabyrne.com

Joseph H. Meltzer (*pro hac vice*)
Melissa L. Troutner (*pro hac vice*)
Lauren M. McGinley (*pro hac vice*)
**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
jmeltzer@ktmc.com
mtroutner@ktmc.com
egerard@ktmc.com
lmcginley@ktmc.com

Charles E. Schaffer (*pro hac vice*)
David C. Magagna Jr. (*pro hac vice*)
**LEVIN, SEDRAN & BERMAN, LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
cschaffer@lfsblaw.com
dmagagna@lfsblaw.com

E. Powell Miller (*pro hac vice to be filed*)
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com

Jason P. Sultzer, Esq. (*pro hac vice*)
**THE SULTZER LAW GROUP P.C.**
270 Madison Avenue, Suite 1800
New York, NY 10016
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com