UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAMIRO PEREDA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GENERAL MOTORS LLC, et al., <br><br> Defendants. | Case No. 21-cv-06338-JST <br><br> **GRANTING MOTION TO DISMISS** <br> Re: ECF No. 150 |

Before the Court are a motion to dismiss and motion to transfer filed by Defendants

General Motors LLC, General Motors Holdings LLC, and General Motors Company (collectively

"GM"). ECF No. 150. The Court will grant the motion to dismiss and deny the motion to transfer

as moot.

## I. BACKGROUND[1]

This is a case about the seatbelt and airbag systems in passenger vehicles manufactured by

GM from 1999 until the present.

A brief history of the relevant safety technology is helpful to understanding Plaintiffs'

allegations. Under federal law, motor vehicles must "use [certain] safety features to protect

occupants in the event of a crash." FAC ¶ 94. "These features include seatbelt pretensioners,

which tighten seatbelts to secure the occupants, and airbags, which are cushions that rapidly inflate

from the steering wheel and other areas of the vehicle." *Id.* "[S]eatbelt pretensioners hold vehicle

occupants in place [during an accident,] and airbags buffer or prevent impact between occupants

and hard structures in the vehicle." *Id.* "Without the airbags, slamming into the hard structures

---

[1] The Court takes the facts from Plaintiffs' First Amended Complaint ("FAC"), ECF No. 12. *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

1    (such as the steering wheel) during a crash can cause serious injuries or death." *Id.*

2        Before 1998, airbag systems were designed to protect against only frontal crashes. *Id.* ¶

3    132. Airbags underwent government testing that required the airbags to protect "an unbelted,

4    midsize adult male dummy (175 pounds) in a 30-MPH crash into a rigid barrier." *Id.* Not all

5    vehicle drivers and passengers fit this description, however, and first-generation airbags could be

6    dangerous for children if they were seated too close to the bag. *Id.* ¶ 133. First generation airbags

7    also sometimes deployed late or too "aggressive[ly]." *Id.* ¶ 134. Thus, in October 1995, the

8    National Highway Traffic and Safety Administration ("NHTSA") began a series of actions

9    designed to decrease these problems while still preserving the "life-saving benefits" of airbags. *Id.*

10   For example, NHTSA began permitting "automakers to reduce the energy in frontal airbags,"

11   which "led to an 'industry-wide changeover' to 'redesigned' airbags" in 1998-1999 model year

12   vehicles. *Id.* ¶ 135. Reducing the pressure and velocity of deployments also led to a reduction in

13   the number of low-to-moderate speed fatalities. *Id.* Other innovations "included reducing the

14   volume or rearward extent of airbags, positioning them further from occupants, [and] revised

15   folding techniques." *Id.* ¶ 136. According to the complaint, GM "knew about and employed these

16   new technologies in its vehicles." *Id.* ¶ 137.[2]

17       Safety features continued to evolve, culminating in the creation of "advanced" or "smart"

18   airbags which "alter deployment patterns according to feedback from several sensors." *Id.* ¶ 138.

19   These sensors allow airbag deployment to adjust to the "severity of the crash, the size and posture

20   of the vehicle occupant, whether the occupant is wearing a seatbelt, and how close the occupant is

21   to the airbag." *Id.* According to the complaint, these airbags "phased into production beginning

22   September 1, 2003 and were required in all new vehicles by September 1, 2006." *Id.* ¶ 140. As a

23   consequence of this new technology, "serious injuries from properly functioning airbags are rare."

24   *Id.* ¶ 141.

25       "Seatbelt and airbag systems are known as 'passive' safety systems because . . . they are

26

27   [2] The cited paragraph, and other parts of the complaint, refer to the General Motors Corporation
     that filed for bankruptcy in 2009, which it refers to as "Old GM." The Court does not adopt this

28   nomenclature because distinguishing between the various GM entities is not necessary to the
     Court's order.

supposed to operate automatically" using sophisticated components and software, rather than manually. *Id.* ¶ 97. To achieve these automatic operations, vehicles are equipped with technology that controls the car's safety features and issues a "command" when necessary to deploy airbags and tighten seatbelts in a crash.[3] *Id.* ¶ 98. "[D]uring regular vehicle operation, the SDM is" in resting mode. *Id.* ¶ 99. In resting mode, the SDM monitors and interprets signals such as "acceleration, wheel speed, brake pressure, and impacts[,] . . . to determine whether the vehicle is involved (or about to be involved) in a crash." *Id.* If "the SDM detects an irregular input that suggests a potential crash, it 'wakes up' to search for confirmation of a crash." *Id.* ¶ 100. If additional inputs confirm that a moderate-to-severe frontal crash has occurred, "the SDM should issue a command to 'fire' the airbag and/or tighten the seatbelts as needed." *Id.* The vehicle then "resets" once the crash or potential crash has fully competed and returns to its resting phase. *Id.* ¶ 101. The entire progression – "from sensing an irregular signal (the pothole), to waking up and searching for confirmation of a crash, to firing the airbag where needed" – can occur in "fractions of a second." *Id.* ¶ 103.

According to Plaintiffs, however, GM intentionally built a feature into its airbag deployment system that made the system unreasonably dangerous. Plaintiffs claim that in 1999, GM made the decision to utilize a software program in its SUVs and trucks that prevented airbag and seatbelt deployment after a period of 45 milliseconds from the beginning of the collision. *Id.* ¶ 6. In practice this means that an airbag will not deploy "in frontal crashes that endure for 45 milliseconds or longer and require airbag deployment or seatbelt tightening after 45 milliseconds." *Id.* ¶ 108. This includes concatenated crashes where the first incident sends the SDM into "wake up" mode but does not trigger airbag deployment or tightening the seatbelt (for example, hitting a curb or a speed bump) and a second, more severe incident occurs more than 45 milliseconds later. *Id.* ¶¶ 109-110. This defect would also be implicated in frontal crashes that increase in severity over time. *Id.* ¶ 111. For example, a "soft crash" – like hitting another vehicle's bumper – that takes more than 45 milliseconds to evolve into a "hard" impact will not trigger airbag deployment

---

[3] This computer goes by many names, including airbag control unit ("ACU"), Electronic Control Unit ("ECU"), and Sensing and Diagnostic Module ("SDM"). This order uses SDM throughout.

1   or seatbelt tightening in the Class Vehicles.  *Id.*  Instead, the SDM enters a "dead zone" starting 45

2   milliseconds into a crash that lasts until the SDM detects that the irregular signals have concluded

3   and then resets back to its resting mode.  *Id.* ¶ 114.  During this "dead zone" a crash may be

4   underway, but the airbags will not deploy, and the seatbelts will not tighten.  *Id.* ¶ 115.

5       It made this decision even though the external team of software engineers who designed

6   the system "warned . . . GM in 1999 that preventing airbag and seatbelt deployment after 45

7   milliseconds was a reckless and dangerous design decision."  *Id.* ¶ 6; *see also id.* ¶ 124.  It also

8   ignored the views of "a separate [internal] team in charge of design and development for GM cars"

9   which proposed "a much longer window (150 milliseconds) for the airbags and seatbelts to deploy

10  in a crash for the vehicles they designed."  *Id.* ¶ 6.  It made this decision "due to concerns about

11  the potential for airbags to deploy 'too late' during an accident," even though "these concerns

12  were unwarranted given technology that mitigated the risks of 'late' airbag deployments."  *Id.* ¶

13  131.

14      According to Plaintiffs, GM "knew or had reason to know" about the SDM calibration

15  defect and the risks it posed as early as June 10, 2009, when it had "acquired substantially all of [a

16  prior GM entity's] books, records, and personnel."  *Id.* ¶ 116.  Rather than issue a safety recall, the

17  complaint alleges that GM decided "to conceal this problem and the pattern of accidents, injuries,

18  and deaths that have resulted from it" in an attempt to avoid "the costs, potential liabilities, and

19  reputational harms."  *Id.* ¶¶ 117-118.

20      The operative complaint is brought by 72 named plaintiffs: 3 from California and 69 from

21  other states.  *See id.* ¶ 12.  They allege the claims on behalf of themselves, individually, as well as

22  a proposed nationwide class that "includes all persons and entities that purchased or leased a Class

23  Vehicle in the United States, including its territories."  *Id.* ¶ 204.  "Class Vehicles" are defined in

24  the complaint as "all vehicles in the United States that contain the SDM Calibration Defect that

25  were (1) manufactured, sold, distributed, or leased by Defendants or (2) manufactured, sold,

26  distributed, or leased by . . . GM and purchased or leased by Plaintiffs or a Class member after

27  July 10, 2009."  *Id.* at 5 n.1.

28      Now before the Court is GM's motion to dismiss the FAC.  ECF No. 150.  Plaintiffs

opposed the motion, ECF No. 162, and GM replied, ECF No. 170.

## II.    REQUESTS FOR JUDICIAL NOTICE

The Federal Rules of Evidence require a court to take judicial notice of facts "if a party requests it and the court is supplied with the necessary information" that shows the facts are "not subject to reasonable dispute." Fed. R. Evid. 201.  Facts are not subject to reasonable dispute if they are "generally known within the trial court's territorial jurisdiction," or "can be accurately or readily determined from sources whose accuracy cannot reasonably be questioned." *Id.*

GM requests that the court take judicial notice of nineteen exhibits.  ECF No. 150-2. Exhibits A and B are documents publicly available on the NHTSA's website, which GM cites "solely to establish the indisputable facts that airbags may not deploy for various reasons, and that 'late' deployment creates a risk of injury to an occupant." *Id.* at 4-5.  Because these facts are already alleged in the complaint, FAC ¶¶ 96, 133-136, and are "matters of public record," the Court takes judicial notice of them. *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (the court "may take judicial notice of undisputed matters of public record").

GM also seeks judicial notice of Exhibits C-Q, which contain "downloaded EDR or SDM data that is publicly reported and published on the NHTSA's official website." ECF No. 150-2 at 5.  Plaintiffs do not dispute that the Court may take judicial notice of the existence of these documents.  ECF No. 162-1 at 5.  However, they argue the Court "may not notice GM's erroneous interpretation of the data they contain or draw inferences from the document in favor of GM." *Id.* Specifically, "Plaintiffs dispute that the NHTSA vehicle crash documents (Exhibits C-P) show that the airbags deployed more than 45ms after the first frontal collision event." *Id.* at 6.

The Court will take judicial notice of the existence of the documents themselves, but will not adopt GM's interpretation of those documents, which would require a degree of fact-finding that is not appropriate at the motion to dismiss stage. *See Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, No. EDCV 13-00883 JGB (SPx), 2019 WL 2610965, at *13 n.13 (C.D. Cal. April 19, 2019) ("Defendants are correct that the Court may not use the MWD Plan to take judicial notice of its interpretation of data or the Tribe's interpretation of the MWD Plan."); *G.N. v. Life Ins. Co. of N. Am.*, No. 20-cv-08907-HSG, 2021 WL 2633404, at *2 (N.D. Cal. June

United States District Court
Northern District of California

25, 2021) (denying a request to incorporate because the defendant "offers these documents to contradict Plaintiff's allegations"); *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (expressing the Ninth Circuit's concern with defendants "exploiting [judicial notice] improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage").

Finally, GM requests the Court take notice of Exhibits R and S, which consist of two warranties that are referenced in the complaint. *See, e.g.*, FAC ¶ 195. Because the complaint references these warranties and the parties do not dispute their authenticity, the Court takes judicial notice of them pursuant to the incorporation by reference doctrine. *See Grant v. Aurora Loan Servs., Inc.*, 736 F. Supp. 2d 1257, 1264 n.37 (C.D. Cal. Sept. 10, 2010) ("[The incorporation by reference doctrine] permits a court . . . to consider documents incorporated by reference, but not physically attached to the complaint, if they are central to plaintiff's claim and no party questions their authenticity.").

## III. DISCUSSION

In its motion to dismiss, GM argues that the Court cannot exercise jurisdiction over claims brought by the non-California named plaintiffs. ECF No. 150 at 42. GM also argues that the Court should transfer the entire case to the Eastern District of Michigan. *Id.* Finally, GM argues that the California plaintiffs' claims should be dismissed because they do not plausibly allege a defect in their vehicle and because the complaint fails to state a claim under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. *Id.* at 21-42.

### A. Personal Jurisdiction

"Personal jurisdiction must exist for each claim asserted against a defendant." *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) (citation omitted). Since the Supreme Court's "seminal decision in *International Shoe*," courts "have recognized two types of personal jurisdiction: 'general' (sometimes called 'all-purpose') jurisdiction and 'specific' (sometimes called 'case-linked') jurisdiction." *Bristol-Myers Squibb Co. v. Super. Ct.*, 137 S. Ct. 1773, 1779-80 (2017) (citation omitted). "[A] court may assert pendent personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction

1    so long as it arises out of a common nucleus of operative facts with a claim in the same suit over

2    which the court does have personal jurisdiction." *Action Embroidery*, 368 F.3d at 1180 (collecting

3    cases).

4           In this case, the parties do not dispute that the Court has jurisdiction over the named

5    California plaintiffs. The question is whether the Court may exercise pendent jurisdiction over the

6    out-of-state named Plaintiffs' claims in the wake of the Supreme Court's decision in *Bristol-*

7    *Myers*. In *Bristol-Myers,* plaintiffs from all over the country sued the Bristol-Myers Squibb

8    Company in California state court alleging that its drug was harmful to their health. 137 S. Ct. at

9    1777-78. The Supreme Court found that California courts could not exercise specific jurisdiction

10   over the out-of-state plaintiffs' claim because the claims did not arise in California or out of the

11   companies' activities in California. *Id.* at 1780-84. Specific jurisdiction, the Supreme Court

12   explained, requires an "affiliation between the forum and the underlying controversy, principally

13   an activity or an occurrence that takes place in the forum state." *Id.* at 1780 (alteration, quotation,

14   and citation omitted). In reaching this decision, the Supreme Court left open the question of

15   "whether the Fifth Amendment imposes the same restrictions on the exercise of personal

16   jurisdiction by a federal court." *Id.* at 1783-84 (citation omitted).

17          Although the Ninth Circuit has not yet spoken on this issue, the "overwhelming majority of

18   federal courts," including courts in this district, "have held that *Bristol-Myers* applies to claims

19   brought by named plaintiffs in class actions" when federal courts are sitting in diversity. *Sloan v.*

20   *Gen. Motors LLC*, No. 16-cv-07244-EMC, 2019 WL 6612221, at *9 (N.D. Cal. Dec. 5, 2019)

21   (*"Sloan II"*); *see La Fosse v. Sanderson Farms, Inc.*, No. 19-cv-06570-RS, 2020 WL 3617786, at

22   *4 (N.D. Cal. July 2, 2020) (granting 12(b)(2) motion and dismissing all claims brought by the

23   non-California plaintiffs on this basis); *see also* Daniel Wilf-Townsend, *Did* Bristol-Myers Squibb

24   *Kill the Nationwide Class Action?*, 129 Yale L.J. Forum 205, 226 (2019) ("[T]here is consensus

25   that *BMS*'s personal-jurisdiction holding applies to the named plaintiffs in a class action[.]").

26          Plaintiffs argue that the Ninth Circuit has not limited pendent personal jurisdiction to

27   federal claims and that "there is no reason to do so here." ECF No. 162 at 51. They argue that

28   GM is already defending California claims before this Court and all claims arise out of "common

7

. . . operative facts." *Id.* at 52. These arguments are not without their appeal, but the Supreme Court rejected virtually identical arguments in *Bristol-Myers*, and they do not become more persuasive in the present context. *See Bristol-Myers*, 137 S. Ct. at 1780-81 (holding that the Due Process Clause can divest a court of jurisdiction "even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; [and] even if the forum State is the most convenient location for litigation" (citation and internal quotation omitted)); *id.* at 1781 (holding that "the mere fact that other plaintiffs . . . allegedly sustained the same injuries as did the nonresidents . . . does not allow the State to assert specific jurisdiction over the nonresidents' claims" because "a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction" (emphasis, citation, and quotation omitted)). Rather, the Court is persuaded by "the weight of authority [that] weighs heavily against the exercise of pendent jurisdiction in a diversity case such as this one." *King v. Bumble Trading, Inc.*, No. 18-cv-06868-NC, 2020 WL 663741, at *6 (N.D. Cal. Feb. 11, 2020). Accordingly, the Court will not assert pendent jurisdiction over the out-of-state named Plaintiffs' claims because these claims arise out of out-of-state activities with no connection to California.[4]

---

[4] Plaintiffs rely heavily on this Court's prior decision in *In re Bang Energy Drink Marketing Litigation*, No. 18-cv-05758-JST, 2020 WL 4458916, at *6 (N.D. Cal. Feb. 6, 2020), to argue that the Court may exercise pendent personal jurisdiction "so long as [the claim] arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." ECF No. 162 at 50. GM invites the Court to reconsider its ruling in *Bang Energy* because the Court relied there on a case in which Judge Chen did "not address whether and how *Bristol-Myers* would apply if jurisdiction arose exclusively on the basis of diversity." *Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840, 859 n.2 (N.D. Cal. 2018) (*"Sloan I"*). Judge Chen did have the opportunity to decide that question in *Sloan II*, where he held that "*Bristol-Myers* applies to federal courts sitting in diversity" and dismissed the non-resident claims. 2019 WL 6612221, at *9. Defendants further argue that the other cases the Court relied on in *Bang Energy* are inapt. For example, *Action Embroidery*, 368 F.3d at 1174, involved federal question jurisdiction, not diversity jurisdiction, and *Allen v. ConAgra Foods, Inc.*, No. 3:13-cv-01279-WHO, 2018 WL 6460451 (N.D. Cal. Dec. 10, 2018), was decided before *Sloan II*. . After reviewing the caselaw, the Court agrees with "nearly every court considering the issue" and joins them in holding that "pendent party jurisdiction cannot be exercised by a federal court sitting in diversity." *Sloan II*, 2019 WL 6612221, at *9.

### B.     Failure to State a Claim[5]

A complaint need not contain detailed factual allegations, but facts pleaded by a plaintiff must be "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter that, when accepted as true, states a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  While this standard is not a probability requirement, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quotation marks and citation omitted).  In determining whether a plaintiff has met this plausibility standard, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).  If the motion to dismiss is granted, the court should grant leave to amend "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995) (quotation marks and citation omitted).

Any claims that are "grounded in fraud . . . must satisfy the traditional plausibility standard of Rules 8(a) and 12(b)(6), as well as the heightened pleading requirements of Rule 9(b)." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018).  Under Rule 9(b) "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Allegations of fraud must "be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong.  Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quotation marks, alterations, and citations omitted).

---

[5] After finding that the Court lacks jurisdiction over the non-California plaintiffs, the Court uses the term "Plaintiffs" to refer to the named California plaintiffs.

### 1. Defect Arguments

GM argues that the complaint is deficient because it does not adequately allege a defect in the vehicles at issue.[6]  "[A]llegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged . . . ."  *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (internal quotation marks and citation omitted).  Claims sounding in fraud must allege "an account of the time, place, and specific content of the false representations."  *Swartz v. KPMG LLP*, 476 F.3d 757, 764 (9th Cir. 2007) (internal quotation marks and citation omitted).  "Courts have dismissed causes of action sounding in fraud when the alleged defect is not well-defined."  *Sciacca v. Apple, Inc.*, No. 18-CV-03312-LHK, 2019 WL 331280, at *5 (N.D. Cal. Jan. 25, 2019) (collecting cases).

Here, the complaint alleges that the Class Vehicles contain an SDM calibration defect.  FAC at 5 n.1.  According to the complaint, the defective calibration "means that the airbags and seatbelt pretensioners in the Class Vehicles can *only* fire within 45 milliseconds of a first, irregular signal.  If a second signal occurs after 45 milliseconds, the SDM purposefully, by design, disregards signals that would otherwise trigger airbag deployment."  *Id.* ¶ 113 (emphasis in original).  The complaint alleges that this defect is present in all Class Vehicles, as "GM continued to use this same defective software algorithm in its vehicles in 2009 and beyond."  *Id.* ¶ 142.

According to GM, the description of the alleged defect is insufficient because Plaintiffs have not adequately supported their claim that the defective software algorithm was incorporated

---

[6] GM also accuses Plaintiffs of "completely chang[ing] their defect theory from an absolute cutoff, claiming now that it is only applicable in 'certain conditions.'"  ECF No. 170 at 6.  To support its argument, GM points to statements in the complaint that "airbags and seatbelt pretensioners in the Class Vehicles can *only* fire within 45 milliseconds of a first, irregular signal," FAC ¶ 113 (emphasis in original), compared with Plaintiffs' current argument that "GM made a deliberate decision to prevent airbag deployment after 45 milliseconds in *certain situations*."  3/10/22 Hr'g Tr. at 8:21-23 (emphasis added).  The Court does not understand these quotes to contradict each other.  Instead, it understands "certain situations" to refer to "frontal crashes that endure for 45 milliseconds or longer and require airbag deployment or seatbelt tightening after 45 milliseconds," as alleged in the complaint.  FAC ¶ 108.  GM also argues that Plaintiffs changed their theory because they now state that non-deployment occurs only "in a second frontal event that *immediately* follows the first by more than 45ms."  ECF No. 162-1 at 2 (emphasis in original).  This allegation is consistent with the "dead zone" discussion in the complaint.  FAC ¶ 114.  GM has not demonstrated that Plaintiffs have changed their defect theory.

United States District Court
Northern District of California

into Plaintiffs' vehicles. ECF No. 150 at 21. Plaintiffs disagree, arguing that it is enough that the complaint "states clearly that the SDM Calibration Defect was included in *every vehicle within the GM trucks group*—i.e. trucks and SUVs—starting in model year 1999." ECF No. 162 at 21 (emphasis in original).

Plaintiffs allege the following facts in support of their claims. First, "[o]n information and belief, despite these well-established advancements in airbag technology outlined above, GM continued to use this same defective software algorithm in its vehicles in 2009 and beyond." FAC ¶ 142. Second, that "[p]ublicly available crash data reports from NHTSA indicate that the Delco SDM was used in GM trucks vehicles up through at least MY 2015." *Id.* at 53 n.38. Third, the complaint includes hundreds of publicly available NHTSA Reports regarding airbag deployment issues in 1999-2014 GM Trucks and SUVs, *id.* at 289-357, although none of those reports mentions the alleged 45 millisecond cutoff or the alleged software coding defect.

The complaint also references two expert opinions. The first is from Chris Caruso, an expert in automotive crash sensing systems who worked for Delco engineering during the development of the allegedly defective SDM software in the Class Vehicles. *Id.* ¶ 148. According to the complaint, his report states that airbags failed to deploy following a crash of a 2005 Chevrolet Trailblazer because "the algorithm deployment thresholds were no longer active." *Id.* ¶ 149. Caruso claimed firsthand knowledge regarding the "premature turning off of algorithm thresholds which effectively disables the front airbags after 45 to 50ms." *Id.* ¶ 150. He concluded that the airbags and seatbelts failed because "the SDM calibration had already timed out after 45-ms after the crash started." *Id.* ¶ 151. Caruso also stated that he expected discovery to reveal "emails and other correspondence between GM Truck Engineers and Delphi Crash Sensor engineers discussing the concerns over GM Truck Groups' edict to set certain crash sensor calibration parameters outside the recommended minimum guidelines set by the crash sensing algorithm designers [i.e. the Delphi/Delco engineers]." *Id.* ¶ 150. The other automotive crash expert referenced in the complaint, Sal Fariello, wrote to GM's CEO Mary Barra twice in December 2016 to raise concerns about issues in the model year 2006 GM SUVs' airbag sending system. *Id.* ¶ 155.

11

In the present case, the complaint provides enough information for the Court to infer that the SDM defect existed in 1999. *See id.* ¶ 149 ("Based on Caruso's experience working in the development of the SDM software, he related that there were concerns, due to the calibration, 'that in longer duration, but high severity events and in concatenated events (such as a curb impact followed by a utility pole impact), the airbags would fail to deploy because the algorithm deployment thresholds were no longer active.'"). Plaintiffs have also stated facts showing that customers filed NHTSA complaints regarding the failure of airbag deployment in a variety of vehicle makes and models. *Id.* at 289-357.

The complaint does not, however, plausibly allege that the defective software continued to be used decades after it was allegedly placed in GM vehicles. Conclusory statements are insufficient. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) ("Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."). Nor do the NHTSA and expert reports support Plaintiffs' claims, because they do not relate to the makes and models of Plaintiffs' vehicles. *Morales v. Toyota Motor Sales, USA, Inc.*, No. 5:19-cv-01611-VAP (ADSx), 2020 WL 4723975, at *4 (C.D. Cal. Apr. 27, 2020) (finding plaintiffs' allegations inadequate and too vague where "the FAC contains no factual allegations to support Plaintiff's assertion that all of the purported class vehicles contain the same transmission system"); *cf. Loo v. Toyota Motor Sales, USA, Inc.*, No. 8:19-cv-00750-VAP (ADSx), 2019 WL 7753448, at *4 (C.D. Cal. Dec. 20, 2019) (plaintiffs cited Toyota TSBs that specifically related to 2018-2019 Camry vehicles to support their transmission defect theory); *Peguero v. Toyota Motor Sales, USA, Inc.*, No. 2:20-cv-05889-VAP (ADSx), 2020 WL 10354127, at *7 (C.D. Cal. Nov. 18, 2020) (finding plaintiffs allege sufficient facts because, among other things, they "cite to a TSB that applies specifically to their vehicles"). Caruso's expert opinion is also insufficient because it refers to alleged defects in 1999 but does not support an inference that the same SDM from 1999 was installed in Plaintiffs' 2010 and 2012 vehicles. Because Plaintiffs do not provide facts supporting an inference that the defective SDM installed in model year 1999 still exists in their vehicles, the Court finds that Plaintiffs have failed to allege a plausible claim.

The authority the Court has been able to locate is in accord. In *Morales*, for example, the

court granted the defendants' motion to dismiss because the named plaintiff failed to adequately

allege a transmission defect in her Lexus vehicle. 2020 WL 4723975, at *4. The plaintiff alleged

that seven different Toyota vehicle models from 2017 to the present were "equipped with Toyota's

UA80 transmission, a transverse, eight-speed transmission" which allegedly caused several

vehicular issues. *Id.* However, the complaint contained "no factual allegations to support

Plaintiff's assertion that all of the purported class vehicles contain[ed] the same transmission

system." *Id.* And "Plaintiff allege[d] no facts showing that any of the [cited] TSBs or the

Customer Support Program even applie[d] to her Lexus RX 350." *Id.* Therefore, the court

concluded that the plaintiff had not alleged sufficient information to support a plausible inference

that the transmission issues she was experiencing were due to the allegedly faulty calibration. In

reaching this conclusion, the *Morales* court distinguished another case where the plaintiffs

adequately supported this inference by citing TSBs that applied to the make and model of the

vehicle at issue. *Id.*

Similarly, in *Nava v. Kobe Steel, Ltd.*, Kobe Steel had admitted publicly that it had been

falsely certifying that its metals met industry standards like minimum tensile strength, thickness,

and durability. No. 18-cv-01423-VC, 2019 WL 4729540, at *1 (N.D. Cal. July 18, 2019).

Plaintiffs were owners of Toyota Prius automobiles who sued Kobe, alleging that Kobe's

defective metals likely ended up in their Priuses, rendering their cars unsafe. *Id.* Plaintiffs relied

on the opinion of a retained expert, "who surveyed Toyota's history of recalls and maintenance

advisories, identified four defects that he believe[d] were consistent with what one would expect if

substandard materials were used, and surmised that Kobe may have provided some of the

materials involved in the failed car parts." *Id.* However, none of the malfunctions the expert

identified had occurred in the plaintiffs' Priuses. Thus, "the complaint [did] not adequately allege

with 'substantial certainty' that the non-conforming materials in the plaintiffs' cars are likely to

result in malfunction." *Id.* (citing *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1028 (9th Cir.

2017)).

Accordingly, the Court grants the motion and dismisses GM's claims without prejudice for

failure to allege a plausible claim.[7]

### 2.    Fraudulent Omissions

GM argues that Plaintiffs' fraudulent omissions claims must be dismissed for three reasons:  (1) the complaint fails to identify the content of the alleged omission; (2) the complaint fails to properly allege reliance on any omissions; and (3) the only omission adequately identified in the complaint – "that airbags will not deploy in some frontal collisions" – was disclosed in GM's Owner's Manuals.  ECF No. 150 at 28.

### a.    Content of the Omission

GM argues that "Plaintiffs' omissions claims . . . fail because they do not identify with particularity the content of the alleged omission."  *Id.* at 32.  Claims of fraudulent omissions must "describe the content of the omission and where the omitted information should or could have been revealed."  *Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992, 1002 (N.D. Cal. 2009).

Here, the complaint alleges that "[GM] had a duty to disclose the SDM Calibration Defect to consumers and NHTSA."  FAC ¶ 217.  The defect is described in the complaint as the calibration of "the software program that controls the SDM to prevent airbag and seatbelt deployment just 45 milliseconds after a crash has begun."  *Id.* ¶ 5.

In *Sims v. Kia Motors America, Inc.*, a case GM describes as "indistinguishable" from this case, the court found that the plaintiffs' "bare allegations" failed Rule 9(b) because, among other reasons, the complaint alleged that the defendants had a duty to disclose "[t]he gas tank defects described herein," leaving the defendants "to guess exactly what information it was obliged to disclose."  No. SACV 13-1791 AG (DFMx), 2014 WL 12558251, at *4 (C.D. Cal. Oct. 8, 2014).  In *Villanueva v. American Honda Motor Co., Inc.*, on the other hand, the court found that although it was a close call, the plaintiff "sufficiently alleged the content of the omission."  No. CV 19-1390-MWF (MAAx), 2019 WL 8112467, at *1, *12 (C.D. Cal. Oct. 10, 2019).  In reaching this conclusion, the court distinguished *Sims*, finding that the complaint did not "leave Defendants

---

[7] Although the Court dismisses the complaint for failure to allege a plausible defect, it nonetheless addresses Defendant's remaining arguments to provide guidance regarding any future amended pleading.

guessing as to what information it was supposed to disclose." *Id.* at *12. Even though the plaintiffs in that case broadly asserted that the defendant's automated braking systems "[were] defective and may malfunction," the court highlighted the fact that the complaint also included "an example of how the braking systems are defective" when it alleged that the car may abruptly brake "when there is otherwise no risk of a collision." *Id.*

Here, the Court finds that the complaint provides GM with adequate notice as to what information it was supposed to disclose. The allegations in this case are even more specific than the ones in *Villanueva*. Plaintiffs not only state that the airbags "may not operate in a prolonged frontal crash," they also provide real world examples of categories of crashes – concatenated and prolonged– that implicate the defect. FAC ¶¶ 11, 109-114. The complaint also details the origin of the defect (GM's decision in 1999), the location of the defect (SDM's algorithm), and the precise algorithmic problem (it is programmed to "wake up" for a maximum of 45 ms). *Id.* ¶¶ 102, 106, 112, 124, 142. This is more than enough information to put GM on notice of the alleged defect.

### b.     Reliance

GM also contends that Plaintiffs fail adequately to allege reliance, which requires Plaintiffs to show that, had GM disclosed information about the defect, Plaintiffs "would have been aware of it and behaved differently." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (quoting *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (1993)). The showing that "one would have behaved differently can be presumed, or at least inferred, when the omission is material. An omission is material if a reasonable consumer would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Id.* (internal citation and quotation marks omitted). "Materiality is judged from the perspective of a 'reasonable consumer,' and it is generally a question of fact." *Id.* at 1226 (internal citations omitted).

Courts have found materiality, and therefore reliance, when an alleged defect "would pose an unreasonable safety risk." *Id.*; *see Ehrlich v. BMW of N. Am., LLC*, 801 F. Supp. 2d 908, 917-19 (C.D. Cal. 2010) (windshields with high propensity to crack or chip); *Falk v. Gen. Motors*

*Corp.*, 496 F. Supp. 2d 1088, 1095-96 (N.D. Cal. 2007) (defective speedometer); *see also Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1141-43 (9th Cir. 2012) (holding in the duty-to-disclose context that an omission must pose safety concerns to be material).  Here, the facts in the complaint, viewed in the light most favorable to the Plaintiffs, establish materiality and an inference of reliance.  The complaint alleges that GM intentionally designed a SDM that does not deploy airbags in specific categories of moderate-to-severe accidents, which can result in injuries or death.  FAC ¶ 115.  This alleged defect creates an "unreasonable safety risk" that is even more serious than in other cases where courts reached this same conclusion.  Therefore, the Court finds that Plaintiffs have sufficiently alleged reliance.

### c. Disclosure

Pleading reliance also requires Plaintiffs to allege that they would have been aware of a disclosure by GM, had one been made.  *See Daniel*, 806 F.3d at 1225.  Although a plaintiff "need not plead that they actually viewed a specific advertisement to satisfy this prong," a plaintiff must "establish a plausible method of disclosure and that they would have been aware of information disclosed using that method."  *Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 967 (N.D. Cal. 2018) (quotation marks, alterations, and citations omitted).  Conclusory allegations are not enough.  For example, in *Baranco*, the court found this prong was not met where the plaintiffs "generally plead[ed] that Ford disseminated marketing materials to the public" but failed to plead, in even general terms "that they received or reviewed *any* information from Ford" nor that the plaintiffs "would have received the omitted information if Ford had exercised reasonable care in disseminating it to the general market of consumers."  *Id.* at 968 (emphasis added).

Here, the complaint provides sufficient information to satisfy the disclosure prong.  The complaint alleges that Plaintiffs "viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of plaintiff's vehicles and GM vehicles generally," that "Plaintiffs and Class members, directly or indirectly, were exposed to . . . advertisements and promotional materials prior to purchasing or leasing their Class Vehicles," and that "[i]f GM had . . . chosen to disclose the truth about the SDM calibration Defect . . . Plaintiffs and Class members would have seen those disclosures."  FAC ¶¶ 62, 68, 81, 174.  At this stage of

16

the litigation, these statements are enough to satisfy the disclosure prong because it pleads, in general terms, that Plaintiffs received information from GM and, had the omitted information been in these materials, Plaintiffs would have been aware of it.

### d. Group Pleadings

GM also argues by grouping together three GM defendants in the complaint – General Motors LLC, General Motors Holdings LLC, and General Motors Company – Plaintiffs violate the requirement that the allegations be specific enough to give GM notice of the *particular misconduct* they are alleged to have committed, so that they can defend against the charges. ECF No. 150 at 34-35.

"Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant[.]" *Swartz*, 476 F.3d at 764-65 (quotation marks, alterations, and citations omitted). And, in a fraud suit involving multiple defendants, "a plaintiff must, at a minimum identify the role of each defendant in the alleged fraudulent scheme." *Id.* (quotation marks, alterations, and citations omitted). However, where the defendants are entities that "largely hold the same role," courts have declined to dismiss for inappropriate grouping. *See, e.g.*, *Cirulli v. Hyundai Motor Co.*, No. SACV 08-0854 AG (MLGx), 2009 WL 4288367, at *3 (C.D. Cal. Nov. 9, 2009).[8]

Plaintiffs' allegations here are adequate to avoid dismissal for group pleading. *E.g.*, ECF No. 162 at 38 ("GM holds itself out as one company[.]"). Further, Defendants are related entities and "Plaintiff[s] [are] likely to experience difficulty in obtaining information regarding Defendants' internal policies and exactly which subsidiaries and employees took part in the alleged fraud." *Munning v. Gap, Inc.*, No. 16-cv-03804-TEH, 2016 WL 6393550, at *3 (N.D. Cal. Oct. 28, 2016); *see In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. 16-2765 (JLL), 2017

---

[8] GM argues that the relationship between the entities must be explicitly stated in the complaint. ECF No. 170 at 14-15. To support this rule, GM cites cases where the relationship happened to be included in the complaint. *Id.* at 15 n.10. But the cases do not mean that the same level of specificity is *required*. *United States v. Andrade-Larrios*, 39 F.3d 986, 990 (9th Cir. 1994) ("The holding of a case is not the same thing as a quotation from a case. The holding is the proposition of law which requires that the particular facts in that case produce the result.").

WL 1902160, at *9 (D.N.J. May 8, 2017) ("Plaintiffs cannot be expected to know the exact corporate structure and degree of each Defendant's involvement, at this stage in the litigation and prior to discovery.").

### 3. Equitable Claims

GM asks the Court to (1) dismiss Plaintiffs' equitable claims because (1) "they do not sufficiently allege an inadequate remedy at law" as required by *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), and (2) dismiss Plaintiffs' unjust enrichment claims because they "do not allege that they purchased their vehicles from (or otherwise conferred benefit on) GM." ECF No. 150 at 35.

### a. Adequacy of Legal Remedies

In seeking equitable relief, a plaintiff must "establish that she lacks an adequate remedy at law." *Sonner*, 971 F.3d at 844. "Courts in the Ninth Circuit are divided on how exacting of a standard *Sonner* imposes on plaintiffs who plead claims for equitable and legal remedies at the pleading stage." *Jeong v. Nexo Fin. LLC*, No. 21-cv-02392-BLF, 2022 WL 174236, at *27 (N.D. Cal. Jan. 19, 2022) (collecting cases). GM argues that because "Plaintiffs have not adequately alleged a 'continuing or imminent injury' that risked future harm," ECF No. 150 at 36, Plaintiffs' equitable claims should be dismissed under *Sonner*.

In *Sonner*, the Ninth Circuit held that "federal courts must apply equitable principles derived from federal common law to claims for equitable restitution under" the UCL and CLRA. 971 F.3d at 837. "That holding, the Ninth Circuit explained, flowed from the general principle that 'a federal court must apply traditional equitable principles before awarding restitution,' an equitable remedy." *Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 686-87 (N.D. Cal. 2021) (quoting *Sonner*, 971 F.3d at 841). "One well-established equitable principle is that equitable remedies will not be awarded when there is an 'adequate remedy at law.'" *Id.* at 687 (quoting *Sonner*, 971 F.3d at 842). Thus, the Ninth Circuit "affirmed the dismissal of the plaintiff's UCL and CLRA claims for equitable restitution because the plaintiff failed to: (i) allege she lacked an adequate remedy at law, and (ii) show she lacked an adequate remedy at law for damages under [the] CLRA." *Souter v. Edgewell Pers. Care Co.*, No. 20-CV-1486 TWR (BLM), 2022 WL

485000, at *12 (S.D. Cal. Feb. 16, 2022) (citing *Sonner*, 971 F.3d at 844-45). In *Sonner*, the court found that the plaintiff sought the same sum in equitable restitution as "'a full refund of the purchase price' – $32,000,000 – [which] she requested in damages to compensate her for the same past harm." 971 F.3d at 844. The *Sonner* court denied the plaintiff's claim because she failed to "explain how the same amount of money for the exact same harm is inadequate or incomplete." *See id.*

At one time, the undersigned applied *Sonner* as GM suggests. *See Sharma v. Volkswagen AG*, 524 F. Supp. 3d 891, 908-09 (N.D. Cal. 2021). More recently, however, the Court has changed its approach. *Hrapoff v. Hisamitsu Am., Inc.*, No. 21-cv-01943-JST, 2022 WL 2168076, at *6 (N.D. Cal. June 16, 2022) (holding that "a review of cases from other district courts in the Ninth Circuit persuades the Court that a more nuanced approach is appropriate") First, the plaintiff in *Sonner* did not even allege that she lacked an adequate remedy at law, 971 F.3d at 844, and another court in this district has persuasively concluded that "because *Sonner* was decided at a later posture, . . . if a plaintiff pleads that she lacks an adequate legal remedy, *Sonner* will rarely (if ever) require more this early in the case." *Johnson v. Trumpet Behav. Health, LLC*, No. 3:21-cv-03221-WHO, 2022 WL 74163, at *3 (N.D. Cal. Jan. 7, 2022). Second, given the unique facts of *Sonner*, it is not clear that its holding applies to all forms of equitable relief. It is easy to find equivalence between two separate requests for an identical $32,000,000; it is harder to do so with respect to a claim for damages, on the one hand, and a claim for injunctive relief, on the other. *See Zeiger*, 526 F. Supp. 3d at 687 (citing *Milliken v. Bradley*, 433 U.S. 267, 288-90 (1977) for the proposition that "[t]he Supreme Court has often affirmed that retrospective money damages play a markedly different role than prospective injunctive relief."); *see also Hrapoff*, 2022 WL 2168076, at *6 (applying the foregoing analysis).

Because Plaintiffs adequately plead the absence of an adequate remedy at law, the Court declines to dismiss Plaintiffs' equitable claims on that basis. *See* FAC ¶ 238 ("Plaintiffs and Class members do not have an adequate remedy at law.").

### b. Conferred Benefit

In addition to alleging the lack of an adequate remedy at law, an unjust enrichment claim

must also allege that "the plaintiff [have] conferred a benefit on the defendant." *Gerstle v. Am. Honda Motor Co., Inc.*, No. 16-cv-04384-JST, 2017 WL 2797810, at *14 (N.D. Cal. June 28, 2017) (*"Gerstle II"*). Courts in this district and elsewhere have dismissed unjust enrichment claims for failure to demonstrate a benefit to the defendant where the plaintiff purchased a used car from a dealership with no affiliation to the defendant manufacturer. *See Gerstle v. American Honda Motor Company, Inc.*, No. 16-cv-04384-JST, 2017 WL 1477141, at *15 (N.D. Cal. Apr. 25, 2017) (*"Gerstle I"*) ("The Court agrees with Defendant that the purchase of a used car, whether private or certified at a dealership, does not benefit [Defendant] because such a purchase has no impact on product allocation. The Court also agrees that the third-party seller, not the manufacturer, receives a benefit when a used car is purchased in an arm's length transaction."), *amended and superseded on other grounds*, *Gerstle II*, , 2017 WL 2797810, at *14; *In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d 1324, 1342-43 (S.D. Fla. 2016) (dismissing unjust enrichment claims under Alabama law because the plaintiff purchased a vehicle from a used car dealership and therefore plaintiff had not "directly confer[red] a benefit on defendants"); *Hall v. Gen. Motors, LLC*, No. 19-cv-10186, 2020 WL 1285636, at *10 (E.D. Mich. Mar. 18, 2020) (finding that the plaintiffs failed to state a viable unjust enrichment claim when they purchased used cars from dealerships with no affiliations to the manufacturer); *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 843 (S.D. Ohio 2012) (dismissing unjust enrichment claims under Florida law related to used vehicle because the plaintiff failed to show that he conferred a direct benefit on the manufacturer as Florida law requires).

Because Plaintiffs Milstead and Pereda purchased "pre-owned" vehicles from used car dealerships with no evident connections to GM, the Court dismisses their unjust enrichment claims for failure to demonstrate that GM received a benefit from the transaction.

The Court will also dismiss Plaintiff Vargas's claim. Plaintiffs ask the Court to draw the inference that Vargas purchased a new car because he purchased a model year 2012 car in the year 2012. *See* FAC ¶ 81 ("In or around December 2012, Plaintiff [Vargas] purchased a 2012 Chevrolet Suburban . . . from El Camino Real Chevrolet located in Monterey Park, California."). The Court cannot draw this inference, because doing so would require the Court to assume that a

car of a given model year cannot be purchased as a used vehicle in the equivalent calendar year. That assumption defies common sense. Therefore, Plaintiffs' unjust enrichment claims are dismissed.

### 4. Warranty Claims

#### a. Express Warranty

##### i. Defect Manifestation

GM argues that Plaintiffs' express warranty claims must be dismissed because the complaint does not allege manifestation of the defect – i.e., seatbelt or airbag nondeployment – during the warranty period. ECF No. 150 at 38. Plaintiffs respond that GM mischaracterizes the defect and that the true defect is the SDM algorithm itself, which was at the time of purchase. ECF No. 162 at 42.

The Court agrees with Plaintiffs. *See Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 819 (9th Cir. 2019) ("Both Nissan and the district court mischaracterized Plaintiff's theory as being centered on performance issues, rather than the defective system itself."); *see Daniel v. Ford Motor Co.*, No. 2:11-02890 WBS EFB, 2016 WL 2899026, at *7 (E.D. Cal. May 18, 2016) ("[A] reasonable jury could conclude that a consumer would demand that the purchase price of a vehicle with a defect be reduced by the cost of remedying that defect."); *Kearney v. Hyundai Motor Co.*, No. SACV 09-1298 DOC (MLGx), 2010 WL 9093204, at *5 (C.D. Cal. June 4, 2010) (finding that if "the receipt of a vehicle whose alleged defects reduced the car's value and deprived the consumer of the benefit of the bargain, *even when the alleged defects did not later materialize*," then "the loss was suffered 'at the moment' of purchase" (emphasis in original)) (citing *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007)). Because "Plaintiff[s'] theory is that the allegedly defective [SDM] is itself the injury, regardless of whether the [SDM] caused performance issues," GM's argument is unavailing. *Nguyen*, 932 F.3d at 822. As noted above, any argument that the defect existed at the time of purchase will fail unless Plaintiffs can also plausibly allege that the same SDM algorithm that existed in 1999 continued to be used in the named plaintiffs' vehicles.

### ii. Failure to Present Vehicle for Repair

GM also argues that Plaintiffs express warranty claims must be dismissed because they never presented their vehicles for repair as required by the warranty. ECF No. 150 at 38. Plaintiffs, on the other hand, contend that presentation would have been futile "because Defendants already knew that each Class Vehicle could not perform as warranted at the time of sale, but nonetheless failed to rectify the situation and/or disclose the defect." ECF No. 162 at 41.

A Plaintiff cannot assert an express warranty claim unless and until the seller has been "given an opportunity to repair or replace the product." *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 970(N.D. Cal. 2014) (emphasis omitted) (quoting *Asp v. Toshiba Am. Consumer Prods., LLC*, 616 F. Supp. 2d 721, 729 (S.D. Ohio 2008)). Some cases recognize a "futility" exception to this requirement, but others do not. *Compare In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d at 971 ("Plaintiffs have cited no cases establishing a futility exception to the presentation required by the express terms of the express warranty."); *Snyder v. TAMKO Building Prods., Inc.*, No. 1:15-CV-01892-TLN-KJN, 2019 WL 4747950, at *4 (E.D. Cal. Sept. 30, 2019) ("a customer can[not] simply refuse the remedy provided for in a warranty on the belief that such remedy is futile"); *with Johnson v. Nissan N. Am., Inc.*, No. 17-cv-00517-WHO, 2018 WL 905850, at *4 (N.D. Cal. Feb. 15, 2018) (finding that the plaintiffs sufficiently alleged futility where the company repeatedly failed to disclose defect or provide repairs, refused to cover the named plaintiffs damages under the warranty, at least 105 other owners reported the defect as early as 2008, and the company had long known of the defect). There is no controlling authority establishing such an exception.

The Court finds that there is no "futility" exception to the presentment requirement. Not only is there is no controlling authority, but the cases the Court has located finding such an exception do not identify the precise elements a plaintiff must plead, or how to define the threshold a plaintiff must cross – i.e., the amount of "futility" the plaintiff must have experienced – before the exception has been adequately pleaded. Finally, even assuming that such an exception existed, however, the Court would find that Plaintiffs here failed to sufficiently allege it. They do not allege that any GM vehicle owner ever took steps to have the alleged defect remedied,

or that GM took any affirmative steps to prevent vehicle owners' exercise of their warranty rights. Instead, they claim only that Defendants knew of the alleged defect but failed to remedy it on their own. The futility exception, if one exists, must consist of more than that, or else the exception would swallow the rule. Accordingly, Plaintiffs' express warranty claim is not adequately pleaded.

### b.    Implied Warranty[9]

GM argues that Plaintiffs' implied warranty claims are barred by the four-year statute of limitations because Plaintiffs' vehicles were all originally sold more than four years before they filed this suit in 2021. ECF No. 150 at 40-41. Plaintiffs respond that the statute of limitations is tolled by both the discovery rule and the doctrine of fraudulent concealment. ECF No. 162 at 42-43. This Court, and others in this district, have refused to apply the discovery rule to breach of warranty claims. *See, e.g.*, *Gerstle II*, 2017 WL 2797810, at \*12; *Marcus v. Apple Inc.*, No. C 14-03824 WHA, 2015 WL 151489, at \*8 (N.D. Cal. Jan. 8, 2015); *Williams v. Tesla, Inc.*, No. 20-cv-08208-HSG, 2021 WL 2531177, at \*6 (N.D. Cal. June 21, 2021). However, the Court will consider whether the implied warranty claim is subject to tolling based on fraudulent concealment.

The fraudulent concealment doctrine applies when a defendant's "own deception . . . has caused a claim to become stale and a plaintiff dilatory." *Regents of Univ. of Cal. v. Super. Ct.*, 20 Cal. 4th 509, 533 (1999). To toll the statute of limitations under the fraudulent concealment doctrine, a plaintiff must plead "(a) the substantive elements of [the] fraud, and (b) an excuse for late delivery of the facts." *Sater v. Chrysler Grp., LLC*, No. EDCV 14-00700-VAP (DTBx), 2015 WL 736273, at \*9 (C.D. Cal. Feb. 20, 2015) (internal quotations and citation omitted); *see also Sloan I*, 287 F. Supp. 3d at 888 (same).

Plaintiffs provide the following justifications for their late discovery of the facts: (1) GM's active concealment of the defect from consumers and NHTSA, (2) the fact that GM had not recalled Class Vehicles for this issue, and (3) "[d]ue to the highly technical nature of the SDM

---

[9] Because "Plaintiffs Milstead and Pereda withdr[e]w their Song-Beverly claim based on their purchase of used vehicles," ECF No. 162 at 42 n.33, the Court does not address GM's argument that Plaintiffs Milstead and Pereda do not adequately allege a Song-Beverly implied warranty claim, ECF No. 150 at 40.

Calibration Defect, Plaintiffs and Class members were unable to independently discover it using reasonable diligence." ECF No. 162 at 44. GM argues that Plaintiffs do not adequately justify the lag because the information in the complaint was available for many years. ECF No. 170 at 17. Plaintiffs do not explain what led to the discovery of the alleged fraud in August 2021, and why that discovery did not happen earlier, thus, GM argues, Plaintiffs have not sufficiently alleged fraudulent tolling. *Id.*

The Court agrees with GM. Because there is no information regarding when the fraud was discovered or the circumstances surrounding the discovery, the Court cannot excuse Plaintiffs' delay in discovery warranted. *See Garcia v. Gen. Motors LLC*, No. 1:18-cv-01313-LJO-BAM, 2018 WL 6460196, at *7 (E.D. Cal. Dec. 10, 2018) (finding that the plaintiffs failed to adequately justify the delay in discovery where plaintiffs did not "plead with particular[ity] when the fraud was discovered," "the circumstances surrounding [the] discovery," and an explanation for why "they were not at fault for their failure to discover the defect").[10]

**CONCLUSION**

The Court dismisses the non-California named plaintiffs for lack of jurisdiction. The Court also dismisses the complaint for failure to allege a plausible defect. The Court further holds that: (1) Plaintiffs fail to plead unjust enrichment because no Plaintiff pleads that he or she purchased a new vehicle from an authorized GM dealer; (2) Plaintiffs' express warranty claim fails because they did not present their vehicles for repair as required by the warranty; (3) Plaintiffs' implied warranty claims are barred by the statute of limitations.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[10] Because the statute of limitations bars the implied warranty claims, the Court does not reach the remaining implied warranty arguments.

Plaintiffs may file an amended complaint, solely to correct the deficiencies identified above, within 21 days of the date of this order. Failure to file a timely amended complaint will result in dismissal of this case with prejudice.

**IT IS SO ORDERED.**

Dated: December 9, 2022



JON S. TIGAR
United States District Judge