# EXHIBIT E

1   Richard Heimann (CA State Bar # 063607)
    Nimish R. Desai (CA State Bar # 244953)
2   **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
    275 Battery St., 29th Fl
3   San Francisco, CA 94111-3339
    Telephone: 415-956-1000
4   Facsimile: 415-956-1008
    rheimann@lchb.com
5   ndesai@lchb.com

6   David S. Stellings (*pro hac vice* ~~forthcoming~~)
    Katherine I. McBride (*pro hac vice* ~~forthcoming~~)
7   Jessica A. Moldovan (*pro hac vice* ~~forthcoming~~)
    **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
8   250 Hudson Street, 8th Floor
    New York, NY 10013
9   Telephone: 212.355.9500
    Facsimile: 212.355.9592
10  dstellings@lchb.com
    kmcbride@lchb.com
11  jmoldovan@lchb.com

12  *Attorneys for Plaintiffs*

13  *[Additional counsel listed on signature page]*

14              UNITED STATES DISTRICT COURT

15            NORTHERN DISTRICT OF CALIFORNIA

16

17  ~~Eloise Ackiss~~James Milstead, et al.,          Case No. 4:21-cv-06338-JST

18              Plaintiffs,                           **SECOND AMENDED CLASS ACTION
                                                      COMPLAINT**
19  v.

20  GENERAL MOTORS LLC, et al.,                       **JURY TRIAL DEMANDED**

21              Defendant.

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................... 1

II. PARTIES ..................................................................................................... ~~3~~4

    A. Plaintiffs ............................................................................................ ~~3~~4

    B. Defendants ......................................................................................... ~~37~~6

III. JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT ....................... ~~38~~7

IV. GENERAL FACTUAL ALLEGATIONS ............................................................. ~~38~~7

    A. SDMs are supposed to detect crashes and control airbags and seatbelts. ........... ~~38~~7

    B. GM used a dangerous and defective SDM software calibration in its trucks and SUVs. ........................................................................................... ~~41~~10

    C. GM knew that the SDM Calibration Defect was dangerous and unjustified but has failed to warn or compensate consumers. ...................................... ~~44~~13

        1. Old GM recklessly downplayed serious risks of injury when it chose to include the SDM Calibration Defect in the Class Vehicles. ... ~~45~~15

        2. The 45-millisecond cutoff was not necessary to protect against "late" airbag deployments. .............................................................. ~~47~~18

        3. GM knew about a pattern of suspicious accidents involving the SDM Calibration Defect ~~but has done nothing to correct it~~ in the Class Vehicles. ................................................................. ~~49~~21

            a. GM has litigated (and settled) many personal injury lawsuits for suspicious airbag failures in the Class Vehicles. ................. ~~50~~22

            b. GM knew or should have known about hundreds of publicly reported airbag failures in the Class Vehicles. ......................... ~~53~~30

    D. Despite its knowledge, GM misrepresented and concealed important information about the SDM Calibration Defect and Class Vehicle safety. ...... ~~72~~48

        1. Labels and window stickers on the Class Vehicles stated that they were equipped with working airbags and seatbelts and failed to disclose the SDM Calibration Defect. .............................................. ~~73~~49

        2. GM published owners' manuals for the Class Vehicles that detailed their safety features but did not disclose the SDM Calibration Defect. ............................................................................................ ~~76~~52

        3. GM marketed the Class Vehicles to be safe and reliable but failed to mention the SDM Calibration Defect. ............................................ ~~79~~56

        4. ~~Defendants~~ GM provided warranties to repair defects in the Class Vehicles and have not done so. ........................................................ ~~83~~59

V. CLASS ACTION ALLEGATIONS ..................................................................... ~~84~~60

    A. The Class Definition ............................................................................. ~~84~~60

    B. Numerosity: Federal Rule of Civil Procedure 23(a)(1) ............................... ~~85~~61

    C. Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3) ...................................................................................... ~~86~~62

    D. Typicality: Federal Rule of Civil Procedure 23(a)(3) .................................. ~~87~~63

**TABLE OF CONTENTS**
(continued)

Page

E.    Adequacy: Federal Rule of Civil Procedure 23(a)(4) ..................................... 8763

F.    Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2).. 8764

G.    Superiority: Federal Rule of Civil Procedure 23(b)(3) ................................... 8864

VI.    ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED....................... 8864

VII.    CAUSES OF ACTION ................................................................... 8966

A.    Claims Asserted on Behalf of the Nationwide Class ...................................... 89

B.    State-Specific Claims .............................................................. 92

        1.    Alabama .................................................................. 92

        2.    Alaska .................................................................. 97

        3.    Arkansas ................................................................ 102

        4.    California .............................................................. 107

        5.    Colorado ................................................................ 119

        6.    Delaware ................................................................ 124

        7.    Florida ................................................................. 129

        8.    Georgia ................................................................. 134

        9.    Idaho .................................................................. 141

        10.    Illinois ............................................................... 146

        11.    Indiana ................................................................ 151

        12.    Kansas ................................................................. 155

        13.    Louisiana .............................................................. 160

        14.    Maryland ............................................................... 164

        15.    Michigan ............................................................... 169

        16.    Minnesota .............................................................. 175

        17.    Mississippi ............................................................ 182

        18.    Missouri ............................................................... 187

        19.    Nevada ................................................................. 192

        20.    New Jersey ............................................................. 197

        21.    New York ............................................................... 202

        22.    North Carolina ......................................................... 208

        23.    Ohio ................................................................... 213

        24.    Oklahoma ............................................................... 221

        25.    Oregon ................................................................. 226

        26.    Pennsylvania ........................................................... 230

        27.    South Carolina ......................................................... 235

        28.    Tennessee .............................................................. 241

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| 29. | Texas | 246 |
| 30. | Utah | 252 |
| 31. | Virginia | 256 |
| 32. | Washington | 261 |
| 33. | West Virginia | 268 |
| 34. | Wisconsin | 274 |
| VIII. | PRAYER FOR RELIEF | 27981 |
| IX. | DEMAND FOR JURY TRIAL | 28082 |

Plaintiffs, individually and on behalf of all others similarly situated (the "Class" ~~or~~

~~"Classes"),~~ ), allege the following against General Motors LLC, General Motors Holdings LLC,

and General Motors Company (collectively, "Defendants," "GM," or "New GM") based, where

applicable, on personal knowledge, information and belief, and the ~~pre-filing~~ investigation of

counsel and their experts.

Plaintiffs file this ~~Amended Complaint as a matter of course, as no responsive pleading or~~

~~Rule 12 motion has been served. See Fed. R. Civ. P. 15(a)(1)(B)~~complaint pursuant to the Court's

Order granting leave (Dkt. 177 at 25), and attach hereto as Exhibit E a redline comparison

between this complaint and the previous pleading for the Court's reference.

## I.   **INTRODUCTION**

~~1.Car crashes kill or seriously injure hundreds of thousands of people every year.  Because~~

~~of this risk, the federal government requires automobile manufacturers to include critical safety~~

~~features—seatbelts and airbags—in all vehicles sold in the United States. This life-saving~~

~~equipment has been mandatory in passenger vehicles since 1997. See 49 U.S.C. § 30127.~~

1.   ~~2.~~This case involves a dangerous defect that compromises ~~these~~ critical safety

systems in millions of GM trucks and SUVs. When working properly, during a frontal crash of

sufficient severity, ~~the~~ a vehicle's seatbelts should tighten to hold the vehicle occupants in place,

and the airbags should inflate to protect them from hard impacts. A defect in ~~GM trucks and~~

~~SUVs~~the Class Vehicles, however, can prevent seatbelt tightening and airbag deployment during

certain types of crashes, leaving vehicle occupants without protection exactly when they need it

most.[1]

2.   ~~3.~~The defect is contained in the ~~vehicles~~software that governs the Class Vehicles'

airbag control unit. This unit, ~~which is referred to by GM and herein as an "SDM" or "Sensing~~

also known as the Sending and Diagnostic Module~~." The defect itself is referred to herein as the~~

~~"SDM Calibration Defect."~~ ("SDM"), is a small computer connected to sensors placed

_____

[1] The "Class Vehicles" include all vehicles in the United States that contain the SDM Calibration Defect that were (1) manufactured, sold, distributed, or leased by Defendants or (2) manufactured, sold, distributed, or leased by General Motors Corporation ("Old GM") and purchased or leased by Plaintiffs or a Class member after July 10, 2009.

1    throughout a vehicle. These sensors monitor vehicle performance and tell the SDM when they

2    detect irregular behavior.

3    ~~The SDM is a small computer connected to sensors placed throughout 4.    the vehicle.~~

4    ~~These sensors tell the SDM when they detect irregular behavior and, based on these signals, the~~

5    ~~SDM will fire the airbags and tighten seatbelts when needed in a crash.~~

6         3.    ~~5.In~~ Based on the signals it receives from these sensors, the SDM *should* fire the

7    airbags and tighten seatbelts when needed in a crash of sufficient severity. But in the Class

8    Vehicles, ~~GM calibrated~~ the software program that controls the SDM ~~to prevent~~ is calibrated in

9    such a way that it prevents airbag and seatbelt deployment just 45 milliseconds after a crash has

10   begun.[1] This has serious repercussions in real-world accidents that ~~last longer than~~ need seatbelt

11   and airbag deployment after 45 milliseconds—such as accidents that involve multiple impacts, or

12   that start and then increase in severity over ~~a period of time    in~~ time, before the SDM has reset—

13   in which the airbags and seatbelts in the Class Vehicles can fail. Put simply, GM decided to

14   install a calibration that can and does prematurely close the time window to engage airbags and

15   seatbelts in a crash, putting occupants of the Class Vehicles in serious danger.

16        4.       ~~6.GM made the decision~~ Old GM knew about the effect of this calibration and

17   related dangers from the very outset, when it decided to prematurely close the time window for

18   airbag deployment in the Class Vehicles in the late 1990s.[2] In the process, ~~overriding the~~ Old GM

19   overrode serious concerns ~~of~~ from a team from ~~Delphi (then operating as~~ Delco Electronics~~).  A~~

20   (later called Delphi Electronics, now known as Aptiv), including engineering manager, Chris

21   Caruso. Mr. Caruso and a team of software engineers from Delco—which designed the base

22   SDM software program used in the Class ~~Vehicles    expressly~~ Vehicles and other GM vehicles—

23

24

25

---

26   [1] ~~The "Class Vehicles" include all vehicles in the United States that contain the SDM Calibration~~
     ~~Defect that were (1) manufactured, sold, distributed, or leased by Defendants or (2)~~

27   ~~manufactured, sold, distributed, or leased by Old GM and purchased or leased by Plaintiffs or a~~
     ~~Class member after July 10, 2009.~~

28   [2] As detailed further below, Old GM filed for bankruptcy in 2009, which led to the creation of the
     contemporary GM entities named as Defendants herein.

1  expressly warned Old GM in or about 1999 that preventing airbag and seatbelt deployment after

2  45 milliseconds was a reckless and dangerous design decisio[2]n.

3          5.          Old GM's trucks group, which was in charge of the design and development for all

4  GM trucks and SUVs, ignored this warning and insisted on using a its defective SDM calibration

5  that shuts strategy to shut off the ability to deploy airbags and seatbelts after 45 milliseconds (the

6  "SDM Calibration Defect"). Given their significant concerns, Mr. Tellingly, a separate team in

7  charge of design and development for GM cars rejected this approach after hearing the Delco

8  team's concerns and included a much longer window (150 milliseconds) for the airbags and

9  seatbelts to deploy in a crash for the vehicles they designed.Caruso and the Delco team insisted

10  that Old GM sign a disclaimer of Delco's liability for the modified algorithm as used in GM

11  trucks and SUVs.

12          6.          Tellingly, a separate team in charge of the design and development for GM cars

13  rejected GM Trucks' approach after hearing the Delco team's concerns. GM cars included a much

14  longer window (at least two to three times longer than GM Trucks, approximately 100-150

15  milliseconds) for the airbags and seatbelts to deploy in a crash for the vehicles they designed. GM

16  Trucks also ignored the cars group's views. On information and belief, starting in or about 1999,

17  GM (and Old GM before it) installed the defective SDM calibration in all of the Class Vehicles,

18  at least through model year 2018.

19          7.          When it was formed in 2009, General Motors, LLC ("GM LLC") was formed in

20  2009, it acquired books, records, and personnel from Old GM that reflected this reckless decision

21  to use the dangerous SDM calibration in its GM trucks and SUVs. Despite this acquired

22  knowledge, GM continued to use Delco SDMs in its vehicles and, on information and belief,

23  continued to use the defective software calibration associated with those Delco SDMs as well.

24          8.          Since it was formed in 2009, GM has continued to gain gained still more

25  knowledge of the defect through individual personal injury lawsuits, consumer complaints, and its

26  own investigations into serious crashes where the airbags and seatbelts failed to deploy in the

27

28  [2] As detailed further below, Old GM filed for bankruptcy in 2009, which led to the creation of the
    contemporary GM entities named as Defendants herein.

Class Vehicles. As an example, documents in a personal- injury lawsuit filed against GM LLC in 2011 describe the defect SDM Calibration Defect in detail and relate Old GM's reckless decision to use it. *See* § IV.C.3.a, infra. Chris Caruso, the engineer who originally objected to the defective algorithm in the first instance, has gone on to serve as an expert in a number of these cases.

9. While the use of the defective shutoff strategy began some twenty years ago, it remains a real and immediate risk to Plaintiffs and Class members today. Indeed, GM settled yet another personal injury lawsuit about this SDM calibration defect ***just last month***, in December 2022. Discovery in that case revealed the defect was included in a model year 2018 GM SUV. This is direct evidence that GM Trucks continued to use the defective strategy in its vehicles for many years (decades) after its introduction in approximately 1999. *See* § IV.C.3.a, infra.

10. 9.FurtherFinally, publicly available consumer complaints to the National Highway Traffic and Safety Administration ("NHTSA") detail more than ***eight hundred*** instances where the airbags and/or seatbelts suspiciously failed in the Class Vehicles during frontal crashes. Many of these reports specifically state that GM knew about and investigated the crash after the reported airbag failures. A separate NHTSA dataset indicates that, from 1999 to the present2021, at least 1,298 people were killed or injured in a frontal collision in which the airbags did not deploy in one of these vehicles. *See* IV.C.3.b, infra.

11. 10.Despite its knowledge of the defect and its impact on safety, GM has concealed the defect and failed to recall or repair the Class Vehicles, presumably to avoid and has thereby avoided the significant costs and, inconveniences, and reputational harms of recalling millions of vehiclestrucks and SUVs. GM has hidden the defect Defect despite its obligation to disclose it, misrepresented the Class Vehicles to be safe, and continued to sell them to consumers.

12. 11.Because of GM's failure to disclose the truth, consumers continue to purchase and drive Class Vehicles with the SDM Calibration Defect every day—on road trips, commutes, and weekend errands alike—unaware that their airbags and seatbelts may not operate in a prolonged frontal crashwork in certain serious crashes when they need them. This lawsuit seeks

redress from GM for the damages incurred when Plaintiffs and proposed Class members paid for

vehicles with a safety system that may fail them in life-threatening collisions.

II.    **PARTIES**

    A.    **Plaintiffs**

    1.    For ease of reference, the following chart identifies the representative Plaintiffs and the state(s) in which they reside and purchased their Class Vehicles:

| Representative Plaintiff | State of Purchase/Lease | State of Residence |
|---|---|---|
| Eloise Ackiss | GA | GA |
| Rachel Bailey | MI | MI |
| Richard Baker | MD | MD |
| Kerry Batman | KS | KS |
| Ric Batten | TX | TX |
| George Bayer | MI | MI |
| Jerome Blatt | IN | MN |
| Ira Bondsteel | TX | TX |
| Adam Brown | NY | NY |
| David Casey | NC | NC |
| Christina Colatriano | DE | DE |
| Delbert Dehne | IL | IL |
| Ashley Dheel | WA | WA |
| Travis Dieter | ID | ID |
| Greg Douthwaite | WI | WI |
| Ed Driggers, Jr. | GA | GA |
| Stephen Duncan | AK | AR |
| Douglas Dye | VA | VA |
| William Endress | PA | NJ |
| Lee Ford | NJ | NJ |
| William Free | FL | FL |
| Lisa Gerould | SC | SC |
| Alisha Gonzalez | MI | MI |
| Harryette Gosa | MS | MS |
| Rex Hartman | PA | PA |
| Judy Haviland | MI | MI |
| Bruce Heise | PA | PA |
| Zeckery Henslee | MI | MI |
| John Hickey | WV | WV |
| Kimberly Hickle | MN | MN |
| Randy Holdren | IL | FL |

| Representative Plaintiff | State of Purchase/Lease | State of Residence |
|---|---|---|
| Kevin Hopkins | NV | NV |
| Kara Hummel | WA | WA |
| Aaron Jackson | AL | AL |
| David James | IN | IN |
| Gregory Juskiewicz | OH | OH |
| ShaVon Keith | NV | GA |
| Jason Klinger | NC | NC |
| Debra Knerr | VA | TN |
| Clarise Knight | FL | FL |
| Andrew Lawson | SC | SC |
| Eric Leeds | VA | NJ |
| Toni Lowe | FL | FL |
| Stephen Loyd | TN | AL |
| Angelica Mar | IL | IL |
| Allan Martin | LA | LA |
| Michael Merkley | ID | ID |
| Allan Miles | MS | MS |
| Stephen Miles | OR | OR |
| James Milstead | CA | CA |
| Ira Nash | VA | VA |
| Patrick O'Connor | NY | NY |
| Jorge L. Orihuela | NJ | NJ |
| Gary Owens | TN | TN |
| Larry Paetzold | TX | TX |
| Ramiro Pereda | CA | CA |
| Delana Petersen | UT | UT |
| Frank Pignone | NY | NY |
| Dolly Price | MO | KS |
| Michael Romania | PA | PA |
| Donald Roxberry | OK | OK |
| Lakiesha Shears | CO | CO |
| David Stalcup | AR | AR |
| Larry Swafford | GA | GA |
| Brian Swann | OH | AL |
| Joseph Sweat | GA | GA |
| David Taylor | AL | AL |
| Walter Tooson | OH | OH |
| Richard Vargas | CA | CA |
| Warren Whitsey | IN | IN |
| Denise Wilson | MS | MS |

| ~~Representative Plaintiff~~ | ~~State of Purchase/Lease~~ | ~~State of Residence~~ |
|---|---|---|
| ~~Carl Wurmlinger~~ | ~~MI~~ | ~~MI~~ |

13.   ~~2.Plaintiff Eloise Ackiss~~ Plaintiff James Milstead ("Plaintiff" for the purposes of this paragraph) is an individual residing in ~~Ellaville~~Oxnard, ~~GA~~CA. ~~In or around summer 2015~~On September 11, 2021, Plaintiff purchased a ~~pre-owned 2010 GMC Terrain SLE~~ 2012 Avalanche (for purposes of Plaintiff's allegations, the "Class Vehicle") from ~~a used car dealership in Georgia. At the time,~~ Escondido Auto Super Center in Escondido, CA. On information and belief for the reasons set forth herein, GM installed the SDM calibration defect—which shut off the vehicle's ability to deploy airbags in a crash after 45 milliseconds—in Mr. Milstead's truck during the manufacturing process, and Mr. Milstead's truck contained the SDM calibration defect at the time he purchased the vehicle. At the time of purchase, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

14.   ~~3.Plaintiff Rachel Bailey~~ Arthur Ray ("Plaintiff" for the purposes of this paragraph) is an individual residing in ~~Saginaw~~Brentwood, ~~MI~~California. ~~On~~ In or around ~~2020~~January 22, 2010, Plaintiff purchased a ~~2011~~ new 2010 GMC ~~Terrain SLT~~ Sierra 2500 (for purposes of Plaintiff's allegations, the "Class Vehicle") from ~~Cliff's Chevrolet~~Concord GMC, an authorized dealership located in ~~Adrian~~Concord, ~~MI~~California. ~~At the time,~~ On information and belief for the reasons set forth herein, GM installed the SDM Calibration Defect—which shut off the vehicle's ability to deploy airbags in a crash after 45 milliseconds—in Mr. Ray's truck during

the manufacturing process, and Mr. Ray's truck contained the SDM Calibration Defect at the time he purchased the vehicle. At the time of purchase, Plaintiff reasonably expected that the vehicle's airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicleVehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle, including its "Five Star" safety rating, and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

4.      Plaintiff Richard Baker ("Plaintiff" for the purposes of this paragraph) is an individual residing in Ijamsville, MD. On or around 2012, Plaintiff purchased a 2012 GMC Terrain (for purposes of Plaintiff's allegations, the "Class Vehicle") from Ideal Motors in Frederick, MD. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

5.      Plaintiff Kerry Batman ("Plaintiff" for the purposes of this paragraph) is an individual residing in Ashland, KS. In or around 2013, Plaintiff purchased a 2013 Chevrolet Pickup 2500 HD (for purposes of Plaintiff's allegations, the "Class Vehicle") from Mcguirk Dealership in Dodge City, KS. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during

1    a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and

2    reviews through television, radio, and the internet that touted the safety and reliability of

3    Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM

4    calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class

5    Vehicle, or would have paid less for it, if Defendants did not conceal material information about

6    the defective SDM calibration.

7         6.      Plaintiff Ric Batten ("Plaintiff" for the purposes of this paragraph) is an individual

8    residing in Arlington, TX. In or around 2016, Plaintiff purchased a 2011 GMC Crew Cab Pickup

9    2500 (for purposes of Plaintiff's allegations, the "Class Vehicle") from a pre-owned Car Lot in

10   the Greater Texas area. At the time, Plaintiff reasonably expected that the airbags and seatbelts

11   would function in the event of a crash and had no way of knowing that it contained a dangerous

12   and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To

13   the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews

14   through television, radio, and the internet that touted the safety and reliability of Plaintiff's

15   vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration

16   from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or

17   would have paid less for it, if Defendants did not conceal material information about the defective

18   SDM calibration.

19        7.      Plaintiff George Bayer ("Plaintiff" for the purposes of this paragraph) is an

20   individual residing in Lowell, MI. On or around 2014, Plaintiff purchased a 2014 GMC Sierra

21   1500 (for purposes of Plaintiff's allegations, the "Class Vehicle") from Whittenbag GMC, Lowell

22   (now Betton Baker GMC) in Lowell, MI. At the time, Plaintiff reasonably expected that the

23   airbags and seatbelts would function in the event of a crash and had no way of knowing that it

24   contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to

25   fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard

26   commercials and reviews through television, radio, and the internet that touted the safety and

27   reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the

28   defective SDM calibration from consumers including Plaintiff. Plaintiff would not have

purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

8.     Plaintiff Jerome Blatt ("Plaintiff" for the purposes of this paragraph) is an individual residing in Eagan, MN. In or around 2019, Plaintiff purchased a 2014 GMC Sierra (for purposes of Plaintiff's allegations, the "Class Vehicle") from a private party in Indiana. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

9.     Plaintiff Ira Bondsteel ("Plaintiff" for the purposes of this paragraph) is an individual residing in Webster, TX.  In or about January 2018, Plaintiff purchased a 2012 Chevrolet Silverado 1500 (for purposes of Plaintiff's allegations, the "Class Vehicle") from A1 Auto Finance, located in Kemah, TX. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash.  To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

10.     Plaintiff Adam Brown ("Plaintiff" for the purposes of this paragraph) is an individual residing in Beacon, NY. On or around July 2015, Plaintiff purchased a pre-owned 2012 GMC Yukon (for purposes of Plaintiff's allegations, the "Class Vehicle") from a used car

1  dealership in New York, NY. At the time, Plaintiff reasonably expected that the airbags and
2  seatbelts would function in the event of a crash and had no way of knowing that it contained a
3  dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during
4  a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and
5  reviews through television, radio, and the internet that touted the safety and reliability of
6  Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM
7  calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class
8  Vehicle, or would have paid less for it, if Defendants did not conceal material information about
9  the defective SDM calibration.

10      11.     Plaintiff David Casey ("Plaintiff" for the purposes of this paragraph) is an
11  individual residing in Pleasant Garden, NC.  On or around February 17, 2021, Plaintiff purchased
12  a 2021 Chevrolet Silverado (for purposes of Plaintiff's allegations, the "Class Vehicle") from
13  Powers Swain Chevrolet, located in Fayetteville, NC. At the time, Plaintiff reasonably expected
14  that the Vehicles' airbags and seatbelts would function in the event of a crash and had no way of
15  knowing that it contained a dangerous and defective SDM calibration that could cause the airbags
16  and seatbelts to fail during a crash.  To the contrary, before acquiring the Class Vehicle, Plaintiff
17  viewed or heard commercials and reviews through television, radio, and the internet that touted
18  the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the
19  existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would
20  not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not
21  conceal material information about the defective SDM calibration.

22      12.     Plaintiff Christina Colatriano ("Plaintiff" for the purposes of this paragraph) is an
23  individual residing in Delmar, DE. In or around 2018, Plaintiff purchased a 2013 Chevy Silverado
24  3500 (for purposes of Plaintiff's allegations, the "Class Vehicle") from Hertrich Buick/GMC in
25  Seaford, DE. At the time, Plaintiff reasonably expected that the airbags and seatbelts would
26  function in the event of a crash and had no way of knowing that it contained a dangerous and
27  defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the
28  contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through

television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

13.     Plaintiff Delbert Dehne ("Plaintiff" for the purposes of this paragraph) is an individual residing in East Peoria, IL. In or around 2013, Plaintiff purchased a 2013 Chevrolet Silverado 1550 (for purposes of Plaintiff's allegations, the "Class Vehicle") from the Sam Leman Dealership in Morton, IL. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

14.     Plaintiff Ashley Dheel ("Plaintiff" for the purposes of this paragraph) is an individual residing in Lakewood, WA. In or about spring 2021, Plaintiff purchased a pre-owned 2010 GMC Acadia SLT (for purposes of Plaintiff's allegations, the "Class Vehicle") from JRS Auto Sales in Tacoma, WA. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class

1    Vehicle, or would have paid less for it, if Defendants did not conceal material information about

2    the defective SDM calibration.

3        15.    Plaintiff Travis Dieter ("Plaintiff" for the purposes of this paragraph) is an

4    individual residing in Sandpoint, ID. On April 20, 2013, Plaintiff purchased a 2013 Chevrolet

5    Silverado LTZ (for purposes of Plaintiff's allegations, the "Class Vehicle") from Taylor & Sons

6    Chevrolet in Ponderay, ID. At the time, Plaintiff reasonably expected that the Vehicles' airbags

7    and seatbelts would function in the event of a crash and had no way of knowing that it contained a

8    dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during

9    a crash.  To the contrary, before acquiring the Vehicle, Plaintiff viewed or heard commercials and

10   reviews through television, radio, and the internet that touted the safety and reliability of

11   Plaintiff's vehicle and GM vehicles generally. Plaintiff reviewed GM's promotional materials

12   such as GM's website, sales brochures, television advertisements, Monroney sticker and spoke

13   with at least one sales representative, none of which disclosed the SDM Calibration Defect.  GM

14   concealed the existence of the defective SDM calibration from consumers including Plaintiff.

15   Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if

16   Defendants did not conceal material information about the defective SDM calibration.

17       16.    Plaintiff Greg Douthwaite ("Plaintiff" for the purposes of this paragraph) is an

18   individual residing in Beaver Dam, WI. On or around 2016/2017, Plaintiff purchased a 2013

19   Chevy Silverado 1500 (for purposes of Plaintiff's allegations, the "Class Vehicle") from

20   Countryside GM in Beaver Dam, WI. At the time, Plaintiff reasonably expected that the airbags

21   and seatbelts would function in the event of a crash and had no way of knowing that it contained a

22   dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during

23   a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and

24   reviews through television, radio, and the internet that touted the safety and reliability of

25   Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM

26   calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class

27   Vehicle, or would have paid less for it, if Defendants did not conceal material information about

28   the defective SDM calibration.

17.     Plaintiff Ed Driggers, Jr. ("Plaintiff" for the purposes of this paragraph) is an individual residing in Savannah, GA. On or around 2016, Plaintiff purchased a 2012 Chevy Silverado 1500 (for purposes of Plaintiff's allegations, the "Class Vehicle") from Metter Ford in Metter, GA. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

18.     Plaintiff Stephen Duncan ("Plaintiff" for the purposes of this paragraph) is an individual residing in Clinton, AR. On or around 2016, Plaintiff purchased a 2011 GMC Sierra Pickup (for purposes of Plaintiff's allegations, the "Class Vehicle") from Peyton Dodge - Cowboy Dodge in Clinton, AK. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

19.     Plaintiff Douglas Dye ("Plaintiff" for the purposes of this paragraph) is an individual residing in Cedar Bluff, Virginia.  In or about December 2020, Plaintiff purchased a 2021 GMC Canyon (for purposes of Plaintiff's allegations, the "Class Vehicle") from Ramey Princeton, a GM dealership, located in Princeton, West Virginia. At the time, Plaintiff reasonably

1    expected that the airbags and seatbelts would function in the event of a crash and had no way of

2    knowing that it contained a dangerous and defective SDM calibration that could cause the airbags

3    and seatbelts to fail during a crash.  To the contrary, before acquiring the vehicle, Plaintiff viewed

4    or heard commercials and reviews through television, radio, and the internet that touted the safety

5    and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of

6    the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have

7    purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material

8    information about the defective SDM calibration.

9           20.    Plaintiff William Endress ("Plaintiff" for the purposes of this paragraph) is an

10   individual residing in Lebanon, NJ.  In May 2012 Plaintiff purchased a 2012 Chevrolet Colorado

11   (for purposes of Plaintiff's allegations, the "Class Vehicle") from Brown-Daub Chevrolet, a GM

12   dealership, located in Nazareth, PA. At the time, Plaintiff reasonably expected that the airbags

13   and seatbelts would function in the event of a crash and had no way of knowing that it contained a

14   dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during

15   a crash.  To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and

16   reviews through television, radio, and the internet that touted the safety and reliability of

17   Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM

18   calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class

19   Vehicle, or would have paid less for it, if Defendants did not conceal material information about

20   the defective SDM calibration.

21          21.    Plaintiff Lee Ford ("Plaintiff" for the purposes of this paragraph) is an individual

22   residing in Egg Harbor City, NJ.  In or about November 2020, Plaintiff purchased a 2011

23   Chevrolet Tahoe (for purposes of Plaintiff's allegations, the "Class Vehicle") from 322 Motors,

24   located in Williamstown, NJ. At the time, Plaintiff reasonably expected that the airbags and

25   seatbelts would function in the event of a crash and had no way of knowing that it contained a

26   dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during

27   a crash.  To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and

28   reviews through television, radio, and the internet that touted the safety and reliability of

1   Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM

2   calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class

3   Vehicle, or would have paid less for it, if Defendants did not conceal material information about

4   the defective SDM calibration.

5          22.   Plaintiff William Free ("Plaintiff" for the purposes of this paragraph) is an

6   individual residing in Cocoa, FL. In or around 2016, Plaintiff purchased a 2010 GMC Yukon XL

7   (for purposes of Plaintiff's allegations, the "Class Vehicle") from Mullin X Ford Dealership

8   Orlando in Orlando, FL. At the time, Plaintiff reasonably expected that the airbags and seatbelts

9   would function in the event of a crash and had no way of knowing that it contained a dangerous

10  and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To

11  the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews

12  through television, radio, and the internet that touted the safety and reliability of Plaintiff's

13  vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration

14  from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or

15  would have paid less for it, if Defendants did not conceal material information about the defective

16  SDM calibration.

17         23.   Plaintiff Lisa Gerould ("Plaintiff" for the purposes of this paragraph) is an

18  individual residing in Spartanburg, SC.  In or about January 2016, Plaintiff purchased a 2013

19  Chevrolet Silverado 1500 (for purposes of Plaintiff's allegations, the "Class Vehicle") from

20  Greenway Chevrolet, located in Spartanburg, SC. At the time, Plaintiff reasonably expected that

21  the airbags and seatbelts would function in the event of a crash and had no way of knowing that it

22  contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to

23  fail during a crash.  To the contrary, before acquiring the vehicle, Plaintiff viewed or heard

24  commercials and reviews through television, radio, and the internet that touted the safety and

25  reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the

26  defective SDM calibration from consumers including Plaintiff. Plaintiff would not have

27  purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material

28  information about the defective SDM calibration.

24.     Plaintiff Alisha Gonzalez ("Plaintiff" for the purposes of this paragraph) is an individual residing in Six Lakes, MI. In or around December 2019, Plaintiff purchased a 2012 GMC Acadia (for purposes of Plaintiff's allegations, the "Class Vehicle") from The Car Corner in Vestaburg, MI. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

25.     Plaintiff Harryette Gosa ("Plaintiff" for the purposes of this paragraph) is an individual residing in Greenwood Springs, MS. In or around 2014, Plaintiff purchased a 2014 GMC Acadia (for purposes of Plaintiff's allegations, the "Class Vehicle") from Larry Clark Chevy Dealership in Amory, MS. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

26.     Plaintiff Rex Hartman ("Plaintiff" for the purposes of this paragraph) is an individual residing in Bedford, PA. On or around 2017/2018, Plaintiff purchased a 2014 Chevy Silverado Pickup (for purposes of Plaintiff's allegations, the "Class Vehicle") from Team Auto in Duncansville, PA. At the time, Plaintiff reasonably expected that the airbags and seatbelts would

1  function in the event of a crash and had no way of knowing that it contained a dangerous and
2  defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the
3  contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through
4  television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and
5  GM vehicles generally. GM concealed the existence of the defective SDM calibration from
6  consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would
7  have paid less for it, if Defendants did not conceal material information about the defective SDM
8  calibration.

9       27.    Plaintiff Judy Haviland ("Plaintiff" for the purposes of this paragraph) is an
10  individual residing in Harrison, MI.  In August 2021, Plaintiff purchased a 2009 Chevrolet
11  Silverado 1500 (for purposes of Plaintiff's allegations, the "Class Vehicle") from Lakeside
12  Motors LLC, located in Houghton Lake, Michigan. At the time, Plaintiff reasonably expected that
13  the airbags and seatbelts would function in the event of a crash and had no way of knowing that it
14  contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to
15  fail during a crash.  To the contrary, before acquiring the vehicle, Plaintiff viewed or heard
16  commercials and reviews through television, radio, and the internet that touted the safety and
17  reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the
18  defective SDM calibration from consumers including Plaintiff. Plaintiff would not have
19  purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material
20  information about the defective SDM calibration.

21       28.    Plaintiff Bruce Heise ("Plaintiff" for the purposes of this paragraph) is an
22  individual residing in Blairsville, PA.  In or about, January 2017 Plaintiff purchased a 2016
23  Chevrolet Silverado 1500 (for purposes of Plaintiff's allegations, the "Class Vehicle") from
24  Watson Chevrolet, located in Blairsville, PA. At the time, Plaintiff reasonably expected that the
25  airbags and seatbelts would function in the event of a crash and had no way of knowing that it
26  contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to
27  fail during a crash.  To the contrary, before acquiring the vehicle, Plaintiff viewed or heard
28  commercials and reviews through television, radio, and the internet that touted the safety and

1    reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the

2    defective SDM calibration from consumers including Plaintiff. Plaintiff would not have

3    purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material

4    information about the defective SDM calibration.

5         29.    Plaintiff Zeckery Henslee ("Plaintiff" for the purposes of this paragraph) is an

6    individual residing in Decatur, MI. On or around 2017, Plaintiff purchased a 2009 Chevy

7    Silverado (for purposes of Plaintiff's allegations, the "Class Vehicle") from Autowest in

8    Plainwell, MI. At the time, Plaintiff reasonably expected that the airbags and seatbelts would

9    function in the event of a crash and had no way of knowing that it contained a dangerous and

10   defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the

11   contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through

12   television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and

13   GM vehicles generally. GM concealed the existence of the defective SDM calibration from

14   consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would

15   have paid less for it, if Defendants did not conceal material information about the defective SDM

16   calibration.

17        30.    Plaintiff John Hickey ("Plaintiff" for the purposes of this paragraph) is an

18   individual residing in Keyser, WV. On or around 2019, Plaintiff purchased a 2010 GMC Sierra

19   (for purposes of Plaintiff's allegations, the "Class Vehicle") from a private party in West

20   Virginia. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function

21   in the event of a crash and had no way of knowing that it contained a dangerous and defective

22   SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary,

23   before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through

24   television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and

25   GM vehicles generally. GM concealed the existence of the defective SDM calibration from

26   consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would

27   have paid less for it, if Defendants did not conceal material information about the defective SDM

28   calibration.

1         31.    Plaintiff Kimberly Hickle ("Plaintiff" for the purposes of this paragraph) is an

2 individual residing in Crystal, MN. On or around 2018, Plaintiff purchased a 2010 Chevy

3 Traverse LT (for purposes of Plaintiff's allegations, the "Class Vehicle") from Jake's Auto Mall

4 in Ham Lake, MN. At the time, Plaintiff reasonably expected that the airbags and seatbelts would

5 function in the event of a crash and had no way of knowing that it contained a dangerous and

6 defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the

7 contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through

8 television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and

9 GM vehicles generally. GM concealed the existence of the defective SDM calibration from

10 consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would

11 have paid less for it, if Defendants did not conceal material information about the defective SDM

12 calibration.

13         32.    Plaintiff Randy Holdren ("Plaintiff" for the purposes of this paragraph) is an

14 individual residing in Fort Meyers, FL. In or around 2014, Plaintiff purchased a 2014 Chevy

15 Travers and a 2012 GMC Sierra Truck (for purposes of Plaintiff's allegations, the "Class

16 Vehicles") from Sullivan Chevy Dealership and Warton Martin Dealership in Champagne, IL. At

17 the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event

18 of a crash and had no way of knowing that it contained a dangerous and defective SDM

19 calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before

20 acquiring the vehicles, Plaintiff viewed or heard commercials and reviews through television,

21 radio, and the internet that touted the safety and reliability of Plaintiff's vehicles and GM vehicles

22 generally. GM concealed the existence of the defective SDM calibration from consumers

23 including Plaintiff. Plaintiff would not have purchased the Class Vehicles, or would have paid

24 less for them, if Defendants did not conceal material information about the defective SDM

25 calibration.

26         33.    Plaintiff Kevin Hopkins ("Plaintiff" for the purposes of this paragraph) is an

27 individual residing in Las Vegas, NV. In or around 2019, Plaintiff purchased a 2011 Chevrolet

28 Silverado (for purposes of Plaintiff's allegations, the "Class Vehicle") from Fairway Chevrolet in

1   Las Vegas, NV. At the time, Plaintiff reasonably expected that the airbags and seatbelts would

2   function in the event of a crash and had no way of knowing that it contained a dangerous and

3   defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the

4   contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through

5   television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and

6   GM vehicles generally. GM concealed the existence of the defective SDM calibration from

7   consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would

8   have paid less for it, if Defendants did not conceal material information about the defective SDM

9   calibration.

10       34.    Plaintiff Kara Hummel ("Plaintiff" for the purposes of this paragraph") is an

11   individual residing in Longview, Washington. On or around March 15, 2016, Plaintiff purchased

12   a 2015 Chevrolet Suburban (for purposes of Plaintiff's allegations, the "Class Vehicle") from

13   Alan Webb Chevrolet in Vancouver, WA. At the time, Plaintiff reasonably expected that the

14   Vehicles' airbags and seatbelts would function in the event of a crash and had no way of knowing

15   that it contained a dangerous and defective SDM calibration that could cause the airbags and

16   seatbelts to fail during a crash.  To the contrary, before acquiring the vehicle, Plaintiff viewed or

17   heard commercials and reviews through television, radio, and the internet that touted the safety

18   and reliability of Plaintiff's vehicle and GM vehicles generally, and spoke with at least one sales

19   representative who did not disclose the SDM Calibration Defect. GM concealed the existence of

20   the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have

21   purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material

22   information about the defective SDM calibration.

23       35.    Plaintiff Aaron Jackson ("Plaintiff' for the purposes of this paragraph) is an

24   individual residing in Huntsville, AL. On or around 2016, Plaintiff purchased a 2013 Chevy

25   Pickup (for purposes of Plaintiff's allegations, the "Class Vehicle") from a Chevrolet Dealership

26   in Huntsville, AL. At the time, Plaintiff reasonably expected that the airbags and seatbelts would

27   function in the event of a crash and had no way of knowing that it contained a dangerous and

28   defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the

contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

36.     Plaintiff David James ("Plaintiff" for the purposes of this paragraph) is an individual residing in Lebanon, IN. On or around 2018, Plaintiff purchased a 2012 GMC Sierra (for purposes of Plaintiff's allegations, the "Class Vehicle") from Bart Car Sales in Fort Wayne, IN. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

37.     Plaintiff Gregory Juskiewicz ("Plaintiff" for the purposes of this paragraph) is an individual residing in Chardon, OH. In or around 2013, Plaintiff purchased a 2013 Chevy 1500 Silverado (for purposes of Plaintiff's allegations, the "Class Vehicle") from Preston Chevy in Burton, OH. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would

1  have paid less for it, if Defendants did not conceal material information about the defective SDM
2  calibration.

3       38.    Plaintiff ShaVon Keith ("Plaintiff" for the purposes of this paragraph) is an
4  individual residing in Villa Rica, GA. In or around 2021, Plaintiff purchased a 2014 Chevy
5  Silverado (for purposes of Plaintiff's allegations, the "Class Vehicle") from Fairway Chevrolet in
6  Las Vegas, NV. At the time, Plaintiff reasonably expected that the airbags and seatbelts would
7  function in the event of a crash and had no way of knowing that it contained a dangerous and
8  defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the
9  contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through
10  television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and
11  GM vehicles generally. GM concealed the existence of the defective SDM calibration from
12  consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would
13  have paid less for it, if Defendants did not conceal material information about the defective SDM
14  calibration.

15       39.    Plaintiff Jason Klinger ("Plaintiff" for the purposes of this paragraph) is an
16  individual residing in Indian Trial, NC. In or around 2014, Plaintiff purchased a 2014 Chevy
17  Silverado LT (for purposes of Plaintiff's allegations, the "Class Vehicle") from City Chevy in
18  Charlotte, NC. At the time, Plaintiff reasonably expected that the airbags and seatbelts would
19  function in the event of a crash and had no way of knowing that it contained a dangerous and
20  defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the
21  contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through
22  television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and
23  GM vehicles generally. GM concealed the existence of the defective SDM calibration from
24  consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would
25  have paid less for it, if Defendants did not conceal material information about the defective SDM
26  calibration.

27       40.    Plaintiff Debra Knerr ("Plaintiff" for the purposes of this paragraph) is an
28  individual residing in Trade, TN. In or about fall 2019, Plaintiff purchased a pre-owned 2016

1  Chevrolet Silverado 1500 LTZ (for purposes of Plaintiff's allegations, the "Class Vehicle") from

2  Ramey Auto Group in Virginia. At the time, Plaintiff reasonably expected that the airbags and

3  seatbelts would function in the event of a crash and had no way of knowing that it contained a

4  dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during

5  a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and

6  reviews through television, radio, and the internet that touted the safety and reliability of

7  Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM

8  calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class

9  Vehicle, or would have paid less for it, if Defendants did not conceal material information about

10  the defective SDM calibration.

11  41.    Plaintiff Clarise Knight ("Plaintiff" for the purposes of this paragraph) is an

12  individual residing in Miami Gardens, FL. In or around 2014, Plaintiff purchased a pre-owned

13  2014 Chevrolet Traverse (for purposes of Plaintiff's allegations, the "Class Vehicle") from

14  AutoNation, located in Miami, FL. At the time, Plaintiff reasonably expected that the airbags and

15  seatbelts would function in the event of a crash and had no way of knowing that it contained a

16  dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during

17  a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and

18  reviews through television, radio, and the internet that touted the safety and reliability of

19  Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM

20  calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class

21  Vehicle, or would have paid less for it, if Defendants did not conceal material information about

22  the defective SDM calibration.

23  42.    Plaintiff Andrew Lawson ("Plaintiff" for the purposes of this paragraph) is an

24  individual residing in Pauline, SC. On or around 2021, Plaintiff purchased a 2013 Chevy

25  Silverado (for purposes of Plaintiff's allegations, the "Class Vehicle") from Bradshaw Chevrolet

26  in Greer, SC. At the time, Plaintiff reasonably expected that the airbags and seatbelts would

27  function in the event of a crash and had no way of knowing that it contained a dangerous and

28  defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the

contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

43.     Plaintiff Eric Leeds ("Plaintiff" for the purposes of this paragraph) is an individual residing in Northfield, NJ.  In or about September 2019, Plaintiff purchased a 2012 Chevrolet Tahoe (for purposes of Plaintiff's allegations, the "Class Vehicle") from Koons Ford, located in Falls Church, VA. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash.  To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

44.     Plaintiff Toni Lowe ("Plaintiff" for the purposes of this paragraph) is an individual residing in Lakeland, FL.  In or about August 2018, Plaintiff purchased a 2018 GM Chevrolet 1500 Silverado (for purposes of Plaintiff's allegations, the "Class Vehicle") from Stingray Chevrolet, located in Plant City, FL. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash.  To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class

1   Vehicle, or would have paid less for it, if Defendants did not conceal material information about

2   the defective SDM calibration.

3       45.     Plaintiff Stephen Loyd ("Plaintiff" for the purposes of this paragraph) is an

4   individual residing in Toney, AL. On or around 2016, Plaintiff purchased a 2012 Chevy Silverado

5   1500 (for purposes of Plaintiff's allegations, the "Class Vehicle") from Howard Bentley Chevy

6   Dealership in Fayetteville, TN. At the time, Plaintiff reasonably expected that the airbags and

7   seatbelts would function in the event of a crash and had no way of knowing that it contained a

8   dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during

9   a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and

10  reviews through television, radio, and the internet that touted the safety and reliability of

11  Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM

12  calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class

13  Vehicle, or would have paid less for it, if Defendants did not conceal material information about

14  the defective SDM calibration.

15      46.     Plaintiff Angelica Mar ("Plaintiff" for the purposes of this paragraph) is an

16  individual residing in Melrose Park, IL. In or around late 2016, Plaintiff purchased a pre-owned

17  2015 GMC Terrain SLT (for purposes of Plaintiff's allegations, the "Class Vehicle") from The

18  Hawk Auto Group in IL. At the time, Plaintiff reasonably expected that the airbags and seatbelts

19  would function in the event of a crash and had no way of knowing that it contained a dangerous

20  and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To

21  the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews

22  through television, radio, and the internet that touted the safety and reliability of Plaintiff's

23  vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration

24  from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or

25  would have paid less for it, if Defendants did not conceal material information about the defective

26  SDM calibration.

27      47.     Plaintiff Allan Martin ("Plaintiff" for the purposes of this paragraph) is an

28  individual residing in Winnsboro, LA. On or around 2017, Plaintiff purchased a 2009 Chevrolet

1   Silverado 1500 from a private party in Louisiana, and a 2010 Buick Enclave from a pre-owned

2   car lot in Monroe, LA (for purposes of Plaintiff's allegations, the "Class Vehicles"). At the time,

3   Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash

4   and had no way of knowing that it contained a dangerous and defective SDM calibration that

5   could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the

6   vehicles, Plaintiff viewed or heard commercials and reviews through television, radio, and the

7   internet that touted the safety and reliability of Plaintiff's vehicles and GM vehicles generally.

8   GM concealed the existence of the defective SDM calibration from consumers including Plaintiff.

9   Plaintiff would not have purchased the Class Vehicles, or would have paid less for them, if

10  Defendants did not conceal material information about the defective SDM calibration.

11          48.     Plaintiff Michael Merkley ("Plaintiff" for the purposes of this paragraph) is an

12  individual residing in Boise, ID. On or around July 2017, Plaintiff purchased a 2012 Chevy

13  Silverado (for purposes of Plaintiff's allegations, the "Class Vehicle") from Elite Auto Sales in

14  Idaho Falls, ID. At the time, Plaintiff reasonably expected that the airbags and seatbelts would

15  function in the event of a crash and had no way of knowing that it contained a dangerous and

16  defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the

17  contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through

18  television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and

19  GM vehicles generally. GM concealed the existence of the defective SDM calibration from

20  consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would

21  have paid less for it, if Defendants did not conceal material information about the defective SDM

22  calibration.

23          49.     Plaintiff Allan Miles ("Plaintiff" for the purposes of this paragraph) is an

24  individual residing in Pearl, MS. On or around 2018, Plaintiff purchased a 2014 GMC Sierra

25  Denali Pickup (for purposes of Plaintiff's allegations, the "Class Vehicle") from Pops Auto Sales

26  in Florence, MS. At the time, Plaintiff reasonably expected that the airbags and seatbelts would

27  function in the event of a crash and had no way of knowing that it contained a dangerous and

28  defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the

contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

50.     Plaintiff Stephen Miles ("Plaintiff" for the purposes of this paragraph) is an individual residing in Forest Grove, OR. On or around 2021, Plaintiff purchased a 2010 GMC Sierra HD 3500 (for purposes of Plaintiff's allegations, the "Class Vehicle") from Bridge City Auto in Gladstone, OR. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

51.     Plaintiff James Milstead ("Plaintiff" for the purposes of this paragraph) is an individual residing in Oxnard, CA. On September 11, 2021, Plaintiff purchased a 2012 Avalanche (for purposes of Plaintiff's allegations, the "Class Vehicle") from Escondido Auto Super Center in Escondido, CA. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would

1   have paid less for it, if Defendants did not conceal material information about the defective SDM
2   calibration.

3       52.     Plaintiff Ira Nash ("Plaintiff" for the purposes of this paragraph) is an individual
4   residing in Honaker, VA. In or around 2017, Plaintiff purchased a 2014 GMC Denali Pickup (for
5   purposes of Plaintiff's allegations, the "Class Vehicle") from Ramey Chevy Dealership in
6   Richlands, VA. At the time, Plaintiff reasonably expected that the airbags and seatbelts would
7   function in the event of a crash and had no way of knowing that it contained a dangerous and
8   defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the
9   contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through
10  television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and
11  GM vehicles generally. GM concealed the existence of the defective SDM calibration from
12  consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would
13  have paid less for it, if Defendants did not conceal material information about the defective SDM
14  calibration.

15      53.     Plaintiff Patrick O'Connor ("Plaintiff" for the purposes of this paragraph) is an
16  individual residing in Depew, NY. In or around 2018, Plaintiff purchased a 2013 Chevrolet
17  Equinox (for purposes of Plaintiff's allegations, the "Class Vehicle") from Joe Basil Chevrolet in
18  Depew, NY. At the time, Plaintiff reasonably expected that the airbags and seatbelts would
19  function in the event of a crash and had no way of knowing that it contained a dangerous and
20  defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the
21  contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through
22  television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and
23  GM vehicles generally. GM concealed the existence of the defective SDM calibration from
24  consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would
25  have paid less for it, if Defendants did not conceal material information about the defective SDM
26  calibration.

27      54.     Plaintiff Jorge Orihuela ("Plaintiff" for the purposes of this paragraph) is an
28  individual residing in Hamburg, NJ.  In or around October 2020, Plaintiff purchased a 2021

1   Chevrolet Tahoe (for purposes of Plaintiff's allegations, the "Class Vehicle") from Paul Miller
2   Chevrolet, a GM dealership, located in West Caldwell, NJ. At the time, Plaintiff reasonably
3   expected that the airbags and seatbelts would function in the event of a crash and had no way of
4   knowing that it contained a dangerous and defective SDM calibration that could cause the airbags
5   and seatbelts to fail during a crash.  To the contrary, before acquiring the vehicle, Plaintiff viewed
6   or heard commercials and reviews through television, radio, and the internet that touted the safety
7   and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of
8   the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have
9   purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material
10  information about the defective SDM calibration.

11          55.     Plaintiff Gary Owens ("Plaintiff" for the purposes of this paragraph) is an
12  individual residing in Kenton, TN. In or about May 2019, Plaintiff purchased a 2012 GMC Sierra
13  1500 (for purposes of Plaintiff's allegations, the "Class Vehicle") from Herman Jenkins Motors, a
14  GM dealership, located in Union City, Tennessee. At the time, Plaintiff reasonably expected that
15  the airbags and seatbelts would function in the event of a crash and had no way of knowing that it
16  contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to
17  fail during a crash.  To the contrary, before acquiring the vehicle, Plaintiff viewed or heard
18  commercials and reviews through television, radio, and the internet that touted the safety and
19  reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the
20  defective SDM calibration from consumers including Plaintiff. Plaintiff would not have
21  purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material
22  information about the defective SDM calibration.

23          56.     Plaintiff Larry Paetzold ("Plaintiff" for the purposes of this paragraph) is an
24  individual residing in Brownwood, TX. On or around 2011, Plaintiff purchased a 2011 GMC
25  Acadia (for purposes of Plaintiff's allegations, the "Class Vehicle") from Stevens Chevrolet in
26  Herford, TX. At the time, Plaintiff reasonably expected that the airbags and seatbelts would
27  function in the event of a crash and had no way of knowing that it contained a dangerous and
28  defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the

contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

57.    Plaintiff Ramiro Pereda ("Plaintiff" for the purposes of this paragraph) is an individual residing in San Leandro, CA.  During 2016, Plaintiff purchased a pre-owned 2010 Silverado 2500 HD (for purposes of Plaintiff's allegations, the "Class Vehicle") from Trucks and Toyz, a used vehicle dealership, located in Fairfield, CA. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash.  To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

58.    Plaintiff Delana Petersen ("Plaintiff" for the purposes of this paragraph) is an individual residing in Lehi, UT. During May 2019, Plaintiff purchased a pre-owned 2016 Chevrolet Silverado 2500 (for purposes of Plaintiff's allegations, the "Class Vehicle") from Larry H. Miller Super Ford in Salt Lake City, UT. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have

- 31 -

1  purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material
2  information about the defective SDM calibration.

3  59.  Plaintiff Frank Pignone ("Plaintiff" for the purposes of this paragraph) is an
4  individual residing in Derby, NY. On or around 2013, Plaintiff purchased a 2014 Chevy Silverado
5  (for purposes of Plaintiff's allegations, the "Class Vehicle") from Emerling Chevy (Now
6  Capilono Chevy) in Boston, NY. At the time, Plaintiff reasonably expected that the airbags and
7  seatbelts would function in the event of a crash and had no way of knowing that it contained a
8  dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during
9  a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and
10  reviews through television, radio, and the internet that touted the safety and reliability of
11  Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM
12  calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class
13  Vehicle, or would have paid less for it, if Defendants did not conceal material information about
14  the defective SDM calibration.

15  60.  Plaintiff Dolly Price ("Plaintiff" for the purposes of this paragraph) is an
16  individual residing in Kansas City, KS. On or around December 2013, Plaintiff purchased a pre-
17  owned 2011 Chevrolet Traverse LTZ (for purposes of Plaintiff's allegations, the "Class Vehicle")
18  from Cable Dahmer Chevrolet in Independence, MO. At the time, Plaintiff reasonably expected
19  that the airbags and seatbelts would function in the event of a crash and had no way of knowing
20  that it contained a dangerous and defective SDM calibration that could cause the airbags and
21  seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or
22  heard commercials and reviews through television, radio, and the internet that touted the safety
23  and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of
24  the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have
25  purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material
26  information about the defective SDM calibration.

27  61.  Plaintiff Michael Romania ("Plaintiff" for the purposes of this paragraph) is an
28  individual residing in Benton, PA. In or about September 2021, Plaintiff purchased a Chevrolet

1  Silverado 3500 HD (for purposes of Plaintiff's allegations, the "Class Vehicle") from Blaise

2  Alexander Chevrolet, a GM dealership, located in Muncy, PA. At the time, Plaintiff reasonably

3  expected that the airbags and seatbelts would function in the event of a crash and had no way of

4  knowing that it contained a dangerous and defective SDM calibration that could cause the airbags

5  and seatbelts to fail during a crash.  To the contrary, before acquiring the vehicle, Plaintiff viewed

6  or heard commercials and reviews through television, radio, and the internet that touted the safety

7  and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of

8  the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have

9  purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material

10  information about the defective SDM calibration.

11       62.    Plaintiff Donald Roxberry ("Plaintiff" for the purposes of this paragraph) is an

12  individual residing in Durant, OK. In or around 2018, Plaintiff purchased a 2012 GMC Sierra (for

13  purposes of Plaintiff's allegations, the "Class Vehicle") from Hudiburg Chevrolet in Oklahoma

14  City, OK. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function

15  in the event of a crash and had no way of knowing that it contained a dangerous and defective

16  SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary,

17  before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through

18  television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and

19  GM vehicles generally. GM concealed the existence of the defective SDM calibration from

20  consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would

21  have paid less for it, if Defendants did not conceal material information about the defective SDM

22  calibration.

23       63.    Plaintiff Lakiesha Shears ("Plaintiff" for the purposes of this paragraph) is an

24  individual residing in Denver, CO. In or around 2021, Plaintiff purchased a 2010 Cadillac SRX

25  (for purposes of Plaintiff's allegations, the "Class Vehicle") from the Besnibad Lot in Colorado.

26  At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the

27  event of a crash and had no way of knowing that it contained a dangerous and defective SDM

28  calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before

1   acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television,
2   radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles
3   generally. GM concealed the existence of the defective SDM calibration from consumers
4   including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less
5   for it, if Defendants did not conceal material information about the defective SDM calibration.

6       64.    Plaintiff David Stalcup ("Plaintiff" for the purposes of this paragraph) is an
7   individual residing in Mammoth Springs, AR.  In or about January 2018, Plaintiff purchased a
8   2011 GMC Sierra (for purposes of Plaintiff's allegations, the "Class Vehicle") from Mark Martin
9   Chevrolet, a GM dealership, located in Ash Flat, Arkansas. At the time, Plaintiff reasonably
10  expected that the airbags and seatbelts would function in the event of a crash and had no way of
11  knowing that it contained a dangerous and defective SDM calibration that could cause the airbags
12  and seatbelts to fail during a crash.  To the contrary, before acquiring the vehicle, Plaintiff viewed
13  or heard commercials and reviews through television, radio, and the internet that touted the safety
14  and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of
15  the defective SDM calibration from consumers including Plaintiff. Moreover, Plaintiff
16  experiences issues with his 2011 GMC Sierra where the seatbelt does not lock. Plaintiff would
17  not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not
18  conceal material information about the defective SDM calibration.

19      65.    Plaintiff Larry Swafford ("Plaintiff" for the purposes of this paragraph") is an
20  individual residing in Cedartown, GA. In May of 2013, Plaintiff purchased a 2013 GMC Sierra
21  (for purposes of Plaintiff's allegations, the "Class Vehicle") from John Thornton Chevrolet in
22  Carrolton, Georgia. At the time, Plaintiff reasonably expected that the Vehicles' airbags and
23  seatbelts would function in the event of a crash and had no way of knowing that it contained a
24  dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during
25  a crash.  To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and
26  reviews through television, radio, and the internet that touted the safety and reliability of
27  Plaintiff's vehicle and GM vehicles generally. Plaintiff also spoke with at least one sales
28  representative without Defendants disclosing the SDM System Defect. In September of 2021,

1   Plaintiff received a recall notice from GM for the replacement of a part of the airbag mechanism
2   on the passenger side of his Vehicle due to a risk of deployment delivered shrapnel. Plaintiff has
3   presented his Vehicle to GM dealers for airbag recall and numerous other repairs, yet GM never
4   disclosed the SDM Calibration Defect. GM concealed the existence of the defective SDM
5   calibration from consumers including Plaintiff. Moreover, Plaintiff experiences issues with his
6   2011 GMC Sierra where the seatbelt does not lock. Plaintiff would not have purchased the Class
7   Vehicle, or would have paid less for it, if Defendants did not conceal material information about
8   the defective SDM calibration.

9          66.   Plaintiff Brian Swann ("Plaintiff" for the purposes of this paragraph) is an
10  individual residing in Madison, AL. On or around 2017, Plaintiff purchased a 2010 Chevrolet
11  Silverado (for purposes of Plaintiff's allegations, the "Class Vehicle") from Bob Chevrolet in
12  Cincinnati, OH. At the time, Plaintiff reasonably expected that the airbags and seatbelts would
13  function in the event of a crash and had no way of knowing that it contained a dangerous and
14  defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the
15  contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through
16  television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and
17  GM vehicles generally. GM concealed the existence of the defective SDM calibration from
18  consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would
19  have paid less for it, if Defendants did not conceal material information about the defective SDM
20  calibration.

21         67.   Plaintiff Joseph Sweat ("Plaintiff" for the purposes of this paragraph) is an
22  individual residing in Lilburn, GA. In or around 2015, Plaintiff purchased a 2009 Chevrolet
23  Silverado (for purposes of Plaintiff's allegations, the "Class Vehicle") from Cole Automotive
24  Sale in Monroe, GA. At the time, Plaintiff reasonably expected that the airbags and seatbelts
25  would function in the event of a crash and had no way of knowing that it contained a dangerous
26  and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To
27  the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews
28  through television, radio, and the internet that touted the safety and reliability of Plaintiff's

vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

68.   Plaintiff David Taylor ("Plaintiff" for the purposes of this paragraph) is an individual residing in Theodore, AL. On or around 2014, Plaintiff purchased a 2014 Chevy Silverado LT Pickup (for purposes of Plaintiff's allegations, the "Class Vehicle") from Terry Thompson Chevy Dealership in Daphne, AL. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

69.   Plaintiff Walter Tooson ("Plaintiff" for the purposes of this paragraph) is an individual residing in Springfield, OH. On or around 2014, Plaintiff purchased a 2012 GMC Terrain (for purposes of Plaintiff's allegations, the "Class Vehicle") from Jeff Wiler in Springfield, OH. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

15.   70.Plaintiff Richard Vargas ("Plaintiff" for the purposes of this paragraph) is an individual residing in Menifee, California. In or around December 2012, Plaintiff purchased a new 2012 Chevrolet Suburban (for purposes of Plaintiff's allegations, the "Class Vehicle") from El Camino Real Chevrolet dealership located in Monterey Park, California. At the time, On information and belief for the reasons set forth herein, GM installed the SDM Calibration Defect—which shut off the vehicle's ability to deploy airbags in a crash after 45 milliseconds—in Mr. Vargas' SUV during the manufacturing process, and Mr. Vargas' SUV contained the SDM Calibration Defect at the time he purchased the vehicle. At the time of purchase, Plaintiff reasonably expected that the Vehicles' airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the Vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle, including its "Five Star" safety rating, and GM vehicles generally. Additionally, when at the dealership before making his purchase, Plaintiff inquired about the airbags in the Class Vehicle. GM concealed the existence of the defective SDM calibration from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the defective SDM calibration.

71.   Plaintiff Warren Whitsey ("Plaintiff" for the purposes of this paragraph) is an individual residing in Indianapolis, IN. On or around 2021, Plaintiff purchased a 2013 Yukon XL (for purposes of Plaintiff's allegations, the "Class Vehicle") from Andy Moore VW in Avon, IN. At the time, Plaintiff reasonably expected that the airbags and seatbelts would function in the event of a crash and had no way of knowing that it contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration from consumers

1 | including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less

2 | for it, if Defendants did not conceal material information about the defective SDM calibration.

3 |      72.    Plaintiff Denise Wilson ("Plaintiff" for the purposes of this paragraph) is an

4 | individual residing in Fayette, MS. On or around February 2020, Plaintiff purchased a pre-owned

5 | 2019 Chevrolet Silverado 1500 (for purposes of Plaintiff's allegations, the "Class Vehicle") from

6 | Gray-Daniels Chevrolet, located in Jackson, MS. At the time, Plaintiff reasonably expected that

7 | the airbags and seatbelts would function in the event of a crash and had no way of knowing that it

8 | contained a dangerous and defective SDM calibration that could cause the airbags and seatbelts to

9 | fail during a crash. To the contrary, before acquiring the vehicle, Plaintiff viewed or heard

10 | commercials and reviews through television, radio, and the internet that touted the safety and

11 | reliability of Plaintiff's vehicle and GM vehicles generally. GM concealed the existence of the

12 | defective SDM calibration from consumers including Plaintiff. Plaintiff would not have

13 | purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material

14 | information about the defective SDM calibration.

15 |      73.    Plaintiff Carl Wurmlinger ("Plaintiff" for the purposes of this paragraph) is an

16 | individual residing in Croswell, MI. In or around 2014, Plaintiff purchased a 2014 GMC Sierra

17 | (for purposes of Plaintiff's allegations, the "Class Vehicle") from Saint Claire Automotive in

18 | Saint Claire, Michigan. At the time, Plaintiff reasonably expected that the airbags and seatbelts

19 | would function in the event of a crash and had no way of knowing that it contained a dangerous

20 | and defective SDM calibration that could cause the airbags and seatbelts to fail during a crash. To

21 | the contrary, before acquiring the vehicle, Plaintiff viewed or heard commercials and reviews

22 | through television, radio, and the internet that touted the safety and reliability of Plaintiff's

23 | vehicle and GM vehicles generally. GM concealed the existence of the defective SDM calibration

24 | from consumers including Plaintiff. Plaintiff would not have purchased the Class Vehicle, or

25 | would have paid less for it, if Defendants did not conceal material information about the defective

26 | SDM calibration.

27 |

28 |

1

**B.** **Defendants**

2      16.     General Motors LLC ("GM LLC") is a Delaware limited liability company with its

3   principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen

4   of the States of Delaware and Michigan. The sole member and owner of GM LLC is General

5   Motors Holdings LLC.

6      17.     General Motors Holdings LLC ("GM Holdings") is a Delaware limited liability

7   company with its principal place of business in Detroit, Michigan, and is a citizen of the States of

8   Delaware and Michigan. The sole member and owner of GM Holdings is General Motors

9   Company.

10     18.     General Motors Company ("GM Parent") is a Delaware corporation with its

11   principal place of business in Detroit, Michigan, and is a citizen of the States of Delaware and

12   Michigan. GM Parent's only asset is its 100% ownership interest in GM Holdings. In public SEC

13   filings, GM Parent states: "We design, build and sell cars, trucks, crossovers and automobile parts

14   worldwide." GM Parent sells vehicles throughout the United States "through [its] dealer network

15   to retail customers." As further noted in SEC filings, GM Parent is also responsible for making

16   reports to NHTSA related to vehicle safety and making determinations as to vehicle recalls.[3]

17     19.     Each of GM LLC, GM Holdings, and GM Parent operates out of GM's Global

18   Headquarters in Detroit, Michigan.

19     20.     In June 2009, ~~General Motors Corporation ("~~Old GM~~")~~ filed for bankruptcy.

20   Defendants were then created on or about July 10, 2009, in connection with the sale of

21   substantially all of Old GM's assets pursuant to a Master Sale and Purchase Agreement. As a

22   result of the sale, GM LLC acquired substantially all of Old GM's books, records, and personnel.

23   GM LLC then transferred some of these assets to GM Holdings (formed shortly after the

24   bankruptcy sale). Defendants thereby acquired from Old GM the knowledge about the SDM

25   Calibration Defect (defined below) that those books, records, and personnel held. GM Parent and

26   GM LLC also took responsibility for any necessary recalls of Old GM vehicles going forward.

27

28
_____
[3] *See* General Motors Company's Form 10-K for fiscal year 2019.

21.     The causes of action in this Complaint are directed to GM Parent, GM Holdings, and GM LLC and are based on their misconduct.

III.    **JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT**

22.     This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

23.     This Court has personal jurisdiction over Defendants under California Code of Civil Procedure section 410.10. ~~The Court has pendent jurisdiction as to the claims of Plaintiffs that arose in states other than California.~~

24.     Venue is proper in this District under 28 U.S.C. § 1391, and assignment is proper to this division under N.D. Cal. L.R. 3-2, because a substantial part of the events or omissions which give rise to the claims occurred in this District, and because Defendants have caused harm to Class members residing in this District, including Plaintiff ~~Pereda~~Ray. GM conducts substantial business, including through numerous dealerships, and marketed, advertised, sold, and leased Class Vehicle in this District.

IV.     **GENERAL FACTUAL ALLEGATIONS**

        A.      **SDMs are supposed to detect crashes and control airbags and seatbelts.**

25.     Car crashes kill or seriously injure hundreds of thousands of people every year. Because of this risk, the federal government requires automobile manufacturers to include critical safety features—seatbelts and airbags—in all vehicles sold in the United States. This life-saving equipment has been mandatory in passenger vehicles since 1997. *See* 49 U.S.C. § 30127.

26.     ~~1.Federal law requires that motor vehicles use safety features to protect occupants in the event of a crash.~~These features include seatbelt pretensioners, which tighten seatbelts to secure the occupants, and airbags, which are cushions that rapidly inflate from the steering wheel and other areas of the vehicle. During an accident, seatbelt pretensioners hold vehicle occupants in place, and airbags buffer or prevent impact between occupants and hard structures in the

1   vehicle. Without the airbags, slamming into the hard structures (such as the steering wheel)

2   during a crash can ~~cause~~ and has caused serious injuries ~~or~~ and death.

3       27.     ~~2.~~When functioning properly, the combination of seatbelts and airbags is highly

4   effective in reducing the safety risk in automobile collisions. NHTSA reports that the use of

5   seatbelts and airbags reduces fatality risk by *61 percent* compared to an unbelted occupant in a

6   vehicle without airbags.[4] From 1987 to 2017, an estimated 50,457 lives were saved because

7   frontal airbags deployed during a crash.[5]

8       28.     ~~3.~~Although airbags work effectively to protect occupants when necessary, they are

9   not meant to deploy with every impact. A crash may be of lower intensity (e.g., a low-speed

10  fender bender in a parking lot) such that the seatbelt alone will be sufficient protection for the

11  occupant.[6] Airbags are designed to deploy in "moderate to severe" frontal or near-frontal crashes.

12  A "moderate to severe" frontal crash is the equivalent of hitting a solid, fixed barrier at 8-14 miles

13  per hour or higher.[7]

14      29.     ~~4.~~Seatbelt and airbag systems are known as "passive" safety systems because,

15  when they are needed, they are supposed to operate automatically (meaning, the driver does not

16  need to hit a button to deploy the airbag). They use sophisticated hardware components and

17  software to activate and deploy the seatbelts and airbags systems automatically.

18      30.     ~~5.~~The "brain" behind this operation is the airbag control unit or "ACU" (also

19  known as an Electronic Control Unit or "ECU"). GM refers to this component as the "Sensing

20  and Diagnostic Module" or "SDM," and that term is used throughout this Complaint. SDMs are

21  effectively computers that control the car's safety systems. They are intended, where

22  ~~necessary~~appropriate, to issue a "command" to deploy airbags and tighten seatbelts to prevent or

23  mitigate injury to ~~the~~ vehicle occupants in a crash.

24

25  _____

26  [4] U.S. Department of Transportation, NHTSA, *Fatalities in Frontal Crashes Despite Seat Belts and Airbags*, NHTSA Technical Report No. DOT HS 811 202 (September 2009).

27  [5] NHTSA, Air Bags Overview. *Available at*: https://www.nhtsa.gov/equipment/air-bags (last visited ~~August 4~~January 26, ~~2021~~ 2023).

28  [6] Dr. Ching-Yao Chan, *Fundamentals of Crash Sensing in Automotive Airbag Systems*. Copyright Society of Automotive Engineers, (2000), at p. 50.
[7] Air Bags Overview, *supra* note 5.

1    31.    The SDM operates in three basic phases. ~~First, during regular vehicle operation,~~

2    ~~the SDM is set~~ :

3    a.    ~~6.~~*First, during regular vehicle operation, the SDM sits* in a resting or

4    "normal" mode. In this mode, the SDM constantly receives signals from sensors placed

5    throughout the vehicle, which collect and report information on inputs such as acceleration, wheel

6    speed, brake pressure, and impacts.[8] The SDM monitors and interprets these signals to determine

7    whether the vehicle is involved (or about to be involved) in a crash.

8    b.    ~~7.~~*Second*, while monitoring these signals in "normal" mode, if and when

9    the SDM detects an irregular input that suggests a potential crash, it "wakes up" to search for

10   further confirmation of a crash (as opposed to, for example, an irregular input from slamming on

11   the brakes and then avoiding a collision). In this second stage—known as "wake up" or "standby"

12   mode—the SDM's crash-sensing software algorithm is engaged to quickly decipher crash status

13   and respond.[9] After ~~this~~ "wake up" mode is ~~initially~~ triggered by an irregular input, if additional

14   inputs confirm a moderate to severe frontal crash, the SDM *should* issue a command to "fire" the

15   airbag and/or tighten the seatbelts as needed.[10]

16   c.    ~~8.~~*Third*, the final phase in this sequence is the "reset" phase. From "wake

17   up" mode, after it detects that a crash or a potential crash has fully completed, (i.e., that the

18   vehicle has returned to normal operation after an irregular input) the SDM ultimately returns to its

19   normal operating state through "resetting."

20   32.    ~~9.~~A vehicle striking a pothole illustrates this three-phase sequence. The vehicle

21   first operates with the SDM in "normal" mode as it drives down the road. Then, suddenly, the

22   driver hits an unseen pothole. This jolt from hitting the pothole (and/or related inputs like

23   deceleration) will trigger the SDM to enter "wake up" mode where it searches for more inputs.

24

---

[8] Clemson University Vehicular Electronics Laboratory, "Airbag Deployment Systems." Available at: https://cecas.clemson.edu/cvel/auto/systems/airbag_deployment.html (last visited ~~August 4~~January 26, ~~2021~~ 2023).

[9] John Pearley Huffman, "The Physics of Airbags," *Car & Driver*, June 14, 2011. Available at: https://www.caranddriver.com/features/a15121591/the-physics-of-airbags-feature (last visited ~~August 4~~January 26, ~~2021~~ 2023).

[10] Jesse Kendall, P.E., and Kenneth Solomon, Ph.D., "Airbag Deployment Criteria" at p. 11. Available at: https://www.experts.com/content/articles/Kenneth-Solomon-Airbag-Paper.pdf (last visited ~~August 4~~January 26, ~~2021~~ 2023).

Awake, the SDM quickly ~~asking~~asks: "How fast is the vehicle slowing down? Is the front bumper crushed? Is the vehicle speeding back up normally?" and reacting in turn.[11]

33.    If the SDM senses that the vehicle returns to normal operation and continues down the road, it will stop looking for confirmation of a crash and reset ~~back~~ to normal ~~after it determines the danger has passed~~operation. On the other hand, if, after it hits the pothole, the vehicle veers out of its lane and crashes into another vehicle head on, the SDM should detect this second input and fire the airbag.[12]

34.    This entire sequence—from sensing an irregular signal (the pothole), to waking up and searching for confirmation of a crash, to firing the airbag where needed—might take only fractions of a second. Indeed, a typical "crash duration" in a frontal, vehicle-to-barrier collision lasts for approximately 80-150 milliseconds (0.08-0.15 seconds).[13] For that reason, timing this sequence properly is critically important to ensure that the seatbelts are tightened, and the airbags deploy ~~,~~ to protect the occupants when they need to.

**B.    GM used a dangerous and defective SDM software calibration in its trucks and SUVs.**

35.    Throughout the three-phase sequence described above, SDMs rely on software algorithms to interpret signals, estimate crash dynamics, and issue a "deploy" or "do not deploy" command to the safety systems. For the SDM to function as intended, the software that controls it must be designed to recognize and ~~react to~~respond to real-world crashes so that the airbags inflate and seatbelts tighten when they are needed.

36.    Crash sensing occurs in "real-time~~," meaning~~." This means that the sensing algorithm can only examine a limited window of data to predict and judge the severity of crash events before conclusion, so that the airbags can deploy and protect the occupant on impact.[14] A decision to "deploy" the airbags should occur when certain pre-set thresholds ~~set to~~that tell the SDM a crash is severe enough (i.e.~~,~~ a moderate to severe frontal collision) are met or exceeded.

---

[11] Solomon, *supra* note 10, at p. 11.
[12] *Id.* at p. 8.
[13] Chan, *supra* note 6, at p. 169.
[14] Chan, *supra* note 6, at p. 95.

1    These deployment thresholds are programmed into the SDM software through a process in which

2    engineers "calibrate" the software algorithm in the vehicle.

3        37.    In the Class Vehicles, the software calibration that controls how and when the

4    SDM detects accidents and deploys the safety ~~system~~ systems contains a serious defect (the

5    "SDM Calibration Defect"). Specifically, for frontal crashes, GM calibrated the SDM to prevent

6    deployment of airbags and pretensioners more than 45 milliseconds after it enters "wake up"

7    mode.[15] GM did this by increasing the deployment thresholds to unattainable values 45

8    milliseconds into the crash sequence. With this calibration in place, no matter how severe the

9    inputs the SDM received immediately after 45 milliseconds, the airbags and pretensioners ~~would~~

10   will not deploy until a reset has occurred.

11       38.    This ~~defect~~ defective calibration was no accident; rather, as detailed below, GM

12   included it by design when it modified the SDM software program (originally known as ALGO-

13   S) in the Class Vehicles to include it.

14       39.    In affirmatively blocking these critical safety features after 45 milliseconds, GM

15   greatly and needlessly increased the risk of injury and death in a variety of frontal crashes.

16   Specifically, the ~~defect~~ SDM Calibration Defect manifests in frontal crashes that ~~endure for 45~~

17   ~~milliseconds or longer and~~ require airbag deployment or seatbelt tightening after 45 milliseconds

18   into the crash, and before the SDM resets.

19       40.    For example, this includes frontal crashes with multiple, distinct points of impact

20   known as "concatenated" events. A vehicle that first hits a curb and then veers and hits a tree, or

21   first hits a speed bump and then crashes into the vehicle in front of it, are examples of

22   concatenated crashes. By their nature, concatenated accidents involve multiple discrete inputs for

23   the SDM to detect during a crash sequence.

24       41.    In concatenated crashes, the first part of the incident (hitting a curb) sends the

25   SDM into its "wake up" or "stand by" mode. The initial curb hit does not trigger the airbag or

26

---

27   [15] At this early stage, Plaintiffs note that the interpretation of time recorded by the SDM software and in related Crash Data Reports is complex. The 45-millisecond timing described in this

28   complaint refers to the value as calculated in the software, as opposed to 45 milliseconds in linear time.

1  tighten the seatbelt, but the SDM "wakes up" to confirm whether further irregular signals will

2  follow and indicate a need for the seatbelts or airbags. In the Class Vehicles—because of the

3  software calibration that controls the SDM—the "wake up" mode lasts for just 45 milliseconds

4  after the first irregular signal. After that time, and by GM's design, the deployment thresholds in

5  the software drastically increase, such that no further input, no matter how severe, could exceed

6  the thresholds and trigger the ~~airbag~~ airbags to deploy and/or seatbelts to tighte[15]n. As detailed in

7  this section, the triggering thresholds are pre-set inputs in the software that tell the SDM that a

8  crash is severe enough to deploy an airbag.

9       42.     In addition to concatenated crashes, the ~~defect~~ SDM Calibration Defect is also

10  implicated in frontal crashes that increase in severity and require airbag deployment or seatbelt

11  tightening after an initial, "soft" impact.  These types of crashes are referred to herein as

12  "prolonged" or "long-soft" crash onsets. This would include, for example, a crash into another

13  vehicle's bumper which—because the bumper is comparatively "soft"—may take time before the

14  "soft" bumper collapses, and a "hard" impact into the engine compartment begins.[16] "Soft"

15  crashes involve a "relatively long crash duration" that may last 20-50 percent longer than a head-

16  on crash into a rigid barrier, like a cement wall.[17]

17       43.     In a prolonged onset crash, the initial impact into a "soft" surface, such as a

18  bumper, starts the SDM clock ticking. Depending on the crash conditions such as speed, road

19  incline, angle of impact, weather, ice on the road, etc., this "soft" impact may ~~last longer than~~ not

20  require airbag deployment before 45 milliseconds has elapsed. Throughout the "soft" impact, the

21  SDM will be in wake-up mode to search for a confirmatory signal. But it will not find another

22  input sufficient to trigger the airbags from the "soft" impact. As explained above, in the Class

23  Vehicles, the SDM clock effectively times out when the 45-millisecond mark hits. So, if the crash

24  proceeds through the "soft" layers and into the engine compartment of another vehicle at say, ~~70~~

25

26  _____
   [15] ~~As detailed in this section, the triggering thresholds are pre-set inputs in the software that tell
   the SDM that a crash is severe enough to deploy an airbag.~~

27  [16] An example of a "soft" crash is where a vehicle crashes into a deformable barrier, or crashes at
   an angle, which will result in a "softer" impact than a head-on crash into a rigid barrier (which is

28  a "hard" crash). Chan, *supra* note 6, at p. 40.
   [17] Chan, *supra* note 6, at p. 40.

1    75 milliseconds, no airbag or seatbelt deployment is possible no matter how severe the later,

2    "hard" impact gets.

3          44.    In practice, this means that the airbags and seatbelt pretensioners in the Class

4    Vehicles can *only* fire within 45 milliseconds of a first, irregular signal. If a second, irregular

5    signal occurs after 45 milliseconds, but before the SDM has reset, the SDM purposefully, by

6    design, disregards signals that the second signal, even if it would otherwise trigger airbag

7    deployment and/or seatbelts to tighten.

8          45.    The net result is a "dead zone" starting just 45 milliseconds into a crash, after

9    which vehicle occupants are completely vulnerable before the SDM software resets. The dead

10   zone lasts until the SDM detects that the crash has ended completely (meaning that the irregular

11   signals have concluded, and the vehicle has resumed normal operation), and then resets back to

12   normal mode.  After the SDM has reset, additional impacts or irregular inputs register as new

13   events, triggering the process to begin anew.

14         46.    This significant gap in protection after 45 milliseconds is unreasonably dangerous

15   because accidents—particularly complicated, real-world accidents—are not necessarily

16   completed at that point. In many cases, a crash continues, in the "dead zone," and airbags and

17   seatbelts are needed, well after the thresholds for airbag and seatbelt deployment are met during

18   that time. Yet, GM's SDM software calibration in the Class Vehicles makes it impossible for

19   prevents deployment of the airbags to deploy and seatbelts to tighten and seatbelt pretensioners in

20   the "dead zone" in which while a crash may is still be underway—which is a serious, unjustified,

21   and dangerous safety defect. Indeed, even GM's own cars division includes a significantly longer

22   window for potential deployment.

23         **C.    GM knew that the SDM Calibration Defect was dangerous and unjustified
               but has failed to warn or compensate consumers.**

24

25         47.    GM knew or had reason to know of the SDM Calibration Defect and the risks it

26   entails from at least July 10, 2009, when GM acquired substantially all of Old GM's books,

27   records, and personnel, and the knowledge about the defective SDM software calibration those

28   books, records, and personnel held. GM has continued to acquire knowledge—based on lawsuits

implicating the SDM Calibration Defect and hundreds of publicly reported accidents with airbag and seatbelt failures—from 2009 to the present.

48.     Nonetheless, GM has continued to conceal this problem and the pattern of accidents, injuries, and deaths that have resulted from it. GM has failed to share this information with the consumers who paid for and drive these Class Vehicles every day.

49.     It should come as no surprise that GM has unreasonably and unsafely delayed disclosure of the SDM Calibration Defect. Indeed, GM has a recent history of attempts to avoid the costs, potential liabilities, and reputational harms from a safety recall for Takata airbags and seems to have repeated that same tactic here.

50.     As is now public knowledge, millions of GM vehicles contain the dangerous and defective Takata airbag inflators that can explode with too much force and spray metal shrapnel into vehicle passenger compartments. While the dangers of these Takata airbags were widely known for years, GM lobbied regulators to delay a recall for its affected vehicles to avoid a resulting hit to its profits.[18] In 2016, GM reported that recalling its vehicles with Takata inflators would cost hundreds of millions of dollars.[19]

51.     Consumers brought a putative class action seeking redress. *See In re Takata Airbag Product Liability Litigation*, Case No. 14-cv-240009, Dkt. 2750, (S.D. Fl.). While other vehicle manufacturers had earlier and voluntarily recalled their vehicles with Takata airbags, it was only years later, with that consumer litigation pending, that GM finally issued a belated recall. And importantly, it did so only after regulators from NHTSA denied GM's petition for inconsequentiality, in which it attempted to argue that a recall was not necessary.[20]

52.     Here, as in *Takata*, GM knew or should have known that the SDM software calibration strategy in the Class Vehicles—which includes a dead zone that prevents the airbag

---

[18] "GM seeks to delay recall of 1 million vehicles with Takata air bag inflators." *Reuters*, September 16, 2016. Available at: https://www.reuters.com/article/us-gm-recall/gm-seeks-to-delay-recall-of-1-million-vehicles-with-takata-air-bag-inflators-idUSKCN11M27N (last visited August 4January 26, 2021 2023).
[19] *Id.*
[20] "GM will recall 7 million vehicles for air bag issue worldwide." *Reuters*, November 23, 2020. Available at: https://www.reuters.com/article/us-gm-recall/gm-will-recall-7-million-vehicles-for-air-bag-issue-worldwide-idUSKBN2831TH (last visited August 4January 26, 2021 2023).

1  and seatbelts from deploying after 45 ~~milliseconds—was~~ milliseconds until the SDM resets—was

2  dangerous. Nonetheless, GM kept using it anyway, did not recall or repair the Class Vehicles to

3  correct it, and still has not told consumers about it.

4          **1.      Old GM recklessly downplayed serious risks of injury when it chose to
                  include the SDM Calibration Defect in the Class Vehicles.**
5

6          53.     In general, the vehicle manufacturer ~~sets~~ provides the requirements to set the

7  deployment thresholds in the SDM software calibration that will trigger a command to fire the

8  airbags and/or tighten the seatbelts. The vehicle manufacturer uses results from laboratory crash

9  testing to inform these parameters.[21]

10         54.     But laboratory results are not sufficient in themselves, because real-world

11 accidents—which can occur from multiple angles and involve inputs from myriad variables like

12 weather, temperature, or incline—will differ from the testing environment.[22] For that reason,

13 manufacturers must exercise appropriate care to design crash sensing frameworks that function to

14 keep people safe in the real world.

15         55.     As relevant to the defect here, Old GM worked with ~~an external team of engineers~~

16 ~~from~~ Delco Electronics (later called Delphi Electronics~~) to~~ , now known as Aptiv) to select and

17 install SDM models and develop the SDM software program used in the Class Vehicles, starting

18 with Model Year 1999. ~~The team from Delco developed a proposed software program, known as~~

19 ~~ALGO-S, which it presented to Old GM for review.~~ As to the physical component, Old GM

20 installed Delco SDMs in many of its vehicles, including all the Class Vehicles. The model names

21 for Delco SDMs have changed over time, and have included, from earliest to latest, models

22 known as the SDM-GS,[23] SDM-11, SDM30, and others. GM continued to use Delco SDMs and

23 the defective calibration in its vehicles after it was formed in 2009, including in all the Class

24 Vehicles.

25

26

---

27 [21] Huffman, *supra* note 9.
   [22] Solomon, *supra* note 10, at 13.
28 [23] The SDM-GS is the SDM model included in Mr. Nossar's 2005 Trailblazer, which would have
   been in development during Mr. Caruso's tenure with Delco, which ended in 2006.

56.    In addition to the Delco hardware, GM also worked with Delco to develop and implement the software that controls the SDMs. To that end, Delco developed a proposed software program, known originally as ALGO-S, and presented it to Old GM for review.

57.    4.During this time, Old GM divided the design and development of its vehicles into a "cars" group and a "trucks" group, with the trucks group responsible for design, development, and production of larger model trucks and SUVs. After it reviewed the Delco team's proposed SDM software algorithm, ALGO-S, the trucks group insisted on adding the 45-millisecond cut off described above when it calibrated that program for use in its trucks and SUVs. On information and belief, the trucks group proposed this cutoff based on test results which indicated that frontal-barrier accidents in its trucks and SUVs would be complete within 45 milliseconds or less in laboratory conditions.

58.    The 45 millisecond cut off was dictated by GM trucks as part of its calibration strategy for all vehicles within the fleet. This means that regardless of any differences across makes and model years, all vehicles within the group include SDM software that was calibrated to meet GM trucks' guiding philosophy for when and how the safety systems will deploy, which included the SDM Calibration Defect.

59.    On information and belief, the trucks group insisted on this cutoff based on test results which indicated that frontal-barrier accidents (i.e., a simulated, single-impact crash into a hard barrier) in its trucks and SUVs would not require airbags after 45 milliseconds or less in laboratory conditions.

60.    5.In response, the Delco team expressly warned the trucks group that such an aggressive cutoff could fail to capture additional signals in complex crashes outside of the laboratory, leaving occupants completely unprotected during prolonged onset crashes or crashes with multiple impact points. The trucks group insisted, however, and the 45-millisecond cutoff was added in the SDM software calibration for GM trucks and SUVs.On information and belief, documents, records, and personnel reflecting GM trucks' insistence—over Delco's objection—to include this cutoff were passed on from Old GM to New GM in 2009.

1    61.   6.On information and belief, documents, records, and personnel reflecting GM

2    trucks' insistence—over Delco's objection—to include this cutoff were passed on from Old GM

3    to New GM in 2009.  On GM's own cars group, and on information and belief, other major

4    vehicle manufacturers throughout the industry , include a significantly longer window for the

5    SDM to detect a potential accident and deploy the airbags and seatbelts. Indeed, in the ALGO-S

6    program as it was originally designed by Delco, the window in which the airbags and seatbelts

7    can deploy in a crash is up to at least 150 milliseconds—over three times the interval that GM

8    trucks added in the defective calibration*multiple* times the level set by GM Trucks (up to 150

9    milliseconds). Tellingly, after the Delco team repeated the same warnings about the truck group's

10   proposed 45-millisecond cutoff to GM's cars group, the cars group rejected the shorter cutoff.

11   Instead, the cars group used the ALGO-S software with the Delco-recommended period of 150

12   milliseconds for deployment that was two or even three times longer than the GM Trucks group's

13   proposal. GM ignored this decision by the cars group in insisting on the dangerous calibration.

14   62.   8.Delco's original 150 -millisecond window allows for airbag and seatbelt

15   deployment in real-world frontal crashes, which themselves can endure for up to 150

16   milliseconds.[23][24] When GM trucks added the defective 45-millisecond cutoff to the software

17   calibration in the Class Vehicles, it prematurely, and dangerously, prevented the airbags and

18   seatbelts from functioning when a frontal crash may still be well underway.

19   63.   Given their serious concerns, Mr. Caruso and his Delco team refused to release the

20   defective software calibration for use in GM trucks and SUVs until Old GM signed a disclaimer

21   of Delco's liability for the modified calibration. The trucks group still insisted on the defective

22   calibration, signed the disclaimer, and the 45-millisecond cutoff was added in the SDM software

23   calibration as used in GM trucks and SUVs.[25]

24   64.   This defective calibration was included in all of the trucks and SUVs under the

25   direction of GM's trucks group, including all the Class Vehicles. This is so because, as explained

26

---

27   [23][24] Chan, *supra* note 6, at p. 169.

28   [25] *See* Objection to Defendants' Motion for Partial Summary Judgment, *McCoy v. General
Motors LLC*, Case No. X03- HHD-CV-20-6142910-S (Conn. Sup. Ct), available at:
https://civilinquiry.jud.ct.gov/DocumentInquiry/DocumentInquiry.aspx?DocumentNo=23354481.

1    above, the abrupt cutoff was part of a calibration philosophy that is not vehicle dependent, i.e., it

2    was a decision on the overall strategy for safety system deployment that applied to all vehicles

3    within the group, including all the Class Vehicles.

4          65.    In practice, this meant that GM Trucks leadership set the calibration strategy for

5    all vehicles within the Trucks group (including all the Class Vehicles), and the software engineers

6    tasked with implementing that strategy for individual vehicle platforms were obligated to follow

7    that strategy for all vehicles within the group—the strategy was not set, or adapted, at the

8    individual vehicle level.

9          66.    This group-level approach to vehicle software is logical from a cost and resources

10   standpoint; developing software algorithms is time intensive and expensive, making it effective

11   and ordinary practice to develop one algorithm for use across multiple vehicle makes and models.

12         67.    This typical practice of using the same SDM software strategy for groups of

13   vehicles is evidenced by a prior recall conducted by GM in September 2016. Specifically, GM

14   previously recalled some 3,640,000 vehicles across three different model years (from 2014 to

15   2017) due to a "software defect" present in the SDM software in all of those vehicles. As GM

16   described it, the SDM software in *all of these* vehicles included the same "oscillation test" in the

17   software that could "interfere with the SDM's proper deployment of frontal airbags or

18   pretensioners as required."[26]

19         68.    This oscillation-test issue is distinct from the 45-millisecond cutoff described in

20   this case, but GM's use of the same software with the identical defective oscillation test in more

21   than three and a half million vehicles is evidence that GM developed and applied the same SDM

22   software across a very large range of makes and model years.

23         69.    The widespread use of this same oscillation test in the SDM software used for a

24   wide variety of makes and models, including both GM cars and trucks, also supports Plaintiffs'

25   allegations in this case that both GM trucks and GM cars used the same SDM software algorithm

26

27

---

28   [26] *See* General Motors LLC Part 573 Vehicle Safety Recall Report, 16-V-651 (September 2016)
     available at: https://static.nhtsa.gov/odi/rcl/2016/RCLRPT-16V651-2475.PDF.

1  (which started as ALGO-S) to control the SDMs in the vehicles under their direction, but that GM

2  trucks modified the algorithm as designed to include the SDM Calibration Defect.

3      70.    Finally, the use of the same software calibration strategy across many different

4  vehicles is further supported by Mr. Caruso's description of his work with Old GM in setting and

5  implementing the software calibration strategy for vehicles at the group level, for the trucks group

6  and cars group. *See, e.g.*, Nossar Report, *supra*, at p. 5 (Mr. Caruso recounting the "GM Truck

7  Groups' edict to set certain crash sensor calibration parameters outside the recommended

8  minimum guidelines set by the crash sensing algorithm designers").

9           **2.    The 45-millisecond cutoff was not necessary to protect against "late"
               airbag deployments.**

10

11      71.    GM trucks group's insistence on the 45-millisecond window after which the

12  airbags and seatbelts cannot deploy was unjustified and unsafe.

13      72.    On information and belief, the trucks group chose to set this aggressive cutoff due

14  to concerns about the potential for airbags to deploy "too late" during an accident. But as the

15  trucks group also knew, these concerns were unwarranted given technology that mitigated the

16  risks of "late" airbag deployments.

17      73.    A brief history of airbags in motor vehicles puts this ~~reckless~~ dangerous decision

18  in context. Before 1998, airbag systems were effectively one-size-fits-all. Designed to protect

19  against only frontal crashes, these "first-generation" airbags were built to meet a standardized

20  government test that required they protect an unbelted, midsize adult male dummy (175 pounds)

21  in a 30-MPH crash into a rigid barrier.[~~24~~27] To do so, an airbag had to fill up quickly with gas,

22  resulting in a deployment speed of up to 200 MPH.[~~25~~28]

23      74.    Not all vehicle occupants fit this description, however, and the intensity of first-

24  generation airbag deployment could prove dangerous for children and those who were positioned

25

26  [~~24~~27] Jack Keebler, *Airbags Safe Insane? – Special Report*, Motortrend (Sept. 1, 2000),
    https://www.motortrend.com/news/airbags-safe-insane-special-report/ (last visited ~~August
    4~~January 26, ~~2021~~ 2023).

27  [~~25~~28] *Id.*; *see also* David B. Ottaway & Warren Brown, *From Life Saver to Fatal Threat*, The
    Wash. Post (June 1, 1997), https://www.washingtonpost.com/archive/politics/1997/06/01/from-

28  life-saver-to-fatal-threat/56d05b9e-a1bc-49b7-beb4-43480762b25e/ (last visited ~~August 4~~January
    26, ~~2021~~ 2023).

1  too close to the bag when it inflated (for example, because they had already been thrown forward

2  toward the steering wheel during an under-way accident).[26][29]

3       75.    Public perception about airbag safety in motor vehicles, and in turn, the vehicle

4  manufacturers that sold them, turned increasingly unfavorable following reports of late and

5  aggressive deployments in first-~~-~~generation airbags. Both regulators and vehicle manufacturers

6  recognized the need to address these issues.[27][30] Beginning in October 1995, NHTSA initiated a

7  series of actions to minimize and eventually eliminate the adverse effects of late and aggressive

8  airbag deployments while preserving their life-saving benefits.[28][31]

9       76.    In 1997, NHTSA issued modified federal rules to allow automakers to reduce the

10  energy in frontal airbags. This led to "an industry-wide changeover" to "redesigned" airbags in

11  the very next model years (1998-1999).[29][32] The "redesign" consisted of several new ~~technology~~

12  technological innovations. The first and immediate solution was "depowered" airbags:

13  automobile manufacturers removed some of the gas-generating propellant or stored gas from the

14  inflators to reduce the pressure and velocity of deployments. This change alone was highly

15  effective in reducing low-to-moderate speed fatalities.[30][33]

16       77.    Other innovations to reduce the risk of aggressive deployments included reducing

17  the volume or rearward extent of airbags, positioning them further from occupants, revised

18  folding techniques, and tethering and shifting from pyrotechnic inflators to hybrids including

19  stored gas.[31][34]

20

21

22

---

23  [26][29] Susan A. Ferguson & Lawrence W. Schneider, *An Overview of Frontal Airbag Performance with Changes in Frontal Crash-Test Requirements: Findings of the Blue Ribbon Panel for the*

24  *Evaluation of Advanced Technology Airbags*, Traffic Injury Prevention 3 (Nov. 2008).
[27][30] U.S. Department of Transportation, NHTSA, *An Evaluation of the 1998–1999 Redesign of*

25  *Frontal Air Bags,* NHTSA Technical Report No. DOT HS 810 685, p.11, (August 2006)
[hereinafter "NHTSA Redesign Report"]; *see also* Ferguson & Schneider, *supra* note [26][29].

26  [28][31] NHTSA Redesign Report, *supra* note [27][30], at vii.
[29][32] *Id.*; *see also* Micah Wright, *The Hidden Dangers of Older Airbags*, MotorBiscuit (May 8,

27  2015), https://www.motorbiscuit.com/the-hidden-dangers-of-older-airbags (last visited ~~August 4~~January 26, ~~2021~~ 2023).

28  [30][33] *See* NHTSA Redesign Report, *supra* note ~~27~~30 at 25.
[31][34] *Id.* at vii.

78.     Old GM knew about and employed these new technologies in its vehicles. Indeed, as the director of Old GM's Safety Center Terry Connolly said in 2000, there were no significant downsides to using this new "depowered" airbag technology, even for unbelted passengers.[35]

79.     Further innovations referred to as "advanced" or "smart" airbags followed soon thereafter.[3336] "Advanced" airbags alter deployment patterns according to feedback from several sensors. These sensors tailor how the airbag deploys based on the severity of the crash, the size and posture of the vehicle occupant, whether the occupant is wearing a seatbelt, and how close the occupant is to the airbag. [37]

80.     Many "advanced" systems use dual-stage or multi-stage inflators. This means that they have two inflation stages that can be ignited sequentially or simultaneously depending on crash severity.

81.     "Advanced" airbags phased into production beginning September 1, 2003 and were required in all new vehicles by September 1, 2006.[3538]

82.     Thus, based on the depowered and advanced airbag technology starting in 1998 and 1999, the risks posed by "late" deployments in early generation airbags had greatly diminished. Indeed, while NHTSA estimates that more than 290 deaths were caused by frontal airbag inflation between 1990 and 2008, nearly 90 percent of those deaths occurred in vehicles manufactured before 1998 (i.e., with first-generation airbag technology).[3639] Today, with this new technology, serious injuries from properly functioning airbags are rare.[3740]

83.     Despite knowledge and use of the new technology mitigating the risks of late deployments, the trucks group still insisted on shutting off the airbags and seatbelts in the Class Vehicles after 45 milliseconds. On information and belief, despite these well-established

---

[35] Keebler, *supra* note 2427.
[3336] *See* NHTSA Redesign Report, *supra* note 27 30 at p. 3.
[37] Wright, *supra* note 2932.
[3538] NHTSA Redesign Report, supra note 2730, at vii.
[3639] Insurance Institute for Highway Safety. "Airbags" (2021), available at: https://www.iihs.org/topics/airbags (last visited August 4January 26, 2021 2023).
[3740] *Id.*

1   advancements in airbag technology outlined above, GM continued to use this same defective

2   software ~~algorithm~~ calibration strategy in its vehicles in 2009 and beyon[38]d.

3          **3.      GM knew about a pattern of suspicious accidents involving the SDM
              Calibration Defect in the Class Vehicles.**

4   84.      ~~14.This~~ GM's reckless decision and continued disregard for clear warnings about

5   the risks in shutting off the SDM too soon during an accident has had real and tragic

6   consequences.

7          ~~3.GM knew about a pattern of suspicious accidents involving the SDM
              Calibration Defect but has done nothing to correct it.~~

8

9   85.      ~~1.~~As outlined above, GM has known about the SDM Calibration Defect since it

10  took over Old GM's books, records, and personnel in 2009. GM has continued to accrue

11  knowledge of the defect, and its serious consequences, in the years since. Indeed, GM has known

12  about, investigated, and even litigated numerous crashes in which airbags suspiciously failed to

13  deploy in multi-impact or prolonged-onset frontal crashes in the Class Vehicles—a clear

14  indication of the SDM Calibration Defect.

15  86.      ~~2.~~Despite obvious signs of a known and dangerous risk, GM concealed these

16  accidents and the SDM Calibration Defect from consumers and regulators to avoid or at least

17  delay a recall and the attendant costs and reputational damage therefrom. To date, GM has taken

18  no corrective action to repair or recall the Class Vehicles to address this defect.

19          **a.      GM has litigated (and settled) many personal injury lawsuits
                  for suspicious airbag failures in the Class Vehicles.**

20

21  87.      In addition to its institutional records and knowledge, GM was on notice of the

22  SDM Calibration Defect through litigating and settling personal injury lawsuits involving airbag

23  and ~~seatbelts~~ seatbelt failures consistent with the SDM Calibration Defect.

24  88.      As noted above, Chris Caruso has served as an expert witness in many of these

25  lawsuits. Mr. Caruso has "over 43 years working in the automotive engineering field." Exhibit D

26  at 4. This includes work as an engineer for Old GM from 1979 to 1986. Thereafter, from 1986 to

27

28  [38] ~~Publicly available crash data reports from NHTSA indicate that the Delco SDM was used in
      GM trucks vehicles up through at least MY 2015.~~

1    2006, Mr. Caruso worked for Delco Electronics, where he was "involved in the development and

2    implementation of the second generation of airbag system on GM vehicles and their subsidiaries

3    in the US." *Id.* at 1. Mr. Caruso also worked as a "lead engineer in the development of crash

4    sensor specifications and the airbag sensing systems for major OEM's worldwide," including Old

5    GM, and himself "designed the SDM crash sensing algorithms." *Id.* at 1-2. Mr. Caruso worked

6    for Delco through August of 2006. Thereafter, he began work in his current role as a consultant

7    with Automotive Safety Consulting, where he has "served as a consultant for both plaintiffs and

8    defendants in numerous cases involving automotive safety systems, including cases involving

9    EDR/CDR downloads and readouts." *Id.* at 4.

10           89.     Mr. Caruso recounts much of this work experience and the history of the SDM

11   Calibration Defect in public documents in a case filed in 2011, just two years after GM was

12   formed.

13           90.     2.In one case filed in 2011—just two years after GM was formed—Plaintiffs In

14   that case, Plaintiff James Nossar sued GM LLC following a crash in his 2005 Chevrolet

15   Trailblazer (a Class Vehicle here). As detailed in that complaint, on or about February 25, 2010,

16   Mr. Nossar drove his Trailblazer into the back of a 1999 Suburban "and sustained a moderate to

17   severe frontal impact . . . at a rate of speed that exceeded the airbag system's predetermined

18   deployment threshold." *See Nossar v. General Motors LLC*, Dkt. 4, Case No. 1:11-cv-02129

19   (N.D. Ga.). Despite this "significant frontal collision," the airbag failed to deploy and seatbelt

20   pretensioners failed to trigger. Without the airbag or seatbelt to protect him, Mr. Nossar's head

21   slammed into the steering wheel, which caused "fracturing practically every bone in his face and

22   brain injuries." *Id.*

23           91.     3.In support of his claims, in April 2012, Mr. Nossar filed an expert report from

24   Chris Caruso. Mr. Caruso who, as explained above, is an expert in automotive crash sensing

25   systems and who worked for Delco engineering during the development of the defective SDM

26   software calibration in the Class Vehicles. *See id.* at Dkt. 40 240-1.

27           92.     4.In that report, Caruso detailed the same flaws in the SDM software calibration

28   described herein. He explained that the airbag sensing system in the Trailblazer was "defective by

1   design and has the potential to not deploy frontal impact airbags in high speed frontal impacts

2   where conditions vary slightly from the perfect laboratory conditions where the system was

3   designed and tested." Based on Caruso's experience working in the development of the SDM

4   software, he related that there were concerns, due to the calibration, "that in longer duration, but

5   high severity events and in concatenated events (such as a curb impact followed by a utility pole

6   impact), the airbags would fail to deploy because the algorithm deployment thresholds were no

7   longer active." *Id.*

8          93.    5.Caruso further explained that as that litigation proceeded into discovery, he

9   would "expect to identify emails and other correspondence between GM Truck Engineers and

10  Delphi Crash Sensor engineers discussing the concerns over GM Truck Groups' edict to set

11  certain crash sensor calibration parameters outside the recommended minimum guidelines set by

12  the crash sensing algorithm designers [i.e. the Delphi/Delco engineers]." Caruso expected to

13  obtain this corroborating evidence because he "ha[d] seen these documents before and kn[e]w the

14  content," and summarized that "the calibration values result in premature turning off of algorithm

15  thresholds which effectively disables the front airbags after 45 to 50ms." *Id.* (emphasis added).

16         94.    Mr. Caruso's expectations as to what discovery would reveal are plausible because

17  of his contemporaneous experience with Delco and Old GM in the time period in which Mr.

18  Nossar's vehicle was developed. Mr. Caruso left Delco in 2006, long after the development

19  concluded for Mr. Nossar's model year 2005 vehicle. (Because vehicles are actually sold in their

20  model year, *i.e.*, 2008 vehicles are sold in 2008, their development predates the actual model year

21  by, one, two, or more years).

22         95.    As to Mr. Nossar's 2005 Trailblazer specifically, Caruso observed that the vehicle

23  included a version of the SDM hardware known as the SDM-DS, and concluded:

24      •   6.As to Mr. Nossar's crash specifically, Caruso concluded that the The airbags and
25          seatbelts failed because, at the time the airbags should have deployed, and
            consistent with the SDM Calibration Defect here, **the SDM calibration had**
26          **already timed out after** 45 ms **45-50ms** after the crash started."

27      •   "In reviewing the crash performance of the sensing system for the subject vehicle,
            with respect to the conditions of the subject crash, **it is clear that the calibration**
28

**values result in premature turning off of algorithm thresholds which effectively disables the front airbags after 45 to 50ms.**"

96.    ~~Caruso's conclusion there was that "[t]he~~ "The failure by GM to understand the **risks of certain dictated calibration values** [in the SDM software calibration] led directly to the design defect that rendered the frontal impact airbag system in the 2005 Chevrolet Trailblazer defective and unreasonably dangerous in certain field relevant, real-world crashes." *Id.*

97.    ~~7.~~GM LLC, a named defendant in ~~that~~ the *Nossar* case, clearly knew about and received Mr. Caruso's report outlining the history of these issues in the SDM software calibration.

98.    The *Nossar* case and Mr. Caruso's report support that Old GM continued to install SDMs with the Calibration Defect in its vehicles at least through model year 2005.

99.    More recently, Mark McCoy filed a lawsuit against GM LLC in 2020 after a serious accident in his 2018 Sierra Denali 2500. *See McCoy v. General Motors LLC*, Case No. X03- HHD-CV-20-6142910-S (Conn. Sup. Ct.).

100.    While on a freeway exit ramp, at a sharp turn, Mr. McCoy veered off the road, crashed into a fence, and then crashed into a trailer, before finally crashing into a construction vehicle parked near the ramp. None of the airbags in his vehicle deployed. As a result, Mr. McCoy sustained "catastrophic, painful and severely debilitating injuries," including traumatic spinal injuries, total paralysis from the chest down, a traumatic brain injury, and a broken nose, among other injuries.[41] Below is a picture of Mr. McCoy's Denali after the crash:

---

[41] *See* June 19, 2020 Amended Complaint, ¶ 8, *McCoy v. General Motors LLC*, Case No. X03-HHD-CV-20-6142910-S (Conn. Sup. Ct) ("McCoy"). *Available at*: https://civilinquiry.jud.ct.gov/DocumentInquiry/DocumentInquiry.aspx?DocumentNo=19161992

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18   101.   Mr. Caruso also served as an expert for plaintiff in the *McCoy* case and submitted

19 a detailed report in connection with summary judgment briefing in that matter.[42] Therein, Mr.

20 Caruso described his history with the company, including warning Old GM against using the

21 defective software calibration in trucks and SUVs, and his insistence on a disclaimer of liability

22 before releasing the calibrations for use in the Class Vehicles.

23   102.   Further, Mr. Caruso described his work after he left Delco in 2006 in failure-to-

24 deploy lawsuits "where the root cause was determined to be the 45ms SHUTOFF criteria" [i.e.,

25
26
27
_____

[42] Mr. Caruso's opinions in the McCoy case became publicly available only after the April 2022
28 hearing on the Defendants' motion to dismiss in this matter, and were also not available at the
time Plaintiffs filed their amended complaint in October 2021.

the SDM Calibration Defect]" in "numerous" GM trucks and SUVs in "earlier model[s]" than model year 2018.[43]

103.    Through discovery in the *McCoy* matter, Mr. Caruso analyzed the actual software calibration file for the SDM software in Mr. McCoy's model year 2018 vehicle. Based on his review of the file, Mr. Caruso concluded that the algorithm in the 2018 vehicle remained a "carry over" from the SDM software algorithm, ALGO-S, he himself designed years prior. Exhibit D at 16. Moreover, Caruso concluded that in the 2018 Sierra, GM "appeared to be using **very similar shutoff times in this calibration**" to those he had previously objected to in earlier model years in which GM "forc[ed] the use of 45ms shutoff times." *Id.* at 18.

104.    The presence of the defective calibration strategy in a GM truck sold at least 12 years after he stopped working for Delco came as some surprise to Caruso. Indeed, he "had believed" GM would have discontinued the use of the dangerous calibration prior to model year 2018. But the software itself told a different story. In summary, based on the actual software, discovery produced in that case, as well as the crash conditions from the McCoy accident, Caruso opined:

- "The failure to deploy [the] airbags resulted in a condition that was defective, unsafe and unreasonably dangerous" to the driver in this vehicle;

- "[I]t appears that [GM trucks Group] is **still employing very aggressive stop times**" in its software calibrations as of model year 2018; and

- GM should have implemented an "alternative design" to "[m]odify the algorithm calibrations with more robust 120-150ms" cutoff thresholds.

*See* Exhibit D.

105.    Caruso's report in the *McCoy* case—notably based on his review of the actual software calibration—demonstrates that at least through model year 2018, GM continued to install Delco SDMs governed by dangerous cutoff thresholds in calibrations based on the original ALGO-S software algorithm.

106.    Mr. Caruso also was able to identify the SDM hardware used in the McCoy vehicle as the Delco SDM30, which is evidence that GM continued to use the defective software

---

[43] Mr. Caruso's report in the McCoy matter is attached hereto as Exhibit D. *See id.* at 19.

1   calibration for all vehicles that contain that Delco SDM model. Publicly available crash data

2   reports from NHTSA show the same Delco SDM30 was installed by GM in GM trucks in at least

3   model years 2015 and 2016, including in the model year 2015 Chevrolet Trax, 2015 Chevrolet

4   Tahoe, and 2016 Yukon Denali.

5       107.   Likewise, on information and belief, Plaintiffs Vargas, Ray, and Milstead's Class

6   Vehicles contain SDM-11 model Delco SDMs. Given their model years and the Delco SDM, the

7   plausible, and most reasonable, inference is that they also included the associated defective

8   calibration strategy GM used with Delco SDMs.

9       108.   Based on: (1) Mr. Caruso's early knowledge of the SDM Calibration Defect when

10  it was first used; (2) his subsequent tenure with Delco through 2006, during which model year

11  vehicles for subsequent years were already in development; (3) his expert opinion on the presence

12  of the SDM Calibration Defect in a model year 2005 vehicle (*Nossar*) after his assessment of the

13  vehicle performance and crash dynamics; and (4) his opinion about defect's persistence in a

14  model year 2018 vehicle with the Delco SDM30 (*McCoy*)—the plausible, and most reasonable,

15  inference is that the defect persisted in the years between 1999, 2005 and 2018.

16      109.   Following service of Mr. Caruso's expert report and deposition in the *McCoy* case,

17  GM agreed to settle the case in December 2022.[44]

18      110.   8. Another Plaintiff In addition, Chad Vaith, filed a lawsuit against GM LLC in

19  2017 after an accident in his MY 2014 Silverado. As that complaint relates, in December 2015,

20  Mr. Vaith was involved in an accident in which he drove his Silverado "off the road into a ditch,"

21  after which he "continued through the ditch for approximately forty yards before launching over

22  the driveway/culvert. . . before coming to a final rest approximately twenty yards south." *See*

23  *Vaith v. General Motors LLC*, Dkt. 1, Case No. 18-cv-00031 (D. Minn.). Despite multiple

24  impacts in that prolonged accident, the airbags and seatbelts did not deploy, causing Mr. Vaith to

25  "suffer severe personal injuries." Mr. Caruso was also a disclosed expert for plaintiff in that case,

26  ───────────────

27  [44] Plaintiffs' allegation of a settlement is supported by plaintiff's request in *McCoy* in October
    2022 for additional time to withdraw the case because "additional time is necessary to exchange
    the necessary settlement documents." *See McCoy*, October 19, 2022 CaseFlow Request. Plaintiff

28  then withdrew the matter last month, in December 2022. *See* December 19, 2022 Withdrawal of
    Action, *McCoy v. General Motors LLC*, Case No. X03- HHD-CV-20-6142910-S (Conn. Sup. Ct).

1   although a report from Caruso was his opinions about the 2014 Silverado were not publicly filed.

2   *See, e.g., id.* at Dkt. 64.

3       111.   9.Mr. Vaith's case proceeded into fact discovery and ultimately resulted in a

4   "negotiated settlement" between Mr. Vaith and GM. *Id.* at Dkt. 82.

5       112.   10.Apart from In addition to these previous lawsuits against GM with Mr. Caruso

6   as an expert, another automotive crash expert, Sal Fariello, wrote directly to GM's CEO Mary

7   Barra twice in December 2016 to raise similar concerns about issues he had observed in the

8   airbag sensing system in model year 2006 GM SUVs. Mr. Fariello's letters are available in

9   NHTSA's public records.[3945]

10      113.   11.Mr. Fariello's letters to GM's CEO focused on an accident in a 2006

11  Trailblazer (a Class Vehicle here) for which he served as a litigation consultant in a lawsuit filed

12  in or around 2014. Therein, he lists multiple technical issues with the airbag sensing system that

13  he wanted to bring to GM's attention and urge them to address. For example, he cautions that, in

14  his view:

15          a.    "The deployment thresholds [i.e. , the inputs that will trigger deployment]

16  for the airbag were set too high and compromised driver and passenger safety as a result of GM's

17  improper effort to mitigate lawsuits related to relatively low speed deployments of the airbag.";

18          b.    "The deployment threshold did not meet GM's and generally accepted

19  standards for when an airbag should deploy in order to prevent occupant death based on written

20  technical papers and educational videos produced by GM or its employees."; and

21          c.    "Failure of the SDM to independently process a crash pulse and deploy the

22  airbag implicates a defective software algorithm; specifically 'Algo S-H' [the software algorithm

23  in the Class Vehicles]."

24      114.   12.At the time, in 2016, Mr. Fariello noted proposed that the SDM could be re-

25  programed "with a more responsive algorithm" to resolve these issues, and that GM's "only

26  apparent motive for not doing this related to the cost of implementing a recall."

27  

28  ───────────────
[3945] Mr. Fariello is a forensic crash investigator. *See* Bill Saporito, "Air Bag Blow Out," *Time Magazine,* (December 4, 2014). Available at: https://time.com/3617681/the-air-bag-blowout (last visited August 4January 26, 2021 2023).

115.   13.Frustrated by the response he received from GM's counsel in response to these letters, Mr. Fariello then wrote to Senator Bill Nelson of Florida enclosing his correspondence to GM and escalating his concerns. Senator Nelson then forwarded that correspondence to NHTSA.[4046]

116.   14.As Mr. Fariello concluded, in his view, GM was stalling on this issue "just as they did with the Takata airbag matter."

117.   Finally, in April 2016, plaintiff Kayla Greenwood filed suit against GM on behalf of her deceased parent, Galen Greenwood. *See Greenwood v. General Motors LLC and General Motors Company*, Dkt. 1, Case No. 16-cv-00149 (M.D. GA). Galen Greenwood was fatally injured when his "airbag failed to deploy and his seat belt failed to properly restrain him" during a multi-impact crash in his 2006 GM SUV, a Chevrolet Equinox—hallmarks of the SDM Calibration Defect. *Id.* Specifically, "Mr. Greenwood lost control of the subject vehicle, traveled over the northbound lane and onto the west shoulder in a gradual manner, and impacted two trees with the front of the subject vehicle. During the incident sequence, the driver's side airbag failed to deploy and the seat belt failed to properly restrain Plaintiff's decedent. During the impact, Galen Greenwood suffered severe injuries which resulted in his death." *Id.* GM settled with Ms. Greenwood in May 2017. *See id.* Dkt. 20-1.[47]

118.   Taken together, these and other allegations support the existence of the SDM Calibration Defect and the reasonable inference that Plaintiffs' model years 2010 and 2012 GM trucks and SUVs included it. Specifically, given that: (1) the model years of Plaintiffs' Class Vehicles were developed *after* Old GM first used the defective Software Calibration in or about 1999, and not long after Mr. Caruso left his role with Delco in 2006 (during which subsequent model years were already in development); (2) Plaintiffs' Class Vehicles predate the 2018 vehicle

---

[4046] Mr. Fariello's letters to GM and further documentation are available at: https://static.nhtsa.gov/odi/cmpl/2017/CL-10955948-3381.pdf (last visited ~~August 4~~January 26, ~~2021~~ 2023).

[47] In the *McCoy* matter, GM's designated corporate witness testified that he had previously offered testimony in a personal injury lawsuit about a crash where a vehicle "went off the roadway and struck a tree," where the plaintiff's name was Greenwood. On information and belief, GM's corporate designee in the *McCoy* matter was thus also a deponent in this settled Greenwood lawsuit, demonstrating further corporate knowledge of persistent injuries from the SDM Calibration Defect in the field.

1   in which Mr. Caruso reviewed the software calibration, and concluded that the algorithm still

2   included "very similar shutoff times" to those he had originally raised concerns about twenty

3   years earlier; (3) corroborating instances between those two bookends (1999 and 2018) support

4   the persistence of the defective calibration in the intervening model years (i.e., *Nossar, Vaith,*

5   *Greenwood,* and Fariello's letters, discussed *supra*); and (4) the broad, cross-model way that

6   SDM software calibration strategy is set and implemented across GM's fleet within a given

7   model year, the plausible, and most reasonable inference is that GM installed the same defective

8   calibration in all its trucks and SUVs at least through model year 2018.

9               **b.     GM knew or should have known about hundreds of publicly**
                         **reported airbag failures in the Class Vehicles.**
10

11          119.    GM was also on notice of the SDM Calibration Defect and its attendant safety

12  risks from consumer complaints. These complaints are publicly available online through

13  NHTSA's website. Between 1999 and the present, hundreds of consumers reported to NHTSA

14  that airbags and/or seatbelts had suspiciously failed during frontal crashes involving concatenated

15  (multiple) impacts or potentially prolonged crash onsets.  New allegations—including Mr.

16  Caruso's report showing the defect continued in a model year 2018 vehicle—make the below

17  crashes even more suspicious as relevant incidents with the hallmarks of the SDM Calibration

18  Defect (airbag and seatbelt failures in concatenated and prolonged frontal impacts) in the very

19  vehicles alleged to be impacted by that Defect (GM trucks and SUVs).

20          120.    On information and belief, vehicle manufacturers such as GM monitor these public

21  databases for complaints about their vehicles, considering their statutory obligations to report

22  known safety defects in their vehicles to NHTSA and to consumers. Moreover, in many of these

23  reports, it is expressly clear that GM was directly informed of, and even investigated, the accident

24  in question. While GM has access to the full body of these complaints from 1999 and onward in

25  the public database, it bears mention that over three hundred of them were filed after the new GM

26  entities were created in 2009.[4148]

27  _____

28  [4148] Many publicly reported accidents occurred prior to 2009, which information would likewise
    have been available to Old GM. GM would have acquired Old GM's knowledge of these
    accidents, reflected in its books, records, and personnel, when it was formed in 2009.

121.   One such complaint details an accident in a 2004 Chevrolet Trailblazer in August 2014. The driver states that they were traveling 50 MPH on a four-lane highway where another vehicle, waiting to U-turn, "decided to turn right into me—oncoming traffic." The vehicles crashed, which then "sent [the driver] into a head on collision with the guard rail." The driver questions that "there were 2 incidents in that sequence of events that the airbags should have deployed, but did not! This accident caused several injuries to myself and my passenger. We definitely could have been killed and no airbags to help save our lives…" Photos of the damage to the vehicle from that accident follow. (NHTSA Complaint #1100694).



000-13679321  08/25/2014 COPYRIGHT 2014 - INSURANCE AUTO AUCTIONS

1
2
3
4
5
6
7
8
9
10



000-13679321   08/25/2014 COPYRIGHT 2014 - INSURANCE AUTO AUCTIONS

11   122.   Another report describes a September 2012 accident in a 2005 Chevrolet

12   Trailblazer. It states that the driver, at 30 MPH, swerved to avoid a deer in the road, which caused

13   the vehicle to lose control, exit the road, and ultimately "crash[] off a 9 foot embankment." From

14   there, the vehicle continued to crash through a field, into a dirt levy, and finally into a drainage

15   ditch. None of the airbags deployed. The driver "became unconscious after his head crashed into

16   the steering wheel" and "suffered severe neck injuries." The dealer later inspected the vehicle but

17   responded that the results were "inconclusive" and that the manufacturer "was notified but

18   offered no assistance." Photos of the damage to the vehicle from that accident follow. (NHTSA

19   Complaint #942950).[49]

20
21
22
23
24
25
26
27

28   ---
[49] Accident documentation and photos are available at: https://static.nhtsa.gov/odi/cmpl/2012/EQ-10477257-8767.pdf (last visited January 26, 2023).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



123.    In another example, the complaint describes a serious accident in March 2019 involving a 2005 Chevrolet Equinox. The vehicle crashed into the front of another vehicle at 35

1   MPH. The airbags did not deploy. The driver sustained injuries to the head and ankle and

2   required medical attention. Photos of the damage to the vehicle from that accident follow.





124.    (NHTSA Complaint #1550406).⁴³⁵⁰





125.     Another account of a July 2007 accident in a model year 2001 Isuzu Rodeo describes a crash at 65 MPH so severe that "the median on the highway sustained property damage" and "the vehicle was destroyed," but the airbags did not deploy. This is how the vehicle looked after that accident:



126.     Additional examples of similarly suspicious frontal accidents—i.e., frontal accidents with multiple discrete impacts, or potentially prolonged onset frontal crashes involving "soft" impacts—in which the airbags and/or seatbelts failed include:

        a.       NHTSA complaint #753287 dated Tuesday, October 16, 2001, reported an accident on Monday, October 8, 2001 involving a 1999 CHEVROLET SUBURBAN in Andover, KS. The complaint states: "60 MPH CROSS WIND BLEW THE SUBURBAN HEAD ON INTO THE CONCRETE MEDIAN. THE VEHICLE SPUN 360 DEGREES, WENT INTO THE DITCH, THE FRONT END HIT AGAIN THE VEHICLE WENT UP THE OTHER SIDE OF THE EMBANKMENT AND STOPPED IN A FIELD. ENTIRE FRONT END OF THE FRAME NOT REPAIRABLE . . . FRONT CROSSMEMBER BENT AND ENGINE MOVED UPWARDS AT A 10 DEGREE ANGLE. **AIR BAGS FAILED TO DEPLOY**. *AK"[44][51]

        b.       NHTSA complaint #859858 dated Friday, April 7, 2000, reported an accident on Saturday, April 3, 1999 involving a 1999 CHEVROLET SILVERADO. The

---

[44][51] Emphasis is supplied here and in the paragraphs that follow.

complaint states: "WHILE TRAVELING ON A WET ROAD AT HIGHWAY SPEED OF 60 MPH VEHICLE HYDROPLANED, SPUN INTO A DITCH, AND COLLIDED INTO A TREE WITH BOTH SIDES AND FRONT OF VEHICLE. **UPON IMPACT, AIR BAGS FAILED TO DEPLOY**. MFR. NOTIFIED. *AK"

c.      NHTSA complaint #877320 dated Wednesday, January 3, 2001, reported an accident on Friday, December 1, 2000 involving a 1999 CHEVROLET SUBURBAN in Amarillo, TX. The complaint states: "CONSUMER WAS TRAVELING ABOUT 40MPH ON HIGHWAY AND ANOTHER VEHICLE VEERED INTO HER LANE, HITTING HER HEAD-ON, AND PUSHING VEHICLE INTO ANOTHER LANE. **VEHICLE HIT TELEPHONE POLE, AND DUAL AIRBAGS DIDN'T DEPLOY**. CONSUMER WAS INJURED. CHEVROLET HAS BEEN NOTIFIED. *AK"

d.      NHTSA complaint #10060150 dated Tuesday, March 2, 2004, reported an accident on Tuesday, February 24, 2004 involving a 2001 CHEVROLET BLAZER in Austin, TX. The complaint states: "D**RIVER SIDE AIR BAG FAILED TO DEPLOY IN A CRASH** THROUGH: 1. A SIX FOOT TALL WOODEN FENCE AT ALMOST 30MPH, THEN 2. THE EXTERIOR SIDE OF A 2-STORY HOME THAT CONTAINED THE KITCHEN SINK AND PLUMBING FIXTURES, WHILE SMASHING UP AND OVER THE FIFTEEN-INCH CONCRETE FOUNDATION, FRONT-END FIRST.*AK"

e.      NHTSA complaint #10082050 dated Thursday, July 15, 2004, reported an accident on Wednesday, July 14, 2004 involving a 2003 CHEVROLET SUBURBAN in Fresno, CA. The complaint states: "THE CONSUMER WAS INVOLVED IN AN ACCIDENT WHERE IT WAS HIT FROM THE FRONT DRIVER SIDE, THE IMPACT CAUSED THE VEHICLE TO HIT A TELEPHONE POLE HEAD ON. **THE AIR BAGS DID NOT DEPLOY**. *JB"

f.      NHTSA complaint #10103512 dated Friday, December 10, 2004, reported an accident on Sunday, December 5, 2004 involving a 2001 CHEVROLET SILVERADO in Rialto, CA. The complaint states: "CONSUMER'S VEHICLE WAS REAR ENDED WHILE DRIVING 50 MPH. THE VEHICLE WAS FORCE[D] INTO A SPIN AND THEN, IT HIT A CONCRETE ROAD DIVIDER. UPON IMPACT, **NEITHER FRONTAL AIR BAGS**

1    **DEPLOYED**. DRIVER SUSTAINED INJURIES, AND HAD TO BE TRANSPORTED TO A

2    LOCAL HOSPITAL. DEALER AND MANUFACTURER WERE NOTIFIED. THE

3    CONSUMER STATED THAT THE SEAT BELT DID NOT KEEP HER FROM HITTING HER

4    CHEST ON THE STEERING WHEEL."

5            g.      NHTSA complaint #10108404 dated Tuesday, February 1, 2005, reported

6    an accident on Tuesday, January 11, 2005 involving a 2000 CHEVROLET SILVERADO in

7    Toney, AL. The complaint states: "A CAR PULLED OUT IN FRONT OF ME WHICH STILL

8    HIT THE DRIVER'S SIDE OF MY VEHICLE (2000 CHEVY SILVERADO). **THEN MY**

9    **TRUCK HAD A FULL FRONTAL IMPACT AT GREATER THAN 30 MPH INTO A**

10   **DIRT WALL IN WHICH NEITHER THE DRIVER'S NOR PASSENGER'S AIRBAGS**

11   **DEPLOYED (THE TRUCK IS TOTALLED)**. I HIT THE STEERING WHEEL AND GOT A

12   CONCUSSION WITH BLOOD AROUND THE BRAIN, A BROKE CHEEK BONE, AND

13   FRACTURED HIP. MY WIFE WAS 33 WEEKS PREGNANT AT THE TIME AND HER

14   WATER BROKE AND SHE GOT A COMPOUND FRACTURE IN THE LOWER

15   LEG/ANKLE. AS A RESULT OF THE WATER BREAKING MY SON WAS BORN 3 DAYS

16   LATER 7 WEEKS PREMATURE. AS FOR WHAT WAS DONE TO CORRECT THE

17   PROBLEM I'M HOPING IT WILL AT LEAST BE INVESTIGATED TO MAKE SURE THIS

18   IS NOT A SYSTEMIC PROBLEM (I.E. SOFTWARE SCREWUP SOMETHING NOT

19   HOOKED UP RIGHT IN THE AIRBAG SYSTEM ETC)."

20           h.      NHTSA complaint #10115806 dated Thursday, March 24, 2005, reported

21   an accident on Thursday, March 24, 2005 involving a 2002 CHEVROLET SILVERADO in

22   Claremore, OK. The complaint states: "A PIECE OF FURNITURE WAS LOCATED IN THE

23   MIDDLE OF THE HIGHWAY WHILE DRIVING, CAUSING THE DRIVER TO HIT THE

24   FURNITURE. DRIVER LOST CONTROL OF A VEHICLE, AND IT CRASHED INTO A

25   CONCRETE WALL. DRIVER'S SIDE SEAT BELT FAILED, AND **THE AIRBAGS DID**

26   **NOT DEPLOY**."

27           i.      NHTSA complaint #10158090 dated Tuesday, May 23, 2006, reported an

28   accident on Sunday, February 26, 2006 involving a 2004 CHEVROLET TRAILBLAZER in

Fayetteville, NC. The complaint states: "DT*: THE CONTACT STATED WHILE DRIVING 50 MPH THE VEHICLE WAS INVOLVED IN A HEAD ON COLLISION WITH ANOTHER VEHICLE. THE VEHICLE CONTINUED MOVING AND STOPPED BY COLLIDING WITH A STORE SIGN. **THE AIR BAGS DID NOT DEPLOY** AND SEAT BELTS WERE WORN . . . THE INSURANCE COMPANY DETERMINED THE VEHICLE WAS TOTALED DUE TO THE ACCIDENT. THE DEALER DOES NOT HAVE THE MEANS TO TEST FOR AIR BAG NON-DEPLOYMENT. UPDATED 1/24/2007 - *NM"

j.      NHTSA complaint #10161658 dated Thursday, July 6, 2006, reported an accident on Saturday, June 3, 2006 involving a 1999 CHEVROLET BLAZER in Ludlow, MA. The complaint states in part: "CHEVY DRIVER HIT A CAR IN HER LANE FIRST, THEN RICOCHETED HEAD ON INTO A TREE. **NEITHER TIME DID AIRBAGS DEPLOY**. *TT"

k.      NHTSA complaint #10163811 dated Friday, July 28, 2006, reported an accident on Thursday, July 20, 2006 involving a 2000 ISUZU RODEO in Nederland, TX. The complaint states: "A GIRL RAN A RED LIGHT AND I HIT HER IN THE PASSENGER SIDE OF HER CAR HEAD ON WITH MY 2000 ISUZU RODEO. IT WAS A FULL FRONTAL COLLISION FOR ME AND MY CHILDREN. LUCKILY, WE ARE ALWAYS BUCKLED UP BECAUSE **NONE OF MY AIRBAGS DEPLOYED AT ALL**. THE OTHER CAR WAS GOING ABOUT 60 MPH AND HER AIRBAG DEPLOYED WHEN I HIT HER BUT MINE DID NOT. LUCKILY, MY CHILDREN WERE NOT HURT BADLY BUT UNFORTUNATELY, I SUSTAINED NECK, BACK AND KNEE INJURIES. I WAS AND STILL AM VERY UPSET THAT MY AIRBAGS FAILED. EVEN THE OWNER OF THE BODY SHOP I USE WAS IN SHOCK THAT THEY DID NOT DEPLOY AS THE IMPACT WAS ENOUGH TO SPLIT THE FRAME OF MY RODEO AND TOTAL IT OUT . . . THANK YOU FOR YOUR TIME, I HOPE I CAN HELP ANOTHER FAMILY FROM GETTING INJURED."

l.      NHTSA complaint #10217793 dated Tuesday, February 12, 2008, reported an accident on Thursday, February 7, 2008 involving a 2006 CHEVROLET TRAILBLAZER in

1    Lakewood, OH. The complaint states: "A 2006 CHEVY TRAILBLAZER TRAVELING OVER

2    THE SPEED LIMIT ON MY STREET CRASHED INTO A TREE, A PARKED CAR, AND

3    THEN CONTINUED TO ROLL OVER ACROSS MY FRONT LAWN, LANDING

4    SIDEWAYS AFTER FLIPPING SEVERAL TIMES. THE OCCUPANTS WERE SEVERELY

5    INJURED. **NO AIRBAGS DEPLOYED DURING THE CRASH**. THE DRIVER OF THE

6    VEHICLE IS IN ICU NEEDING FACIAL RECONSTRUCTIVE SURGERY. *TR"

7              m.      NHTSA complaint #10221319 dated Saturday, March 15, 2008, reported

8    an accident on Thursday, February 21, 2008 involving a 2005 CHEVROLET TRAILBLAZER in

9    Clay, NY. The complaint states: "I WAS DRIVING ON A 2 LANE ROAD GOING 45MPH. A

10   CAR WAS FOLLOWING CLOSE BEHIND ME SO I WENT TO GET INTO RIGHT LANE

11   AND MY TRUCK DID 5 360 AND HIT 3 TREES HEAD ON AND **AIR BAG NEVER**

12   **DEPLOYED**. *TR"

13             n.      NHTSA complaint #10263896 dated Wednesday, April 1, 2009, reported

14   an accident on Thursday, March 26, 2009 involving a 2002 CHEVROLET TRAILBLAZER in

15   Elizabeth, NJ. The complaint states: "I WAS IN A CAR ACCIDENT, WHERE I WAS

16   TRAVELING AT ABOUT 35 MPH. AN AGGRESSIVE DRIVER SPEED AROUND ME AND

17   CUT ME OFF AND THAN STOMPED ON THIS BRAKES IN FRONT OF ME. DUE TO

18   THAT I SWERVED TO MISS HIM CLIPPING HIS RIGHT BACK LIGHT AD BUMPER

19   WITH MY LEFT HEADLIGHT AND BUMPER. AS I WAS SWERVING I HIT A TREE JUST

20   ABOUT DEAD ON WITH MY CAR . . . I HIT THE TREE AT A SPEED OF ABOUT 28-30

21   MPH. AFTER INITIAL IMPACT I WAS RUSHED TO THE HOSPITAL DUE TO

22   UNCONSCIOUS AND FACIAL CONTUSIONS. DURING THE FIRST MOMENTS AFTER

23   THE ACCIDENT, ONE OF THE FIRST THINGS OFFICERS, EMTS AND WITNESSES SAID

24   WAS "**I CAN'T BELIEVE THE AIRBAGS DIDN'T GO OFF**." IN THE RECENT DAYS

25   AFTER THE ACCIDENT I HAVE HAD SEVERAL MECHANICS AND SUCH APPRAISE

26   THE CAR, THE ONE COMMON THEME THEY ALL SHARE IS THAT THEY SUSPECT

27   THERE MIGHT NOT BE AN AIRBAG WHERE IT BELONGS. OR THE LACK THERE OF.

28   *TR"

o.        NHTSA complaint #10463248 dated Wednesday, June 27, 2012, reported

an accident on Friday, July 15, 2011 involving a 2005 GMC in Richmond, VA. The complaint

states: "THE CONTACT STATED WHILE DRIVING 55 MPH, HE CRASHED INTO A TREE.

**THE AIR BAGS FAILED TO DEPLOY** . . . A POLICE REPORT WAS FILED. THE

MANUFACTURER WAS MADE AWARE OF THE FAILURE; HOWEVER, THEY

PROVIDED NO ASSISTANCE . . . THE CONSUMER'S VEHICLE WAS DAMAGED WHEN

HE TRIED TO AVOID HITTING THE VEHICLE BY SWERVING SIDEWAYS AND

SLIDING INTO THE GRASS. HE TRIED STOPPING THE VEHICLE WHILE IT WAS STILL

ON THE PAVEMENT BUT HE INEVITABLY RAN INTO THE DITCH AND FLEW

AIRBORNE INTO A TREE, AND THE TRUCK OVERTURNED."

p.        NHTSA complaint #10524151 dated Wednesday, July 10, 2013, reported

an accident on Thursday, May 30, 2013 involving a 2006 CHEVROLET TRAILBLAZER in

Mansfield, OH. The complaint states: "THIS COMPLAINT IS BEING FILED ON BEHALF OF

THE VEHICLE OWNER AND DRIVER. THIS CHEVY TRAILBLAZER WAS INVOLVED

IN A TWO VEHICLE, DOUBLE FATAL CRASH. THE FRONT OF THE TRAILBLAZER

STRUCK THE DRIVER'S SIDE DOOR OF A CAVALIER THAT FAILED TO YIELD FROM

A STOP SIGN. THE TRAILBLAZER STAYED CONNECTED WITH THE CAVALIER,

FORCING IT OFF THE LEFT SIDE OF THE ROADWAY AND INTO A LARGE TREE.

BOTH OCCUPANTS IN THE CAVALIER WERE FATALLY INJURED. **THE FRONT**

**AIRBAGS DID NOT DEPLOY ON THE TRAILBLAZER** AND NO EVENT WAS

RECORDED ON THE AIRBAG CONTROL MODULE. *TR"

q.        NHTSA complaint #10537593 dated Tuesday, August 27, 2013, reported

an accident on Tuesday, August 13, 2013 involving a 2003 CHEVROLET BLAZER in Harrison

Township, MI. The complaint states: "I WAS TRAVELING SOUTHBOUND WHEN I

EXPERIENCED A SEIZURE AND LOST CONTROL OF MY VEHICLE. I PROCEEDED TO

VEER TO THE LEFT WHERE I CLIPPED SEVERAL CARS THAT WERE HEADED

NORTHBOUND . . . I THEN PROCEEDED OVER A TREE LAWN AND INTO A PARKING

LOT. I HIT A DODGE RAM PICKUP WITH THE RIGHT FRONT CORNER OF MY

1    VEHICLE AND PUSHED THAT VEHICLE INTO ANOTHER PARKED CAR THAT WAS

2    NEXT TO IT. BOTH VEHICLES ENDED UP SIDEWAYS AND MY VEHICLE ENDED UP

3    SPUN AROUND 180 DEGREES . . . THE JAWS OF LIFE WERE USED TO EXTRACT ME

4    FROM MY VEHICLE. I WAS TAKEN TO A LOCAL HOSPITAL WHERE IT WAS

5    DETERMINED THAT I SUFFERED BURST FRACTURES OF L1, L2, AND L3. I ALSO

6    SUFFERED AN EVULSION FRACTURE OF MY LEFT ANKLE. THE POLICE REPORT

7    STATES THAT I WAS TRAVELLING AT A HIGH RATE OF SPEED AND THAT THE

8    VEHICLES WHICH WERE NORTHBOUND WERE JUST CLIPPED. **THE AIRBAGS ARE**

9    **BOTH STILL WITHIN THEIR CASES AS NEITHER DEPLOYED** . . . THE INSURANCE

10   INVESTIGATOR EVEN EXPRESSED TO MY WIFE THAT HE WAS SURPRISED THAT

11   THE AIR BAG DID NOT DEPLOY."

12              r.      NHTSA complaint #10550276 dated Wednesday, October 30, 2013,

13   reported an accident on Monday, October 28, 2013 involving a 2006 CHEVROLET

14   TRAILBLAZER in Neihart, MT. The complaint states: "TL* THE CONTACT OWNS A 2006

15   CHEVROLET TRAILBLAZER. THE CONTACT STATED THAT WHILE DRIVING

16   APPROXIMATELY 35 MPH, SHE LOST CONTROL OF THE VEHICLE WHILE DRIVING

17   IN SNOWY WEATHER. THE VEHICLE NOSE DIVED INTO AN EMBANKMENT AND

18   THEN CRASHED INTO A BOULDER. **THE AIR BAGS FAILED TO DEPLOY**. THE

19   CONTACT WAS TRANSPORTED TO THE HOSPITAL VIA AMBULANCE FOR

20   TREATMENT OF A CONCUSSION AND BRUISING. THE FRONT PASSENGER WAS

21   ALSO INJURED AND SUSTAINED BRUISING. THE VEHICLE WAS DESTROYED. THE

22   MANUFACTURER WAS MADE AWARE OF THE FAILURE."

23              s.      NHTSA complaint #10574295 dated Sunday, March 23, 2014, reported an

24   accident on Friday, February 21, 2014 involving a 2010 GMC TERRAIN in Saint Joe, IN. The

25   complaint states: "INVOLVED IN A 21 CAR PILE UP IN THE UPPER PENINSULA DURING

26   A COMPLETE WHITE OUT. WE WERE ONLY TRAVELING APPROXIMATELY 25

27   MILES PER HOUR BUT, WE DID HAVE SERIOUS IMPACT IN THE FRONT, AFTER

28   HITTING A TRAILER AND ALSO SERIOUS IMPACT FROM BEHIND WHEN HIT BY A

1   TRUCK AND TRAILER. **NO AIRBAGS DEPLOYED**. THE TRUCK TRAVELING AHEAD

2   OF US, THAT WE HIT, THE AIRBAGS DID DEPLOY. MY FATHER AND BROTHER,

3   WHO WERE ALSO BOTH DRIVING CHEVY TRUCKS, AND ALSO HAD SERIOUS

4   FRONT END DAMAGE DURING THE SAME ACCIDENT, THEIR AIRBAGS DID NOT

5   DEPLOY EITHER. *TR"

6          t.      NHTSA complaint #10576031 dated Monday, March 31, 2014, reported an

7   accident on Sunday, March 23, 2014 involving a 2012 CADILLAC SRX in Kaplan, LA. The

8   complaint states: "I FELL ASLEEP WHILE DRIVING, JUMPED A LEVEE, RAN THROUGH

9   A FENCE, AND WRECKED IN A GRASSY WATERY AREA. MY ENGINE WAS

10  SMASHED, THE MOTOR MOUNT BROKE, AND MY TIRES ARE PUSHED BACK. MY

11  **AIR BAGS DID NOT DEPLOY**. MY FACE HIT THE STEERING WHEEL AND MY NOSE

12  IS BROKEN. I WOULD LIKE TO FIND OUT IF THERE IS ANY RECALLS ON THIS CAR.

13  *TR"

14         u.      NHTSA complaint #10583703 dated Saturday, April 19, 2014, reported an

15  accident on Thursday, March 13, 2014 involving a 2012 GMC TERRAIN in Moneta, VA. The

16  complaint states: "I INADVERTENTLY VEERED OFF SIDE ROADWAY, (VA HIGHWAY

17  220) COLLIDING WITH A TREE/ROADSIDE SHRUBS, ETC (WAS KNOCKED

18  UNCONSCIOUS AS FOREHEAD HIT STEERING WHEEL ON INITIAL IMPACT).

19  **AIRBAGS DID NOT DEPLOY** ALLOWING ME TO SUSTAIN A HEAD INJURY THAT

20  KNOCKED ME UNCONSCIOUS... FOREHEAD WAS GASHED WITH SIGNIFICANT

21  BLEEDING. I WAS TRANSPORTED BY AMBULANCE IN UNCONSCIOUS STATE.

22  DAMAGE TO VEHICLE IS IN EXCESS OF $8,000 SO FAR AS VEHICLE STILL IN

23  REPAIR SHOP WITH MASSIVE FRONT END DAMAGE THAT AFFECTS STEERING

24  LINKAGE, ETC. THE IMPACT OF VEHICLE AGAINST FOLIAGE, TREES SHRUBS,

25  SHOULD HAVE FORCED AIR BAGS TO DEPLOY AND I BELIEVE THAT I WOULD NOT

26  HAVE SUSTAINED A HEAD INJURY THAT RENDERED ME UNCONSCIOUS WITH

27  MILD CONCUSSION AND COULD NOT CONTROL VEHICLE LEAVING ROADWAY.

28  *TR"

1          v.      NHTSA complaint #10592423 dated Monday, May 19, 2014, reported an

2   accident on Thursday, May 8, 2014 involving a 2003 CHEVROLET SILVERADO in

3   Burtonsville, MD. The complaint states: "TRUCK COLIDED WITH GUARD RAIL.

4   BOUNCED OFF, HIT VEHICLE 1, THEN INTO VEHICLE 2 THEN STOPPED AFTER

5   HITTING VEHICLE 3 A SEMI TRUCK. ALL DAMAGE WAS DONE TO FRONT OF THE

6   CHEVY SILVERADO. **AT NO TIME DID THE AIRBAGS DEPLOY**."

7          w.      NHTSA complaint #10622016 dated Wednesday, August 13, 2014,

8   reported an accident on Saturday, August 9, 2014 involving a 2012 CHEVROLET TAHOE in

9   The Colony, TX. The complaint states: "WHILE TURNING LEFT (TAHOE) WITH A

10  PROTECTED GREEN ARROW AT AN X-SHAPED INTERSECTION, VEHICLE (KIA

11  SEDAN) AT FAULT FAILED TO YIELD AND ENTERED THE INTERSECTION AT

12  SPEEDS UPWARDS OF 40 MPH FROM THE LEFT OF THE TAHOE. FRONT-IMPACT

13  COLLISION OCCURRED . . . TAHOE STRUCK PASSENGER SIDE OF KIA SEDAN.

14  TRAJECTORY OF IMPACT CAUSED DIRECTIONAL CHANGES IN UPWARDS OF 90*

15  FOR BOTH VEHICLES; THE FORCE OF THE PRIMARY ACCIDENT DESCRIBED ABOVE

16  ALSO CAUSED MENTIONED VEHICLES TO COLLIDE WITH LEFT REAR OF ANOTHER

17  VEHICLE (HONDA SEDAN) . . . DUE TO THE FORCE OF IMPACT, FRONT & SIDE

18  AIRBAGS DEPLOYED ON BOTH THE KIA SEDAN AND THE HONDA SEDAN, BUT

19  **FAILED TO DEPLOY ON THE TAHOE** . . . FORCE WAS SUCH THAT AFTER THE

20  COLLISION, TAHOE TRANSMISSION WAS IN DRIVE, BUT REMAINED AT A

21  COMPLETE STOP. DAMAGE SUSTAINED ON THE TAHOE INCLUDE FRONT-END

22  BODY DAMAGE, ENGINE DAMAGE (VEHICLE REQUIRED TOWING AND WAS

23  INOPERABLE), AND FRAME DAMAGE, AT A MINIMUM . . . MULTIPLE FIRST-

24  RESPONDERS COMMENTED ON THE ODDITY THAT, GIVEN THE DAMAGE

25  SUSTAINED BY THE TAHOE AND THE VELOCITY AT IMPACT, THE AIRBAGS

26  DEPLOYED ON ALL VEHICLES BUT THE TAHOE. *TR"

27          x.      NHTSA complaint #10641399 dated Saturday, October 4, 2014, reported

28  an accident on Tuesday, June 7, 2011 involving a 2002 CHEVROLET TAHOE in Cheney, WA.

The complaint states: "THE CONTACT STATED THAT WHILE THE DRIVER WAS DRIVING AT 45 MPH AND ATTEMPTED TO AVOID A CRASH WITH ANOTHER VEHICLE. AS A RESULT, THE DRIVER CRASHED INTO A GUARDRAIL AND **THE AIR BAGS FAILED TO DEPLOY.** A POLICE REPORT WAS FILED. THE CONTACT WAS TAKEN TO A HOSPITAL AND SUSTAINED INJURIES TO THE RIBS, THE COLLAR BONES, A BRAIN TRAUMA AND A COLLAPSED LUNG. THE DRIVER SUFFERED FROM FATAL INJURIES."

y.      NHTSA complaint #10767586 dated Tuesday, September 22, 2015, reported an accident on Saturday, August 1, 2015 involving a 2004 CHEVROLET TRAILBLAZER in Tallahassee, FL. The complaint states: "MY MOTHER WAS INVOLVED IN A 1 CAR ACCIDENT ON BAUM RD LOCATED IN TALLAHASSEE, FL. SHE WAS THE ONLY PASSENGER DETERMINED TO BE IN THE VEHICLE AT THE TIME OF THE ACCIDENT. ACCORDING TO THE CRASH REPORT, D1 (DRIVER ONE) WAS TRAVELING WESTBOUND ON BAUM RD GOING THE NORMAL POSTED SPEED OF 55MPH, WHEN SHE VEERED TOWARDS THE CENTER OF THE RD AND SUDDENLY TURNED RIGHT VEERING OF THE RIGHT SHOULDER OF THE RD AND STRIKING SEVERAL TREES ON THE DRIVERS SIDE AND FRONT END . . . WHEN I WENT TO RETRIEVE MY MOTHERS THINGS FROM HER TRAILBLAZER, I NOTICED THAT **NO AIR BAGS HAD DEPLOYED**. AND AS FAST AS MY MOM WAS GOING AND THE TYPE OF IMPACT & DAMAGE HER SUV SUSTAINED, I WOULD THINK AND HOPE THE AIRBAGS WOULD DEPLOY IN THIS TYPE OF ACCIDENT, THUS PREVENTING SERIOUS INJURY OR DEATH. MY MOM WAS NOT SO LUCKY, AND MYSELF AND MY FAMILY HAVE ENDURED GREAT PAIN FROM LOOSING HER SO SUDDENLY."

z.      NHTSA complaint #10907149 dated Friday, September 16, 2016, reported an accident on Thursday, September 1, 2016 involving a 2006 CADILLAC SRX in Happy Valley, OR. The complaint states: "THE VEHICLE HIT A CURB AND DROVE INTO A BUILDING. **THE AIR BAGS FAILED TO DEPLOY**. THE CONTACT SUSTAINED

1  INJURIES THAT REQUIRED MEDICAL ATTENTION . . . THE MANUFACTURER WAS

2  NOTIFIED OF THE FAILURE."

3       127.    GM knew or had reason to know about these complaints, which are publicly

4  available on NHTSA's website. Indeed, many complaints explicitly state that GM was directly

5  informed of and/or investigated these suspicious accidents. For example:

6          a.    A complaint about an August 2018 accident in a 2008 GMC Acadia details

7  that the airbags and seatbelt pretensioners did not deploy after the complainant's wife fell asleep

8  at the wheel and struck a utility pole and then a large dirt embankment—which caused her to "hit

9  the steering column so hard . . . it broke the column and broke her sternum," and caused the

10  granddaughter in the passenger seat to break her back in two places. It continues that "GENERAL

11  MOTORS . . . SENT A MAN TO DOWNLOAD THE COMPUTER INFORMATION THEY

12  SENT ME A COPY OF THE INFO AND LATER CONTACTED ME SAYING THE INFO

13  SHOWED EVERYTHING WAS WORKING PROPERLY." NHTSA complaint #11066850.

14          b.    After a July 2014 head on collision at 50 MPH where the airbags did not

15  deploy in a 2007 Silverado, totaling the vehicle, another driver was "TOLD BY GM THAT

16  CRASH DID NOT MEET CRITERIA FOR DEPLOYMENT." The driver expressed skepticism

17  about this response, and in the complaint, stated "A HEAD ON COLLISION AT 50 MPH THAT

18  TOTALED 2500 SERIES CHEVY TRUCK. HARD FOR ME TO BELIEVE . . . DO I NEED

19  TO [BE] CONCERNED?" NHTSA complaint #10608220.

20          c.    Another driver reported on a May 2014 accident in a 2012 GMC Terrain in

21  Moneta, VA. The driver struck "something" head on after veering off the highway and proceeded

22  through trees and brush. They were knocked unconscious after hitting their head on the steering

23  wheel upon the first impact, as the airbags had failed to deploy. They were transported to a

24  hospital by ambulance and spent two days in inpatient care. The driver later "CONTACTED

25  GMC CORPORATE . . . TO ADVISE MY CONCERNS FOR SAFETY . . . RECEIVED A

26  FOLLOW UP TELEPHONE CALL FROM GMC REPRESENTATIVE . . . HE EXPRESSED

27  NO INTEREST IN MY COMPLAINT . . . REFUSED TO COMMENT ON MY STATEMENT

28  THAT AIR BAG FAILED TO DEPLOY RESULTING IN EXTENSIVE DAMAGE TO FRONT

OF VEHICLE AND SUSTAINING A HEAD INJURY AS NO BAG DEPLOYED . . . I WAS ADVISED THAT GMC HAD NO FURTHER INTEREST IN THIS MATTER AND WOULD NOT EVALUATE MY SAFETY CONCERNS." NHTSA complaint #10588334.

d.      After a July 2012 accident involving a 2012 GMC Terrain in San Clemente, CA, in which the Terrain was hit multiple times in an intersection in the driver's front end, but no airbags deployed, resulting in whiplash and contusions to the driver, a GM representative responded to a complaint lodged by the driver's parents and stated that there was "NO NEED FOR DEPLOYMENT" because it was a "LOW THRESHOLD EVENT." NHTSA complaint #10466384.

e.      After hitting a patch of black ice at 58 MPH in a Chevrolet Silverado in January 2008, another complainant described that they lost control of the vehicle, ran off the road, crashed into a telephone pole and ultimately into a frozen embankment. The airbags did not deploy, causing the driver to hit the steering wheel. As the complainant relates, they "FILED A COMPLAINT WITH THE MANUFACTURER, BUT THE COMPLAINT WAS DENIED. THE MANUFACTURER WAS UNABLE TO DIAGNOSE THE VEHICLE; HOWEVER, AFTER INSPECTION OF THE VEHICLE, THE MANUFACTURER CONFIRMED THAT THE AIR BAGS WERE ENABLED AT THE TIME OF IMPACT. THEY DID NOT GIVE AN EXPLANATION FOR THE DEPLOYMENT FAILURE." NHTSA complaint #10238395.

f.      In a report about a March 2006 accident involving a 2005 Cadillac Escalade in Louisville, KY, the complainant describes that after none of the airbags deployed in a front end collision in their 4-week old vehicle, they "CALLED CADILLAC CUSTOMER SERVICE AND WAS GIVEN AN AIRBAG HISTORY LESSON VIA TELEPHONE FROM SOMEONE THAT HAD NEVER SEEN MY VEHICLE OR INSPECTED IT FOR DAMAGE AFTER THE ACCIDENT. AT THE END OF OUR CONVERSATION I WAS TOLD ALL WAS OK, NONE OF MY AIRBAGS SHOULD HAVE DEPLOYED AND NOT TO WORRY ABOUT IT. THE ENTIRE FRONT END OF MY VEHICLE WAS KNOCKED OFF, THE FRAME HAS MULTIPLE CRACKS AND IS BENT AS A RESULT OF THE COLLISION

1   AND THE COLLISION CENTER IS 90% CERTAIN THE VEHICLE IS NOT REPAIRABLE.

2   \*JB" NHTSA complaint #10152376.

3         g.      After an August 2004 accident involving a 1999 Chevrolet Astro in

4   Norfolk, ~~Virginia~~ VA in which the vehicle jumped a curb, struck ~~and~~ a fire hydrant, and then

5   struck a tree without the airbags deploying, the driver was taken by ambulance to the hospital for

6   head and neck injuries. After the accident, the "CONSUMER CONTACTED THE

7   MANUFACTURER AND A REPRESENTATIVE CAME DOWN TO MEET WITH THE

8   DEALER AND CONSUMER. THE REPRESENTATIVE INFORMED CONSUMER THAT

9   THE VEHICLE WAS FUNCTIONING AS DESIGNED." NHTSA complaint # 10087718.

10         h.      Another driver contacted GM after the airbags did not deploy in a February

11   2004 front end collision at 25-30 MPH in their 2000 Isuzu Rodeo in Westwood, NJ. "THE

12   CONSUMER CONTACTED THE MANUFACTURER ABOUT THE AIR BAGS BUT THE

13   REPRESENTATIVE DID NOT SEEM TO BE TOO CONCERNED ABOUT THE

14   SITUATION." NHTSA complaint #10087550.

15         i.      Another driver described a head on collision at 39 MPH in their 2002

16   Chevrolet Tahoe in which the airbags did not deploy and the seatbelts did not tighten. The driver

17   hit their head on the steering wheel, knocking them unconscious. A readout from the vehicle's

18   computer showed the seatbelts were in working order, and GM responded by sending a

19   representative to inspect the vehicle in person. The complainant was awaiting a response from

20   GM at the time of the report. NHTSA complaint #10353935.

21         128.     More than eight hundred similar complaints—i.e.~~.~~, frontal crashes in the Class

22   Vehicles with airbag and seatbelt failures following multiple impacts, or, potentially long-soft

23   frontal impacts—are attached hereto as Exhibit A.[52] These accidents are relevant, and suspicious,

24

[52] The accidents in the preceding paragraph and Exhibit A include data for Class Vehicles in model years 1999-2014. In the interest of efficiency, Plaintiffs have not supplemented the accidents included in Exhibit A from the previously filed version with the first amended complaint, but note that significant numbers of similar consumer reports of multi-impact and front-end impact accidents with airbag and seatbelt failures have continued to accrue in the NHTSA database in model years 1999-2014, as well as later model years, in the time since Exhibit A was originally prepared in 2021. Plaintiffs are prepared to submit supplemental examples of such incidents at the Court's request.

because they include hallmarks of the SDM Calibration Defect (airbag and seatbelt failures), under the very crash conditions where it arises, and in the specific population of vehicles Plaintiffs allege to be impacted.

129.     In addition to these consumer complaints, a separate, public dataset from NHTSA, the Fatality Analysis Reporting System ("FARS") provides a nationwide census of crashes that resulted in fatal injuries. While the complaints outlined above are reported to NHTSA by consumers and can include any type of complaint or incident, FARS data is reported by state agencies responsible for monitoring all qualifying fatal crashes in their states. To be included in FARS data, a crash must involve a motor vehicle traveling on a public road and result in the death of a person in one or more of the vehicles involved in the crash within 30 days of the crash. The dataset collects information on over 100 different data elements that characterize the crash, the vehicles, and the people involved—including whether or not the airbags deployed.

130.     NHTSA's FARS dataset also reveals a recurring pattern of suspicious nondeployments during frontal crashes (i.e., the crash dynamics that can implicate the SDM Calibration Defect) and reinforces the extremely high stakes of such incidents. From 1999 to present, FARS data reflects at least 1,946 frontal crashes where the airbags did not deploy in a Class Vehicle—1,167 of which occurred in 2009 or later, after New GM was formed. This same data reflects that at least 1,298 individual occupants (drivers or passengers) in a Class Vehicle were injured or killed in these crashes.

**D.     Despite its knowledge, GM misrepresented and concealed important information about the SDM Calibration Defect and Class Vehicle safety.**

131.     For many consumers, including Plaintiffs, safety is one of the most important factors when buying or leasing a vehicle. GM capitalized on this fact in advertising and other consumer-facing representations about the Class Vehicles and touted the safety of the Class Vehicles in national marketing campaigns.

132.     In nationwide advertisement campaigns and promotional materials, GM maintained that the Class Vehicles were safe and reliable, and it did not correct representations about the Class Vehicles' safety and reliability made by Old GM in the past. Instead, GM has

repeatedly touted the Class Vehicles' passenger safety systems and assured consumers they could be relied upon to activate the airbags and seatbelts during a crash. These representations are false and misleading because of what they fail to say; GM uniformly failed to disclose that the SDM Calibration Defect could—at the worst possible moment—prevent the airbags and seatbelts from activating.

133.    Plaintiffs and Class members, directly or indirectly, were exposed to these advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. ~~If GM had instead chosen to disclose the truth about the SDM Calibration Defect—including at dealerships, on its website, in brochures, press releases or in other promotional materials—Plaintiffs and Class members would have seen those disclosures.~~ The misleading statements about Class Vehicles' safety in GM's advertisements and promotional materials, as well as GM's omission of the truth about the SDM Calibration Defect, influenced Plaintiffs and Class members' decisions to purchase or lease Class Vehicles. If GM had instead chosen to disclose the truth about the SDM Calibration Defect, Plaintiffs and Class members would have seen those disclosures. Indeed, Plaintiffs would have had multiple opportunities to receive information about the SDM Calibration Defect if GM chose to disclose it, including at dealerships, on GM's website, in radio or television advertisements, brochures, press releases or in other promotional materials, as well as in news media reports that would likely follow from the revelation of a serious safety defect in millions of GM vehicles.

### 1.    Labels and window stickers on the Class Vehicles stated that they were equipped with working airbags and seatbelts and failed to disclose the SDM Calibration Defect.

134.    To sell vehicles in the United States, GM was required to "certify to the distributor or dealer at delivery that the vehicle or equipment complies with applicable motor vehicle safety standards prescribed" by NHTSA under Chapter 301 of Title 49 of the U.S. Code. GM "may not issue the certificate if, in exercising reasonable care," they have "reason to know the certificate is false or misleading in a material respect." 49 U.S.C. § 30115; *see also* 49 U.S.C. § 30112.

135.    Because "[c]ertification of a vehicle must be shown by a label permanently fixed to the vehicle," all Class Vehicles have a permanent label certifying compliance with the safety

regulations prescribed by NHTSA. Since all the Class Vehicles are passenger vehicles, the permanent label must state: "This vehicle conforms to all applicable Federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of manufacture shown above." 49 C.F.R. § 567.4(g)(5).

136.    These labels were false and misleading because they failed to warn consumers about the risk that the SDM would fail during a frontal crash, and instead indicated that the passenger safety system would function properly. *See* 49 C.F.R. § 571.208 (S4.1.5.4, S4.1.5.5) (Federal motor vehicle safety standards requiring Occupant Restraint Systems with airbags and seatbelts).

137.    Vehicle manufacturers have a duty to disclose known safety defects to the public and to NHTSA. When a vehicle manufacturer learns of a safety defect, federal law requires it to disclose the defect to NHTSA and to the owners, purchasers, and dealers of the vehicle. 49 U.S.C. § 30118(c). Indeed, GM Parent acknowledges these obligations in its public SEC filings. In its Form 10-K for fiscal year 2019, GM Parent states: "If we or NHTSA determine that either a vehicle or vehicle equipment does not comply with a safety standard or if a vehicle defect creates an unreasonable safety risk, the manufacturer is required to notify owners and provide a remedy."

138.    The interiors of the Class Vehicles also contain prominent labels that alert the driver and passengers to the vehicle's airbag system. For example, steering wheels and passenger dashboards typically have labels identifying the airbag and safety restraint system (or "SRS").

139.    GM was also specifically required by law to include in their vehicles warning labels that alerted consumers of the need to perform airbag maintenance. For example, S4.5.1 of 49 C.F.R. § 571.208 states:

> Air bag maintenance or replacement information. If the vehicle manufacturer recommends periodic maintenance or replacement of an inflatable restraint system, as that term is defined in S4.1.5.1(b) of this standard, installed in a vehicle, that vehicle shall be labeled with the recommended schedule for maintenance or replacement. The schedule shall be specified by month and year, or in terms of vehicle mileage, or by intervals measured from the date appearing on the vehicle certification label provided pursuant to 49 CFR Part 567. The label shall be permanently affixed to the vehicle within the passenger compartment and lettered in English in block capital and numerals not less than three thirty-seconds of an inch high.

This label may be combined with the label required by S4.5.1(b) of this standard to appear on the sun visor.

140.     Plaintiffs is are unaware of any label in any Class Vehicle that alerted consumers to the SDM Calibration Defect or the need to perform maintenance to protect the SDM from preventing airbag deployment or seatbelt tightening when they are needed.

141.     GM also distributed the Class Vehicles with so-called "Monroney" labels (also known as "window stickers") that described the equipment and safety features of the vehicles, including airbags. Dealers sell Class Vehicles to consumers with these labels visible. An image of a Monroney label for the 2012 Silverado is included below as a representative example. In the center of the image, it features a "Five Star" frontal crash rating for drivers. Under "Safety & Security" features, it touts the "dual stage" airbags.



142.     Monroney labels for many of the Class Vehicles are available at: https://monroneylabels.com. Additional exemplars of Monroney labels from some of the Class Vehicles are attached as Exhibit B. On information and belief, the original printed Monroney

labels for the Class Vehicles included the same content as pertains to safety and airbags as the exemplar Monroney labels from monroneylabels.com.

143.    As demonstrated by these examples, Monroney labels uniformly assured consumers that the Class Vehicles had working airbags and seatbelts. This information would have suggested to any reasonable consumer that the passenger safety system did not suffer from a defect and would perform its intended function of activating the seatbelts and airbags when needed during a frontal collision.

11.    Had GM disclosed the defective nature of the SDM software calibration on the Monroney labels or other labels or in marketing for the Class Vehicles, Plaintiffs and Class members would have seen that disclosure.

**2.    GM published owners' manuals for the Class Vehicles that detailed their safety features but did not disclose the SDM Calibration Defect.**

144.    GM (and Old GM before it) published owners' manuals for each of the Class Vehicles, which were and distributed and made them available throughout the United States. These manuals were directed at consumers and included misleading statements regarding seatbelts, airbags, and passenger safety systems. These statements uniformly omitted any warning to consumers that the SDM could effectively shut off during a crash after just 45 milliseconds, or that the airbags and seatbelt pretensioners may not deploy when expected.

145.    Representative examples of statements from owners' manuals with materially misleading omissions concerning the effectiveness of their airbags follow in the paragraphs below.

146.    The manual for the 2002 Cadillac Escalade provides extensive detail about the vehicle's airbags, including the below details and images. In addition to explaining the types of airbags and where they are located, the manual specifically alerts consumers that the airbags "are designed to inflate in moderate to severe frontal or near-frontal crashes" where "the impact speed is above the system's designed 'threshold level.'" As to frontal airbags, it explains that they have been "designed to help reduce the risk of injury from the force of an inflating airbag."

## Supplemental Restraint Systems (SRS)

This part explains the frontal and side impact Supplemental Restraint Systems (SRS) or air bag systems.

Your vehicle has four air bags -- a frontal air bag for the driver, another frontal air bag for the right front passenger, a side impact air bag for the driver, and another side impact air bag for the right front passenger.

Frontal air bags are designed to help reduce the risk of injury from the force of an inflating frontal air bag. But these air bags must inflate very quickly to do their job and comply with federal regulations.

### When should an air bag inflate?

The driver's and right front passenger's frontal air bags are designed to inflate in moderate to severe frontal or near-frontal crashes. But they are designed to inflate only if the impact speed is above the system's designed "threshold level."

If your vehicle goes straight into a wall that doesn't move or deform, the threshold level is about 9 to 16 mph (14 to 26 km/h). The threshold level can vary, however, with specific vehicle design, so that it can be somewhat above or below this range.

If your vehicle strikes something that will move or deform, such as a parked car, the threshold level will be higher. The driver's and right front passenger's frontal air bags are not designed to inflate in rollovers, side impacts, or rear impacts, because inflation would not help the occupant.

## How the Air Bag Systems Work

### Where are the air bags?



The driver's frontal air bag is in the middle of the steering wheel.



The right front passenger's frontal air bag is in the instrument panel on the passenger's side.

The driver's side impact air bag is in the side of the driver's seatback closest to the door.

1
2
3
4
5
6
7
8
9
10
11
12

### How the Air Bag Systems Work

**Where are the air bags?**



The driver's frontal air bag is in the middle of the steering wheel.



The right front passenger's frontal air bag is in the instrument panel on the passenger's side.

The driver's side impact air bag is in the side of the driver's seatback closest to the door.

13
14
15
16
17
18
19
20
21
22
23

### When Should an Airbag Inflate?

Frontal airbags are designed to inflate in moderate to severe frontal or near-frontal crashes to help reduce the potential for severe injuries mainly to the driver's or right front passenger's head and chest. However, they are only designed to inflate if the impact exceeds a predetermined deployment threshold. Deployment thresholds are used to predict how severe a crash is likely to be in time for the airbags to inflate and help restrain the occupants.

Whether the frontal airbags will or should deploy is not based on how fast your vehicle is traveling. It depends largely on what you hit, the direction of the impact, and how quickly your vehicle slows down.

All of the airbags in the vehicle will have the word AIRBAG embossed in the trim or on an attached label near the deployment opening.

For frontal airbags, the word AIRBAG will appear on the middle part of the steering wheel for the driver and on the instrument panel for the right front passenger.

With seat-mounted side impact airbags, the word AIRBAG will appear on the side of the seatback closest to the door.

With roof-rail airbags, the word AIRBAG will appear along the headliner or trim.

Airbags are designed to supplement the protection provided by safety belts. Even though today's airbags are also designed to help reduce the risk of injury from the force of an inflating bag, all airbags must inflate very quickly to do their job.

### Airbag System

The vehicle has the following airbags:

- A frontal airbag for the driver.
- A frontal airbag for the right front passenger.
- A seat-mounted side impact airbag for the driver.
- A seat-mounted side impact airbag for the right front passenger.
- A roof-rail airbag for the driver, passenger seated directly behind the driver, and the third row outboard passenger position.
- A roof-rail airbag for the right front passenger, passenger seated directly behind the right front passenger, and the third row outboard passenger position.

24
25
26
27
28

147.    The manuals for the 2009 Chevy Traverse and 2010 Buick Enclave include similar details and images. Like the manual for the 2002 Cadillac Escalade, they also assure consumers that the vehicle's airbags are "designed to help reduce the risk of injury from the force of an inflating bag" and, thus, that the aggressive deployment problems that plagued first-generation airbags had been alleviated.  It also assures that the frontal airbags have been "designed to inflate

in moderate to severe frontal crashes to help reduce the potential for severe injuries….” It continues that airbag “deployment thresholds are used to predict how severe a crash is likely to be in time for the airbags to inflate and help restrain the occupants.” While it ~~gives~~ provides very specific detail ~~on~~ about the way the passenger safety systems should function, the manual notably fails to say that the deployment thresholds are wholly and intentionally ignored just 45 milliseconds into a crash sequence, preventing the airbags and seatbelts from functioning when they need to.

148.    The manual for the 2014 GMC Acadia provides additional detail about how the passenger safety system functions. It explains that “Airbags are designed to inflate if the impact exceeds the specific airbag system's deployment thresholds.” Yet again, however, the manual does not indicate that the SDM and its sensors are rendered useless in multi-impact crashes that endure for longer than a specific, 45-millisecond time frame.



**Where Are the Airbags?**

The driver frontal airbag is in the center of the steering wheel.



The front outboard passenger frontal airbag is in the passenger side instrument panel.



If the vehicle has a front center airbag, it is in the inboard side of the driver seatback.

**When Should an Airbag Inflate?**

This vehicle is equipped with airbags. See *Airbag System on page 3-23*. Airbags are designed to inflate if the impact exceeds the specific airbag system's deployment threshold. Deployment thresholds are used to predict how severe a crash is likely to be in time for the airbags to inflate and help restrain the occupants. The vehicle has electronic sensors that help the airbag system determine the severity of the impact. Deployment thresholds can vary with specific vehicle design.

Frontal airbags are designed to inflate in moderate to severe frontal or near frontal crashes to help reduce the potential for severe injuries, mainly to the driver's or front outboard passenger's head and chest.

Whether the frontal airbags will or should inflate is not based primarily on how fast the vehicle is traveling.

It depends on what is hit, the direction of the impact, and how quickly the vehicle slows down.

Frontal airbags may inflate at different crash speeds depending on whether the vehicle hits an object straight on or at an angle, and whether the object is fixed or moving, rigid or deformable, narrow or wide.

Frontal airbags are not intended to inflate during vehicle rollovers, rear impacts, or many side impacts.

In addition, the vehicle has advanced technology frontal airbags. Advanced technology frontal airbags adjust the restraint according to crash severity.

The front center airbag, if equipped, is designed to inflate in moderate to severe side crashes depending upon the location of the impact, when either side of the vehicle is struck. In addition, the front center airbag is designed to inflate when the sensing system predicts that the vehicle is about to roll over on its

side. The front center airbag is not designed to inflate in frontal impacts, near frontal impacts, or rear impacts.

Seat-mounted side impact airbags are designed to inflate in moderate to severe side crashes depending on the location of the impact. Seat-mounted side impact airbags are not designed to inflate in frontal impacts, near frontal impacts, rollovers, or rear impacts. A seat-mounted side impact airbag is designed to inflate on the side of the vehicle that is struck.

Roof-rail airbags are designed to inflate in moderate to severe side crashes depending on the location of the impact. In addition, these roof-rail airbags are designed to inflate during a rollover or in a severe frontal impact. Roof-rail airbags are not designed to inflate in rear impacts. Both roof-rail airbags will inflate when either side of the vehicle is struck, if the sensing

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**3.**      **GM marketed the Class Vehicles to be safe and reliable but failed to mention the SDM Calibration Defect.**

149.    Like its other consumer-facing representations, GM's advertisements for the Class Vehicles left out a crucial part of the story. By uniformly omitting any information about the SDM Calibration Defect, GM misled consumers into believing that their airbags and seatbelts would function properly in a crash, despite its knowledge to the contrary.

150.    A 2013 press release about the 2014 Chevy Silverado 1500, GMC Sierra, and Sierra Denali 1500 is further illustrative of GM's misleading statements about the Class Vehicles. Acknowledging that safety is "as important to truck buyers as it is to car buyers," Gay Kent, GM general director of Vehicle Safety and Crashworthiness, stated that the "Silverado and Sierra set a benchmark for pickup truck safety by offering a full array of advanced features designed to protect occupants before, during and after a collision." The press release noted the vehicle's "[s]ix standard air bags and 360-degree sensor system, including dual-stage frontal air bags, head-curtain side-impact air bags with rollover protect, and front outboard seat-mounted side-impact air bags."

151.    Brochures and press releases for other Class Vehicles use similar language to send a misleading message of safety. Illustrative examples are described listed below.

a.      Beginning with the 1999 Chevy Blazer, GM promised to go "to the ends of the earth to bring you driving security," assuring "peace of mind" with its "mainstay features such as Next Generation driver and right-front-passenger airbags."

b.      "Because safety and security are so important to your family," the brochure for the 2002 Chevy Astro reads, "Astro features a comprehensive system to help you feel secure while you're driving." Among other safety features, "[s]tandard driver and front-passenger air bags . . . [are] designed to give you peace of mind. Chevy Astro. It's the midsize van that's serious about safety and security."

1          c.       The brochure for the 2006 GMC Yukon promises, "should the worst

2    happen, your Yukon will protect you and your passengers with front and rear crush zones, a

3    sturdy steel safety cage, up to four air bags and a host of other important safety features."

4          d.       The brochure for the 2008 Buick Enclave explains that "[s]afety and

5    protection were top priorities in the design of the Enclave" and touts the vehicle's "360°

6    perimeter safety system [that] will deploy the appropriate airbags."

7          e.       Promising "[f]eelings of security and confidence," the brochure for the

8    2009 Chevy Equinox states the vehicle's "dual-stage frontal and head-curtain side-impact air

9    bags" helped earn it "the highest possible government rating for frontal crash tests – five stars."

10          f.       Declaring that "[s]afety never goes out of style," the brochure for the 2009

11    Chevy Traverse highlights the vehicle's "five-star frontal and side-impact crash test ratings" and

12    its "six air bags that help protect all three rows of seating."

13          g.       A press release for the 2009 Cadillac Escalade ESV goes further,

14    proclaiming that the "Escalade is designed to be among the industry's safest and most secure

15    vehicles, with numerous safety systems and crash-avoidance technologies."

16          h.       "Speaking of safety," the brochure for the 2010 Buick Enclave reads,

17    "Enclave has earned an impressive five-star crash rating for both front and side impacts . . . .

18    Five-star rating is for the driver and front passenger seating positions in the frontal crash test and

19    for the front and rear seating positions in the side-impact crash test."

20          i.       The brochure for the 2010 GMC Terrain describes the vehicle as "the state

21    of the art in air bags" and contends that "[s]egment-best safety is anticipated, with features that

22    include . . . six standard air bags: dual frontal airbags; head curtain side air bags and pelvic/thorax

23    seat-mounted side airbags."

24          j.       The brochure for the 2010 Silverado assures that the "head of security

25    never goes off the clock," boasting of a "five-star frontal crash test rating," including through its

26    "driver and right-front passenger dual-stage airbags."

27

28

1          k.       A press release for the 2011 Cadillac Escalade Hybrid explains, "[f]ront-

2  image airbags for the driver and passenger have been designed to protect the head during a frontal

3  crash."

4          l.       According to the brochure for the 2011 Cadillac SRX, "[p]assenger safety

5  is a primary consideration throughout the engineering process." If an incident occurs, "the SRX

6  looks out for you and yours," with its "six standard airbags, including advanced, frontal dual-

7  stage and seat mounted side-impact airbags for the driver and front-seat passenger, as well as

8  first- and second- row outboard head-curtain airbags."

9          m.       Describing Buick's "holistic[]" approach to safety, the brochure for the

10  2012 Enclave proclaims, "Enclave's approach to safety helps you and your companions feel safe

11  and secure before, during and after your travels." Inside the vehicle, "all rows have curtain side-

12  impact air bags with rollover protection, along with driver and front-passenger side-impact and

13  ~~dual sage~~ dual-stage airbags."

14          n.       In a 2013 press release announcing that NHTSA gave "its highest possible

15  5-star Overall Score" to a number of Chevrolet vehicles, including the Traverse and the

16  Silverado, Kent said "We design safety and crashworthiness into our vehicles very early in

17  development." He continued, "We are committed to offering advanced safety technologies on a

18  broad range of models . . . . All of our vehicles are designed to provide continuous protection for

19  customers before, during and after a crash."

20          o.       A press release for the 2013 Buick Enclave likewise publicized Buick's

21  safety record: "In 2012, every Buick model was named a Top Safety Pick by the Insurance

22  Institute for Highway Safety, underscoring the brand's commitment to safety leadership. The

23  2013 builds on that distinction with the industry's first front center side air bag – a standard

24  feature."

25          p.       "With head curtain side-impact air bags reaching from the front to the third

26  row of seating for outboard passengers," the 2014 brochure for the GMC Yukon XL reads,

27  "Yukon is engineered to help protect passengers regardless of where they're seated."

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

q.      Claiming to "set[] the standard . . . in everything from safety to performance," the brochure for the 2014 Cadillac Escalade touts the vehicle's "eight standard airbags," including "[d]ual-stage driver and front passenger, front-impact, Automatic Occupant Sensing System, driver and front passenger seat-mounted side-impact airbags for thorax and pelvic protection and head-curtain side-impact airbags with rollover protection for all outboard passenger rows."

r.      The brochure for the 2014 Buick Enclave promises that the vehicle has "your back, front and sides, proclaiming that "in an industry first, the standard driver's seat side-mounted front center air bag adds another layer of protection by providing cushioning between you and your front passenger to help reduce injuries in side impacts." The brochure includes the below picture, indicating that the airbags will function as expected.



152.    Based on information and belief, every single Class Vehicle advertisement omitted any mention that the vehicles' airbags and seatbelts could fail in a serious frontal collision due to the SDM Calibration Defect.

**4.      ~~Defendants~~ GM provided warranties to repair defects in the Class Vehicles and have not done so.**

153.    ~~Defendants~~ GM also provided Plaintiffs and Class members with an express warranty "to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle related to materials or workmanship" in the Class Vehicles.

154.    The warranty terms became part of the basis of the bargain when Plaintiffs and ~~each~~ Class ~~member~~ members purchased or leased their Class Vehicles.

155.    Plaintiffs and each Class member have had sufficient direct dealings with either Defendants or their agents (including dealerships) to establish privity of contract between Defendants, on the one hand, and Plaintiffs and each Class member, on the other hand, as to the express and implied warranties described in the Claims for Relief below.

156.    Nonetheless, privity is not required here because Plaintiffs and each Class member are intended third-party beneficiaries of contracts between Defendants and their dealers, and of their implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers only. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the safety defect in the SDM Calibration.

* * *

157.    GM's deceptive actions harmed Plaintiffs and the Class(es). As a result of GM's unfair, deceptive, and/or fraudulent business practices, and failure to disclose that the Class Vehicles carried a dangerous safety defect that would cause the passenger safety systems to shut off during certain types of accidents, owners and lessees of the Class Vehicles have lost money and/or property.

## V.    CLASS ACTION ALLEGATIONS

158.    This case is about GM's legal responsibility for its knowledge, conduct, and products. The proposed Class members' claims all derive directly from a single course of conduct by GM. The objective facts are the same for all Class members. Within each Count asserted by Plaintiffs on behalf of themselves and the respective proposed ClassesClass, the same legal standards govern. Additionally, many states share the same legal standards and elements of proof, facilitating the certification of multistate or nationwide classes for some or all claims.

159.    Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf, and on behalf of all other persons similarly situated, as members of the proposed Classes Class pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3), and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority

1    requirements of those provisions. Certification of Plaintiffs' claims for class-wide treatment is

2    appropriate because Plaintiffs can prove the elements of the claims on a class-wide basis using the

3    same evidence as would be used in individual actions alleging the same claims.

4          **A.    The Class Definition**

5          160.    The "Class Vehicles" herein include all vehicles in the United States that contain

6    the SDM Calibration Defect that were (1) manufactured, sold, distributed, or leased by

7    Defendants or (2) manufactured, sold, distributed, or leased by Old GM and purchased or leased

8    by Plaintiffs or a Class member after July 10, 2009.

9          161.    On information and belief, the The SDM Calibration Defect exists in all GM

10   trucks and SUVs starting with model year 1999. This would include, for example, trucks and

11   SUVs such as the Silverado, Tahoe, Astro, and Trailblazer. The information presently available to

12   Plaintiffs shows that, after it was introduced in or about 1999, the calibration defect persisted in

13   GM SUVs through model year 2018. Discovery will reveal when, if ever, GM discontinued use

14   of the SDM Calibration Defect in its trucks and SUVs. This information is uniquely in the

15   Defendants' hands, as only GM (and Delco, n/k/a Aptiv) possess the software calibration files for

16   GM vehicles that will demonstrate the presence of the defect in the software; these files are not

17   downloadable or otherwise accessible from the vehicles themselves, meaning Plaintiffs are unable

18   to obtain those files on their own.

19         162.    The proposed Nationwide Class includes all persons and entities that purchased or

20   leased a Class Vehicle in the United States, including its territories. Alternatively, Plaintiffs

21   propose separate State Classes as to the state claims herein, each of which Class includes all

22   persons and entities that purchased or leased a Class Vehicle in that the state of California.

23         163.    Excluded from the Classes Class are:

24              a.      Defendants' officers, directors and employees and participants in the

25   Porsche Associate Lease Program; Defendants' affiliates and affiliates' officers, directors, and

26   employees; Defendants' distributors and distributors' officers, directors, and employees; and

27              b.      Judicial officers and their immediate family members and associated court

28   staff assigned to this case.

164.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims.

165.   Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, reduced, divided into additional subclasses under Rule 23(c)(5), or otherwise modified.

**B.   Numerosity: Federal Rule of Civil Procedure 23(a)(1)**

166.   The members of the ~~Classes~~ Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. There are millions of Class Vehicles ~~and Class members~~ nationwide, a significant number of which are in the state of California. The precise number and identities of ~~Nationwide Class and State~~ the California Class members may be ascertained from Defendants' records and motor vehicle regulatory data. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

**C.   Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**

167.   This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These include, without limitation, the following:

a.   Whether the Class Vehicles' SDM software calibration is defective, as described herein;

b.   Whether Defendants knew, or should have known, about the SDM Calibration Defect, and, if so, how long they have or should have known about it;

c.   Whether Defendants had a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class members;

d.   Whether Defendants' concealment of the SDM Calibration Defect caused Plaintiffs and Class members to act to their detriment by purchasing or leasing the Class Vehicles;

1            e.      Whether Defendants' certifications concerning vehicle safety were

2 misleading considering the risk that the SDMs will not trigger airbags and seatbelts during certain

3 types of collisions;

4            f.      Whether Defendants' conduct tolls any or all applicable limitations periods

5 by acts of fraudulent concealment, application of the discovery rule, or equitable estoppel;

6            g.      Whether Defendants misrepresented that the Class Vehicles were safe;

7            h.      Whether Defendants concealed the SDM Calibration Defect;

8            i.      Whether Defendants' statements, concealments, and omissions regarding

9 the Class Vehicles were material, in that a reasonable consumer could consider them important in

10 purchasing, leasing, selling, maintaining, or operating such vehicles;

11            j.      Whether Defendants engaged in unfair, deceptive, unlawful , and/or

12 fraudulent acts or practices, in trade or commerce, by failing to disclose that the Class Vehicles

13 were designed, manufactured, sold, and leased with defective airbag components;

14            k.      Whether the Class Vehicles were unfit for the ordinary purposes for which

15 they were used, in violation of the implied warranty of merchantability;

16            l.      Whether Defendants' concealment of the true defective nature of the Class

17 Vehicles caused their market price to incorporate a premium reflecting the assumption by

18 consumers that the Class Vehicles were equipped with fully functional passenger safety systems

19 and, if so, the market value of that premium; and

20            m.      Whether Plaintiffs and the other Class members are entitled to damages

21 and other monetary relief and, if so, in what amount.

22       **D.**      **Typicality: Federal Rule of Civil Procedure 23(a)(3)**

23       168.      Plaintiffs' claims are typical of the claims of Class members whom they seek to

24 represent under Fed. R. Civ. P. 23(a)(3), because Plaintiffs and each Class member purchased or

25 leased a Class Vehicle and were comparably injured through Defendants' wrongful conduct as

26 described above. Plaintiffs and the other Class members suffered damages as a direct proximate

27 result of the same wrongful practices by Defendants. Plaintiffs' claims arise from the same

28 practices and courses of conduct that give rise to the claims of the other Class members.

Plaintiffs' claims are based upon the same legal theories as the claims of the other Class members.

### E.     Adequacy: Federal Rule of Civil Procedure 23(a)(4)

169.     Plaintiffs will fairly and adequately represent and protect the interests of the Class members as required by Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests do not conflict with the interests of the Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, including automobile defect litigation and other consumer protection litigation. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Class members. Therefore, the interests of the Class members will be fairly and adequately protected.

### F.     Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)

170.     Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

### G.     Superiority: Federal Rule of Civil Procedure 23(b)(3)

171.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in its management. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants such that it would be impracticable for members of the Classes Class to individually seek redress for Defendants' wrongful conduct.

172.     Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

1

**VI.    ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED**

2      173.    Defendants have known of the SDM Calibration Defect since at least 2009, when

3   GM learned, through books, records, and personnel, that Old GM had launched the defective

4   ~~algorithm~~ calibration strategy despite clear warnings of the risk of doing so, and then continued to

5   use that defective software strategy thereafter. They obtained further knowledge of the risks of the

6   SDM Calibration Defect from lawsuits and multiple suspicious accidents (involving airbag and

7   seatbelt failures in frontal accidents) occurring in practically every year since, which provided

8   additional and confirmatory notice of the continued risks of the SDM Calibration Defect.

9      ~~2.    Despite this knowledge, for years, Defendants did not disclose the seriousness of~~

10  ~~the issue and in fact concealed its prevalence. In so doing, Defendants have failed to warn~~

11  ~~consumers, initiate timely recalls, or inform NHTSA, as GM is obligated to do.~~

12      174.    ~~3.Defendants~~ GM had a duty to disclose the SDM Calibration Defect to consumers

13  and NHTSA. ~~Contrary to this duty, GM~~ Instead, GM knowingly, affirmatively, and actively

14  concealed the defect from regulators and consumers by continuing to distribute, sell, and/or lease

15  the Class Vehicles to Plaintiffs and the Class members; to advertise the safety of the Class

16  Vehicles; and to fail to notify regulators or Plaintiffs and the Class members about the true nature

17  of the Class Vehicles.

18      175.    As of the date of this Complaint, GM still has not disclosed, and continues to

19  conceal, that the Class Vehicles are defective, that the SDM Calibration Defect could prevent the

20  airbags and seatbelts from activating during certain kinds of frontal collisions, and that these

21  Class Vehicles' safety systems may fail them in life-threatening collisions. Despite its knowledge

22  of the SDM Calibration Defect and its attendant safety risks, GM continues to market the Class

23  Vehicles based on superior safety and reliability while omitting the disclosure safety and

24  reliability risks associated with the SDM Calibration Defect.

25      176.    Plaintiffs and members of the proposed Class could not have discovered through

26  the exercise of reasonable diligence that GM was concealing the SDM Calibration Defect in their

27  vehicles and misrepresenting the defective nature of the Class Vehicles.

28

1    177.    With respect to Class Vehicles that have not experienced airbags or seatbelt

2    failure, Plaintiffs and other Class members did not discover, could not reasonably have

3    discovered, and had no reason to suspect that their Class Vehicles are defective, that GM

4    calibrated the software program that controls the SDM to prevent airbag and seatbelt deployment

5    just 45 milliseconds after a crash has begun, that—in affirmatively blocking these critical safety

6    features after 45 milliseconds—GM significantly and unnecessarily increased the risk of injury

7    and death in frontal crashes, that the safety of their Class Vehicles is impaired by this defect such

8    that the Class Vehicles' safety system may fail them in potentially deadly collisions, or that, as a

9    result of the foregoing, they overpaid for their vehicles, and/or the value of their vehicles is

10   diminished.

11   178.    With respect to Class Vehicles that have experienced airbag and/or seatbelt failure

12   prior to the filing of this Complaint, Class members did not discover and could not reasonably

13   have discovered that such failure was due to a defect known to GM through a dangerous and

14   defective SDM software calibration.

15   179.    Plaintiffs and other Class members did not discover, and did not know of, facts

16   that would have caused a reasonable person to suspect that GM did not report this material

17   information within their knowledge to consumers, dealerships, or relevant authorities; nor would

18   a reasonable and diligent investigation have disclosed that GM was aware of the defective nature

19   of the SDM software calibration and the Class Vehicles in which it was incorporated.

20   180.    4.Due to the highly technical nature of the SDM Calibration Defect, Plaintiffs and

21   Class members were unable to independently discover it using reasonable diligence. Prior to the

22   retention of Absent counsel and without third-party expertsconsultants with relevant expertise,

23   Plaintiffs and Class members lack the necessary expertise to analyze the software algorithm for

24   the SDMs , or vehicle safety system performance in and accident, and to understand its defective

25   nature. GM has not issued a recall or issued other similar public statements about the SDM

26   Calibration Defect, and Plaintiffs first learned of the defective nature of the SDM software

27   calibration in their vehicles, and of GM's scheme to design and sell vehicles with defective SDM

28   software calibrations, only in connection with retaining counsel and filing this lawsuit in 2021

1   (for Plaintiff Vargas and Milstead). Plaintiff Ray learned of the SDM Calibration Defect in

2   connection with retention of counsel in late 2020, and was also aware of the pendency of this

3   putative class action before filing his claims in this pleading.

4       181.    For the foregoing reasons, GM is estopped from relying on any statutes of

5   limitation or repose as a defense in this action. All applicable statutes of limitation and repose

6   have been tolled by operation of the discovery rule and by GM's fraudulent concealment with

7   respect to all claims against GM.

8       5.    Accordingly: (1) Defendants' fraudulent concealment tolls the statute of

9   limitations; (2) Defendants are estopped from relying on the statute of limitations; and (3) the

10   statute of limitations is tolled by the discovery rule.

11   **VII.**   **CAUSES OF ACTION**

12       **A.**   **Claims Asserted on Behalf of the Nationwide Class**

13   **NATIONWIDE COUNT I:**
    **FRAUD BY CONCEALMENT**

14   **(Common Law)**

15       182.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

16   forth herein.

17

18       183.    Plaintiffs bring this claim against all Defendants on behalf of themselves and the

19   Nationwide California State Class under the common law of fraudulent concealment, as there are

    no true conflicts among various states' laws of fraudulent concealment. In the alternative,

20   Plaintiffs bring this claim on behalf of the State Classes against all Defendants.

21

22       184.    Defendants are liable for both fraudulent concealment and non-disclosure. *See,*

23   *e.g.*, Restatement (Second) of Torts §§ 550-51 (1977).

24       185.    Defendants intentionally and knowingly concealed and suppressed material facts

25   from regulators and consumers regarding the SDM Calibration Defect that causes the airbags and

26   seatbelts to fail in prolonged onset, complex, or otherwise multi-impact accidents, causing a

27   serious risk or of injury or death.

28

186.    A reasonable consumer would not have expected that the Class Vehicles contained a software program that was calibrated to prevent seatbelt tightening and airbag deployment during certain types of frontal crashes. Defendants knew that reasonable consumers expect that their vehicle has working airbags and seatbelt pretensioners and would rely on those facts in deciding whether to purchase, lease, or retain a new or used motor vehicle. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

187.    Defendants ensured that Plaintiffs and the Class did not discover this information by actively concealing and misrepresenting the true nature of the Class Vehicles' safety systems. Defendants intended for Plaintiffs and the Class to rely on their omissions—which they did by purchasing and leasing the Class Vehicles at the prices they paid.

188.    Defendants had a duty to disclose the SDM Calibration Defect because:

a.    GM had exclusive and/or far superior knowledge and access to the facts about this hidden and complex safety defect. Defendants also knew that these technical facts were not known to or reasonably discoverable by Plaintiffs and the Class; GM knew the SDM Calibration Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class members' decisions to buy or lease Class Vehicles; GM is subject to statutory duties to disclose known safety defects to consumers and to NHTSA; and GM made incomplete representations about the safety and reliability of the Class Vehicles and their passenger safety systems, while purposefully withholding material facts about a known safety defect. In uniform advertising and materials provided with each Class Vehicle, Defendants intentionally concealed, suppressed, and failed to disclose to Plaintiffs and the Class that the Class Vehicles contained the dangerous SDM Calibration Defect. Because they volunteered to provide information about the Class Vehicles that they offered for sale to Plaintiffs and the Class, Defendants had the duty to disclose the whole truth. They did not.

189.    To this day, Defendants have not made full and adequate disclosure and continue to conceal material information regarding the SDM Calibration Defect. The omitted and concealed facts were material because a reasonable person would find them important in

purchasing, leasing, or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class.

190.    Defendants actively concealed or suppressed these material facts, in whole or in part, to maintain a market for their vehicles, to protect profits, and to avoid costly recalls that would hurt the GM brand's image. They did so at the expense of Plaintiffs and the Class. Had they been aware of the SDM Calibration Defect in the Class Vehicles, and Defendants' callous disregard for safety, Plaintiffs and the Class either would not have paid as much as they did for their Class Vehicles, or they would not have purchased or leased them.

191.    Accordingly, Defendants are liable to Plaintiffs and the Class for their damages in an amount to be proven at trial, including, but not limited to, their lost overpayment for the Class Vehicles at the time of purchase or lease.

192.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of Plaintiffs' and the Class' rights and well-being; and to enrich themselves. Their misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

**NATIONWIDE COUNT II:**
**UNJUST ENRICHMENT**
**(Common Law)**

193.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

194.    Plaintiffs Richard Vargas and Arthur Ray assert this Unjust Enrichment count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State ClassesCalifornia State Class.

195.    By reason of their conduct, Defendants caused damages to Plaintiffs and Class members. Plaintiffs and Class members conferred a benefit on the Defendants by overpaying for Class Vehicles at prices that were artificially inflated by Defendants' concealment of the SDM Calibration Defect and misrepresentations regarding the Class Vehicles' safety.

196.     As a result of Defendants' fraud and deception, Plaintiffs and Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from the Defendants' misconduct.

197.     Defendants knowingly benefitted from their unjust conduct. They sold and leased Class Vehicles equipped with the SDM Calibration Defect for more than what the vehicles were worth, at the expense of Plaintiffs and Class members.

198.     Defendants readily accepted and retained these benefits from Plaintiffs and Class members.

199.     It is inequitable and unconscionable for Defendants to retain these benefits because they misrepresented that the Class Vehicles were safe, and intentionally concealed, suppressed, and failed to disclose the SDM Calibration Defect to consumers. Plaintiffs and Class members would not have purchased or leased the Class Vehicles or would have paid less for them, had Defendants not concealed the SDM Calibration Defect.

200.     Plaintiffs and Class members do not have an adequate remedy at law.

201.     Equity cannot in good conscience permit the Defendants to retain the benefits that they derived from Plaintiffs and Class members through unjust and unlawful acts, and therefore restitution or disgorgement of the amount of the Defendants' unjust enrichment is necessary.

**B.     State-Specific Claims**

**1.     Alabama**

**ALABAMA COUNT I:**
**Violations of the Alabama Deceptive Trade Practices Act**
**Ala. Code § 8-19-1, *et seq.***
**(On Behalf of the Alabama State Class)**

1.     Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

2.     Plaintiffs Aaron Jackson and David Taylor (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Alabama State Class against all Defendants.

3.      Plaintiffs and Alabama State Class members are "consumers" within the meaning of Ala. Code § 8-19-3(2).

4.      Plaintiffs and Alabama State Class members and Defendants are "persons" within the meaning of Ala. Code § 8-19-3(5).

5.      The Class Vehicles are "goods" within the meaning of Ala. Code § 8-19-3(3).

6.      Defendants were and are engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

7.      The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5.

8.      In the course of their business, Defendants violated the Alabama DTPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed above.

9.      Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce, as prohibited by Ala. Code § 8-19-5.

10.     Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Alabama State Class members, about the true

1   safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the

2   Class Vehicles.

3          11.     Defendants' scheme and concealment of the SDM Calibration Defect and true

4   characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiffs

5   and Alabama State Class members, as the Defendants intended. Had they known the truth,

6   Plaintiffs and Alabama State Class members would not have purchased or leased the Class

7   Vehicles, or would have paid significantly less for them.

8          12.     Plaintiffs and Alabama State Class members had no way of discerning that

9   Defendants' representations were false and misleading and/or otherwise learning the facts that

10  Defendants had concealed or failed to disclose. Plaintiffs and Alabama State Class members did

11  not, and could not, unravel Defendants' deception on their own.

12         13.     Defendants had an ongoing duty to Plaintiffs and Alabama State Class members to

13  refrain from unfair or deceptive practices under the Alabama DTPA in the course of their

14  business. Specifically, Defendants owed Plaintiffs and Alabama State Class members a duty to

15  disclose all the material facts concerning the SDM Calibration Defect in the Class Vehicles

16  because they possessed exclusive knowledge, they intentionally concealed the defect from

17  Plaintiffs and Alabama State Class members, and/or they made misrepresentations that were

18  misleading because they were contradicted by withheld facts.

19         14.     Defendants' violations present a continuing risk to Plaintiffs and Alabama State

20  Class members, as well as to the general public. Defendants' unlawful acts and practices

21  complained of herein affect the public interest.

22         15.     Plaintiffs and Alabama State Class members suffered ascertainable losses and

23  actual damages as a direct and proximate result of the Defendants' concealment,

24  misrepresentations, and/or failure to disclose material information.

25         16.     Defendants were provided notice of the issues raised in this count and this

26  Complaint by a notice letter sent August 20, 2021 pursuant to Ala. Code § 8-19-10(e). Because

27  the Defendants failed to adequately remedy their unlawful conduct within the requisite time

28

1   period, Plaintiffs seeks all damages and relief to which they and Alabama State Class members

2   are entitled.

3         17.     Pursuant to Ala. Code § 8-19-10, Plaintiffs and the Alabama State Class members

4   seek an order enjoining the Defendants' unfair or deceptive acts and/or practices and awarding

5   damages and any other just and proper relief available under the Alabama DTPA.

6             **ALABAMA COUNT II:**

7   **Breach of Express Warranty**
          **Ala. Code §§ 7-2-313 and 7-2A-210**

8   **(On Behalf of the Alabama State Class)**

9             **COUNT III:**

10   **Violation of California Consumers Legal Remedies Act**
          **Cal. Civ. Code § 1750,** *et seq.*

11

12       **202.**    18.Plaintiffs re-allege and incorporate by reference all preceding allegations as

13   though fully set forth herein.

          **(On Behalf of the California State Class)**

14         1.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though

15   fully set forth herein.

16       **203.**    2.Plaintiffs Ramiro Pereda, James Milstead, and Richard Vargas (for the purposes

17   of this count, "Plaintiffs") P

18         19.     Plaintiffs Aaron Jackson and David Taylor (for the purposes of this count,

19   "Plaintiffs") bring this claim on behalf of themselves and the Alabama State Class against all

20   Defendants.

21         20.     Defendants are and were at all relevant times "merchant[s]" with respect to motor

22   vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and a "seller" of motor vehicles under

23   § 7-2-103(1)(d).

24         21.     With respect to leases, Defendants are and were at all relevant times "lessors" of

25   motor vehicles under Ala. Code. § 7-2A-103(1)(p).

26         22.     The Class Vehicles are and were at all relevant times "goods" within the meaning

27   of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

28

1      23.     In connection with the purchase or lease of Class Vehicles, the Defendants

2  provided Plaintiffs and Alabama State Class members with written express warranties covering

3  the repair or replacement of components that are defective in materials or workmanship.

4      24.     Defendants' warranties formed the basis of the bargain that was reached when

5  Plaintiffs and Alabama State Class members unknowingly purchased or leased Class Vehicles

6  that came equipped with the SDM Calibration Defect.

7      25.     However, Defendants knew or should have known that the warranties were false

8  and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the

9  Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they

10  were sold and leased to Plaintiffs and Alabama State Class members.

11      26.     Plaintiffs and Alabama State Class members reasonably relied on the Defendants'

12  express warranties when purchasing or leasing their Class Vehicles.

13      27.     Defendants knowingly breached their express warranties to repair defects in

14  materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

15  Defendants also breached their express warranties by providing a product containing defects that

16  were never disclosed to Plaintiffs and Alabama State Class members.

17      28.     Plaintiffs and Alabama State Class members have provided the Defendants with

18  reasonable notice and opportunity to cure the breaches of their express warranties by way of letter

19  sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public

20  NHTSA complaints and individual lawsuits, as detailed herein.

21      29.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

22      30.     As a direct and proximate result of the Defendants' breach of express warranties,

23  Plaintiffs and Alabama State Class members have been damaged in an amount to be proven at

24  trial.

25

26

27

28

1
2
3

**ALABAMA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Ala. Code §§ 7-2-314 and 7-2A-212**
**(On Behalf of the Alabama State Class)**

4    31.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

5    forth herein.

6    32.    Plaintiffs Aaron Jackson and David Taylor (for the purposes of this count,

7    "Plaintiffs") bring this claim on behalf of themselves and the Alabama State Class against all

8    Defendants.

9    33.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

10   vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and a "seller" of motor vehicles under

11   § 7-2-103(1)(d).

12   34.    With respect to leases, Defendants are and were at all relevant times "lessors" of

13   motor vehicles under Ala. Code. § 7-2A-103(1)(p).

14   35.    The Class Vehicles are and were at all relevant times "goods" within the meaning

15   of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

16   36.    A warranty that the Class Vehicles were in merchantable condition and fit for the

17   ordinary purpose for which vehicles are used is implied by law pursuant to Ala. Code §§ 7-2-314

18   and 7-2A-212.

19   37.    The Class Vehicles did not comply with the implied warranty of merchantability

20   because, at the time of sale and at all times thereafter, they were defective and not in

21   merchantable condition, would not pass without objection in the trade, and were not fit for the

22   ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the

23   SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an

24   accident, rendering the Class Vehicles inherently defective and dangerous.

25   38.    Defendants were provided reasonable notice of these issues by way of a letter sent

26   by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual

27   lawsuits, as detailed herein.

28   39.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

1  40.  As a direct and proximate result of Defendants' breach of the implied warranty of

2  merchantability, Plaintiffs and Alabama State Class members have been damaged in an amount to

3  be proven at trial.

4  **2.  Alaska**

5  **ALASKA COUNT I:**

6  **Violations of the Alaska Unfair Trade Practices and Consumer Protection Act**
**Alaska Stat. Ann. § 45.50.471 *et seq.***

7  **(On Behalf of the Alaska State Class)**

8  1.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

9  2.  Plaintiff Stephen Duncan (for the purposes of this count, "Plaintiff") brings this

10  claim on behalf of himself and the Alaska State Class against all Defendants.

11  3.  The Alaska Unfair Trade Practices And Consumer Protection Act ("Alaska CPA")

12  declares unfair methods of competition and unfair or deceptive acts or practices in the conduct of

13  trade or commerce unlawful, including: "(4) representing that goods or services have sponsorship,

14  approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a

15  person has a sponsorship, approval, status, affiliation, or connection that the person does not

16  have;" "(6) representing that goods or services are of a particular standard, quality, or grade, or

17  that goods are of a particular style or model, if they are of another;" "(8) advertising goods or

18  services with intent not to sell them as advertised;" or "(12) using or employing deception, fraud,

19  false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or

20  omitting a material fact with intent that others rely upon the concealment, suppression or

21  omission in connection with the sale or advertisement of goods or services whether or not a

22  person has in fact been misled, deceived or damaged." Alaska Stat. § 45.50.471.

23  4.  In the course of their business, Defendants violated the Alaska CPA by knowingly

24  and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts

25  regarding the reliability, safety, and performance of the Class Vehicles, as detailed above.

26  5.  Specifically, by misrepresenting the Class Vehicles as safe and/or free from

27  defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

28  Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of

1   competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

2   conduct of any trade or commerce, as prohibited by Alaska Stat. § 45.50.471.

3         6.     Defendants' unfair or deceptive acts or practices, including misrepresentations,

4   concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

5   mislead and create a false impression in consumers, and were likely to and did in fact deceive

6   reasonable consumers, including Plaintiff and Alaska State Class members, about the true safety

7   and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class

8   Vehicles.

9         7.     Defendants' scheme and concealment of the SDM Calibration Defect and true

10  characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiff and

11  Alaska State Class members, as the Defendants intended. Had they known the truth, Plaintiff and

12  Alaska State Class members would not have purchased or leased the Class Vehicles, or would

13  have paid significantly less for them.

14        8.     Plaintiff and Alaska State Class members had no way of discerning that

15  Defendants' representations were false and misleading and/or otherwise learning the facts that

16  Defendants had concealed or failed to disclose. Plaintiff and Alaska State Class members did not,

17  and could not, unravel Defendants' deception on their own.

18        9.     Defendants had an ongoing duty to Plaintiff and Alaska State Class members to

19  refrain from unfair or deceptive practices under the Alaska CPA in the course of their business.

20  Specifically, Defendants owed Plaintiff and Alaska State Class members a duty to disclose all the

21  material facts concerning the SDM Calibration Defect in the Class Vehicles because they

22  possessed exclusive knowledge, they intentionally concealed the defect from Plaintiff and Alaska

23  State Class members, and/or they made misrepresentations that were misleading because they

24  were contradicted by withheld facts.

25        10.    Defendants' violations present a continuing risk to Plaintiff and Alaska State Class

26  members, as well as to the general public. Defendants' unlawful acts and practices complained of

27  herein affect the public interest.

28

1    11.    Pursuant to Alaska Stat. § 45.50. 531, the Alaska State Class seeks monetary relief
2    against Defendants measured as the greater of (a) three times the actual damages in an amount to
3    be determined at trial or (b) $500 for each Alaska State Class member.

4    12.    Plaintiff and the Alaska State Class also seek an order enjoining Defendants'
5    unfair, unlawful, and/or deceptive practices pursuant to Alaska Stat. § 45.50. 535, attorneys' fees,
6    and any other just and proper relief available under the Alaska CPA.

7    13.    Pursuant to Alaska Stat. § 45.50.535, Plaintiffs sent notice letters to Defendants.
8    The Alaska State Class seeks all damages and relief to which it is entitled.

9                            **ALASKA COUNT II:**
10                        **Breach of Express Warranty**
                     **Alaska Stat. §§ 45.02.313 and 45.12.210**
11                   **(On Behalf of the Alaska State Class)**

12    14.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though
13    fully set forth herein.

14    15.    Plaintiff Stephen Duncan (for the purposes of this count, "Plaintiff") brings this
15    claim on behalf of himself and the Alaska State Class against all Defendants.

16    16.    Defendants are and were at all relevant times "merchant[s]" with respect to motor
17    vehicles under Alaska Stat. §§ 45.02.104(a) and 45.12.103(c)(11), and a "seller" of motor
18    vehicles under Alaska Stat. § 45.02.103(a)(4).

19    17.    With respect to leases, Defendants are and were at all relevant times "lessors" of
20    motor vehicles under Alaska Stat. § 45.12.103(a)(16).

21    18.    The Class Vehicles are and were at all relevant times "goods" within the meaning
22    of Alaska Stat. §§ 45.02.105(a) and 45.12.103(a)(8).

23    19.    In connection with the purchase or lease of Class Vehicles, the Defendants
24    provided Plaintiff and Alaska State Class members with written express warranties covering the
25    repair or replacement of components that are defective in materials or workmanship.

26    20.    Defendants' warranties formed the basis of the bargain that was reached when
27    Plaintiff and Alaska State Class members unknowingly purchased or leased Class Vehicles that
28    came equipped with the SDM Calibration Defect.

21.   However, Defendants knew or should have known that the warranties were false and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to Plaintiff and Alaska State Class members.

22.   Plaintiff and Alaska State Class members reasonably relied on the Defendants' express warranties when purchasing or leasing their Class Vehicles.

23.   Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles. Defendants also breached their express warranties by providing a product containing defects that were never disclosed to Plaintiff and Alaska State Class members.

24.   Plaintiff and Alaska State Class members have provided the Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of letter sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public NHTSA complaints and individual lawsuits, as detailed herein.

25.   Alternatively, any opportunity to cure the breach is unnecessary and futile.

26.   As a direct and proximate result of the Defendants' breach of express warranties, Plaintiff and Alaska State Class members have been damaged in an amount to be proven at trial.

**ALASKA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Alaska Stat. §§ 45.02.314 and 45.12.212**
**(On Behalf of the Alaska State Class)**

27.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

28.   Plaintiff Stephen Duncan (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Alaska State Class against all Defendants.

29.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Alaska Stat. §§ 45.02.104(a) and 45.12.103(c)(11), and a "seller" of motor vehicles under Alaska Stat. § 45.02.103(a)(4).

1      30.     With respect to leases, Defendants are and were at all relevant times "lessors" of

2  motor vehicles under Alaska Stat. § 45.12.103(a)(16).

3      31.     The Class Vehicles are and were at all relevant times "goods" within the meaning

4  of Alaska Stat. §§ 45.02.105(a) and 45.12.103(a)(8).

5      32.     A warranty that the Class Vehicles were in merchantable condition and fit for the

6  ordinary purpose for which vehicles are used is implied by law pursuant to Alaska Stat.

7  §§ 45.02.314 and 45.12.212.

8      33.     The Class Vehicles did not comply with the implied warranty of merchantability

9  because, at the time of sale and at all times thereafter, they were defective and not in

10  merchantable condition, would not pass without objection in the trade, and were not fit for the

11  ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the

12  SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an

13  accident, rendering the Class Vehicles inherently defective and dangerous.

14      34.     Defendants were provided reasonable notice of these issues by way of a letter sent

15  by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual

16  lawsuits, as detailed herein.

17      35.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

18      36.     As a direct and proximate result of Defendants' breach of the implied warranty of

19  merchantability, Plaintiff and Alaska State Class members have been damaged in an amount to be

20  proven at trial.

21          **3.     Arkansas**

22              **ARKANSAS COUNT I:**
23          **Violations of the Deceptive Trade Practices Act**
            **Ark. Code Ann. § 4-88-101 *et seq.***
24          **(On Behalf of the Arkansas State Class)**

25      1.     Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

26      2.     Plaintiff David Stalcup (for the purposes of this count, "Plaintiff") brings this

27  claim on behalf of himself and the Arkansas State Class against the Defendants.

28

1      3.      Defendants and Arkansas State Class members are "persons" within the meaning

2  of Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), Ark. Code Ann. § 4-88-102(5).

3      4.      The Class Vehicles are "goods" within the meaning of Ark. Code Ann. § 4-88-

4  102(4).

5      5.      The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices,"

6  which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any

7  other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" Ark.

8  Code Ann. § 4-88-107(a)(10). The Arkansas DTPA also prohibits the following when utilized in

9  connection with the sale or advertisement of any goods: "(1) The act, use, or employment by any

10  person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or

11  omission of any material fact with intent that others rely upon the concealment, suppression, or

12  omission." Ark. Code Ann. § 4-88-108.

13      6.      In the course of their business, Defendants violated the Arkansas DTPA by

14  knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose

15  material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed

16  above.

17      7.      Specifically, by misrepresenting the Class Vehicles as safe and/or free from

18  defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

19  Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of

20  competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

21  conduct of any trade or commerce, as prohibited by Ark. Code Ann. § 4-88-107(a)(10).

22      8.      Defendants' unfair or deceptive acts or practices, including misrepresentations,

23  concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

24  mislead and create a false impression in consumers, and were likely to and did in fact deceive

25  reasonable consumers, including Plaintiff and Arkansas State Class members, about the true

26  safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the

27  Class Vehicles.

28

9.      Defendants' scheme and concealment of the SDM Calibration Defect and true characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiff and Arkansas State Class members, as the Defendants intended. Had they known the truth, Plaintiff and Arkansas State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

10.     Plaintiff and Arkansas State Class members had no way of discerning that Defendants' representations were false and misleading and/or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiff and Arkansas State Class members did not, and could not, unravel Defendants' deception on their own.

11.     Defendants had an ongoing duty to Plaintiff and Arkansas State Class members to refrain from unfair or deceptive practices under the Arkansas DTPA in the course of their business. Specifically, Defendants owed Plaintiff and Arkansas State Class members a duty to disclose all the material facts concerning the SDM Calibration Defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the defect from Plaintiff and Arkansas State Class members, and/or they made misrepresentations that were misleading because they were contradicted by withheld facts.

12.     Defendants' violations present a continuing risk to the Arkansas State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

13.     The Arkansas State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Arkansas DTPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

14.     As a direct and proximate result of Defendants' violations of the Arkansas DTPA, Plaintiff and members of the Arkansas State Class have suffered injury-in-fact and/or actual damage.

1    15.    The Arkansas State Class seeks monetary relief against Defendants in an amount

2    to be determined at trial. The Arkansas State Class also seeks punitive damages because

3    Defendants acted wantonly in causing the injury or with conscious indifference to the

4    consequences.

5    16.    Plaintiff also seeks an order enjoining Defendants' unfair, unlawful, and/or

6    deceptive practices, attorneys' fees, and any other just and proper relief available under the

7    Arkansas DTPA.

8    **ARKANSAS COUNT II:**
     **Breach of Express Warranty**

9    **Ark Code Ann. §§ 4-2-313 and 4-2A-210**
     **(On Behalf of the Arkansas State Class)**

10

11   17.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

12   fully set forth herein.

13   18.    Plaintiff David Stalcup (for the purposes of this count, "Plaintiff") brings this

14   claim on behalf of himself and the Arkansas State Class against the Defendants.

15   19.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

16   vehicles under Ark. Code §§ 4-2-104(1) and 4-2A-103(3), and "seller[s]" of motor vehicles under

17   § 4-2-103(1)(d).

18   20.    With respect to leases, Defendants are and were at all relevant times "lessors" of

19   motor vehicles under Ark. Code § 4-2A-103(1)(p).

20   21.    The Class Vehicles are and were at all relevant times "goods" within the meaning

21   of Ark. Code §§ 4-2-105(1) and 4-2A-103(1)(h).

22   22.    In connection with the purchase or lease of Class Vehicles, the Defendants

23   provided Plaintiff and Arkansas State Class members with written express warranties covering

24   the repair or replacement of components that are defective in materials or workmanship.

25   23.    Defendants' warranties formed the basis of the bargain that was reached when

26   Plaintiff and Arkansas State Class members unknowingly purchased or leased Class Vehicles that

27   came equipped with the SDM Calibration Defect.

28

24.     However, Defendants knew or should have known that the warranties were false and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to Plaintiff and Arkansas State Class members.

25.     Plaintiff and Arkansas State Class members reasonably relied on the Defendants' express warranties when purchasing or leasing their Class Vehicles.

26.     Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles. Defendants also breached their express warranties by providing a product containing defects that were never disclosed to Plaintiff and Arkansas State Class members.

27.     Plaintiff and Arkansas State Class members have provided the Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of letter sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public NHTSA complaints and individual lawsuits, as detailed herein.

28.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

29.     As a direct and proximate result of the Defendants' breach of express warranties, Plaintiff and Arkansas State Class members have been damaged in an amount to be proven at trial.

**ARKANSAS COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Ark. Code Ann. §§ 4-2-314 and 4-2A-212**
**(On Behalf of the Arkansas State Class)**

30.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

31.     Plaintiff David Stalcup (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Arkansas State Class against the Defendants.

32.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ark. Code §§ 4-2-104(1) and 4-2A-103(3), and "seller[s]" of motor vehicles under § 4-2-103(1)(d).

33. With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ark. Code § 4-2A-103(1)(p).

34. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code §§ 4-2-105(1) and 4-2A-103(1)(h).

35. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ark. Code §§ 4-2-314 and 4-2A-212.

36. The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

37. Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual lawsuits, as detailed herein.

38. Alternatively, any opportunity to cure the breach is unnecessary and futile.

39. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Arkansas State Class members have been damaged in an amount to be proven at trial.

**4.    California**

**CALIFORNIA COUNT I:** **Violation of California Consumers Legal Remedies Act**Cal. Civ. Code § 1750, *et seq.* laintiffs bring this claim on behalf of themselves and the California State Class against the Defendants.

204. 3.Plaintiffs and California State Class members are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

205. 4.Defendants, the California Plaintiffs, and California State Class members are "persons" within the meaning of Cal. Civ. Code § 1761(c).

1    206.   5.The Class Vehicles are "goods" within the meaning of Cal. Civ. Code § 1761(a).

2    207.   6.The California Legal Remedies Act ("CLRA") prohibits "unfair methods of

3    competition and unfair or deceptive acts or practices undertaken by any person in a transaction

4    intended to result or that results in the sale or lease of goods or services to any consumer[.]" Cal.

5    Civ. Code § 1770.

6    208.   7.Defendants engaged in unfair or deceptive acts or practices when, in the course

7    of their business they, among other acts and practices, intentionally and knowingly made

8    materially false representations regarding the reliability, safety, and performance of the Class

9    Vehicles and/or the defective SDM software calibration, as detailed above.

10   209.   8.Specifically, by misrepresenting the Class Vehicles as safe and/or free from

11   defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

12   Vehicles, Defendants engaged in one or more of the following unfair or deceptive business

13   practices as defined in Cal. Civ. Code § 1770(a):

14       a.   Representing that the Class Vehicles have characteristics, uses, benefits, and qualities

15            which they do not have.

16       b.   Representing that the Class Vehicles are of a particular standard, quality, and grade

17            when they are not.

18       c.   Advertising the Class Vehicles and/or with the intent not to sell or lease them as

19            advertised.

20       d.   Representing that the subject of a transaction has been supplied in accordance with a

21            previous representation when it has not.

22   Cal. Civ. Code §§ 1770(a)(5), (7), (9), and (16).

23   210.   9.Additionally, in the various channels of information through which Defendants

24   sold and marketed Class Vehicles, Defendants failed to disclose material information concerning

25   the Class Vehicles, which they had a duty to disclose. Defendants had a duty to disclose the

26   defect because, as detailed above: (a) Defendants knew about the defect in the SDM software

27   calibration in the Class Vehicles; (b) Defendants had exclusive knowledge of material facts not

28   known to the general public or the other California State Class members; (c) Defendants actively

concealed material facts concerning the software calibration from the general public and Plaintiffs and California State Class members; and (d) Defendants made partial representations about the Class Vehicles that were misleading because they did not disclose the full truth.

211.    10.Defendants' unfair or deceptive acts or practices, including their misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and California State Class members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

212.    11.Plaintiffs and the other California State Class members have suffered injury in fact and actual damages resulting from Defendants' material omissions.

213.    12.Defendants' violations present a continuing risk to Plaintiffs and California State Class members, as well as to the general public, and therefore affect the public interest.

214.    13.Defendants are on notice of the issues raised in this count and this Complaint by way of, among other things, the individual personal injury litigation and hundreds of public consumer complaints detailed above, as well as their own intrinsic knowledge of defect they have included in the Class Vehicles by design. Plaintiffs has also sent a notice letter to Defendants in accordance with Cal. Civ. Code § 1782(a) of the CLRA, notifying Defendants of their alleged violations of Cal. Civ. Code § 1770(a) and demanding that Defendants correct or agree to correct the actions described therein within thirty (30) days of the notice letter. If Defendants fail to do so, Plaintiffs will amend this Complaint as of right (or otherwise seek leave to amend the Complaint) to include Defendants did not correct or agree to correct their actions within thirty days, and Plaintiffs therefore seek compensatory and monetary damages to which Plaintiffs and California Class Members are entitled under the CLRA.

215.    14.Attached hereto as Exhibit C is the venue affidavit required by CLRA, Cal. Civ. Code § 1780(d).

**CALIFORNIA COUNT IIIV:**
**Violations of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, *et seq*.(On Behalf of the California State Class)**

216.   15.Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

217.   16.Plaintiffs Ramiro Pereda, James Milstead, and Richard Vargas (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the California State Class against the Defendants.

218.   17.The California Unfair Competition Law ("UCL"), Cal. Bus. and Prof. Code § 17200, prohibits any "unlawful, unfair, or fraudulent business act or practices."

219.   18.Defendants' knowing and intentional conduct described in this Complaint constitutes unlawful, fraudulent, and unfair business acts and practices in violation of the UCL. Specifically, Defendants' conduct is unlawful, fraudulent, and unfair in at least the following ways:

a.      by knowingly and intentionally concealing from Plaintiffs and California State Class members that the Class Vehicles suffer from the SDM Calibration Defect while obtaining money from the California State Class members;

b.      by marketing Class Vehicles as possessing a functional, safe, and defect-free passenger safety system.;

c.      by purposefully designing and manufacturing the Class Vehicles to contain a defective SDM software calibration that causes airbags and seatbelts to fail in certain accidents contrary to what was disclosed to regulators and represented to consumers who purchased or leased Class Vehicles, and failing to fix the SDM Calibration Defect free of charge; and

d.      by violating the other California laws alleged herein, including the False Advertising Law, Consumers Legal Remedies Act, California Commercial Code, and Song-Beverly Consumer Warranty Act.

220.   19.Defendants' misrepresentations, omissions, and concealment were material to the California Plaintiffs and California State Class members, and Defendants misrepresented,

concealed, or failed to disclose the truth with the intention that consumers would rely on the misrepresentations, concealment, and omissions.

221.   20. Defendants' material misrepresentations and omissions alleged herein caused Plaintiffs and the California State Class members to make their purchases or leases of their Class Vehicles. Absent those misrepresentations and omissions, Plaintiffs and California State Class members would not have purchased or leased these vehicles or would not have purchased or leased these Class Vehicles at the prices they paid.

222.   21. Accordingly, Plaintiffs and California State Class members have suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information.

223.   22. Defendants' violations present a continuing risk to Plaintiffs and California State Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

224.   23. Plaintiffs requests request that this Court enter an order enjoining Defendants from continuing their unfair, unlawful, and/or deceptive practices and restoring to members of the California State Class any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345, and for such other relief set forth below.

**CALIFORNIA COUNT IIIV:**
**Violations of the California False Advertising Law**
**Cal. Bus. & Prof. Code § 17500, *et seq.*(On Behalf of the California State Class)**

225.   24. Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

226.   25. Plaintiffs Ramiro Pereda, James Milstead, and Richard Vargas (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the California State Class against the Defendants.

227.   26. The California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, prohibits false advertising.

228.    27.Defendants, Plaintiffs, and California State Class members are "persons" within the meaning of Cal. Bus. & Prof. Code § 17506.

229.    28.Defendants violated the FAL by causing to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements regarding the safety of the Class Vehicles that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including California State Class members. Numerous examples of these statements and advertisements appear in the preceding paragraphs throughout this Complaint and in Exhibit B.

230.    29.The misrepresentations and omissions regarding the reliability and safety of Class Vehicles as set forth in this Complaint were material and had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and California State Class members, about the true safety and reliability of Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

231.    30.In purchasing or leasing their Class Vehicles, the California State Class members relied on the misrepresentations and/or omissions of Defendants with respect to the safety and reliability of the Class Vehicles. Defendants' representations turned out not to be true because the Class Vehicles are distributed with a dangerous safety defect, rendering the vehicles' airbags and seatbelts inoperative in certain types of accidents.

232.    31.Plaintiffs and the other California State Class members have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices. Had they known the truth, Plaintiffs and California State Class members would not have purchased or leased the Class Vehicles or would have paid significantly less for them.

233.    32.Plaintiffs and California State Class members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that

1   Defendants had concealed or failed to disclose. Plaintiffs and California State Class members did

2   not, and could not, unravel Defendants' deception on their own.

3       234.    33.Defendants had an ongoing duty to Plaintiffs and California State Class

4   members to refrain from unfair or deceptive practices under the California False Advertising Law

5   in the course of their business. Specifically, the Defendants owed Plaintiffs and California State

6   Class members a duty to disclose all the material facts concerning the SDM Calibration Defect in

7   the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the

8   defect from Plaintiffs and California State Class members, and/or they made misrepresentations

9   that were misleading because they were contradicted by withheld facts.

10      235.    34.All of the wrongful conduct alleged herein occurred, and continues to occur, in

11  the conduct of Defendants ' business. Defendants' wrongful conduct is part of a pattern or

12  generalized course of conduct that is still perpetuated and repeated, both in the State of California

13  and nationwide.

14      236.    35.Defendants' violations present a continuing risk to Plaintiffs and California

15  State Class members, as well as to the general public. Defendants' unlawful acts and practices

16  complained of herein affect the public interest.

17      237.    36.Plaintiffs requests request that this Court enter an order enjoining Defendants

18  from continuing their unfair, unlawful, and/or deceptive practices and restoring to the California

19  State Class any money Defendants acquired by unfair competition, including restitution and/or

20  restitutionary disgorgement, and for such other relief set forth below.

21              CALIFORNIA COUNT IVVI:
                **Breach of Express Warranty**
22      **Cal. Com. Code §§ 2313 and 10210(On Behalf of the California State Class)**

23      238.    37.Plaintiffs re-allege and incorporate by reference all preceding allegations as

24  though fully set forth herein.

25      239.    38.Plaintiffs Ramiro Pereda, James Milstead, and Plaintiff Richard Vargas (for the

26  purposes of this count, "Plaintiffs") bring brings this claim on behalf of themselves himself and

27  the California State Class against the Defendants.

28

240.   39.Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

241.   40.With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

242.   41.All California State Class members who purchased Class Vehicles in California are "buyers" within the meaning of Cal. Com. Code § 2103(1)(a).

243.   42.All California State Class members who leased Class Vehicles in the California are "lessees" within the meaning of Cal. Com. Code § 10103(a)(14).

244.   43.The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

245.   44.In connection with the purchase or lease of Class Vehicles, Defendants provided Plaintiffs and California State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

246.   45.Defendants' warranties formed the basis of the bargain that was reached when Plaintiffs and California State Class members unknowingly purchased or leased Class Vehicles that came equipped with the SDM Calibration Defect.

247.   46.However, Defendants knew or should have known that the warranties were false and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to Plaintiffs and California State Class members.

248.   47.Plaintiffs Plaintiff and California State Class members reasonably relied on Defendants' express warranties when purchasing or leasing their Class Vehicles.

249.   48.Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles. Defendants also breached their express warranties by providing a product containing defects that were never disclosed to Plaintiffs Plaintiff and California State Class members.

250. On January 27, 2023, Plaintiff Vargas presented his Class Vehicle and requested a repair for the SDM Calibration Defect under the vehicle's warranty at Anderson Chevrolet, an authorized GM dealership in Lake Elsinore, California. In response, dealership personnel informed Mr. Vargas that there were no open recalls for the SDM software in his vehicle, and thus they would not provide a repair for the SDM Calibration Defect. Based on this refusal, Mr. Vargas left the dealership without obtaining a repair for the SDM Calibration Defect under his warranty.

251. 49.Defendants were on reasonable notice of these issues and an opportunity to cure the breaches due to Mr. Vargas' request for a repair at the dealership, as well as their extensive knowledge of the SDM Calibration Defect, as detailed herein. Any opportunity to cure the breach is unnecessary and futile, Defendants have not cured the breaches of their warranties despite years of knowledge of those breaches.

252. 50.As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs Plaintiff and California State Class members have been damaged in an amount to be proven at trial.

**CALIFORNIA COUNT VVII:**
**Breach of Implied Warranty of Merchantability**
**Cal. Com. Code §§ 2314 and 10212(On Behalf of the California State Class)**

253. 51.Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

254. 52.Plaintiffs Ramiro Pereda, James Milstead, and Richard Vargas (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the California State Class against the Defendants.

255. 53.Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

256. 54.With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

257. 55. All California State Class members who purchased Class Vehicles in California are "buyers" within the meaning of Cal. Com. Code § 2103(1)(a).

258. 56. All California State Class members who leased Class Vehicles in the California are "lessees" within the meaning of Cal. Com. Code § 10103(a)(14).

57. The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

259. 58. The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

260. 59. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

261. 60. The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

262. 61. Defendants were on reasonable notice of these issues and an opportunity to cure the breaches due to their extensive knowledge of the SDM Calibration Defect, as detailed herein. Any opportunity to cure the breach is unnecessary and futile, Defendants have not cured the breaches of their warranties despite years of knowledge of those breaches.

263. 62. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and California State Class members have been damaged in an amount to be proven at trial.

~~CALIFORNIA~~ COUNT ~~VI~~VIII:
**Violation of Song-Beverly Consumer Warranty Act,**
**Breach of Implied Warranty**
**Cal Civ. Code § 1790,** *et seq.*~~(On Behalf of the California State Class)~~

264.    ~~63.~~Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

265.    ~~64.~~Plaintiffs ~~Ramiro Pereda, James Milstead, and Richard Vargas (for the purposes of this count, "Plaintiffs")~~ bring this claim on behalf of themselves and the California State Class against the Defendants.

266.    ~~65.~~All California State Class members who purchased Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

267.    ~~66.~~All California State Class members who leased Class Vehicles in California are "lessors" within the meaning of Cal. Civ. Code § 1791(h).

268.    ~~67.~~The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

269.    ~~68.~~Defendants are the "manufacturer[s]" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

270.    ~~69.~~Defendants impliedly warranted to Plaintiffs and the other members of the California State Class that the Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Class Vehicles do not have the quality that a buyer would reasonably expect.

271.    ~~70.~~The Class Vehicles would not pass without objection in the automotive trade due to the SDM Calibration Defect. Because the Class Vehicles contain defective SDMs, the Class Vehicles are not in merchantable condition and thus not fit for ordinary purposes.

272.    ~~71.~~The Class Vehicles are not adequately labeled because the labeling fails to disclose the SDM Calibration Defect. The Class Vehicles do not conform to the promises and affirmations made by the Defendants regarding safety.

273.   ~~72.~~The Defendants' breach of the implied warranty of merchantability caused damage to ~~Plaintiffs~~ Plaintiff Vargas and California State Class members who purchased or leased the defective Class Vehicles. The amount of damages due will be proven at trial.

274.   ~~73.~~Pursuant to Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiffs and California State Class members seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and any other just and proper relief available under the Song-Beverly Consumer Warranty Act.

**~~CALIFORNIA~~ COUNT ~~VIII~~IX:**
**Violation of the Song-Beverly Consumer Protection Act,**
**Breach of Express Warranty**
**Cal Civ. Code § 1790, *et seq.*~~(On Behalf of the California State Class)~~**

275.   ~~74.~~Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

276.   ~~75.Plaintiffs Ramiro Pereda, James Milstead, and Richard Vargas (for the purposes of this count, "Plaintiffs") bring~~ Plaintiff Vargas brings this claim on behalf of ~~themselves~~ himself and the California State Class against the Defendants.

277.   ~~76.~~All California State Class members who purchased Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

278.   ~~77.~~All California State Class members who leased Class Vehicles in California are "lessors" within the meaning of Cal. Civ. Code § 1791(h).

279.   ~~78.~~The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

280.   ~~79.~~Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of California Civil Code § 1791(j).

281.   ~~80.~~Defendants are and were at all relevant times "sellers" of motor vehicles under Cal. Civ. Code § 1791(l).

282.   ~~81.~~With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Civ. Code § 1791(i).

1   283.   82.Defendants made express warranties to members of the California State Class

2   within the meaning of California Civil Code §§ 1791.2 and 1793.2.

3   284.   83.In connection with the purchase or lease of Class Vehicles, Defendants

4   provided Plaintiffs Plaintiff and California State Class members with written express warranties

5   covering the repair or replacement of components that are defective in materials or workmanship.

6   285.   84.Defendants' warranties formed the basis of the bargain that was reached when

7   Plaintiffs Plaintiff and California State Class members unknowingly purchased or leased their

8   Class Vehicles equipped with the SDM Calibration Defect.

9   286.   85.However, Defendants knew or should have known that their warranties were

10   false and misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the

11   Class Vehicles which made the vehicles inherently defective and dangerous at the time that they

12   were sold and leased to Plaintiffs Plaintiff and California State Class members.

13   287.   86.Plaintiffs Plaintiff and California State Class members reasonably relied on

14   Defendants' express warranties when purchasing or leasing the California Class Vehicles.

15   288.   87.Defendants knowingly breached their express warranties to repair defects in

16   materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

17   Defendants also breached their express warranties by providing a product containing defects that

18   were never disclosed to Plaintiffs Plaintiff and California State Class members.

19   289.   88.Defendants were on reasonable notice of these issues and an opportunity to cure

20   the breaches due to their extensive knowledge of the SDM Defect, as detailed herein. Any

21   opportunity to cure the breach is unnecessary and futile, Defendants have not cured the breaches

22   of their warranties despite years of knowledge of those breaches, as detailed herein.

23   290.   89.As a result of Defendants' breach of their express warranties, members of the

24   California State Class received goods whose defect substantially impairs their value to Plaintiffs

25   and the other members of the California State Class. Plaintiffs and members of the California

26   State Class have been damaged as a result of, inter alia, the diminished value of Defendants'

27   products.

28

291. ~~90.~~Pursuant to California Civil Code §§ 1793.2 & 1794, Plaintiffs and members of the California State Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

292. ~~91.~~Pursuant to California Civil Code § 1794, the Class is entitled to costs and attorneys' fees.

~~5.      Colorado~~

~~COLORADO COUNT I:~~
~~Violations of the Colorado Consumer Protection Act~~
~~Colo. Rev. Stat. § 6-1-101 *et seq.*~~
~~(On Behalf of the Colorado State Class)~~

~~1.      Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.~~

~~2.      Plaintiff Lakiesha Shears (for the purposes of this count, "Plaintiff") brings this claim on behalf of herself and the Colorado State Class against all Defendants.~~

~~3.      Defendants are "person[s]" under § 6-1-102(6) of the Colorado Consumer Protection Act "Colorado CPA"), Col. Rev. Stat. § 6-1-101, *et seq.*~~

~~4.      Plaintiff and Colorado State Class members are "consumers" for purposes of Col. Rev. Stat § 6-1-113(1)(a) who purchased or leased one or more Class Vehicles.~~

~~5.      The Colorado CPA prohibits deceptive trade practices in the course of a person's business.  Defendants engaged in deceptive trade practices prohibited by the Colorado CPA, including: (1) knowingly making a false representation as to the characteristics, uses, and benefits of the Class Vehicles that had the capacity or tendency to deceive Colorado State Class members; (2) representing that the Class Vehicles are of a particular standard, quality, and grade even though Defendants knew or should have known they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; and (4) failing to disclose material information concerning the Class Vehicles that was known to Defendants at the time of advertisement or sale with the intent to induce Colorado State Class members to purchase, lease or retain the Class Vehicles.~~

1    6.    In the course of their business, Defendants violated the Colorado CPA by

2 knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose

3 material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed

4 above.

5    7.    Specifically, by misrepresenting the Class Vehicles as safe and/or free from

6 defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

7 Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of

8 competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

9 conduct of any trade or commerce, as prohibited by the Colorado CPA.

10    8.    Defendants' unfair or deceptive acts or practices, including misrepresentations,

11 concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

12 mislead and create a false impression in consumers, and were likely to and did in fact deceive

13 reasonable consumers, including Plaintiff and Colorado State Class members, about the true

14 safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the

15 Class Vehicles.

16    9.    Defendants' scheme and concealment of the SDM Calibration Defect and true

17 characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiff and

18 Colorado State Class members, as the Defendants intended. Had they known the truth, Plaintiff

19 and Colorado State Class members would not have purchased or leased the Class Vehicles, or

20 would have paid significantly less for them.

21    10.    Plaintiff and Colorado State Class members had no way of discerning that

22 Defendants' representations were false and misleading and/or otherwise learning the facts that

23 Defendants had concealed or failed to disclose. Plaintiff and Colorado State Class members did

24 not, and could not, unravel Defendants' deception on their own.

25    11.    Defendants had an ongoing duty to Plaintiff and Colorado State Class members to

26 refrain from unfair or deceptive practices under the Colorado CPA in the course of their business.

27 Specifically, Defendants owed Plaintiff and Colorado State Class members a duty to disclose all

28 the material facts concerning the SDM Calibration Defect in the Class Vehicles because they

1   possessed exclusive knowledge, they intentionally concealed the defect from Plaintiff and

2   Colorado State Class members, and/or they made misrepresentations that were misleading

3   because they were contradicted by withheld facts.

4        12.    Defendants' violations present a continuing risk to the Colorado State Class as

5   well as to the general public. Defendants' unlawful acts and practices complained of herein affect

6   the public interest.

7        13.    Plaintiff and the Colorado State Class suffered ascertainable loss and actual

8   damages as a direct and proximate result of Defendants' misrepresentations and concealment of

9   and failure to disclose material information. Defendants had an ongoing duty to all their

10  customers to refrain from unfair and deceptive practices under the Colorado CPA. All owners and

11  lessees of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and

12  unfair acts and practices made in the course of Defendants' business.

13                              **COLORADO COUNT II:**
                               **Breach of Express Warranty**
14                        **Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-210**
                          **(On Behalf of the Colorado State Class)**
15

16       14.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

17  fully set forth herein.

18       15.    Plaintiff Lakiesha Shears (for the purposes of this count, "Plaintiff") brings this

19  claim on behalf of herself and the Colorado State Class against all Defendants.

20       16.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

21  vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles

22  under § 4-2-103(1)(d).

23       17.    With respect to leases, Defendants are and were at all relevant times "lessors" of

24  motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

25       18.    The Class Vehicles are and were at all relevant times "goods" within the meaning

26  of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

27

28

1     19.     In connection with the purchase or lease of Class Vehicles, Defendants provided

2  Plaintiff and Colorado State Class members with written express warranties covering the repair or

3  replacement of components that are defective in materials or workmanship.

4     20.     Defendants' warranties formed the basis of the bargain that was reached when

5  Plaintiff and Colorado State Class members unknowingly purchased or leased Class Vehicles that

6  came equipped with the SDM Calibration Defect.

7     21.     However, Defendants knew or should have known that the warranties were false

8  and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the

9  Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they

10  were sold and leased to Plaintiff and Colorado State Class members.

11     22.     Plaintiff and Colorado State Class members reasonably relied on the Defendants'

12  express warranties when purchasing or leasing their Class Vehicles.

13     23.     Defendants knowingly breached their express warranties to repair defects in

14  materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

15  Defendants also breached their express warranties by providing a product containing defects that

16  were never disclosed to Plaintiff and Colorado State Class members.

17     24.     Plaintiff and Colorado State Class members have provided the Defendants with

18  reasonable notice and opportunity to cure the breaches of their express warranties by way of letter

19  sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public

20  NHTSA complaints and individual lawsuits, as detailed herein.

21     25.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

22     26.     As a direct and proximate result of the Defendants' breach of express warranties,

23  Plaintiff and Colorado State Class members have been damaged in an amount to be proven at

24  trial.

25

26

27

28

1

**COLORADO COUNT III:**

2

**Breach of Implied Warranty of Merchantability**
**Colo. Rev. Stat. §§ 4-2-314 and 4-2.5-212**

3

**(On Behalf of the Colorado State Class)**

4

27.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

5

forth herein.

6

28.     Plaintiff Lakiesha Shears (for the purposes of this count, "Plaintiff") brings this

7

claim on behalf of herself and the Colorado State Class against all Defendants.

8

29.     Defendants are and were at all relevant times "merchant[s]" with respect to motor

9

vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles

10

under § 4-2-103(1)(d).

11

30.     With respect to leases, Defendants are and were at all relevant times "lessors" of

12

motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

13

31.     The Class Vehicles are and were at all relevant times "goods" within the meaning

14

of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

15

32.     A warranty that the Class Vehicles were in merchantable condition and fit for the

16

ordinary purpose for which vehicles are used is implied by law pursuant to Colo. Rev. Stat. §§ 4-

17

2-313 and 4-2.5-212.

18

33.     The Class Vehicles did not comply with the implied warranty of merchantability

19

because, at the time of sale and at all times thereafter, they were defective and not in

20

merchantable condition, would not pass without objection in the trade, and were not fit for the

21

ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the

22

SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an

23

accident, rendering the Class Vehicles inherently defective and dangerous.

24

34.     Defendants were provided reasonable notice of these issues by way of a letter sent

25

by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual

26

lawsuits, as detailed herein.

27

35.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

28

36.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Colorado State Class members have been damaged in an amount to be proven at trial.

6.     **Delaware**

**DELAWARE COUNT I:**
**Violations of the Delaware Consumer Fraud Act**
**6 Del. Code § 2513 *et seq*.**
**(On Behalf of the Delaware State Class)**

1.     Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2.     Plaintiff Christina Colatriano (for the purposes of this count, "Plaintiff") brings this claim on behalf of herself and the Delaware State Class against all Defendants.

3.     Defendants are "person[s]" within the meaning of 6 Del. Code § 2511(7).

4.     The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby." 6 Del. Code § 2513(a).

5.     In the course of their business, Defendants violated the Delaware CFA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed above.

6.     Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce, as prohibited by 6 Del. Code § 2513(a).

7.     Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

1    mislead and create a false impression in consumers, and were likely to and did in fact deceive

2    reasonable consumers, including Plaintiff and Delaware State Class members, about the true

3    safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the

4    Class Vehicles.

5    8.    Defendants' scheme and concealment of the SDM Calibration Defect and true

6    characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiff and

7    Delaware State Class members, as the Defendants intended. Had they known the truth, Plaintiffs

8    and Delaware State Class members would not have purchased or leased the Class Vehicles, or

9    would have paid significantly less for them.

10   9.    Plaintiff and Delaware State Class members had no way of discerning that

11   Defendants' representations were false and misleading and/or otherwise learning the facts that

12   Defendants had concealed or failed to disclose. Plaintiff and Delaware State Class members did

13   not, and could not, unravel Defendants' deception on their own.

14   10.    Defendants had an ongoing duty to Plaintiff and Delaware State Class members to

15   refrain from unfair or deceptive practices under the Delaware CFA in the course of their business.

16   Specifically, Defendants owed Plaintiffs and Delaware State Class members a duty to disclose all

17   the material facts concerning the SDM Calibration Defect in the Class Vehicles because they

18   possessed exclusive knowledge, they intentionally concealed the defect from Plaintiff and

19   Delaware State Class members, and/or they made misrepresentations that were misleading

20   because they were contradicted by withheld facts.

21   11.    Defendants' violations present a continuing risk to the Delaware Class as well as

22   to the general public. Defendants' unlawful acts and practices complained of herein affect the

23   public interest.

24   12.    The Delaware State Class suffered ascertainable loss and actual damages as a

25   direct and proximate result of Defendants' misrepresentations and concealment of and failure to

26   disclose material information. Defendants had an ongoing duty to all their customers to refrain

27   from unfair and deceptive practices under the Delaware CFA. All owners of Class Vehicles

28

1    suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made

2    in the course of Defendants' business.

3        13.    As a direct and proximate result of Defendants' violations of the Delaware CFA,

4    the Delaware State Class have suffered injury-in-fact and/or actual damage.

5        14.    The Delaware State Class seeks damages under the Delaware CFA for injury

6    resulting from the direct and natural consequences of Defendants' unlawful conduct. *See, e.g.,*

7    *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983). The Delaware State Class

8    also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices,

9    declaratory relief, attorneys' fees, and any other just and proper relief available under the

10   Delaware CFA.

11       15.    Defendants engaged in gross, oppressive or aggravated conduct justifying the

12   imposition of punitive damages.

13                        **DELAWARE COUNT II:**
                          **Breach of Express Warranty**
14                        **6 Del. Code §§ 2-313 and 2A-210**
                          **(On Behalf of the Delaware State Class)**

15

16       16.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

17   fully set forth herein.

18       17.    Plaintiff Christina Colatriano (for the purposes of this count, "Plaintiff") brings

19   this claim on behalf of herself and the Delaware State Class against all Defendants.

20       18.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

21   vehicles under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-

22   103(1)(d).

23       19.    With respect to leases, Defendants are and were at all relevant times "lessors" of

24   motor vehicles under 6 Del. C. § 2A-103(1)(p).

25       20.    The Class Vehicles are and were at all relevant times "goods" within the meaning

26   of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

27

28

1    21.    In connection with the purchase or lease of Class Vehicles, Defendants provided
2    Plaintiff and Delaware State Class members with written express warranties covering the repair or
3    replacement of components that are defective in materials or workmanship.

4    22.    Defendants' warranties formed the basis of the bargain that was reached when
5    Plaintiff and Delaware State Class members unknowingly purchased or leased Class Vehicles that
6    came equipped with the SDM Calibration Defect.

7    23.    However, Defendants knew or should have known that the warranties were false
8    and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the
9    Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they
10   were sold and leased to Plaintiff and Delaware State Class members.

11   24.    Plaintiff and Delaware State Class members reasonably relied on the Defendants'
12   express warranties when purchasing or leasing their Class Vehicles.

13   25.    Defendants knowingly breached their express warranties to repair defects in
14   materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.
15   Defendants also breached their express warranties by providing a product containing defects that
16   were never disclosed to Plaintiffs and Delaware State Class members.

17   26.    Plaintiff and Delaware State Class members have provided the Defendants with
18   reasonable notice and opportunity to cure the breaches of their express warranties by way of letter
19   sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public
20   NHTSA complaints and individual lawsuits, as detailed herein.

21   27.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

22   28.    As a direct and proximate result of the Defendants' breach of express warranties,
23   Plaintiff and Delaware State Class members have been damaged in an amount to be proven at
24   trial.

25

26

27

28

**DELAWARE COUNT III:**
**Breach of Implied Warranty of Merchantability**
**6 Del. Code §§ 2-314 and 7-2A-212**
**(On Behalf of the Delaware State Class)**

29.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

30.     Plaintiff Christina Colatriano (for the purposes of this count, "Plaintiff") brings this claim on behalf of herself and the Delaware State Class against all Defendants.

31.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

32.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under 6 Del. C. § 2A-103(1)(p).

33.     The Class Vehicles are and were at all relevant times "goods" within the meaning of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

34.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 6 Del. C. §§ 2-314 and 2A-212.

35.     The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

36.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual lawsuits, as detailed herein.

37.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

1    38.    As a direct and proximate result of Defendants' breach of the implied warranty of

2    merchantability, Plaintiffs and Delaware State Class members have been damaged in an amount

3    to be proven at trial.

4                        **7.    Florida**

5                    **FLORIDA COUNT I:**

6         **Violations of the Florida Unfair & Deceptive Trade Practices Act**
          **Fla. Stat. § 501.201, *et seq.***

7              **(On Behalf of the Florida State Class)**

8    1.    Plaintiffs reallege and incorporate by reference all preceding allegations as though

9    fully set forth herein.

10   2.    Plaintiffs Toni Lowe, Clarise Knight, and William Free (for the purposes of this

11   count, "Plaintiffs") bring this claim on behalf of themselves and the Florida State Class against all

12   Defendants.

13   3.    Plaintiffs and members of the Florida State Class are "consumers" within the

14   meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat.

15   § 501.203(7).

16   4.    Defendants engaged in "trade or commerce" within the meaning of Fla. Stat.

17   § 501.203(8).

18   5.    FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or

19   practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . ."

20   Fla. Stat. § 501.204(1). Defendants participated in unfair and deceptive trade practices that

21   violated the FUDTPA as described herein.

22   6.    In the course of their business, Defendants violated the FUDTPA by knowingly

23   and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts

24   regarding the reliability, safety, and performance of the Class Vehicles, as detailed above.

25   7.    Specifically, by misrepresenting the Class Vehicles as safe and/or free from

26   defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

27   Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of

28

1   competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

2   conduct of any trade or commerce, as prohibited by Fla. Stat. § 501.204(1).

3        8.      Defendants' unfair or deceptive acts or practices, including misrepresentations,

4   concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

5   mislead and create a false impression in consumers, and were likely to and did in fact deceive

6   reasonable consumers, including Plaintiffs and Florida State Class members, about the true safety

7   and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class

8   Vehicles.

9        9.      Defendants' scheme and concealment of the SDM Calibration Defect and true

10  characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiffs

11  and Florida State Class members, as the Defendants intended. Had they known the truth,

12  Plaintiffs and Florida State Class members would not have purchased or leased the Class

13  Vehicles, or would have paid significantly less for them.

14       10.     Plaintiffs and Florida State Class members had no way of discerning that

15  Defendants' representations were false and misleading and/or otherwise learning the facts that

16  Defendants had concealed or failed to disclose. Plaintiffs and Florida State Class members did

17  not, and could not, unravel Defendants' deception on their own.

18       11.     Defendants had an ongoing duty to Plaintiffs and Florida State Class members to

19  refrain from unfair or deceptive practices under the FUDTPA in the course of their business.

20  Specifically, Defendants owed Plaintiffs and Florida State Class members a duty to disclose all

21  the material facts concerning the SDM Calibration Defect in the Class Vehicles because they

22  possessed exclusive knowledge, they intentionally concealed the defect from Plaintiffs and

23  Florida State Class members, and/or they made misrepresentations that were misleading because

24  they were contradicted by withheld facts.

25       12.     Defendants' violations present a continuing risk to Plaintiffs and Florida State

26  Class members, as well as to the general public. Defendants' unlawful acts and practices

27  complained of herein affect the public interest.

28

13.     Pursuant to Fla. Stat. § 501.211, Plaintiffs and Florida State Class members seek an order enjoining Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the FUDTPA.

14.     Plaintiffs and the Florida State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

15.     Plaintiffs and the Florida State Class are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

16.     Plaintiffs and the Florida State Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

**FLORIDA COUNT II:**
**Breach of Express Warranty**
**Fla. Stat. §§ 672.313 and 680.21**
**(On Behalf of the Florida State Class)**

17.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

18.     Plaintiffs Toni Lowe, Clarise Knight, and William Free (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Florida State Class against all Defendants.

19.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

20.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

21.     All Florida State Class members who purchased Class Vehicles in Florida are "buyers" within the meaning of Fla. Stat. §§ 672.103(1)(a).

22.     All Florida State Class members who leased Class Vehicles in Florida are "lessees" within the meaning of Fla. Stat. § 680.1031(1)(n).

23.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

24.     In connection with the purchase or lease of Class Vehicles, Defendants provided Plaintiffs and Florida State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

25.     Defendants' warranties formed the basis of the bargain that was reached when Plaintiffs and Florida State Class members unknowingly purchased or leased Class Vehicles that came equipped with the SDM Calibration Defect.

26.     However, Defendants knew or should have known that the warranties were false and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to Plaintiffs and Florida State Class members.

27.     Plaintiffs and Florida State Class members reasonably relied on the Defendants' express warranties when purchasing or leasing their Class Vehicles.

28.     Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles. Defendants also breached their express warranties by providing a product containing defects that were never disclosed to Plaintiffs and Florida State Class members.

29.     Plaintiffs and Florida State Class members have provided the Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of letter sent by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual lawsuits, as detailed herein.

30.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

31.     As a direct and proximate result of the Defendants' breach of express warranties, Plaintiffs and Florida State Class members have been damaged in an amount to be proven at trial.

**FLORIDA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Fla. Stat. §§ 672.314 and 680.212**
**(On Behalf of the Florida State Class)**

32.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

33.     Plaintiffs Toni Lowe, Clarise Knight, and William Free (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Florida State Class against all Defendants.

34.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

35.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

36.     All Florida State Class members who purchased Class Vehicles in Florida are "buyers" within the meaning of Fla. Stat. §§ 672.103(1)(a).

37.     All Florida State Class members who leased Class Vehicles in Florida are "lessees" within the meaning of Fla. Stat. § 680.1031(1)(n).

38.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

39.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Fla. Stat. §§ 672.314 and 680.212.

40.     The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

41.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public NHTSA complaints and individual lawsuits, as detailed herein.

42.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

43.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and Florida State Class members have been damaged in an amount to be proven at trial.

8.     **Georgia**

**GEORGIA COUNT I:**
**Violations of Georgia's Fair Business Practices Act**
**Ga. Code Ann. § 10-1-390 *et seq*.**
**(On Behalf of the Georgia State Class)**

1.     Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2.     Plaintiffs Eloise Ackiss, Joseph Sweat, Ed Driggers, Jr., and Larry Swafford (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Georgia State Class against all Defendants.

3.     The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code. Ann. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code. Ann. § 10-1-393(b).

4.     In the course of their business, Defendants violated the Georgia FBPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed above.

5.     Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

1    Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of

2    competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

3    conduct of any trade or commerce, as prohibited by Ga. Code. Ann. § 10-1-393(b).

4         6.       Defendants' unfair or deceptive acts or practices, including misrepresentations,

5    concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

6    mislead and create a false impression in consumers, and were likely to and did in fact deceive

7    reasonable consumers, including Plaintiffs and Georgia State Class members, about the true

8    safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the

9    Class Vehicles.

10        7.       Defendants' scheme and concealment of the SDM Calibration Defect and true

11   characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiffs

12   and Georgia State Class members, as the Defendants intended. Had they known the truth,

13   Plaintiffs and Georgia State Class members would not have purchased or leased the Class

14   Vehicles, or would have paid significantly less for them.

15        8.       Plaintiffs and Georgia State Class members had no way of discerning that

16   Defendants' representations were false and misleading and/or otherwise learning the facts that

17   Defendants had concealed or failed to disclose. Plaintiffs and Georgia State Class members did

18   not, and could not, unravel Defendants' deception on their own.

19        9.       Defendants had an ongoing duty to Plaintiffs and Georgia State Class members to

20   refrain from unfair or deceptive practices under the Georgia FBPA in the course of their business.

21   Specifically, Defendants owed Plaintiffs and Georgia State Class members a duty to disclose all

22   the material facts concerning the SDM Calibration Defect in the Class Vehicles because they

23   possessed exclusive knowledge, they intentionally concealed the defect from Plaintiffs and

24   Georgia State Class members, and/or they made misrepresentations that were misleading because

25   they were contradicted by withheld facts.

26        10.      Defendants' violations present a continuing risk to Plaintiffs and Georgia State

27   Class members, as well as to the general public. Defendants' unlawful acts and practices

28   complained of herein affect the public interest.

1    11.    As a direct and proximate result of Defendants' violations of the Georgia FBPA,

2  Plaintiffs and the Georgia State Class has suffered injury-in-fact and/or actual damage.

3    12.    Plaintiffs and the Georgia State Class are entitled to recover damages and

4  exemplary damages (for intentional violations) per Ga. Code. Ann. § 10-1-399(a).

5    13.    Plaintiffs and the Georgia State Class also seek an order enjoining Defendants'

6  unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief

7  available under the Georgia FBPA per Ga. Code. Ann. § 10-1-399.

8    14.    Pursuant to Ga. Code Ann. § 10-1-399, Plaintiffs sent a notice letter to Defendants.

9  Plaintiffs and the Georgia State Class seek all damages and relief to which it is entitled.

10                    **GEORGIA COUNT II:**

11  **Violations of Georgia's Uniform Deceptive Trade Practices Act**
    **Ga. Code Ann. § 10-1-370 *et seq*.**

12                **(On Behalf of the Georgia State Class)**

13    15.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

14    16.    Plaintiffs Eloise Ackiss, Joseph Sweat, Ed Driggers, Jr., and Larry Swafford (for

15  the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Georgia

16  State Class against all Defendants.

17    17.    Defendants, Plaintiffs, and members of the Georgia State Class are "persons"

18  within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga.

19  Code. Ann. § 10-1-371(5).

20    18.    The Georgia UDTPA prohibits "deceptive trade practices," which include the

21  "misrepresentation of standard or quality of goods or services," and "engaging in any other

22  conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code.

23  Ann. § 10-1-372(a).

24    19.    In the course of their business, Defendants violated the Georgia UDTPA by

25  knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose

26  material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed

27  above.

28

1       20.    Specifically, by misrepresenting the Class Vehicles as safe and/or free from

2   defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

3   Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of

4   competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

5   conduct of any trade or commerce, as prohibited by the Georgia UDTPA.

6       21.    Defendants' unfair or deceptive acts or practices, including misrepresentations,

7   concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

8   mislead and create a false impression in consumers, and were likely to and did in fact deceive

9   reasonable consumers, including Plaintiffs and Georgia State Class members, about the true

10   safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the

11   Class Vehicles.

12       22.    Defendants' scheme and concealment of the SDM Calibration Defect and true

13   characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiffs

14   and Georgia State Class members, as the Defendants intended. Had they known the truth,

15   Plaintiffs and Georgia State Class members would not have purchased or leased the Class

16   Vehicles, or would have paid significantly less for them.

17       23.    Plaintiffs and Georgia State Class members had no way of discerning that

18   Defendants' representations were false and misleading and/or otherwise learning the facts that

19   Defendants had concealed or failed to disclose. Plaintiffs and Georgia State Class members did

20   not, and could not, unravel Defendants' deception on their own.

21       24.    Defendants had an ongoing duty to Plaintiffs and Georgia State Class members to

22   refrain from unfair or deceptive practices under the Georgia UDTPA in the course of their

23   business. Specifically, Defendants owed Plaintiffs and Georgia State Class members a duty to

24   disclose all the material facts concerning the SDM Calibration Defect in the Class Vehicles

25   because they possessed exclusive knowledge, they intentionally concealed the defect from

26   Plaintiffs and Georgia State Class members, and/or they made misrepresentations that were

27   misleading because they were contradicted by withheld facts.

28

25.     Defendants' violations present a continuing risk to Plaintiffs and Georgia State Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

26.     As a direct and proximate result of Defendants' violations of the Georgia UDTPA, Plaintiffs and the Georgia State Class have suffered injury in fact and/or actual damage.

27.     Plaintiffs and the Georgia State Class seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA per Ga. Code. Ann § 10-1-373.

**GEORGIA COUNT III:**
**Breach of Express Warranty**
**Ga. Code Ann. §§ 11-2-313 and 11-2A-210**
**(On Behalf of the Georgia State Class)**

28.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

29.     Plaintiffs Eloise Ackiss, Joseph Sweat, Ed Driggers, Jr., and Larry Swafford (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Georgia State Class against all Defendants.

30.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

31.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

32.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

33.     In connection with the purchase or lease of Class Vehicles, the Defendants provided Plaintiffs and Georgia State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

1    34.    Defendants' warranties formed the basis of the bargain that was reached when

2    Plaintiffs and Georgia State Class members unknowingly purchased or leased Class Vehicles that

3    came equipped with the SDM Calibration Defect.

4    35.    However, Defendants knew or should have known that the warranties were false

5    and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the

6    Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they

7    were sold and leased to Plaintiffs and Georgia State Class members.

8    36.    Plaintiffs and Georgia State Class members reasonably relied on the Defendants'

9    express warranties when purchasing or leasing their Class Vehicles.

10    37.    Defendants knowingly breached their express warranties to repair defects in

11    materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

12    Defendants also breached their express warranties by providing a product containing defects that

13    were never disclosed to Plaintiffs and Georgia State Class members.

14    38.    Plaintiffs and Georgia State Class members have provided the Defendants with

15    reasonable notice and opportunity to cure the breaches of their express warranties by way of letter

16    sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public

17    NHTSA complaints and individual lawsuits, as detailed herein.

18    39.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

19    40.    As a direct and proximate result of the Defendants' breach of express warranties,

20    Plaintiffs and Georgia State Class members have been damaged in an amount to be proven at

21    trial.

22                               **GEORGIA COUNT IV:**
                          **Breach of Implied Warranty of Merchantability**
23                          **Ga. Code Ann. §§ 11-2-314 and 11-2A-212**
                               **(On Behalf of the Georgia State Class)**
24

25    41.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

26    forth herein.

27

28

42.     Plaintiffs Eloise Ackiss, Joseph Sweat, Ed Driggers, Jr., and Larry Swafford for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Georgia State Class against all Defendants.

43.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

44.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

45.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

46.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ga. Code Ann. §§ 11-2-314 and 11-2A-212.

47.     The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

48.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual lawsuits, as detailed herein.

49.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

50.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and Georgia State Class members have been damaged in an amount to be proven at trial.

**9.     Idaho**

**IDAHO COUNT I:**
**Violations of the Idaho Consumer Protection Act**
**Idaho Code Ann. § 48-601, *et seq.***

1.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2.     Plaintiffs Michael Merkley and Travis Dieter (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Idaho State Class against all Defendants.

3.     Defendants are "person[s]" under the Idaho Consumer Protection Act ("Idaho CPA"), Idaho Code § 48-602(1).

4.     Defendants' acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under Idaho Code § 48-602(2).

5.     Defendants participated in misleading, false, or deceptive acts that violated the Idaho CPA.

6.     In the course of their business, Defendants violated the Idaho CPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed above.

7.     Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce, as prohibited by the Idaho CPA.

8.     Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Idaho State Class members, about the true safety

1   and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class

2   Vehicles.

3         9.     Defendants' scheme and concealment of the SDM Calibration Defect and true

4   characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiffs

5   and Idaho State Class members, as the Defendants intended. Had they known the truth, Plaintiffs

6   and Idaho State Class members would not have purchased or leased the Class Vehicles, or would

7   have paid significantly less for them.

8         10.    Plaintiffs and Idaho State Class members had no way of discerning that

9   Defendants' representations were false and misleading and/or otherwise learning the facts that

10   Defendants had concealed or failed to disclose. Plaintiffs and Idaho State Class members did not,

11   and could not, unravel Defendants' deception on their own.

12         11.    Defendants had an ongoing duty to Plaintiffs and Idaho State Class members to

13   refrain from unfair or deceptive practices under the Idaho CPA in the course of their business.

14   Specifically, Defendants owed Plaintiffs and Idaho State Class members a duty to disclose all the

15   material facts concerning the SDM Calibration Defect in the Class Vehicles because they

16   possessed exclusive knowledge, they intentionally concealed the defect from Plaintiffs and Idaho

17   State Class members, and/or they made misrepresentations that were misleading because they

18   were contradicted by withheld facts.

19         12.    Defendants' violations present a continuing risk to the Idaho State Class as well as

20   to the general public. Defendants' unlawful acts and practices complained of herein affect the

21   public interest.

22         13.    The Idaho State Class suffered ascertainable loss and actual damages as a direct

23   and proximate result of Defendants' misrepresentations and concealment of and failure to

24   disclose material information. Defendants had an ongoing duty to all their customers to refrain

25   from unfair and deceptive practices under the Idaho CPA. All owners of Class Vehicles suffered

26   ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the

27   course of Defendants' business.

28

14.     As a direct and proximate result of Defendants' violations of the Idaho CPA, the Idaho State Class has suffered injury-in-fact and/or actual damage.

15.     Pursuant to Idaho Code § 48-608, the Idaho State Class seeks monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each Idaho State Class member.

16.     The Idaho State Class also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

17.     The Idaho State Class also seeks punitive damages against Defendants because Defendants conduct evidences an extreme deviation from reasonable standards. Defendants flagrantly and fraudulently misrepresented the reliability of the Class Vehicles, deceived Class members, and concealed material facts that only they knew—all to avoid the expense and public relations nightmare of correcting a flaw in the Class Vehicles. Defendants' unlawful conduct constitutes oppression and fraud warranting punitive damages.

**IDAHO COUNT II:**
**Breach of Express Warranty**
**Idaho Code §§ 28-2-313 and 28-12-210**
**(On Behalf of the Idaho State Class)**

18.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

19.     Plaintiffs Michael Merkley and Travis Dieter (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Idaho State Class against all Defendants.

20.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and "sellers" of motor vehicles under § 28-2-103(1)(d).

21.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Idaho Code § 28-12-103(1)(p).

22.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h).

23.     In connection with the purchase or lease of Class Vehicles, the Defendants provided Plaintiffs and Idaho State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

24.     Defendants' warranties formed the basis of the bargain that was reached when Plaintiffs and Idaho State Class members unknowingly purchased or leased Class Vehicles that came equipped with the SDM Calibration Defect.

25.     However, Defendants knew or should have known that the warranties were false and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to Plaintiffs and Idaho State Class members.

26.     Plaintiffs and Idaho State Class members reasonably relied on the Defendants' express warranties when purchasing or leasing their Class Vehicles.

27.     Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles. Defendants also breached their express warranties by providing a product containing defects that were never disclosed to Plaintiffs and Idaho State Class members.

28.     Plaintiffs and Idaho State Class members have provided the Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of letter sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public NHTSA complaints and individual lawsuits, as detailed herein.

29.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

30.     As a direct and proximate result of the Defendants' breach of express warranties, Plaintiffs and Idaho State Class members have been damaged in an amount to be proven at trial.

1

**IDAHO COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Idaho Code §§ 28-2-314 and 28-12-212**
**(On Behalf of the Idaho State Class)**

2

3

4    31.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

5    forth herein.

6    32.    Plaintiffs Michael Merkley and Travis Dieter (for the purposes of this count,

7    "Plaintiffs") bring this claim on behalf of themselves and the Idaho State Class against all

8    Defendants.

9    33.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

10   vehicles under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and "sellers" of motor vehicles

11   under § 28-2-103(1)(d).

12   34.    With respect to leases, Defendants are and were at all relevant times "lessors" of

13   motor vehicles under Idaho Code § 28-12-103(1)(p).

14   35.    The Class Vehicles are and were at all relevant times "goods" within the meaning

15   of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h).

16   36.    A warranty that the Class Vehicles were in merchantable condition and fit for the

17   ordinary purpose for which vehicles are used is implied by law pursuant to Idaho Code §§ 28-2-

18   314 and 28-12-212.

19   37.    The Class Vehicles did not comply with the implied warranty of merchantability

20   because, at the time of sale and at all times thereafter, they were defective and not in

21   merchantable condition, would not pass without objection in the trade, and were not fit for the

22   ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the

23   SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an

24   accident, rendering the Class Vehicles inherently defective and dangerous.

25   38.    Defendants were provided reasonable notice of these issues by way of a letter sent

26   by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual

27   lawsuits, as detailed herein.

28   39.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

1     40.     As a direct and proximate result of Defendants' breach of the implied warranty of

2     merchantability, Plaintiffs and Idaho State Class members have been damaged in an amount to be

3     proven at trial.

4          10.     Illinois

5                    ILLINOIS COUNT I:
6     Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act
                    815 ILCS 505/1, *et seq.* and 720 ILCS 295/1a
7                    (On Behalf of the Illinois State Class)

8     1.     Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

9     2.     Plaintiffs Angelica Mar, Delbert Dehne, and Randy Holdren (for the purposes of

10    this count, "Plaintiffs") bring this claim on behalf of themselves and the Illinois State Class

11    against all Defendants.

12    3.     Defendants are "person[s]" as that term is defined in 815 ILCS 505/1(c).

13    4.     Members of the Illinois State Class are "consumers" as that term is defined in 815

14    ILCS 505/1(e).

15    5.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois

16    CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or

17    employment of any deception, fraud, false pretense, false promise, misrepresentation or the

18    concealment, suppression or omission of any material fact, with intent that others rely upon the

19    concealment, suppression or omission of such material fact . . . in the conduct of trade or

20    commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815

21    ILCS 505/2.

22    6.     In the course of their business, Defendants violated the Illinois CFA by knowingly

23    and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts

24    regarding the reliability, safety, and performance of the Class Vehicles, as detailed above.

25    7.     Specifically, by misrepresenting the Class Vehicles as safe and/or free from

26    defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

27    Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of

28

1    competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

2    conduct of any trade or commerce, as prohibited by 815 ILCS 505/2.

3           8.      Defendants' unfair or deceptive acts or practices, including misrepresentations,

4    concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

5    mislead and create a false impression in consumers, and were likely to and did in fact deceive

6    reasonable consumers, including Plaintiffs and Illinois State Class members, about the true safety

7    and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class

8    Vehicles.

9           9.      Defendants' scheme and concealment of the SDM Calibration Defect and true

10   characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiffs

11   and Illinois State Class members, as the Defendants intended. Had they known the truth, Plaintiffs

12   and Illinois State Class members would not have purchased or leased the Class Vehicles, or

13   would have paid significantly less for them.

14          10.     Plaintiffs and Illinois State Class members had no way of discerning that

15   Defendants' representations were false and misleading and/or otherwise learning the facts that

16   Defendants had concealed or failed to disclose. Plaintiffs and Illinois State Class members did

17   not, and could not, unravel Defendants' deception on their own.

18          11.     Defendants had an ongoing duty to Plaintiffs and Illinois State Class members to

19   refrain from unfair or deceptive practices under the Illinois CFA in the course of their business.

20   Specifically, Defendants owed Plaintiffs and Illinois State Class members a duty to disclose all

21   the material facts concerning the SDM Calibration Defect in the Class Vehicles because they

22   possessed exclusive knowledge, they intentionally concealed the defect from Plaintiffs and

23   Illinois State Class members, and/or they made misrepresentations that were misleading because

24   they were contradicted by withheld facts.

25          12.     Defendants' violations present a continuing risk to Plaintiffs and Illinois State

26   Class members, as well as to the general public. Defendants' unlawful acts and practices

27   complained of herein affect the public interest.

28

1   13.   Plaintiffs and the Illinois State Class suffered ascertainable loss and actual

2   damages as a direct and proximate result of Defendants' misrepresentations and concealment of

3   and failure to disclose material information Defendants had an ongoing duty to all their customers

4   to refrain from unfair and deceptive practices under the Illinois CFA. All owners of Class

5   Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and

6   practices made in the course of Defendants' business.

7   14.   As a direct and proximate result of Defendants' violations of the Illinois CFA,

8   Plaintiffs and members of the Illinois State Class have suffered injury-in-fact and/or actual

9   damage.

10   15.   Pursuant to 815 ILCS 505/10a(a), the Illinois State Class seeks monetary relief

11   against Defendants in the amount of actual damages, as well as punitive damages because

12   Defendants acted with fraud and/or malice and/or was grossly negligent.

13   16.   Plaintiffs and the Illinois State Class also seek an order enjoining Defendants'

14   unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just

15   and proper relief available under 815 ILCS § 505/1 *et seq.*

16   **ILLINOIS COUNT II:**
    **Breach of Express Warranty**
17   **810 Ill. Comp. Stat. §§ 5/2-313 and 5/2A-210**
    **(On Behalf of the Illinois State Class)**
18

19   17.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

20   fully set forth herein.

21   18.   Plaintiffs Angelica Mar, Delbert Dehne, and Randy Holdren (for the purposes of

22   this count, "Plaintiffs") bring this claim on behalf of themselves and the Illinois State Class

23   against all Defendants.

24   19.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

25   vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor

26   vehicles under § 5/2-103(1)(d).

27   20.   With respect to leases, Defendants are and were at all relevant times "lessors" of

28   motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

1          21.     The Class Vehicles are and were at all relevant times "goods" within the meaning

2   of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

3          22.     In connection with the purchase or lease of Class Vehicles, the Defendants

4   provided Plaintiffs and Illinois State Class members with written express warranties covering the

5   repair or replacement of components that are defective in materials or workmanship.

6          23.     Defendants' warranties formed the basis of the bargain that was reached when

7   Plaintiffs and Illinois State Class members unknowingly purchased or leased Class Vehicles that

8   came equipped with the SDM Calibration Defect.

9          24.     However, Defendants knew or should have known that the warranties were false

10   and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the

11   Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they

12   were sold and leased to Plaintiffs and Illinois State Class members.

13          25.     Plaintiffs and Illinois State Class members reasonably relied on the Defendants'

14   express warranties when purchasing or leasing their Class Vehicles.

15          26.     Defendants knowingly breached their express warranties to repair defects in

16   materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

17   Defendants also breached their express warranties by providing a product containing defects that

18   were never disclosed to Plaintiffs and Illinois State Class members.

19          27.     Plaintiffs and Illinois State Class members have provided the Defendants with

20   reasonable notice and opportunity to cure the breaches of their express warranties by way of letter

21   sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public

22   NHTSA complaints and individual lawsuits, as detailed herein.

23          28.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

24          29.     As a direct and proximate result of the Defendants' breach of express warranties,

25   Plaintiffs and Illinois State Class members have been damaged in an amount to be proven at trial.

26

27

28

1

ILLINOIS COUNT III:

2

Breach of Implied Warranty of Merchantability
810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212

3

(On Behalf of the Illinois State Class)

4

30.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

5

forth herein.

6

31.     Plaintiffs Angelica Mar, Delbert Dehne, and Randy Holdren (for the purposes of

7

this count, "Plaintiffs") bring this claim on behalf of themselves and the Illinois State Class

8

against all Defendants.

9

32.     Defendants are and were at all relevant times "merchant[s]" with respect to motor

10

vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor

11

vehicles under § 5/2-103(1)(d).

12

33.     With respect to leases, Defendants are and were at all relevant times "lessors" of

13

motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

14

34.     The Class Vehicles are and were at all relevant times "goods" within the meaning

15

of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

16

35.     A warranty that the Class Vehicles were in merchantable condition and fit for the

17

ordinary purpose for which vehicles are used is implied by law pursuant to 810 Ill. Comp. Stat.

18

§§ 28-2-314 and 28-12-212.

19

36.     The Class Vehicles did not comply with the implied warranty of merchantability

20

because, at the time of sale and at all times thereafter, they were defective and not in

21

merchantable condition, would not pass without objection in the trade, and were not fit for the

22

ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the

23

SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an

24

accident, rendering the Class Vehicles inherently defective and dangerous.

25

37.     Defendants were provided reasonable notice of these issues by way of a letter sent

26

by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual

27

lawsuits, as detailed herein.

28

38.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

1    39.    As a direct and proximate result of Defendants' breach of the implied warranty of

2    merchantability, Plaintiffs and Illinois State Class members have been damaged in an amount to

3    be proven at trial.

4    **11.    Indiana**

5    **INDIANA COUNT I:**
     **Violations of the Indiana Deceptive Consumer Sales Act**

6    **Ind. Code § 24-5-0.5-3**

7    **(On Behalf of the Indiana State Class)**

8    1.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

9    2.    Plaintiffs Warren Whitsey, David James, and Jerome Blatt (for the purposes of this

10   count, "Plaintiffs") bring this claim on behalf of themselves and the Indiana State Class against

11   all Defendants.

12   3.    Defendants are "suppliers" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

13   4.    Defendants, Plaintiffs, and the Indiana State Class members are "persons" within

14   the meaning of Ind. Code § 24-5-0.5-2(a)(2).

15   5.    Defendants were and are engaged in "consumer transactions" within the meaning

16   of Ind. Code § 24-5-0.5-2(a)(1).

17   6.    The Indiana Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a supplier

18   from committing an "unfair, abusive, or deceptive act, omission, or practice in connection with a

19   consumer transaction." Ind. Code § 24-5-0.5-3(a).

20   7.    In the course of their business, Defendants violated the Indiana DCSA by

21   knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose

22   material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed

23   above.

24   8.    Specifically, by misrepresenting the Class Vehicles as safe and/or free from

25   defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

26   Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of

27   competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

28   conduct of any trade or commerce, as prohibited by Ind. Code § 24-5-0.5-3(a).

9.      Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Indiana State Class members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

10.     Defendants' scheme and concealment of the SDM Calibration Defect and true characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiffs and Indiana State Class members, as the Defendants intended. Had they known the truth, Plaintiffs and Indiana State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

11.     Plaintiffs and Indiana State Class members had no way of discerning that Defendants' representations were false and misleading and/or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiffs and Indiana State Class members did not, and could not, unravel Defendants' deception on their own.

12.     Defendants had an ongoing duty to Plaintiffs and Indiana State Class members to refrain from unfair or deceptive practices under the Indiana DCSA in the course of their business. Specifically, Defendants owed Plaintiffs and Indiana State Class members a duty to disclose all the material facts concerning the SDM Calibration Defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the defect from Plaintiffs and Indiana State Class members, and/or they made misrepresentations that were misleading because they were contradicted by withheld facts.

13.     Plaintiffs and the Indiana State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

14.     Pursuant to Ind. Code § 24-5-0.5-4, the Indiana State Class seeks monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined

1   at trial and (b) statutory damages in the amount of $500 for each Indiana State Class member,

2   including treble damages up to $1,000 for Defendants' willfully deceptive acts.

3       15.   The Indiana State Class also seeks punitive damages based on the outrageousness

4   and recklessness of the Defendants' conduct and Defendants' high net worth.

5       16.   Pursuant to Ind. Code § 24-5-0.5-5(a), Plaintiffs sent notice letters to Defendants.

6   The Indiana State Class seeks all damages and relief to which it is entitled.

**INDIANA COUNT II:**
**Breach of Express Warranty**
**Ind. Code §§ 26-1-3-313 and 26-1-2.1-210**
**(On Behalf of the Indiana State Class)**

10      17.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

11  fully set forth herein.

12      18.   Plaintiffs Warren Whitsey, David James, and Jerome Blatt (for the purposes of this

13  count, "Plaintiffs") bring this claim on behalf of themselves and the Indiana State Class against

14  all Defendants.

15      19.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

16  vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of motor vehicles

17  under § 26-1-2-103(1)(d).

18      20.   With respect to leases, Defendants are and were at all relevant times "lessors" of

19  motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

20      21.   The Class Vehicles are and were at all relevant times "goods" within the meaning

21  of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

22      22.   In connection with the purchase or lease of Class Vehicles, the Defendants

23  provided Plaintiffs and Indiana State Class members with written express warranties covering the

24  repair or replacement of components that are defective in materials or workmanship.

25      23.   Defendants' warranties formed the basis of the bargain that was reached when

26  Plaintiffs and Pennsylvania State Class members unknowingly purchased or leased Class

27  Vehicles that came equipped with the SDM Calibration Defect.

28

1    24.    However, Defendants knew or should have known that the warranties were false

2  and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the

3  Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they

4  were sold and leased to Plaintiffs and Indiana State Class members.

5    25.    Plaintiffs and Indiana State Class members reasonably relied on the Defendants'

6  express warranties when purchasing or leasing their Class Vehicles.

7    26.    Defendants knowingly breached their express warranties to repair defects in

8  materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

9  Defendants also breached their express warranties by providing a product containing defects that

10  were never disclosed to Plaintiffs and Indiana State Class members.

11    27.    Plaintiffs and Indiana State Class members have provided the Defendants with

12  reasonable notice and opportunity to cure the breaches of their express warranties by way of letter

13  sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public

14  NHTSA complaints and individual lawsuits, as detailed herein.

15    28.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

16    29.    As a direct and proximate result of the Defendants' breach of express warranties,

17  Plaintiffs and Indiana State Class members have been damaged in an amount to be proven at trial.

18                          **INDIANA COUNT III:**
19                  **Breach of Implied Warranty of Merchantability**
20                      **Ind. Code §§ 26-1-3-314 and 26-1-2.1-212**
                          **(On Behalf of the Indiana State Class)**

21    30.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

22  forth herein.

23    31.    Plaintiffs Warren Whitsey, David James, and Jerome Blatt (for the purposes of this

24  count, "Plaintiffs") bring this claim on behalf of themselves and the Indiana State Class against

25  all Defendants.

26    32.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

27  vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of motor vehicles

28  under § 26-1-2-103(1)(d).

33.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

34.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

35.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ind. Code §§ 26-1-2-314 and 26-1-2.1-212.

36.     The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

37.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual lawsuits, as detailed herein.

38.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

39.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and Indiana State Class members have been damaged in an amount to be proven at trial.

**12.     Kansas**

**KANSAS COUNT I:**
**Violations of the Kansas Consumer Protection Act**
**Kan. Stat. Ann. § 50-623 *et seq*.**
**(On Behalf of the Kansas State Class)**

1.     Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2.     Plaintiff Kerry Batman (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Kansas State Class against all Defendants.

1    3.    Each Defendant is a "supplier" under the Kansas Consumer Protection Act

2    ("Kansas CPA"), Kan. Stat. Ann. § 50-624(l).

3    4.    Kansas State Class members are "consumers," within the meaning of Kan. Stat.

4    Ann. § 50-624(b), who purchased or leased one or more Class Vehicles.

5    5.    The sale of the Class Vehicles to the Kansas State Class members was a

6    "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

7    6.    The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice

8    in connection with a consumer transaction," Kan. Stat. Ann. § 50-626(a), and that deceptive acts

9    or practices include: (1) knowingly making representations or with reason to know that "(A)

10   Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses,

11   benefits or quantities that they do not have;" and "(D) property or services are of particular

12   standard, quality, grade, style or model, if they are of another which differs materially from the

13   representation;" "(2) the willful use, in any oral or written representation, of exaggeration,

14   falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a

15   material fact, or the willful concealment, suppression or omission of a material fact." The Kansas

16   CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in

17   connection with a consumer transaction." Kan. Stat. Ann. § 50-627(a).

18   7.    In the course of their business, Defendants violated the Kansas CPA by knowingly

19   and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts

20   regarding the reliability, safety, and performance of the Class Vehicles, as detailed above.

21   8.    Specifically, by misrepresenting the Class Vehicles as safe and/or free from

22   defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

23   Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of

24   competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

25   conduct of any trade or commerce, as prohibited by Kan. Stat. Ann. § 50-627(a).

26   9.    Defendants' unfair or deceptive acts or practices, including misrepresentations,

27   concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

28   mislead and create a false impression in consumers, and were likely to and did in fact deceive

1    reasonable consumers, including Plaintiff and Kansas State Class members, about the true safety

2    and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class

3    Vehicles.

4          10.    Defendants' scheme and concealment of the SDM Calibration Defect and true

5    characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiff and

6    Kansas State Class members, as the Defendants intended. Had they known the truth, Plaintiff and

7    Kansas State Class members would not have purchased or leased the Class Vehicles, or would

8    have paid significantly less for them.

9          11.    Plaintiff and Kansas State Class members had no way of discerning that

10   Defendants' representations were false and misleading and/or otherwise learning the facts that

11   Defendants had concealed or failed to disclose. Plaintiff and Kansas State Class members did not,

12   and could not, unravel Defendants' deception on their own.

13         12.    Defendants had an ongoing duty to Plaintiff and Kansas State Class members to

14   refrain from unfair or deceptive practices under the Kansas CPA in the course of their business.

15   Specifically, Defendants owed Plaintiff and Kansas State Class members a duty to disclose all the

16   material facts concerning the SDM Calibration Defect in the Class Vehicles because they

17   possessed exclusive knowledge, they intentionally concealed the defect from Plaintiff and Kansas

18   State Class members, and/or they made misrepresentations that were misleading because they

19   were contradicted by withheld facts.

20         13.    Defendants' violations present a continuing risk to the Kansas State Class as well

21   as to the general public. Defendants' unlawful acts and practices complained of herein affect the

22   public interest.

23         14.    Members of the Kansas State Class suffered ascertainable loss and actual damages

24   as a direct and proximate result of Defendants' misrepresentations and concealment of and failure

25   to disclose material information. Defendants had an ongoing duty to all their customers to refrain

26   from unfair and deceptive practices under the Kansas CPA. All owners of Class Vehicles suffered

27   ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the

28   course of Defendants' business.

1    15.    As a direct and proximate result of Defendants' violations of the Kansas CPA,

2    Plaintiff and the Kansas State Class have suffered injury-in-fact and/or actual damage.

3    16.    Pursuant to Kan. Stat. Ann. § 50-634, the Kansas State Class seeks monetary relief

4    against Defendants measured as the greater of (a) actual damages in an amount to be determined

5    at trial and (b) statutory damages in the amount of $10,000 for each Kansas State Class member.

6    17.    Plaintiff also seeks an order enjoining Defendants' unfair, unlawful, and/or

7    deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief

8    available under Kan. Stat. Ann § 50-623, *et seq.*

9
10
11

**KANSAS COUNT II:**
**Breach of Express Warranty**
**Kan. Stat. §§ 84-2-313 and 84-2A-210**
**(On Behalf of the Kansas State Class)**

12    18.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

13    fully set forth herein.

14    19.    Plaintiff Kerry Batman (for the purposes of this count, "Plaintiff") brings this

15    claim on behalf of himself and the Kansas State Class against all Defendants.

16    20.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

17    vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and "sellers" of motor vehicles under

18    § 84-2-103(1)(d).

19    21.    With respect to leases, Defendants are and were at all relevant times "lessors" of

20    motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

21    22.    The Class Vehicles are and were at all relevant times "goods" within the meaning

22    of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

23    23.    In connection with the purchase or lease of Class Vehicles, Defendants provided

24    Plaintiff and Kansas State Class members with written express warranties covering the repair or

25    replacement of components that are defective in materials or workmanship.

26    24.    Defendants' warranties formed the basis of the bargain that was reached when

27    Plaintiff and Kansas State Class members unknowingly purchased or leased Class Vehicles that

28    came equipped with the SDM Calibration Defect.

1    25.    However, Defendants knew or should have known that the warranties were false

2    and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the

3    Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they

4    were sold and leased to Plaintiff and Kansas State Class members.

5    26.    Plaintiff and Kansas State Class members reasonably relied on the Defendants'

6    express warranties when purchasing or leasing their Class Vehicles.

7    27.    Defendants knowingly breached their express warranties to repair defects in

8    materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

9    Defendants also breached their express warranties by providing a product containing defects that

10   were never disclosed to Plaintiff and Kansas State Class members.

11   28.    Plaintiff and Kansas State Class members have provided the Defendants with

12   reasonable notice and opportunity to cure the breaches of their express warranties by way of letter

13   sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public

14   NHTSA complaints and individual lawsuits, as detailed herein.

15   29.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

16   30.    As a direct and proximate result of the Defendants' breach of express warranties,

17   Plaintiff and Kansas State Class members have been damaged in an amount to be proven at trial.

18                          **KANSAS COUNT III:**

19               **Breach of Implied Warranty of Merchantability**
                 **Kan. Stat. §§ 84-2-314 and 84-2A-212**

20                  **(On Behalf of the Kansas State Class)**

21   31.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

22   forth herein.

23   32.    Plaintiff Kerry Batman (for the purposes of this count, "Plaintiff") brings this

24   claim on behalf of himself and the Kansas State Class against all Defendants.

25   33.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

26   vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and "sellers" of motor vehicles under

27   § 84-2-103(1)(d).

28

34.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

35.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

36.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Kan. Stat. §§ 84-2-314 and 84-2A-212.

37.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

38.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual lawsuits, as detailed herein.

39.   Alternatively, any opportunity to cure the breach is unnecessary and futile.

40.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Kansas State Class members have been damaged in an amount to be proven at trial.

**13.   Louisiana**

**LOUISIANA COUNT I:**
**Violations of the Louisiana Unfair Trade Practices and**
**Consumer Protection Law**
**La. Stat. Ann. § 51:1401, *et seq.***
**(On Behalf of the Louisiana State Class)**

1.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1      2.      Plaintiff Allan Martin (for the purposes of this count, "Plaintiff") brings this claim
2    on behalf of himself and the Louisiana State Class against all Defendants.
3      3.      Defendants, Plaintiff, and the Louisiana State Class are "persons" within the
4    meaning of the La. Rev. Stat. § 51:1402(8)
5      4.      Plaintiff and Louisiana State Class members are "consumers" within the meaning
6    of La. Rev. Stat. § 51:1402(1).
7      5.      Defendants engaged in "trade" or "commerce" within the meaning of La. Rev.
8    Stat. § 51:1402(10).
9      6.      The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana
10   CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La.
11   Rev. Stat. § 51:1405(A). Defendants participated in misleading, false, or deceptive acts that
12   violated the Louisiana CPL.
13     7.      In the course of their business, Defendants violated the Louisiana CPL by
14   knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose
15   material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed
16   above.
17     8.      Specifically, by misrepresenting the Class Vehicles as safe and/or free from
18   defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class
19   Vehicles and/or the SDM Calibration Defect, Defendants engaged in one or more unfair or
20   deceptive business practices prohibited by La. Rev. Stat. § 51:1405(A).
21     9.      Defendants' unfair or deceptive acts or practices, including misrepresentations,
22   concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to
23   mislead and create a false impression in consumers, and were likely to and did in fact deceive
24   reasonable consumers, including Plaintiff and Louisiana State Class members, about the true
25   safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the
26   Class Vehicles.
27     10.     Defendants' scheme and concealment of the SDM Calibration Defect in the Class
28   Vehicles were material to Plaintiff and Louisiana State Class members, as Defendants intended.

1   Had they known the truth, Plaintiff and Louisiana State Class members would not have purchased

2   or leased the Class Vehicles, or would have paid significantly less for them.

3        11.    Plaintiff and Louisiana State Class members had no way of discerning that the

4   Defendants' representations were false and misleading and/or otherwise learning the facts that the

5   Defendants had concealed or failed to disclose. Plaintiff and Louisiana State Class members did

6   not, and could not, unravel the Defendants' deception on their own.

7        12.    Defendants had an ongoing duty to Plaintiff and Louisiana State Class members to

8   refrain from unfair or deceptive practices under the Louisiana CPL in the course of their business.

9   Specifically, Defendants owed Plaintiff and Louisiana State Class members a duty to disclose all

10   the material facts concerning the SDM Calibration Defect in the Class Vehicles because they

11   possessed exclusive knowledge, they intentionally concealed the defect from Plaintiff and

12   Louisiana State Class members, and/or they made misrepresentations that were misleading

13   because they were contradicted by withheld facts.

14        13.    Defendants' violations present a continuing risk to Plaintiff and Louisiana State

15   Class members, as well as to the general public. Defendants' unlawful acts and practices

16   complained of herein affect the public interest.

17        14.    Plaintiff and the Louisiana State Class suffered ascertainable loss and actual

18   damages as a direct and proximate result of Defendants' misrepresentations and concealment of

19   and failure to disclose material information.

20        15.    Pursuant to La. Rev. Stat. § 51:1409, Plaintiff and the Louisiana State Class seek

21   to recover actual damages in an amount to be determined at trial; treble damages for Defendants'

22   knowing violations of the Louisiana CPL; an order enjoining Defendants' unfair, unlawful, and/or

23   deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief

24   available under La. Rev. Stat. § 51:1409.

25

26

27

28

**LOUISIANA COUNT II:**
**Breach of Implied Warranty of Merchantability/**
**Warranty Against Redhibitory Defects**
**La. Civ. Code Art. 2520, 2524**
**(On Behalf of the Louisiana State Class)**

16.     Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

17.     Plaintiff Allan Martin (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Louisiana State Class against all Defendants.

18.     Defendants are and were at all relevant times merchants with respect to motor vehicles.

19.     A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.

20.     The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

21.     Defendants were provided reasonable notice of these issues by way of a letter sent on August 20, 2021, as well as numerous public NHTSA complaints and individual lawsuits, as detailed herein.

22.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

23.     As a direct and proximate result of Defendants' breach of the warranty of merchantability, Plaintiff and Louisiana State Class members have been damaged in an amount to be proven at trial.

1  **14.    Maryland**

2  **MARYLAND COUNT I:**
**Violations of the Maryland Consumer Protection Act**
3  **Md. Code Com. Law § 13-101 *et seq.***
**(On Behalf of the Maryland State Class)**
4

5  1.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

6  2.    Plaintiff Richard Baker (for the purposes of this count, "Plaintiff") brings this

7  claim on behalf of himself and the Maryland State Class against all Defendants.

8  3.    Defendants and the Maryland State Class are "persons" within the meaning of Md.

9  Code Com. Law § 13-101(h).

10  4.    The Maryland Consumer Protection Act ("Maryland CPA") provides that a person

11  may not engage in any unfair or deceptive trade practice in the sale of any consumer good. Md.

12  Code Com. Law § 13-303. Defendants participated in misleading, false, or deceptive acts that

13  violated the Maryland CPA.

14  5.    In the course of their business, Defendants violated the Maryland CPA by

15  knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose

16  material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed

17  above.

18  6.    Specifically, by misrepresenting the Class Vehicles as safe and/or free from

19  defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

20  Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of

21  competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

22  conduct of any trade or commerce, as prohibited by Md. Code Com. Law § 13-303.

23  7.    Defendants' unfair or deceptive acts or practices, including misrepresentations,

24  concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

25  mislead and create a false impression in consumers, and were likely to and did in fact deceive

26  reasonable consumers, including Plaintiff and Maryland State Class members, about the true

27  safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the

28  Class Vehicles.

8.     Defendants' scheme and concealment of the SDM Calibration Defect and true characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiff and Maryland State Class members, as the Defendants intended. Had they known the truth, Plaintiff and Maryland State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

9.     Plaintiff and Maryland State Class members had no way of discerning that Defendants' representations were false and misleading and/or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiff and Maryland State Class members did not, and could not, unravel Defendants' deception on their own.

10.     Defendants had an ongoing duty to Plaintiff and Maryland State Class members to refrain from unfair or deceptive practices under the Maryland CPA in the course of their business. Specifically, Defendants owed Plaintiff and Maryland State Class members a duty to disclose all the material facts concerning the SDM Calibration Defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the defect from Plaintiff and Maryland State Class members, and/or they made misrepresentations that were misleading because they were contradicted by withheld facts.

11.     Defendants' violations present a continuing risk to the Maryland State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

12.     The Maryland State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Maryland CPA. All owners and lessees of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

13.     As a direct and proximate result of Defendants' violations of the Maryland CPA, the Maryland State Class has suffered injury-in-fact and/or actual damage.

14.     Pursuant to Md. Code Com. Law § 13-408, the Maryland State Class seeks actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

**MARYLAND COUNT II:**
**Maryland Lemon Law**
**Md. Code Com. Law § 14-1501** *et seq.*
**(On Behalf of the Maryland State Class)**

15.     Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth.

16.     Plaintiff Richard Baker (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Maryland State Class against all Defendants.

17.     Plaintiff and the Maryland State Class own or lease "motor vehicles" within the meaning of Md. Code, Com. Law § 14-1501(f), because these vehicles were registered in the state and fall within the categories of vehicles manufactured, assembled, or distributed by Defendants. These vehicles are not auto homes.

18.     Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of Md. Code, Com. Law § 14-1501(d).

19.     The Maryland State Class members are "consumers" within the meaning of Md. Code Com. Law § 14-1501(b) because they: purchased the Class Vehicles, were transferred the Class Vehicles during the warranty period, or are otherwise entitled to the attendant terms of warranty.

20.     The Class Vehicles did not conform to their "warranties" under Md. Code Com. Law § 14-1501(g) during the warranty period because they contained the SDM Calibration Defect and were therefore not fit for the ordinary purpose for which vehicles are used.

21.     Defendants had actual knowledge of the SDM Calibration Defect during the "warranty period" within the meaning of Md. Code, Com. Law § 14-1501(e). But the Defect continued to exist throughout this term, as it has not been fixed. Plaintiff and Maryland State Class members are excused from notifying Defendants of the Defect because they were already fully aware of the problem and any repair attempt is futile.

22.     Defendants have had a reasonable opportunity to cure the SDM Calibration Defect during the warranty period because of their actual knowledge of, creation of, and attempt to conceal the Defect, but has not done so as required under Md. Code, Com. Law § 14-1502.

23.     Plaintiff and the Maryland State Class demands a full refund of the purchase price, including all license fees, registration fees, and any similar governmental charges. Md. Code Com. Law § 14-1502(c). Once payment has been tendered, Maryland State Class members will return their vehicles.

**MARYLAND COUNT III:**
**Breach of Express Warranty**
**Md. Code Com. Law §§ 2-313 and 2a-210**
**(On Behalf of the Maryland State Class)**

24.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

25.     Plaintiff Richard Baker (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Maryland State Class against all Defendants.

26.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Md. Code Com. Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

27.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Md. Code Com. Law § 2A-103(1)(p).

28.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

29.     In connection with the purchase or lease of Class Vehicles, the Defendants provided Plaintiff and Maryland State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

30.     Defendants' warranties formed the basis of the bargain that was reached when Plaintiff and Maryland State Class members unknowingly purchased or leased Class Vehicles that came equipped with the SDM Calibration Defect.

31.     However, Defendants knew or should have known that the warranties were false and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to Plaintiff and Maryland State Class members.

32.     Plaintiff and Maryland State Class members reasonably relied on the Defendants' express warranties when purchasing or leasing their Class Vehicles.

33.     Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles. Defendants also breached their express warranties by providing a product containing defects that were never disclosed to Plaintiff and Maryland State Class members.

34.     Plaintiff and Maryland State Class members have provided the Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of letter sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public NHTSA complaints and individual lawsuits, as detailed herein.

35.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

36.     As a direct and proximate result of the Defendants' breach of express warranties, Plaintiff and Maryland State Class members have been damaged in an amount to be proven at trial.

**MARYLAND COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**Md. Code Com. Law §§ 2-314 and 2a-212**
**(On Behalf of the Maryland State Class)**

37.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

38.     Plaintiff Richard Baker (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Maryland State Class against all Defendants.

39.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Md. Code Com. Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

40.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Md. Code Com. Law § 2A-103(1)(p).

41.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

42.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Md. Code Com. Law §§ 2-314, and 2a-212.

43.     The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

44.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual lawsuits, as detailed herein.

45.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

46.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Maryland State Class members have been damaged in an amount to be proven at trial.

**15.     Michigan**

**MICHIGAN COUNT I:**
**Violations of the Michigan Consumer Protection Act**
**Mich. Comp. Laws § 445.903, *et seq*.**
**(On Behalf of the Michigan State Class)**

1.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1    2.    Plaintiffs Alisha Gonzalez, Rachel Bailey, Carl Wurmlinger, George Bayer,

2  Zeckery Henslee, and Judy Haviland (for the purposes of this count, "Plaintiffs") bring this claim

3  on behalf of themselves and the Michigan State Class against all Defendants.

4    3.    Plaintiffs and Michigan State Class members are "person[s]" within the meaning

5  of the Mich. Comp. Laws § 445.902(1)(d).

6    4.    Defendants are "person[s]" engaged in "trade or commerce" within the meaning of

7  the Mich. Comp. Laws § 445.902(1)(d) and (g).

8    5.    The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair,

9  unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . .

10  ." Mich. Comp. Laws § 445.903(1).

11    6.    In the course of their business, Defendants violated the Michigan CPA by

12  knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose

13  material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed

14  above.

15    7.    Specifically, by misrepresenting the Class Vehicles as safe and/or free from

16  defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

17  Vehicles and/or the SDM Calibration Defect, Defendants engaged in one or more of the following

18  unfair or deceptive business practices prohibited by Mich. Comp. Laws § 445.903:

19    a.    Representing that the Class Vehicles have characteristics, uses, benefits,

20  and qualities which they do not have;

21    b.    Representing that the Class Vehicles are of a particular standard, quality,

22  and grade when they are not;

23    c.    Advertising the Class Vehicles with the intent not to sell or lease them as

24  advertised;

25    d.    Failing to reveal the defective SDM calibration, which could not

26  reasonably be known by the consumer;

27    e.    Making a representation of fact or statement of fact regarding the safety of

28  the Class Vehicles, which is material to the lease or purchase of the Class Vehicles, such that

1    consumers reasonably believe the represented or suggested state of affairs to be other than it

2    actually is; and

3               f.      Failing to reveal the SDM Calibration Defect in light of representations of

4    fact regarding the safety of the Class Vehicles made in a positive manner.

5    Mich. Comp. Laws §§ 445.903(1)(c), (e), (g), (s), (bb), and (cc).

6         8.      Defendants' unfair or deceptive acts or practices, including misrepresentations,

7    concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

8    mislead and create a false impression in consumers, and were likely to and did in fact deceive

9    reasonable consumers, including Plaintiffs and Michigan State Class members, about the true

10   safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the

11   Class Vehicles.

12        9.      Defendants' scheme and concealment of the SDM Calibration Defect in the Class

13   Vehicles were material to Plaintiffs and Michigan State Class members, as Defendants intended.

14   Had they known the truth, Plaintiffs and Michigan State Class members would not have

15   purchased or leased the Class Vehicles, or would have paid significantly less for them.

16        10.     Plaintiffs and Michigan State Class members had no way of discerning that the

17   Defendants' representations were false and misleading and/or otherwise learning the facts that the

18   Defendants had concealed or failed to disclose. Plaintiffs and Michigan State Class members did

19   not, and could not, unravel the Defendants' deception on their own.

20        11.     Defendants had an ongoing duty to Plaintiffs and Michigan State Class members

21   to refrain from unfair or deceptive practices under the Michigan CPA in the course of their

22   business. Specifically, Defendants owed Plaintiffs and Michigan State Class members a duty to

23   disclose all the material facts concerning the SDM Calibration Defect in the Class Vehicles

24   because they possessed exclusive knowledge, they intentionally concealed the defect from

25   Plaintiffs and Michigan State Class members, and/or they made misrepresentations that were

26   misleading because they were contradicted by withheld facts.

27

28

1        12.    Defendants' violations present a continuing risk to Plaintiffs and Michigan State

2  Class members, as well as to the general public. Defendants' unlawful acts and practices

3  complained of herein affect the public interest.

4        13.    Plaintiffs and the Michigan State Class suffered ascertainable loss and actual

5  damages as a direct and proximate result of Defendants' misrepresentations and concealment of

6  and failure to disclose material information.

7        14.    Plaintiffs and the Michigan State Class seek injunctive relief to enjoin Defendants

8  from continuing its unfair and deceptive acts; monetary relief against Defendants measured as the

9  greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in

10  the amount of $250 for each Michigan State Class member; reasonable attorneys' fees; and any

11  other just and proper relief available under Mich. Comp. Laws § 445.911.

12        15.    Plaintiffs and the Michigan State Class also seeks punitive damages against

13  Defendants because they carried out despicable conduct with willful and conscious disregard of

14  the rights of others. Defendants intentionally and willfully misrepresented the reliability and

15  safety of the Class Vehicles and concealed material facts that only they knew—all to avoid the

16  expense and public relations nightmare of correcting a flaw in the Class Vehicles. Defendants'

17  unlawful conduct constitutes oppression and fraud warranting punitive damages.

18                                  **MICHIGAN COUNT II:**

19                            **Breach of Express Warranty**
                            **Mich. Comp. Law §§ 440.2313 and 440.2860**

20                        **(On Behalf of the Michigan State Class)**

21        16.    Plaintiffs reallege and incorporate by reference all preceding allegations as though

22  fully set forth herein.

23        17.    Plaintiffs Alisha Gonzalez, Rachel Bailey, Carl Wurmlinger, George Bayer,

24  Zeckery Henslee, and Judy Haviland (for the purposes of this count, "Plaintiffs") bring this claim

25  on behalf of themselves and the Michigan State Class against all Defendants.

26        18.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

27  vehicles under Mich. Comp. Laws § 440.2104(1) and "sellers" of motor vehicles under

28  § 440.2103(1)(d).

19.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

20.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

21.     All Michigan State Class members who purchased Class Vehicles in Michigan are "buyers" within the meaning of Mich. Comp. Laws § 440.2103(1)(a).

22.     All Michigan State Class members who leased Class Vehicles in Michigan are "lessees" within the meaning of Mich. Comp. Laws § 440.2803(1)(n).

23.     In connection with the purchase or lease of Class Vehicles, Defendants provided Plaintiffs and Michigan State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

24.     Defendants' warranties formed the basis of the bargain that was reached when Plaintiffs and Michigan State Class members unknowingly purchased or leased Class Vehicles that came equipped with the SDM Calibration Defect.

25.     However, Defendants knew or should have known that the warranties were false and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to Plaintiffs and Michigan State Class members.

26.     Plaintiffs and Michigan State Class members reasonably relied on the Defendants' express warranties when purchasing or leasing their Class Vehicles.

27.     Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles. Defendants also breached their express warranties by providing a product containing defects that were never disclosed to Plaintiffs and Michigan State Class members.

28.     Plaintiffs and Michigan State Class members have provided the Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of letter sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public NHTSA complaints and individual lawsuits, as detailed herein.

1    29.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

2    30.    As a direct and proximate result of the Defendants' breach of express warranties,

3  Plaintiffs and Michigan State Class members have been damaged in an amount to be proven at

4  trial.

5                              **MICHIGAN COUNT III:**

6                    **Breach of Implied Warranty of Merchantability**
                     **Mich. Comp. Laws §§ 440.2314 and 440.2860**

7                       **(On Behalf of the Michigan State Class)**

8    31.    Plaintiffs reallege and incorporate by reference all preceding allegations as though

9  fully set forth herein.

10    32.    Plaintiffs Alisha Gonzalez, Rachel Bailey, Carl Wurmlinger, George Bayer,

11  Zeckery Henslee, and Judy Haviland (for the purposes of this count, "Plaintiffs") bring this claim

12  on behalf of themselves and the Michigan State Class against all Defendants.

13    33.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

14  vehicles under Mich. Comp. Laws § 440.2104(1) and "sellers" of motor vehicles under

15  § 440.2103(1)(d).

16    34.    With respect to leases, Defendants are and were at all relevant times "lessors" of

17  motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

18    35.    All Michigan State Class members who purchased Class Vehicles in Michigan are

19  "buyers" within the meaning of Mich. Comp. Laws § 440.2103(1)(a).

20    36.    All Michigan State Class members who leased Class Vehicles in Michigan are

21  "lessees" within the meaning of Mich. Comp. Laws § 440.2803(1)(n).

22    37.    The Class Vehicles are and were at all relevant times "goods" within the meaning

23  of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

24    38.    A warranty that the Class Vehicles were in merchantable condition and fit for the

25  ordinary purpose for which vehicles are used is implied by law pursuant to Mich. Comp. Laws

26  §§ 440.2314 and 440.2862.

27    39.    The Class Vehicles did not comply with the implied warranty of merchantability

28  because, at the time of sale and at all times thereafter, they were defective and not in

1   merchantable condition, would not pass without objection in the trade, and were not fit for the

2   ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the

3   SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an

4   accident, rendering the Class Vehicles inherently defective and dangerous.

5        40.   Defendants were provided reasonable notice of these issues by way of a letter sent

6   by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public

7   NHTSA complaints and individual lawsuits, as detailed herein.

8        41.   Alternatively, any opportunity to cure the breach is unnecessary and futile.

9        42.   As a direct and proximate result of Defendants' breach of the implied warranty of

10  merchantability, Plaintiffs and Michigan State Class members have been damaged in an amount

11  to be proven at trial.

12                              **16.   Minnesota**

13                      **MINNESOTA COUNT I:**
                **Violations of the Minnesota Prevention of Consumer Fraud Act**
14                      **Minn. Stat. § 325F.68 *et seq.***
                    **(On Behalf of the Minnesota State Class)**
15

16       1.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

17       2.    Plaintiff Kimberly Hickle (for the purposes of this count, "Plaintiff") brings this

18  claim on behalf of herself and the Minnesota State Class against all Defendants.

19       3.    The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat.

20  § 325F.68(2).

21       4.    The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits

22  "[t]he act, use, or employment by any person of any fraud, false pretense, false promise,

23  misrepresentation, misleading statement or deceptive practice, with the intent that others rely

24  thereon in connection with the sale of any merchandise, whether or not any person has in fact

25  been misled, deceived, or damaged thereby . . . ." Minn. Stat. § 325F.69(1). Defendants

26  participated in misleading, false, or deceptive acts that violated the Minnesota CFA.

27       5.    In the course of their business, Defendants violated the Minnesota CFA by

28  knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose

1  material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed

2  above.

3        6.     Specifically, by misrepresenting the Class Vehicles as safe and/or free from

4  defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

5  Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of

6  competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

7  conduct of any trade or commerce, as prohibited by Minn. Stat. § 325F.69(1).

8        7.     Defendants' unfair or deceptive acts or practices, including misrepresentations,

9  concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

10  mislead and create a false impression in consumers, and were likely to and did in fact deceive

11  reasonable consumers, including Plaintiff and Minnesota State Class members, about the true

12  safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the

13  Class Vehicles.

14        8.     Defendants' scheme and concealment of the SDM Calibration Defect and true

15  characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiff and

16  Minnesota State Class members, as the Defendants intended. Had they known the truth, Plaintiff

17  and Minnesota State Class members would not have purchased or leased the Class Vehicles, or

18  would have paid significantly less for them.

19        9.     Plaintiff and Minnesota State Class members had no way of discerning that

20  Defendants' representations were false and misleading and/or otherwise learning the facts that

21  Defendants had concealed or failed to disclose. Plaintiff and Minnesota State Class members did

22  not, and could not, unravel Defendants' deception on their own.

23        10.     Defendants had an ongoing duty to Plaintiff and Minnesota State Class members

24  to refrain from unfair or deceptive practices under the Minnesota CFA in the course of their

25  business. Specifically, Defendants owed Plaintiff and Minnesota State Class members a duty to

26  disclose all the material facts concerning the SDM Calibration Defect in the Class Vehicles

27  because they possessed exclusive knowledge, they intentionally concealed the defect from

28

1    Plaintiff and Minnesota State Class members, and/or they made misrepresentations that were

2    misleading because they were contradicted by withheld facts.

3         11.    Defendants' violations present a continuing risk to the Minnesota State Class as

4    well as to the general public. Defendants' unlawful acts and practices complained of herein affect

5    the public interest.

6         12.    Minnesota State Class members suffered ascertainable loss and actual damages as

7    a direct and proximate result of Defendants' misrepresentations and concealment of and failure to

8    disclose material information. Defendants had an ongoing duty to all their customers to refrain

9    from unfair and deceptive practices under the Minnesota CFA. All owners of Class Vehicles

10   suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made

11   in the course of Defendants' business.

12        13.    As a direct and proximate result of Defendants' violations of the Minnesota CFA,

13   Minnesota State Class members have suffered injury in fact and/or actual damage.

14        14.    Pursuant to Minn. Stat. § 8.31(3a), Minnesota State Class members seek actual

15   damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

16        15.    Minnesota State Class members also seek punitive damages under Minn. Stat.

17   § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show deliberate

18   disregard for the rights of others.

19                              **MINNESOTA COUNT II:**
                  **Violations of the Minnesota Uniform Deceptive Trade Practices Act**
20                            **Minn. Stat. § 325D.43-48 *et seq.***
                         **(On Behalf of the Minnesota State Class)**
21

22        16.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

23        17.    Plaintiff Kimberly Hickle (for the purposes of this count, "Plaintiff") brings this

24   claim on behalf of herself and the Minnesota State Class against all Defendants.

25        18.    The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits

26   deceptive trade practices, which occur when a person "(5) represents that goods or services have

27   sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not

28   have or that a person has a sponsorship, approval, status, affiliation, or connection that the person

1   does not have;" "(7) represents that goods or services are of a particular standard, quality, or

2   grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises

3   goods or services with intent not to sell them as advertised." Minn. Stat. § 325D.44. In the course

4   of the Defendants' business, it engaged in deceptive practices by representing that Class Vehicles

5   have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do

6   not have; representing that Class Vehicles are of a particular standard, quality, or grade, or that

7   goods are of a particular style or model, if they are of another; and advertising Class Vehicles

8   with intent not to sell them as advertised. Defendants participated in misleading, false, or

9   deceptive acts that violated the Minnesota DTPA.

10   19.   Defendants' actions as set forth herein occurred in the conduct of trade or

11   commerce.

12   20.   In the course of their business, Defendants violated the Minnesota DTPA by

13   knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose

14   material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed

15   above.

16   21.   Specifically, by misrepresenting the Class Vehicles as safe and/or free from

17   defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

18   Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of

19   competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

20   conduct of any trade or commerce, as prohibited by Minn. Stat. § 325D.44.

21   22.   Defendants' unfair or deceptive acts or practices, including misrepresentations,

22   concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

23   mislead and create a false impression in consumers, and were likely to and did in fact deceive

24   reasonable consumers, including Plaintiff and Minnesota State Class members, about the true

25   safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the

26   Class Vehicles.

27   23.   Defendants' scheme and concealment of the SDM Calibration Defect and true

28   characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiff and

1    Minnesota State Class members, as the Defendants intended. Had they known the truth, Plaintiff

2    and Minnesota State Class members would not have purchased or leased the Class Vehicles, or

3    would have paid significantly less for them.

4          24.    Plaintiff and Minnesota State Class members had no way of discerning that

5    Defendants' representations were false and misleading and/or otherwise learning the facts that

6    Defendants had concealed or failed to disclose. Plaintiff and Minnesota State Class members did

7    not, and could not, unravel Defendants' deception on their own.

8          25.    Defendants had an ongoing duty to Plaintiff and Minnesota State Class members

9    to refrain from unfair or deceptive practices under the Minnesota DTPA in the course of their

10   business. Specifically, Defendants owed Plaintiff and Minnesota State Class members a duty to

11   disclose all the material facts concerning the SDM Calibration Defect in the Class Vehicles

12   because they possessed exclusive knowledge, they intentionally concealed the defect from

13   Plaintiff and Minnesota State Class members, and/or they made misrepresentations that were

14   misleading because they were contradicted by withheld facts.

15         26.    Defendants' violations present a continuing risk to the Minnesota State Class as

16   well as to the general public. Defendants' unlawful acts and practices complained of herein affect

17   the public interest.

18         27.    Minnesota State Class members suffered ascertainable loss and actual damages as

19   a direct and proximate result of Defendants' misrepresentations and concealment of and failure to

20   disclose material information. Defendants had an ongoing duty to all their customers to refrain

21   from unfair and deceptive practices under the Minnesota DTPA. All owners of Class Vehicles

22   suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made

23   in the course of Defendants' business.

24         28.    As a direct and proximate result of Defendants' violations of the Minnesota

25   DTPA, Minnesota State Class members have suffered injury-in-fact and/or actual damage.

26         29.    Pursuant Minn. Stat. §§ 8.31(3a) and 325D.45, the Minnesota State Class seeks

27   actual damages, attorneys' fees, and any other just and proper relief available under the

28   Minnesota DTPA.

1

2

3

**MINNESOTA COUNT III:**
**Breach of Express Warranty**
**Minn. Stat. §§ 336.2-313 and 336.2A-210**
**(On Behalf of the Minnesota State Class)**

4      30.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

5    fully set forth herein.

6      31.    Plaintiff Kimberly Hickle (for the purposes of this count, "Plaintiff") brings this

7    claim on behalf of herself and the Minnesota State Class against all Defendants.

8      32.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

9    vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of motor vehicles under § 336.2-

10    103(1)(d).

11      33.    With respect to leases, Defendants are and were at all relevant times "lessors" of

12    motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

13      34.    The Class Vehicles are and were at all relevant times "goods" within the meaning

14    of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

15      35.    In connection with the purchase or lease of Class Vehicles, Defendants provided

16    Plaintiff and Minnesota State Class members with written express warranties covering the repair

17    or replacement of components that are defective in materials or workmanship.

18      36.    Defendants' warranties formed the basis of the bargain that was reached when

19    Plaintiff and Minnesota State Class members unknowingly purchased or leased Class Vehicles

20    that came equipped with the SDM Calibration Defect.

21      37.    However, Defendants knew or should have known that the warranties were false

22    and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the

23    Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they

24    were sold and leased to Plaintiff and Minnesota State Class members.

25      38.    Plaintiff and Minnesota State Class members reasonably relied on the Defendants'

26    express warranties when purchasing or leasing their Class Vehicles.

27      39.    Defendants knowingly breached their express warranties to repair defects in

28    materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

1    Defendants also breached their express warranties by providing a product containing defects that

2    were never disclosed to Plaintiff and Minnesota State Class members.

3        40.    Plaintiff and Minnesota State Class members have provided the Defendants with

4    reasonable notice and opportunity to cure the breaches of their express warranties by way of letter

5    sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public

6    NHTSA complaints and individual lawsuits, as detailed herein.

7        41.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

8        42.    As a direct and proximate result of the Defendants' breach of express warranties,

9    Plaintiff and Minnesota State Class members have been damaged in an amount to be proven at

10   trial.

11                          **MINNESOTA COUNT IV:**
                 **Breach of Implied Warranty of Merchantability**
12               **Minn. Stat. §§ 336.2-314 and 336.2A-212**
                       **(On Behalf of the Minnesota State Class)**
13

14       43.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

15   forth herein.

16       44.    Plaintiff Kimberly Hickle (for the purposes of this count, "Plaintiff") brings this

17   claim on behalf of herself and the Minnesota State Class against all Defendants.

18       45.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

19   vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of motor vehicles under § 336.2-

20   103(1)(d).

21       46.    With respect to leases, Defendants are and were at all relevant times "lessors" of

22   motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

23       47.    The Class Vehicles are and were at all relevant times "goods" within the meaning

24   of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

25       48.    A warranty that the Class Vehicles were in merchantable condition and fit for the

26   ordinary purpose for which vehicles are used is implied by law pursuant to Minn. Stat. §§ 336.2-

27   314 and 336.2A-212.

28

1    49.    The Class Vehicles did not comply with the implied warranty of merchantability

2    because, at the time of sale and at all times thereafter, they were defective and not in

3    merchantable condition, would not pass without objection in the trade, and were not fit for the

4    ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the

5    SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an

6    accident, rendering the Class Vehicles inherently defective and dangerous.

7    50.    Defendants were provided reasonable notice of these issues by way of a letter sent

8    by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual

9    lawsuits, as detailed herein.

10    51.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

11    52.    As a direct and proximate result of Defendants' breach of the implied warranty

12    merchantability, Plaintiff and Minnesota State Class members have been damaged in an amount

13    to be proven at trial.

14    **17.    Mississippi**

15    **MISSISSIPPI COUNT I:**
     **Violations of Mississippi Consumer Protection Act**
16    **Miss. Code. Ann. § 75-24-1, *et seq*.**
     **(On Behalf of the Mississippi State Class)**

18    1.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

19    2.    Plaintiffs Denise Wilson, Allan Miles, and Harryette Gosa (for the purposes of this

20    count, "Plaintiffs") bring this claim on behalf of themselves and the Mississippi State Class

21    against all Defendants.

22    3.    The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair

23    or deceptive trade practices in or affecting commerce." Miss. Code. Ann. § 75-24-5(1). Unfair or

24    deceptive practices include, but are not limited to, "(e) Representing that goods or services have

25    sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not

26    have or that a person has a sponsorship, approval, status, affiliation, or connection that he does

27    not have;" "(g) Representing that goods or services are of a particular standard, quality, or grade,

28

1    or that goods are of a particular style or model, if they are of another;" and "(i) Advertising goods

2    or services with intent not to sell them as advertised." Miss. Code. Ann. § 75-24-5.

3         4.    Defendants participated in deceptive trade practices that violated the Mississippi

4    CPA as described herein, including representing that Class Vehicles have characteristics, uses,

5    benefits, and qualities which they do not have; representing that Class Vehicles are of a particular

6    standard and quality when they are not; and advertising Class Vehicles with the intent not to sell

7    them as advertised.

8         5.    In the course of their business, Defendants violated the Mississippi CPA by

9    knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose

10   material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed

11   above.

12        6.    Specifically, by misrepresenting the Class Vehicles as safe and/or free from

13   defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

14   Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of

15   competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

16   conduct of any trade or commerce, as prohibited by Miss. Code. Ann. § 75-24-5.

17        7.    Defendants' unfair or deceptive acts or practices, including misrepresentations,

18   concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

19   mislead and create a false impression in consumers, and were likely to and did in fact deceive

20   reasonable consumers, including Plaintiffs and Mississippi State Class members, about the true

21   safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the

22   Class Vehicles.

23        8.    Defendants' scheme and concealment of the SDM Calibration Defect and true

24   characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiffs

25   and Mississippi State Class members, as the Defendants intended. Had they known the truth,

26   Plaintiffs and Mississippi State Class members would not have purchased or leased the Class

27   Vehicles, or would have paid significantly less for them.

28

1       9.     Plaintiffs and Mississippi State Class members had no way of discerning that

2   Defendants' representations were false and misleading and/or otherwise learning the facts that

3   Defendants had concealed or failed to disclose. Plaintiffs and Mississippi State Class members

4   did not, and could not, unravel Defendants' deception on their own.

5       10.    Defendants had an ongoing duty to Plaintiffs and Mississippi State Class members

6   to refrain from unfair or deceptive practices under the Mississippi CPA in the course of their

7   business. Specifically, Defendants owed Plaintiffs and Mississippi State Class members a duty to

8   disclose all the material facts concerning the SDM Calibration Defect in the Class Vehicles

9   because they possessed exclusive knowledge, they intentionally concealed the defect from

10   Plaintiffs and Mississippi State Class members, and/or they made misrepresentations that were

11   misleading because they were contradicted by withheld facts.

12       11.    Defendants' violations present a continuing risk to Plaintiffs and Mississippi State

13   Class members, as well as to the general public. Defendants' unlawful acts and practices

14   complained of herein affect the public interest.

15       12.    Mississippi State Class members suffered ascertainable loss and actual damages as

16   a direct and proximate result of Defendants' misrepresentations and concealment of and failure to

17   disclose material information. Defendants had an ongoing duty to all their customers to refrain

18   from unfair and deceptive practices under the Mississippi CPA. All owners of Class Vehicles

19   suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made

20   in the course of Defendants' business.

21       13.    As a direct and proximate result of Defendants' violations of the Mississippi CPA,

22   Mississippi State Class members have suffered injury-in-fact and/or actual damage.

23       14.    Plaintiffs' seek actual damages in an amount to be determined at trial any other

24   just and proper relief available under the Mississippi CPA.

25

26

27

28

1

2
**MISSISSIPPI COUNT II:**
**Breach of Express Warranty**
3
**Miss. Code §§ 75-2-313 and 75-2A-210**
**(On Behalf of the Mississippi State Class)**
4

5
15.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though
fully set forth herein.
6

7
16.     Plaintiffs Denise Wilson, Allan Miles, and Harryette Gosa (for the purposes of this

8
count, "Plaintiffs") bring this claim on behalf of themselves and the Mississippi State Class
against all Defendants.
9

10
17.     Defendants are and were at all relevant times "merchant[s]" with respect to motor
vehicles under Miss. Code § 75-2-104(1) and "sellers" of motor vehicles under § 75-2-103(1)(d).
11

12
18.     With respect to leases, Defendants are and were at all relevant times "lessors" of
motor vehicles under Miss. Code § 75-2A-103(1)(p).
13

14
19.     The Class Vehicles are and were at all relevant times "goods" within the meaning
of Miss. Code §§ 75-2-105(1) and 75-2A-103(1)(h).
15

16
20.     In connection with the purchase or lease of Class Vehicles, Defendants provided

17
Plaintiffs and Mississippi State Class members with written express warranties covering the

18
repair or replacement of components that are defective in materials or workmanship.

19
21.     Defendants' warranties formed the basis of the bargain that was reached when

20
Plaintiffs and Mississippi State Class members unknowingly purchased or leased Class Vehicles
that came equipped with the SDM Calibration Defect.
21

22
22.     However, Defendants knew or should have known that the warranties were false

23
and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the

24
Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they

25
were sold and leased to Plaintiffs and Mississippi State Class members.

26
23.     Plaintiffs and Mississippi State Class members reasonably relied on the

27
Defendants' express warranties when purchasing or leasing their Class Vehicles.

28

1      24.     Defendants knowingly breached their express warranties to repair defects in

2   materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

3   Defendants also breached their express warranties by providing a product containing defects that

4   were never disclosed to Plaintiffs and Mississippi State Class members.

5      25.     Plaintiffs and Mississippi State Class members have provided the Defendants with

6   reasonable notice and opportunity to cure the breaches of their express warranties by way of letter

7   sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public

8   NHTSA complaints and individual lawsuits, as detailed herein.

9      26.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

10     27.     As a direct and proximate result of the Defendants' breach of express warranties,

11  Plaintiffs and Mississippi State Class members have been damaged in an amount to be proven at

12  trial.

13                            **MISSISSIPPI COUNT III:**
                      **Breach of Implied Warranty of Merchantability**
14                       **Miss. Code §§ 75-2-314 and 75-2A-212**
                         **(On Behalf of the Mississippi State Class)**
15

16     28.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

17  forth herein.

18     29.     Plaintiffs Denise Wilson, Allan Miles, and Harryette Gosa (for the purposes of this

19  count, "Plaintiffs") bring this claim on behalf of themselves and the Mississippi State Class

20  against all Defendants.

21     30.     Defendants are and were at all relevant times "merchant[s]" with respect to motor

22  vehicles under Miss. Code § 75-2-104(1) and "sellers" of motor vehicles under § 75-2-103(1)(d).

23     31.     With respect to leases, Defendants are and were at all relevant times "lessors" of

24  motor vehicles under Miss. Code § 75-2A-103(1)(p).

25     32.     The Class Vehicles are and were at all relevant times "goods" within the meaning

26  of Miss. Code §§ 75-2-105(1) and 75-2A-103(1)(h).

27

28

33.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Miss. Code §§ 75-2-314 and 75-2A-212.

34.     The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

35.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual lawsuits, as detailed herein.

36.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

37.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and Mississippi State Class members have been damaged in an amount to be proven at trial.

**18.     Missouri**

**MISSOURI COUNT I:**
**Violations of the Missouri Merchandising Practices Act**
**Mo. Rev. Stat. § 407.010 *et seq.***
**(On Behalf of the Missouri State Class)**

1.     Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2.     Plaintiff Dolly Price (for the purposes of this count, "Plaintiff") brings this claim on behalf of herself and the Missouri State Class against all Defendants.

3.     Defendants, Plaintiff, and the Missouri State Class are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

4.     Defendants engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

1    5.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the

2    "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation,

3    unfair practice, or the concealment, suppression, or omission of any material fact in connection

4    with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

5    6.    In the course of their business, Defendants violated the Missouri MPA by

6    knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose

7    material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed

8    above.

9    7.    Specifically, by misrepresenting the Class Vehicles as safe and/or free from

10   defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

11   Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of

12   competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

13   conduct of any trade or commerce, as prohibited by Mo. Rev. Stat. § 407.020.

14   8.    Defendants' unfair or deceptive acts or practices, including misrepresentations,

15   concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

16   mislead and create a false impression in consumers, and were likely to and did in fact deceive

17   reasonable consumers, including Plaintiff and Missouri State Class members, about the true

18   safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the

19   Class Vehicles.

20   9.    Defendants' scheme and concealment of the SDM Calibration Defect and true

21   characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiff and

22   Missouri State Class members, as the Defendants intended. Had they known the truth, Plaintiff

23   and Missouri State Class members would not have purchased or leased the Class Vehicles, or

24   would have paid significantly less for them.

25   10.   Plaintiff and Missouri State Class members had no way of discerning that

26   Defendants' representations were false and misleading and/or otherwise learning the facts that

27   Defendants had concealed or failed to disclose. Plaintiff and Missouri State Class members did

28   not, and could not, unravel Defendants' deception on their own.

1    11.    Defendants had an ongoing duty to Plaintiff and Missouri State Class members to

2    refrain from unfair or deceptive practices under the Missouri MPA in the course of their business.

3    Specifically, Defendants owed Plaintiff and Missouri State Class members a duty to disclose all

4    the material facts concerning the SDM Calibration Defect in the Class Vehicles because they

5    possessed exclusive knowledge, they intentionally concealed the defect from Plaintiff and

6    Missouri State Class members, and/or they made misrepresentations that were misleading

7    because they were contradicted by withheld facts.

8    12.    Defendants' violations present a continuing risk to Plaintiff and Missouri State

9    Class members, as well as to the general public. Defendants' unlawful acts and practices

10   complained of herein affect the public interest.

11   13.    Plaintiff and Missouri State Class members suffered ascertainable loss and actual

12   damages as a direct and proximate result of Defendants' misrepresentations and concealment of

13   and failure to disclose material information. Defendants had an ongoing duty to all their

14   customers to refrain from unfair and deceptive practices under the Missouri MPA. All owners of

15   Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and

16   practices made in the course of Defendants' business.

17   14.    As a direct and proximate result of Defendants' violations of the Missouri MPA,

18   Plaintiff and Missouri State Class members have suffered injury-in-fact and/or actual damage.

19   15.    Defendants are liable to Plaintiff and the Missouri State Class for damages in

20   amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as

21   injunctive relief enjoining Defendants' unfair and deceptive practices, and any other just and

22   proper relief under Mo. Rev. Stat. § 407.025.

23   **MISSOURI COUNT II:**
**Breach of Express Warranty**
24   **Mo. Stat. §§ 400.2-313 and 400.2A-210**
**(On Behalf of the Missouri State Class)**
25

26   16.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

27   fully set forth herein.

28

1   17.   Plaintiff Dolly Price (for the purposes of this count, "Plaintiff") brings this claim

2   on behalf of herself and the Missouri State Class against all Defendants.

3   18.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

4   vehicles under Mo. Stat. § 400.2-104(1) and "sellers" of motor vehicles under § 400.2-103(1)(d).

5   19.   With respect to leases, Defendants are and were at all relevant times "lessors" of

6   motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

7   20.   The Class Vehicles are and were at all relevant times "goods" within the meaning

8   of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

9   21.   In connection with the purchase or lease of Class Vehicles, the Defendants

10   provided Plaintiff and Missouri State Class members with written express warranties covering the

11   repair or replacement of components that are defective in materials or workmanship.

12   22.   Defendants' warranties formed the basis of the bargain that was reached when

13   Plaintiff and Missouri State Class members unknowingly purchased or leased Class Vehicles that

14   came equipped with the SDM Calibration Defect.

15   23.   However, Defendants knew or should have known that the warranties were false

16   and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the

17   Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they

18   were sold and leased to Plaintiff and Missouri State Class members.

19   24.   Plaintiff and Missouri State Class members reasonably relied on the Defendants'

20   express warranties when purchasing or leasing their Class Vehicles.

21   25.   Defendants knowingly breached their express warranties to repair defects in

22   materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

23   Defendants also breached their express warranties by providing a product containing defects that

24   were never disclosed to Plaintiff and Missouri State Class members.

25   26.   Plaintiff and Missouri State Class members have provided the Defendants with

26   reasonable notice and opportunity to cure the breaches of their express warranties by way of letter

27   sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public

28   NHTSA complaints and individual lawsuits, as detailed herein.

1    27.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

2    28.    As a direct and proximate result of the Defendants' breach of express warranties,

3    Plaintiff and Missouri State Class members have been damaged in an amount to be proven at trial.

4                                    **MISSOURI COUNT III:**
                              **Breach of Implied Warranty of Merchantability**
5                              **Mo. Stat. §§ 400.2-314 and 400.2A-212**
                              **(On Behalf of the Missouri State Class)**
6

7    29.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

8    forth herein.

9    30.    Plaintiff Dolly Price (for the purposes of this count, "Plaintiff") brings this claim

10   on behalf of himself and the Missouri State Class against all Defendants.

11   31.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

12   vehicles under Mo. Stat. § 400.2-104(1) and "sellers" of motor vehicles under § 400.2-103(1)(d).

13   32.    With respect to leases, Defendants are and were at all relevant times "lessors" of

14   motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

15   33.    The Class Vehicles are and were at all relevant times "goods" within the meaning

16   of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

17   34.    A warranty that the Class Vehicles were in merchantable condition and fit for the

18   ordinary purpose for which vehicles are used is implied by law pursuant to Mo. Stat. § 400.2-314

19   and Mo. Stat. § 400.2A-212.

20   35.    The Class Vehicles did not comply with the implied warranty of merchantability

21   because, at the time of sale and at all times thereafter, they were defective and not in

22   merchantable condition, would not pass without objection in the trade, and were not fit for the

23   ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the

24   SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an

25   accident, rendering the Class Vehicles inherently defective and dangerous.

26   36.    Defendants were provided reasonable notice of these issues by way of a letter sent

27   by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual

28   lawsuits, as detailed herein.

1   37.   Alternatively, any opportunity to cure the breach is unnecessary and futile.

2   38.   As a direct and proximate result of Defendants' breach of the implied warranty of

3   merchantability, Plaintiff and Missouri State Class members have been damaged in an amount to

4   be proven at trial.

5   **19.   Nevada**

6   **NEVADA COUNT I:**
   **Violations of the Nevada Deceptive Trade Practices Act**
7   **Nev. Rev. Stat. § 598.0903 *et seq.***
   **(On Behalf of the Nevada State Class)**
8

9   1.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

10   2.   Plaintiffs ShaVon Keith and Kevin Hopkins (for the purposes of this count,

11   "Plaintiffs") bring this claim on behalf of themselves and the Nevada State Class against all

12   Defendants.

13   3.   The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), Nev. Rev. Stat.

14   § 598.0903, *et seq.* prohibits deceptive trade practices. Nev. Rev. Stat. § 598.0915 provides that a

15   person engages in a "deceptive trade practice" if, in the course of business or occupation, the

16   person: "5. Knowingly makes a false representation as to the characteristics, ingredients, uses,

17   benefits, alterations or quantities of goods or services for sale or lease or a false representation as

18   to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7.

19   Represents that goods or services for sale or lease are of a particular standard, quality or grade, or

20   that such goods are of a particular style or model, if he or she knows or should know that they are

21   of another standard, quality, grade, style or model"; "9. Advertises goods or services with intent

22   not to sell or lease them as advertised"; or "15. Knowingly makes any other false representation

23   in a transaction."

24   4.   In the course of their business, Defendants violated the Nevada DTPA by

25   knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose

26   material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed

27   above.

28

5.      Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce, as prohibited by Nev. Rev. Stat. § 598.0915.

6.      Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Nevada State Class members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

7.      Defendants' scheme and concealment of the SDM Calibration Defect and true characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiffs and Nevada State Class members, as the Defendants intended. Had they known the truth, Plaintiffs and Nevada State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

8.      Plaintiffs and Nevada State Class members had no way of discerning that Defendants' representations were false and misleading and/or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiffs and Nevada State Class members did not, and could not, unravel Defendants' deception on their own.

9.      Defendants had an ongoing duty to Plaintiffs and Nevada State Class members to refrain from unfair or deceptive practices under the Nevada DTPA in the course of their business. Specifically, Defendants owed Plaintiffs and Nevada State Class members a duty to disclose all the material facts concerning the SDM Calibration Defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the defect from Plaintiffs and Nevada State Class members, and/or they made misrepresentations that were misleading because they were contradicted by withheld facts.

10.     Defendants' violations present a continuing risk to Plaintiffs and Nevada State Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

11.     Nevada State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Nevada DTPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

12.     Pursuant to Nev. Rev. Stat. §§ 41.600, Plaintiffs and Nevada State Class members seek an order enjoining the Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Nevada DTPA.

**NEVADA COUNT II:**
**Breach of Express Warranty**
**N.R.S. §§ 104.2313 and 104A.2210**
**(On Behalf of the Nevada State Class)**

13.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

14.     Plaintiffs ShaVon Keith and Kevin Hopkins (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Nevada State Class against all Defendants.

15.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.R.S. § 104.2104(1) and "sellers" of motor vehicles under § 104.2103(1)(c).

16.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.R.S. § 104A.2103(1)(p).

17.     The Class Vehicles are and were at all relevant times "goods" within the meaning of N.R.S. §§ 104.2105(1) and 104A.2103(1)(h).

1    18.    In connection with the purchase or lease of Class Vehicles, Defendants provided

2    Plaintiffs and Nevada State Class members with written express warranties covering the repair or

3    replacement of components that are defective in materials or workmanship.

4    19.    Defendants' warranties formed the basis of the bargain that was reached when

5    Plaintiffs and Nevada State Class members unknowingly purchased or leased Class Vehicles that

6    came equipped with the SDM Calibration Defect.

7    20.    However, Defendants knew or should have known that the warranties were false

8    and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the

9    Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they

10   were sold and leased to Plaintiffs and Nevada State Class members.

11   21.    Plaintiffs and Nevada State Class members reasonably relied on the Defendants'

12   express warranties when purchasing or leasing their Class Vehicles.

13   22.    Defendants knowingly breached their express warranties to repair defects in

14   materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

15   Defendants also breached their express warranties by providing a product containing defects that

16   were never disclosed to Plaintiffs and Nevada State Class members.

17   23.    Plaintiffs and Nevada State Class members have provided the Defendants with

18   reasonable notice and opportunity to cure the breaches of their express warranties by way of letter

19   sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public

20   NHTSA complaints and individual lawsuits, as detailed herein.

21   24.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

22   25.    As a direct and proximate result of the Defendants' breach of express warranties,

23   Plaintiffs and Nevada State Class members have been damaged in an amount to be proven at trial.

24   **NEVADA COUNT III:**
   **Breach of Implied Warranty of Merchantability**
25   **N.R.S. §§ 104.2314 and 104A.2212**
   **(On Behalf of the Nevada State Class)**
26

27   26.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

28   forth herein.

27.     Plaintiffs ShaVon Keith and Kevin Hopkins (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Nevada State Class against all Defendants.

28.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.R.S. § 104.2104(1) and "sellers" of motor vehicles under § 104.2103(1)(c).

29.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.R.S. § 104A.2103(1)(p).

30.     The Class Vehicles are and were at all relevant times "goods" within the meaning of N.R.S. §§ 104.2105(1) and 104A.2103(1)(h).

31.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.R.S. §§ 104.2314 and 104A.2212.

32.     The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

33.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual lawsuits, as detailed herein.

34.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

35.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and Nevada State Class members have been damaged in an amount to be proven at trial.

20.    New Jersey

**NEW JERSEY COUNT I:**
**Violations of the New Jersey Consumer Fraud Act**
**N.J. Stat. Ann. § 56:8-1 *et seq.***
**(On Behalf of the New Jersey State Class)**

1.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

2.    Plaintiffs Jorge L. Orihuela and Lee Ford (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the New Jersey State Class against all Defendants.

3.    Plaintiffs and New Jersey State Class members and Defendants are "persons" under the New Jersey Consumer Fraud Act ("New Jersey CFA"), N.J. Stat. § 56:8-1(d).

4.    Defendants engaged in "sales" of "merchandise" within the meaning of N.J. Stat. §56:8-1(c), (e). Defendants' actions as set forth herein occurred in the conduct of trade or commerce.

5.    The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. Stat. § 56:8-2.

6.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Specifically, Defendants failed to disclose and actively concealed the dangers and risk posed by the Class Vehicles and/or the SDM Calibration Defect.

7.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

1   a transaction involving Class Vehicles has been supplied in accordance with a previous

2   representation when it has not.

3         8.      Defendants intentionally and knowingly misrepresented material facts regarding

4   the Class Vehicles with intent to mislead Plaintiffs and the New Jersey State Class.

5         9.      Plaintiffs and New Jersey State Class members had no way of discerning that

6   Defendants' representations were false and misleading and/or otherwise learning the facts the

7   Defendants had concealed or failed to disclose. Plaintiffs and New Jersey State Class members

8   did not, and could not, unravel the Defendants' deception on their own.

9         10.     Defendants knew or should have known that their conduct violated the New Jersey

10  CFA.

11        11.     Defendants owed Plaintiffs and the New Jersey State Class a duty to disclose all

12  the material facts concerning the SDM Calibration Defect in the Class Vehicles because

13  Defendants:

14              A.      possessed exclusive knowledge that they were manufacturing, selling, and

15        distributing vehicles throughout the United States that did not perform as advertised;

16              B.      intentionally concealed the foregoing from regulators, Plaintiffs, and New

17        Jersey State Class members; and/or

18              C.      made incomplete representations about the Class Vehicles' safety while

19        purposefully withholding material facts that contradicted these representations.

20        12.     Defendants' concealment of the true characteristics of the Class Vehicles' safety

21  and SDM Calibration system was material to Plaintiffs and the New Jersey State Class.

22        13.     Defendants' unfair or deceptive acts or practices were likely to and did in fact

23  deceive regulators and reasonable consumers, including Plaintiffs and the New Jersey State Class,

24  about the true safety of the Class Vehicles, the quality of the Defendants' brands, and the true

25  value of the Class Vehicles.

26        14.     Defendants' violations present a continuing risk to Plaintiffs and the New Jersey

27  State Class as well as to the general public. Defendants' unlawful acts and practices complained

28  of herein affect the public interest.

15. Plaintiffs and New Jersey State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the New Jersey CFA. All owners and lessees of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

16. As a direct and proximate result of Defendants' violations of the New Jersey CFA, Plaintiffs and the New Jersey State Class have suffered injury-in-fact and/or actual damage in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, treble damages, an order enjoining Defendants' deceptive and unfair conduct, costs and reasonable attorneys' fees under N.J. Stat. § 56:8-19, and all other just and appropriate relief.

**NEW JERSEY COUNT II:**
**Breach of Express Warranty**
**N.J.S. 12A:2-313 and 2A-210**
**(On Behalf of the New Jersey State Class)**

17. Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

18. Plaintiffs Jorge L. Orihuela and Lee Ford (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the New Jersey State Class against all Defendants.

19. Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.J.S. 12A:2-104(1) and "sellers" of motor vehicles under 2-103(1)(d).

20. With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.J.S. 12A:2A-103(1)(p).

21. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J.S. 12A:2-105(1) and 2A-103(1)(h).

1    22.    In connection with the purchase or lease of each Class Vehicle, Defendants

2    provided Plaintiffs and New Jersey State Class members with written express warranties covering

3    the repair or replacement of components that are defective in materials or workmanship.

4    23.    Defendants' warranties formed a basis of the bargain that was reached when

5    Plaintiffs and New Jersey Class members unknowingly purchased or leased Class Vehicles that

6    came equipped with the SDM Calibration Defect.

7    24.    However, Defendants knew or should have known that the warranties were false

8    and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the

9    Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they

10   were sold and leased to Plaintiffs and New Jersey State Class members.

11   25.    Plaintiffs and New Jersey State Class members reasonably relied on the

12   Defendants' express warranties when purchasing or leasing their Class Vehicles.

13   26.    Defendants knowingly breached their express warranties to repair defects in

14   materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

15   Defendants also breached their express warranties by providing a product containing defects that

16   were never disclosed to Plaintiffs and New Jersey State Class members.

17   27.    Plaintiffs and New Jersey State Class members have provided the Defendants with

18   reasonable notice and opportunity to cure the breaches of their express warranties by way of letter

19   sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public

20   NHTSA complaints and individual lawsuits, as detailed herein.

21   28.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

22   Accordingly, recovery by Plaintiffs and New Jersey State Class members is not restricted to the

23   limited warranty promising to repair and correct Defendants' defect in materials and

24   workmanship, and they seek all remedies as allowed by law.

25   29.    As a direct and proximate result of Defendants' breach of express warranties,

26   Plaintiffs and New Jersey State Class members have been damaged in an amount to be

27   determined at trial.

28

**NEW JERSEY COUNT III:**
**Breach of Implied Warranty of Merchantability**
**N.J.S. 12A:2-314 and 2A-212**
**(On Behalf of the New Jersey State Class)**

30.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

31.     Plaintiffs Jorge L. Orihuela and Lee Ford (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the New Jersey State Class against all Defendants.

32.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.J.S. 12A:2-104(1) and "sellers" of motor vehicles under 2-103(1)(d).

33.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.J.S. 12A:2A-103(1)(p).

34.     The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J.S. 12A:2-105(1) and 2A-103(1)(h).

35.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.J.S. 12A:2-314 and 2A-212.

36.     The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

37.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual lawsuits, as detailed herein.

38.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

39.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and New Jersey State Class members have been damaged in an amount to be proven at trial.

21.    **New York**

**NEW YORK COUNT I:**
**Violations of the New York General Business Law § 349**
**N.Y. Gen. Bus. Law § 349**
**(On Behalf of the New York State Class)**

1.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

2.    Plaintiffs Adam Brown, Patrick O'Connor, and Frank Pignone (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the New York State Class against all Defendants.

3.    The New York State Class members and Defendants are "persons" under N.Y. Gen. Bus. Law § 349(h), the New York Deceptive Acts and Practices Act ("NY DAPA").

4.    Defendants' actions as set forth herein occurred in the conduct of trade or commerce under the NY DAPA.

5.    The NY DAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendants' conduct, as set forth herein, constitutes deceptive acts or practices under this section.

6.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Specifically, Defendants failed to disclose and actively concealed the dangers and risk posed by the Class Vehicles and/or the SDM Calibration Defect.

7.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

1    8.    Defendants intentionally and knowingly misrepresented material facts regarding

2    the Class Vehicles with intent to mislead the New York State Class.

3    9.    Defendants knew or should have known that their conduct violated the NY DAPA.

4    10.    Defendants owed the New York State Class a duty to disclose the true nature of

5    the Class Vehicles, because Defendants:

6    a.    possessed exclusive knowledge that they were manufacturing, selling, and

7    distributing vehicles throughout the United States that did not perform as advertised;

8    b.    intentionally concealed the foregoing from regulators and New York State

9    Class members; and/or

10    c.    made incomplete representations about the Class Vehicles' safety while

11    purposefully withholding material facts that contradicted these representations.

12    11.    Defendants' concealment of the true characteristics of the Class Vehicles' true was

13    material to the New York State Class.

14    12.    Defendants' unfair or deceptive acts or practices were likely to and did in fact

15    deceive regulators and reasonable consumers, including Plaintiffs and the New York State Class,

16    about the true safety of the Class Vehicles, the quality of the Defendants' brands, and the true

17    value of the Class Vehicles.

18    13.    Defendants' violations present a continuing risk to Plaintiffs and the New York

19    State Class as well as to the general public. Defendants' unlawful acts and practices complained

20    of herein affect the public interest.

21    14.    Plaintiffs and New York State Class members suffered ascertainable loss and

22    actual damages as a direct and proximate result of Defendants' misrepresentations and

23    concealment of and failure to disclose material information. Defendants had an ongoing duty to

24    all their customers to refrain from unfair and deceptive practices under the NY DAPA. All

25    owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and

26    unfair acts and practices made in the course of Defendants' business.

27    15.    As a direct and proximate result of Defendants' violations of the NY DAPA, New

28    York State Class members have suffered injury-in-fact and/or actual damage.

16.   As a result of the foregoing willful, knowing, and wrongful conduct of Defendants, Plaintiffs and New York State Class members have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to actual damages or $50, whichever is greater, treble damages up to $1,000, punitive damages to the extent available under the law, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive and unfair conduct, and all other just and appropriate relief available under the NY DAPA.

**NEW YORK COUNT II:**
**Violations of the New York General Business Law § 350**
**N.Y. Gen. Bus. Law § 350**
**(On Behalf of the New York State Class)**

17.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

18.   Plaintiffs Adam Brown, Patrick O'Connor, and Frank Pignone (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the New York State Class against all Defendants.

19.   Defendants were engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350, the New York False Advertising Act ("NY FAA")

20.   The NY FAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350. False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of . . . representations [made] with respect to the commodity . . . ." N.Y. Gen. Bus. Law § 350-a.

21.   Defendants caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements and omissions that were untrue or misleading, and that were known by Defendants, or that through the exercise of reasonable care should have been known by Defendants, to be untrue and misleading to the New York State Class.

22.   Defendants made numerous material misrepresentations and omissions of fact with intent to mislead and deceive concerning the Class Vehicles, particularly concerning the safety of

1   the Class Vehicles. Defendants intentionally and knowingly misrepresented material facts

2   regarding the Class Vehicles with intent to mislead the New York State Class. The

3   misrepresentations and omissions set forth above were material and likely to deceive a reasonable

4   consumer.

5   23.   Defendants' false advertising was likely to and did in fact deceive regulators and

6   reasonable consumers, including the New York State Class, about the safety of the Class

7   Vehicles, the quality of Defendants brand and the true value of the Class Vehicles.

8   24.   Defendants' violations of the NY FAA present a continuing risk to New York

9   State Class members and to the general public. Defendants' deceptive acts and practices affect the

10  public interest.

11  25.   New York State Class members have suffered injury-in-fact and/or actual damages

12  and ascertainable loss as a direct and proximate result of the Defendants' false advertising in

13  violation of the NY FAA.

14  26.   The New York State Class seeks monetary relief against Defendants measured as

15  the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages

16  in the amount of $500 each for New York State Class members. Because Defendants' conduct

17  was committed willingly and knowingly, New York State Class members are entitled to recover

18  three times actual damages, up to $10,000.

19  27.   The New York State Class also seeks an order enjoining Defendants' false

20  advertising, attorneys' fees, and any other just and proper relief under N.Y. Gen. Bus. Law § 350.

21  **NEW YORK COUNT III:**
    **Breach of Express Warranty**

22  **N.Y. U.C.C. Law §§ 2-313 and 2A-210**
    **(On Behalf of the New York State Class)**

23

24  28.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

    fully set forth herein.

25

26  29.   Plaintiffs Adam Brown, Patrick O'Connor, and Frank Pignone (for the purposes of

27  this count, "Plaintiffs") bring this claim on behalf of themselves and the New York State Class

    against all Defendants.

28

30.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

31.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

32.     The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

33.     In connection with the purchase or lease of each Class Vehicle, Defendants provided Plaintiffs and New Jersey State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

34.     Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

35.     However, Defendants knew or should have known that the warranties were false and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to Plaintiffs and New York State Class members.

36.     Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles. Defendants also breached their express warranties by providing a product containing defects that were never disclosed to Plaintiffs and New York State Class members.

37.     Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile.

38.     Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make New York State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

39.     Accordingly, recovery by New York State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

40.     Plaintiffs and New Jersey State Class members have provided the Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of letter sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public NHTSA complaints and individual lawsuits, as detailed herein.

41.     As a direct and proximate result of Defendants' breach of express warranties, New York State Class members have been damaged in an amount to be determined at trial.

**NEW YORK COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**N.Y. U.C.C. Law §§ 2-314 and 2A-212**
**(On Behalf of the New York State Class)**

42.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

43.     Plaintiffs Adam Brown, Patrick O'Connor, and Frank Pignone (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the New York State Class against all Defendants.

44.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

45.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

46.     The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

47.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.Y. UCC Law §§ 2-314 and 2A-212.

48.     The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the

1   SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an

2   accident, rendering the Class Vehicles inherently defective and dangerous.

3          49.     Defendants were provided reasonable notice of these issues by way of a letter sent

4   by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual

5   lawsuits, as detailed herein.

6          50.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

7          51.     As a direct and proximate result of Defendants' breach of the implied warranty of

8   merchantability, New York State Class members have been damaged in an amount to be proven

9   at trial.

10                         **22.    North Carolina**

11                   **NORTH CAROLINA COUNT VIII:**
     **Violations of the North Carolina Unfair and Deceptive Acts and Practices Act**

12                      **N.C. Gen. Stat. § 75-1.1, *et seq.***
                     **(On Behalf of the North Carolina State Class)**

13

14          1.     Plaintiffs reallege and incorporate by reference all preceding allegations as though

15   fully set forth herein.

16          2.     Plaintiffs David Casey and Jason Klinger (for the purposes of this count,

17   "Plaintiffs") bring this claim on behalf of themselves and the North Carolina State Class against

18   all Defendants.

19          3.     Plaintiffs and North Carolina State Class members are persons under the North

20   Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.*

21   ("NCUDTPA").

22          4.     Defendants' acts and practices complained of herein were performed in the course

23   of Defendants' trade or business and thus occurred in or affected "commerce," as defined in N.C.

24   Gen. Stat. § 75-1.1(b).

25          5.     The NCUDTPA makes unlawful "[u]nfair methods of competition in or affecting

26   commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" The NCUDTPA

27   provides a private right of action for any person injured "by reason of any act or thing done by

28   any other person, firm or corporation in violation of" the NCUDTPA. N.C. Gen. Stat. § 75-16.

1    6.    In the course of their business, Defendants violated the NCUDTPA by knowingly

2    and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts

3    regarding the reliability, safety, and performance of the Class Vehicles, as detailed above.

4    7.    Specifically, by misrepresenting the Class Vehicles as safe and/or free from

5    defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

6    Vehicles and/or the SDM Calibration Defect, Defendants engaged in the unfair methods of

7    competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting

8    commerce prohibited by N.C. Gen § 75-16.

9    8.    Defendants' unfair or deceptive acts or practices, including misrepresentations,

10   concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

11   mislead and create a false impression in consumers, and were likely to and did in fact deceive

12   reasonable consumers, including Plaintiffs and North Carolina State Class members, about the

13   true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value

14   of the Class Vehicles.

15   9.    Defendants' scheme and concealment of the SDM Calibration Defect in the Class

16   Vehicles were material to Plaintiffs and North Carolina State Class members, as the Defendants

17   intended. Had they known the truth, Plaintiffs and North Carolina State Class members would not

18   have purchased or leased the Class Vehicles, or would have paid significantly less for them.

19   10.    Plaintiffs and North Carolina State Class members had no way of discerning that

20   the Defendants' representations were false and misleading and/or otherwise learning the facts that

21   the Defendants had concealed or failed to disclose. Plaintiffs and North Carolina State Class

22   members did not, and could not, unravel the Defendants' deception on their own.

23   11.    Defendants had an ongoing duty to Plaintiffs and North Carolina State Class

24   members to refrain from unfair or deceptive practices under the NCUDTPA in the course of their

25   business. Specifically, Defendants owed Plaintiffs and North Carolina State Class members a

26   duty to disclose all the material facts concerning the SDM Calibration Defect in the Class

27   Vehicles because they possessed exclusive knowledge, they intentionally concealed the defect

28

from Plaintiffs and North Carolina State Class members, and/or they made misrepresentations that were misleading because they were contradicted by withheld facts.

12.     Defendants' violations present a continuing risk to Plaintiffs and North Carolina State Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

13.     Plaintiffs and the North Carolina State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

14.     Pursuant to N.C. Gen. Stat. § 75-16, Plaintiffs and the North Carolina State Class members and seek all just and proper remedies, including but not limited to treble damages, an order enjoining Defendants' deceptive and unfair conduct, court costs and reasonable attorneys' fees, and any other just and proper relief available.

**NORTH CAROLINA COUNT II:**
**Breach of Express Warranty**
**N.C. Gen. Stat. §§ 25-2-313 and 252A-210**
**(On Behalf of the North Carolina State Class)**

15.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

16.     Plaintiffs David Casey and Jason Klinger (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the North Carolina State Class against all Defendants.

17.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.C. Gen. Stat. § 25-2-104(1) and "sellers" of motor vehicles under § 25-2-103(1)(d).

18.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p).

19.     All North Carolina State Class members who purchased Class Vehicles are "buyers" within the meaning of N.C. Gen. Stat. § 25-2-103(1)(a).

20.     All North Carolina State Class members who leased Class Vehicles are "lessees" within the meaning of N.C. Gen. Stat. § 25-2A-103(1)(n).

21.     The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. Gen. Stat. §§ 25-2-105(1) and 25-2A-103(1)(h).

22.     In connection with the purchase or lease of Class Vehicles, the Defendants provided Plaintiffs and North Carolina State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

23.     Defendants' warranties formed the basis of the bargain that was reached when Plaintiffs and North Carolina State Class members unknowingly purchased or leased Class Vehicles that came equipped with the SDM Calibration Defect.

24.     However, Defendants knew or should have known that the warranties were false and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to Plaintiffs and North Carolina State Class members.

25.     Plaintiffs and North Carolina State Class members reasonably relied on the Defendants' express warranties when purchasing or leasing their Class Vehicles.

26.     Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles. Defendants also breached their express warranties by providing a product containing defects that were never disclosed to Plaintiffs and North Carolina State Class members.

27.     Plaintiffs and North Carolina State Class members have provided the Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of letter sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public NHTSA complaints and individual lawsuits, as detailed herein.

28.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

29.     As a direct and proximate result of the Defendants' breach of express warranties, Plaintiffs and North Carolina State Class members have been damaged in an amount to be proven at trial.

**NORTH CAROLINA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**N.C. Gen. Stat. §§ 25-2-314 and 252A-212**
**(On Behalf of the North Carolina State Class)**

30.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

31.     Plaintiffs David Casey and Jason Klinger (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the North Carolina State Class against all Defendants.

32.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.C. Gen. Stat. § 25-2-104(1) and "sellers" of motor vehicles under § 25-2-103(1)(d).

33.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p).

34.     All North Carolina State Class members who purchased Class Vehicles are "buyers" within the meaning of N.C. Gen. Stat. § 25-2-103(1)(a).

35.     All North Carolina State Class members who leased Class Vehicles are "lessees" within the meaning of N.C. Gen. Stat. § 25-2A-103(1)(n).

36.     The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. Gen. Stat. §§ 25-2-105(1) and 25-2A-103(1)(h).

37.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.C. Gen. Stat. §§ 25-2-314 and 25-2A-212.

38.     The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

39.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public NHTSA complaints and individual lawsuits, as detailed herein.

40.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

41.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and North Carolina State Class members have been damaged in an amount to be proven at trial.

### 23.    Ohio

**OHIO COUNT I:**
**Violations of the Ohio Consumer Sales Practices Act**
**Ohio Rev. Code § 1345.01, *et seq.***
**(On Behalf of the Ohio State Class)**

1.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2.    Plaintiffs Brian Swann, Walter Tooson, and Gregory Juskiewicz (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Ohio State Class against all Defendants.

3.    Defendants, Plaintiffs, and Ohio State Class members are "persons" within the meaning of Ohio Rev. Code § 1345.01(B).

4.    Each Defendant is a "supplier" as defined by Ohio Rev. Code § 1345.01(C).

5.    Plaintiffs and the Ohio State Class are "consumers" as that term is defined in Ohio Rev. Code § 1345.01(D), and their purchase and leases of the Class Vehicles are "consumer transactions" within the meaning of Ohio Rev. Code § 1345.01(A).

6.    Ohio Rev. Code § 1345.02, prohibits unfair or deceptive acts or practices in connection with a consumer transaction.

7.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles and/or the defective SDMs, as detailed above. Specifically, Defendants misrepresented the Class Vehicles as safe and/or free from defects and failed to

1  disclose and actively concealed the dangers and risk posed by the Class Vehicles and/or the SDM

2  Calibration Defect, including serious injury or death.

3          8.      Defendants thus violated the CSPA by, at minimum:

4                  a.      representing that Class Vehicles have characteristics, uses, benefits, and

5  qualities which they do not have;

6                  b.      representing that Class Vehicles are of a particular standard, quality, and

7  grade when they are not; and

8                  c.      representing that the subject of a transaction involving Class Vehicles has

9  been supplied in accordance with a previous representation when it has not.

10 Ohio Rev. Code § 1345.02(A), (B)(1), (2), and (4).

11         9.      Defendants intentionally and knowingly misrepresented material facts regarding

12 the Class Vehicles with intent to mislead Plaintiffs and the Ohio State Class.

13         10.     Defendants knew or should have known that their conduct violated the Ohio

14 CSPA.

15         11.     Plaintiffs and Ohio State Class members had no way of discerning that the

16 Defendants' representations were false and misleading and/or otherwise learning the facts that the

17 Defendants had concealed or failed to disclose. Plaintiffs and Ohio State Class members did not,

18 and could not, unravel the Defendants' deception on their own.

19         12.     The Ohio Attorney General has made available for public inspection prior state

20 court decisions which have held that the types of acts and omissions of Defendants in this

21 Complaint—including, but not limited to, the failure to honor both implied warranties and express

22 warranties, the making and distribution of false, deceptive, and/or misleading representations, and

23 the concealment and/or non-disclosure of a substantial defect—constitute deceptive sales

24 practices in violation of the CSPA. These cases include, but are not limited to, the following:

25                  a.      *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

26                  b.      *State ex rel. Betty D. Montgomery v. Ford Motor Co.* (OPIF #10002123);

27                  c.      *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF

28 #10002025);

1             d.     *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS

2   1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

3             e.     *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS

4   525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

5             f.     *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

6             g.     *Cranford v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

7             h.     *Brown v. Spears* (OPIF #10000403);

8             i.     *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427);

9             j.     *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326);

10  and

11            k.     *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524).

12      13.    Defendants owed Plaintiffs and the Ohio State Class a duty to disclose the safety

13  risks associated with the SDM Calibration Defect, the true nature of the Class Vehicles, because

14  Defendants possessed exclusive knowledge that they were manufacturing, selling, and

15  distributing vehicles throughout the United States that did not perform as advertised; intentionally

16  concealed the foregoing from regulators, Plaintiffs, and Ohio State Class members; and/or made

17  incomplete representations about the Class Vehicles' true airbag and seatbelt safety features while

18  purposefully withholding material facts that contradicted these representations.

19      14.    Defendants' concealment of the true characteristics of the Class Vehicles' safety

20  systems was material to Plaintiffs and the Ohio State Class.

21      15.    Defendants' unfair or deceptive acts or practices were likely to and did in fact

22  deceive regulators and reasonable consumers, including Plaintiffs and the Ohio State Class, about

23  the true safety features of the Class Vehicles, the quality of the Defendants' brands, and the true

24  value of the Class Vehicles.

25      16.    Defendants' violations present a continuing risk to Plaintiffs and the Ohio State

26  Class as well as to the general public. Defendants' unlawful acts and practices complained of

27  herein affect the public interest.

28

1   17.   Plaintiffs and Ohio State Class members suffered ascertainable loss and actual

2   damages as a direct and proximate result of Defendants' misrepresentations and concealment of

3   and failure to disclose material information.

4   18.   Pursuant to Ohio Rev. Code § 1345.09, Plaintiffs and the Ohio State Class

5   members seek an order enjoining Defendants' unfair and/or deceptive acts or practices, actual

6   damages—trebled, and attorneys' fees, costs, and any other just and proper relief under the Ohio

7   CSPA.

8   **OHIO COUNT II:**

9   **Violations of the Ohio Deceptive Trade Practices Act**
    **Ohio Rev. Code § 4165.01, *et seq.***

10  **(On Behalf of the Ohio State Class)**

11  19.   Plaintiffs reallege and incorporate by reference all preceding allegations as though

12  fully set forth herein.

13  20.   Plaintiffs Brian Swann, Walter Tooson, and Gregory Juskiewicz (for the purposes

14  of this count, "Plaintiffs") bring this claim on behalf of themselves and the Ohio State Class

15  against all Defendants.

16  21.   Defendants, Plaintiffs, and the Ohio State Class are "persons" within the meaning

17  of Ohio Rev. Code § 4165.01(D).

18  22.   Defendants engaged in "the course of [its] business" within the meaning of Ohio

19  Rev. Code § 4165.02(A) with respect to the acts alleged herein.

20  23.   The Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.02(A) ("Ohio

21  DTPA") prohibits deceptive trade practices.

22  24.   In the course of their business, Defendants concealed and suppressed material facts

23  concerning the Class Vehicles and/or the defective SDMs, as detailed above. Specifically,

24  Defendants misrepresented the Class Vehicles as safe and/or free from defects and failed to

25  disclose and actively concealed the dangers and risk posed by the Class Vehicles and/or the SDM

26  Calibration Defect, including serious injury or death.

27  25.   Defendants thus violated the Act by, at minimum:

28

1              a.      representing that Class Vehicles have characteristics, uses, benefits, and

2   qualities which they do not have;

3              b.      representing that Class Vehicles are of a particular standard, quality, and

4   grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as

5   advertised; and

6              c.      advertising the Class Vehicles as safe with the intent not to sell them as

7   advertised.

8   Ohio Rev. Code § 4165.02(A)(7), (9), and (11).

9          26.     Defendants intentionally and knowingly misrepresented material facts regarding

10   the Class Vehicles with intent to mislead Plaintiffs and the Ohio State Class.

11          27.     Defendants knew or should have known that their conduct violated the Ohio

12   DTPA.

13          28.     Defendants owed Plaintiffs and the Ohio State Class a duty to disclose the safety

14   risks associated with the SDM Calibration Defect, the true nature of the Class Vehicles, because

15   Defendants possessed exclusive knowledge that they were manufacturing, selling, and

16   distributing vehicles throughout the United States that did not perform as advertised; intentionally

17   concealed the foregoing from regulators, Plaintiffs, and Ohio State Class members; and/or made

18   incomplete representations about the Class Vehicles' true airbag and seatbelt safety features while

19   purposefully withholding material facts that contradicted these representations.

20          29.     Defendants' concealment of the true characteristics of the Class Vehicles' safety

21   systems was material to Plaintiffs and the Ohio State Class.

22          30.     Plaintiffs and Ohio State Class members had no way of discerning that the

23   Defendants' representations were false and misleading and/or otherwise learning the facts that the

24   Defendants had concealed or failed to disclose. Plaintiffs and Ohio State Class members did not,

25   and could not, unravel the Defendants' deception on their own.

26          31.     Defendants' unfair or deceptive acts or practices were likely to and did in fact

27   deceive regulators and reasonable consumers, including Plaintiffs and the Ohio State Class, about

28

1   the true safety features of the Class Vehicles, the quality of the Defendants' brands, and the true

2   value of the Class Vehicles.

3       32.     Defendants' violations present a continuing risk to Plaintiffs and the Ohio State

4   Class, as well as to the general public. Defendants' unlawful acts and practices complained of

5   herein affect the public interest.

6       33.     Plaintiffs and Ohio State Class members suffered ascertainable loss and actual

7   damages as a direct and proximate result of Defendants' misrepresentations and concealment of

8   and failure to disclose material information. Defendants had an ongoing duty to all their

9   customers to refrain from unfair and deceptive practices under the Ohio DTPA. All owners of

10  Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and

11  practices made in the course of Defendants' business.

12      34.     Pursuant to Ohio Rev. Code § 4165.03, Plaintiffs and the Ohio State Class

13  members seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages,

14  punitive damages, and attorneys' fees, costs, and any other just and proper relief available under

15  the Ohio DTPA.

16                          **OHIO COUNT III:**

17                   **Breach of Express Warranty**
             **Ohio. Rev. Code § 1302.26, *et seq.* / U.C.C. § 2-313**

18                   **(On Behalf of the Ohio State Class)**

19      35.     Plaintiffs reallege and incorporate by reference all preceding allegations as though

20  fully set forth herein.

21      36.     Plaintiffs Brian Swann, Walter Tooson, and Gregory Juskiewicz (for the purposes

22  of this count, "Plaintiffs") bring this claim on behalf of themselves and the Ohio State Class

23  against all Defendants.

24      37.     Defendants are and were at all relevant times "merchant[s]" with respect to motor

25  vehicles under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and "sellers" of motor

26  vehicles under § 1302.01(4).

27      38.     With respect to leases, Defendants are and were at all relevant times "lessors" of

28  motor vehicles under Ohio Rev. Code § 1310.01(A)(20).

1    39.    The Class Vehicles are and were at all relevant times "goods" within the meaning

2    of Ohio Rev. Code §§ 1302.01(8), and 1310.01(A)(8).

3    40.    In connection with the purchase or lease of Class Vehicles, the Defendants

4    provided Plaintiffs and Ohio State Class members with written express warranties covering the

5    repair or replacement of components that are defective in materials or workmanship.

6    41.    Defendants' warranties formed the basis of the bargain that was reached when

7    Plaintiffs and Ohio State Class members unknowingly purchased or leased Class Vehicles that

8    came equipped with the SDM Calibration Defect.

9    42.    However, Defendants knew or should have known that the warranties were false

10   and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the

11   Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they

12   were sold and leased to Plaintiffs and Ohio State Class members.

13   43.    Plaintiffs and Ohio State Class members reasonably relied on the Defendants'

14   express warranties when purchasing or leasing their Class Vehicles.

15   44.    Defendants knowingly breached their express warranties to repair defects in

16   materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

17   Defendants also breached their express warranties by providing a product containing defects that

18   were never disclosed to Plaintiffs and Ohio State Class members.

19   45.    Plaintiffs and Ohio State Class members have provided the Defendants with

20   reasonable notice and opportunity to cure the breaches of their express warranties by way of letter

21   sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public

22   NHTSA complaints and individual lawsuits, as detailed herein.

23   46.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

24   47.    As a direct and proximate result of the Defendants' breach of express warranties,

25   Plaintiffs and Ohio State Class members have been damaged in an amount to be proven at trial.

26   48.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs

27   and Ohio State Class members assert, as additional and/or alternative remedies, the revocation of

28

1   acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles

2   currently owned or leased, and for such other incidental and consequential damages as allowed.

3                                    **OHIO COUNT IV:**
                          **Breach of Implied Warranty of Merchantability**
4                             **Ohio Rev. Code §§ 1302.27 and 1310.19**
                              **(On Behalf of the Ohio State Class)**
5

6          49.     Plaintiffs reallege and incorporate by reference all preceding allegations as though

7   fully set forth herein.

8          50.     Plaintiffs Brian Swann, Walter Tooson, and Gregory Juskiewicz (for the purposes

9   of this count, "Plaintiffs") bring this claim on behalf of themselves and the Ohio State Class

10  against all Defendants.

11         51.     Defendants are and were at all relevant times "merchant[s]" with respect to motor

12  vehicles under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and "sellers" of motor

13  vehicles under § 1302.01(4).

14         52.     With respect to leases, Defendants are and were at all relevant times "lessors" of

15  motor vehicles under Ohio Rev. Code § 1310.01(A)(20).

16         53.     The Class Vehicles are and were at all relevant times "goods" within the meaning

17  of Ohio Rev. Code §§ 1302.01(8), and 1310.01(A)(8).

18         54.     A warranty that the Class Vehicles were in merchantable condition and fit for the

19  ordinary purpose for which vehicles are used is implied by law pursuant to Ohio Rev. Code

20  §§ 1302.27 and 1310.19.

21         55.     The Class Vehicles did not comply with the implied warranty of merchantability

22  because, at the time of sale and at all times thereafter, they were defective and not in

23  merchantable condition, would not pass without objection in the trade, and were not fit for the

24  ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the

25  SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an

26  accident, rendering the Class Vehicles inherently defective and dangerous.

27

28

1    56.    Defendants were provided reasonable notice of these issues by way of a letter sent

2    by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual

3    lawsuits, as detailed herein.

4    57.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

5    58.    As a direct and proximate result of Defendants' breach of the implied warranty of

6    merchantability, Plaintiffs and Ohio State Class members have been damaged in an amount to be

7    proven at trial.

8    **24.    Oklahoma**

9    **OKLAHOMA COUNT I:**
     **Violations of the Oklahoma Consumer Protection Act**
10   **Okla. Stat. Tit. 15 § 751 *et seq*.**
     **(On Behalf of the Oklahoma State Class)**
11

12   1.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

13   2.    Plaintiff Donald Roxberry (for the purposes of this count, "Plaintiff") brings this

14   claim on behalf of themselves and the Oklahoma State Class against all Defendants.

15   3.    Defendants and the Oklahoma State Class are "persons" within the meaning of

16   Okla. Stat. Tit. 15 § 752.1.

17   4.    Defendants engaged in "the course of [its] business" within the meaning of Okla.

18   Stat. Tit. 15 § 752.3 with respect to the acts alleged herein.

19   5.    The Oklahoma Consumer Protection Act ("Oklahoma CPA") prohibits, in the

20   course of business: "mak[ing] a false or misleading representation, knowingly or with reason to

21   know, as to the characteristics . . ., uses, [or] benefits, of the subject of a consumer transaction,"

22   or making a false representation, "knowingly or with reason to know, that the subject of a

23   consumer transaction is of a particular standard, style or model, if it is of another or

24   "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer transaction with

25   intent not to sell it as advertised;" and otherwise committing "an unfair or deceptive trade

26   practice." Okla. Stat. Tit. 753.

27   6.    In the course of their business, Defendants violated the Oklahoma CPA by

28   knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose

1    material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed

2    above.

3         7.    Specifically, by misrepresenting the Class Vehicles as safe and/or free from

4    defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

5    Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of

6    competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

7    conduct of any trade or commerce, as prohibited by Okla. Stat. Tit. 753.

8         8.    Defendants' unfair or deceptive acts or practices, including misrepresentations,

9    concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

10   mislead and create a false impression in consumers, and were likely to and did in fact deceive

11   reasonable consumers, including Plaintiffs and Oklahoma State Class members, about the true

12   safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the

13   Class Vehicles.

14        9.    Defendants' scheme and concealment of the SDM Calibration Defect and true

15   characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiffs

16   and Oklahoma State Class members, as the Defendants intended. Had they known the truth,

17   Plaintiffs and Oklahoma State Class members would not have purchased or leased the Class

18   Vehicles, or would have paid significantly less for them.

19        10.   Plaintiff and Oklahoma State Class members had no way of discerning that

20   Defendants' representations were false and misleading and/or otherwise learning the facts that

21   Defendants had concealed or failed to disclose. Plaintiffs and Oklahoma State Class members did

22   not, and could not, unravel Defendants' deception on their own.

23        11.   Defendants had an ongoing duty to Plaintiff and Oklahoma State Class members to

24   refrain from unfair or deceptive practices under the Oklahoma CPA in the course of their

25   business. Specifically, Defendants owed Plaintiff and Oklahoma State Class members a duty to

26   disclose all the material facts concerning the SDM Calibration Defect in the Class Vehicles

27   because they possessed exclusive knowledge, they intentionally concealed the defect from

28

1  Plaintiffs and Oklahoma State Class members, and/or they made misrepresentations that were

2  misleading because they were contradicted by withheld facts.

3       12.    Defendants' violations present a continuing risk to Plaintiff and Oklahoma State

4  Class members, as well as to the general public. Defendants' unlawful acts and practices

5  complained of herein affect the public interest.

6       13.    Oklahoma State Class members suffered ascertainable loss and actual damages as

7  a direct and proximate result of Defendants' misrepresentations and concealment of and failure to

8  disclose material information. Defendants had an ongoing duty to all their customers to refrain

9  from unfair and deceptive practices under the Oklahoma CPA. All owners and lessees of Class

10 Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and

11 practices made in the course of Defendants' business.

12      14.    Pursuant to Okla. Stat. Tit. 15 § 761.1, the Oklahoma State Class seeks an order

13 enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and

14 attorneys' fees, costs, and any other just and proper relief available under the Oklahoma CPA.

15                          **OKLAHOMA COUNT II:**
                            **Breach of Express Warranty**
16                       **Okla. Stat. Tit. 12 §§ 2-313 and 2A-210**
                            **(On Behalf of the Oklahoma State Class)**
17

18      15.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

19 fully set forth herein.

20      16.    Plaintiffs Donald Roxberry (for the purposes of this count, "Plaintiff") brings this

21 claim on behalf of themselves and the Oklahoma State Class against all Defendants.

22      17.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

23 vehicles under Okla. Stat. Tit. 12A §§ 2-104(1) and 2-1103(3), and "sellers" of motor vehicles

24 under § 2A-103(1)(t).

25      18.    With respect to leases, Defendants are and were at all relevant times "lessors" of

26 motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(p).

27      19.    The Class Vehicles are and were at all relevant times "goods" within the meaning

28 of Okla. Stat. Tit. 12A §§ 2-105(1) and 2A-103(1)(h).

1    20.    In connection with the purchase or lease of Class Vehicles, Defendants provided
2    Plaintiff and Oklahoma State Class members with written express warranties covering the repair
3    or replacement of components that are defective in materials or workmanship.
4    21.    Defendants' warranties formed the basis of the bargain that was reached when
5    Plaintiff and Oklahoma State Class members unknowingly purchased or leased Class Vehicles
6    that came equipped with the SDM Calibration Defect.
7    22.    However, Defendants knew or should have known that the warranties were false
8    and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the
9    Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they
10   were sold and leased to Plaintiff and Oklahoma State Class members.
11   23.    Plaintiffs and Oklahoma State Class members reasonably relied on the
12   Defendants' express warranties when purchasing or leasing their Class Vehicles.
13   24.    Defendants knowingly breached their express warranties to repair defects in
14   materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.
15   Defendants also breached their express warranties by providing a product containing defects that
16   were never disclosed to Plaintiff and Oklahoma State Class members.
17   25.    Plaintiff and Oklahoma State Class members have provided the Defendants with
18   reasonable notice and opportunity to cure the breaches of their express warranties by way of letter
19   sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public
20   NHTSA complaints and individual lawsuits, as detailed herein.
21   26.    Alternatively, any opportunity to cure the breach is unnecessary and futile.
22   27.    As a direct and proximate result of the Defendants' breach of express warranties,
23   Plaintiffs and Oklahoma State Class members have been damaged in an amount to be proven at
24   trial.
25
26
27
28

**OKLAHOMA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Okla. Stat. Tit. 12A §§ 2-314 and 2A-212**
**(On Behalf of the Oklahoma State Class)**

28.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

29.     Plaintiff Donald Roxberry (for the purposes of this count, "Plaintiffs") brings this claim on behalf of themselves and the Oklahoma State Class against all Defendants.

30.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Okla. Stat. Tit. 12A §§ 2-104(1) and 2-1103(3), and "sellers" of motor vehicles under § 2A-103(1)(t).

31.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(p).

32.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. Tit. 12A §§ 2-105(1) and 2A-103(1)(h).

33.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Okla. Stat. Tit. 12A §§ 2-314 and 2A-212.

34.     The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

35.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual lawsuits, as detailed herein.

36.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

1      37.    As a direct and proximate result of Defendants' breach of the implied warranty of

2    merchantability, Plaintiff and Oklahoma State Class members have been damaged in an amount

3    to be proven at trial.

4              25.    Oregon

5                        OREGON COUNT I:
6          Violations of the Oregon Unlawful Trade Practices Act
7              Or. Rev. Stat. § 646.605, *et seq.*
7              (On Behalf of the Oregon State Class)

8      1.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

9      2.    Plaintiff Stephen Miles (for the purposes of this count, "Plaintiff") brings this

10   claim on behalf of himself and the Oregon State Class against all Defendants.

11     3.    Plaintiff, Defendants, and the Oregon State Class are "persons" within the meaning

12   of Or. Rev. Stat. § 646.605(4).

13     4.    Defendants are engaged in "trade" or "commerce" within the meaning of Or. Rev.

14   Stat. § 646.605(8).

15     5.    The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits "unfair or

16   deceptive acts conduct in trade or commerce . . . ." Or. Rev. Stat. § 646.608(1).

17     6.    In the course of their business, Defendants violated the Oregon UTPA by

18   knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose

19   material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed

20   above.

21     7.    Specifically, by misrepresenting the Class Vehicles as safe and/or free from

22   defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

23   Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of

24   competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

25   conduct of any trade or commerce, as prohibited by Or. Rev. Stat. § 646.608(1).

26     8.    Defendants' unfair or deceptive acts or practices, including misrepresentations,

27   concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

28   mislead and create a false impression in consumers, and were likely to and did in fact deceive

1    reasonable consumers, including Plaintiff and Oregon State Class members, about the true safety

2    and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class

3    Vehicles.

4              9.      Defendants' scheme and concealment of the SDM Calibration Defect and true

5    characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiff and

6    Oregon State Class members, as the Defendants intended. Had they known the truth, Plaintiff and

7    Oregon State Class members would not have purchased or leased the Class Vehicles, or would

8    have paid significantly less for them.

9              10.     Plaintiff and Oregon State Class members had no way of discerning that

10   Defendants' representations were false and misleading and/or otherwise learning the facts that

11   Defendants had concealed or failed to disclose. Plaintiff and Oregon State Class members did not,

12   and could not, unravel Defendants' deception on their own.

13             11.     Defendants had an ongoing duty to Plaintiff and Oregon State Class members to

14   refrain from unfair or deceptive practices under the Oregon UTPA in the course of their business.

15   Specifically, Defendants owed Plaintiff and Oregon State Class members a duty to disclose all the

16   material facts concerning the SDM Calibration Defect in the Class Vehicles because they

17   possessed exclusive knowledge, they intentionally concealed the defect from Plaintiff and Oregon

18   State Class members, and/or they made misrepresentations that were misleading because they

19   were contradicted by withheld facts.

20             12.     Defendants' violations present a continuing risk to Plaintiff and Oregon State

21   Class members, as well as to the general public. Defendants' unlawful acts and practices

22   complained of herein affect the public interest.

23             13.     Plaintiff and Oregon State Class members suffered ascertainable loss and actual

24   damages as a direct and proximate result of Defendants' misrepresentations and concealment of

25   and failure to disclose material information. Defendants had an ongoing duty to all their

26   customers to refrain from unfair and deceptive practices under the Oregon UTPA. All owners and

27   lessees of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and

28   unfair acts and practices made in the course of Defendants' business.

1    14.    Pursuant to Or. Rev. Stat. § 646.638, the Oregon State Class seeks an order

2    enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and

3    attorneys' fees, costs, and any other just and proper relief available under the Oregon UTPA.

4                              **OREGON COUNT II:**

5                         **Breach of Express Warranty**
                         **Or. Rev. Stat. §§ 72.3130 and 72A.2100**

6                         **(On Behalf of the Oregon State Class)**

7    15.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

8    fully set forth herein.

9    16.    Plaintiff Stephen Miles (for the purposes of this count, "Plaintiff") brings this

10   claim on behalf of himself and the Oregon State Class against all Defendants.

11   17.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

12   vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and "sellers" of motor vehicles

13   under § 72.1030(1)(d).

14   18.    With respect to leases, Defendants are and were at all relevant times "lessors" of

15   motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

16   19.    The Class Vehicles are and were at all relevant times "goods" within the meaning

17   of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

18   20.    In connection with the purchase or lease of Class Vehicles, Defendants provided

19   Plaintiff and Oregon State Class members with written express warranties covering the repair or

20   replacement of components that are defective in materials or workmanship.

21   21.    Defendants' warranties formed the basis of the bargain that was reached when

22   Plaintiff and Oregon State Class members unknowingly purchased or leased Class Vehicles that

23   came equipped with the SDM Calibration Defect.

24   22.    However, Defendants knew or should have known that the warranties were false

25   and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the

26   Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they

27   were sold and leased to Plaintiff and Oregon State Class members.

28

23.    Plaintiff and Oregon State Class members reasonably relied on the Defendants' express warranties when purchasing or leasing their Class Vehicles.

24.    Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles. Defendants also breached their express warranties by providing a product containing defects that were never disclosed to Plaintiff and Oregon State Class members.

25.    Plaintiff and Oregon State Class members have provided the Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of letter sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public NHTSA complaints and individual lawsuits, as detailed herein.

26.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

27.    As a direct and proximate result of the Defendants' breach of express warranties, Plaintiffs and Michigan State Class members have been damaged in an amount to be proven at trial.

**OREGON COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Or. Rev. Stat. §§ 72.3140 and 72A.2120**
**(On Behalf of the Oregon State Class)**

28.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

29.    Plaintiff Stephen Miles (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Oregon State Class against all Defendants.

30.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and "sellers" of motor vehicles under § 72.1030(1)(d).

31.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

32.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

33.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Or. Rev. Stat. §§ 72.3140 and 72A-2120.

34.     The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

35.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual lawsuits, as detailed herein.

36.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

37.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Oregon State Class members have been damaged in an amount to be proven at trial.

26.     **Pennsylvania**

**PENNSYLVANIA COUNT I:**
**Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law**
**73 P.S. § 201-1 *et seq.***
**(On Behalf of the Pennsylvania State Class)**

1.      Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

2.      Plaintiffs Bruce Heise, Michael Romania, Rex Hartman, and William Endress (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Pennsylvania State Class against all Defendants.

3.      Plaintiffs, Defendants, and the Pennsylvania State Class are "persons" within the meaning of 73 P.S. § 201-2(2).

1   4.   Defendants engaged in "trade" or "commerce" within the meaning of 73 P.S.

2   § 201-2(3).

3   5.   The Pennsylvania Unfair Trade Practices Act ("Pennsylvania UTPA") prohibits

4   "unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201-3.

5   6.   In the course of their business, Defendants violated the Pennsylvania UTPA by

6   knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose

7   material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed

8   above.

9   7.   Specifically, by misrepresenting the Class Vehicles as safe and/or free from

10   defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

11   Vehicles and/or the SDM Calibration Defect, Defendants engaged in one or more unfair or

12   deceptive business practices prohibited by the Pennsylvania UTPA:

13   a.   Representing that the Class Vehicles and/or the SDM Calibration system

14   have characteristics, uses, benefits, and qualities which they do not have.

15   b.   Representing that the Class Vehicles and/or the SDM Calibration system

16   are of a particular standard, quality, and grade when they are not.

17   c.   Advertising the Class Vehicles and/or the SDM Calibration system with

18   the intent not to sell or lease them as advertised.

19   d.   Engaging in any other fraudulent or deceptive conduct which creates a

20   likelihood of confusion or of misunderstanding.

21   8.   Defendants' unfair or deceptive acts or practices, including misrepresentations,

22   concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

23   mislead and create a false impression in consumers, and were likely to and did in fact deceive

24   reasonable consumers, including the Plaintiffs and Pennsylvania State Class members, about the

25   true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value

26   of the Class Vehicles.

27   9.   Defendants' scheme and concealment of the SDM Calibration Defect in the Class

28   Vehicles were material to the Plaintiffs and Pennsylvania State Class members, as Defendants

1  intended. Had they known the truth, Plaintiffs and Pennsylvania State Class members would not

2  have purchased or leased the Class Vehicles, or would have paid significantly less for them.

3          10.     Plaintiffs and Pennsylvania State Class members had no way of discerning that the

4  Defendants' representations were false and misleading and/or otherwise learning the facts that the

5  Defendants had concealed or failed to disclose. Plaintiffs and Pennsylvania State Class members

6  did not, and could not, unravel the Defendants' deception on their own.

7          11.     Defendants had an ongoing duty to Plaintiffs and Pennsylvania State Class

8  members to refrain from unfair or deceptive practices under the Pennsylvania UTPA in the course

9  of their business. Specifically, Defendants owed Plaintiffs and Pennsylvania State Class members

10  a duty to disclose all the material facts concerning the SDM Calibration Defect in the Class

11  Vehicles because they possessed exclusive knowledge, they intentionally concealed the defect

12  from Plaintiffs and Pennsylvania State Class members, and/or they made misrepresentations that

13  were misleading because they were contradicted by withheld facts

14          12.     Defendants' violations present a continuing risk to the Pennsylvania State Class as

15  well as to the general public. Defendants' unlawful acts and practices complained of herein affect

16  the public interest.

17          13.     Plaintiffs and Pennsylvania State Class members suffered ascertainable loss and

18  actual damages as a direct and proximate result of Defendants' misrepresentations and

19  concealment of and failure to disclose material information. Defendants had an ongoing duty to

20  all their customers to refrain from unfair and deceptive practices under the Pennsylvania UTPA.

21  All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and

22  unfair acts and practices made in the course of Defendants' business.

23          14.     As a direct and proximate result of Defendants' violations of the Pennsylvania

24  UTPA, Pennsylvania State Class members have suffered injury in fact and/or actual damage.

25          15.     Pursuant to 73 P.S. § 201-9.2(a), Plaintiffs and the Pennsylvania State Class seek

26  an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive

27  damages, and attorneys' fees, costs, and any other just and proper relief available under the

28  Pennsylvania UTPA.

1
2
3

**PENNSYLVANIA COUNT II:**
**Breach of Express Warranty**
**13. Pa. Cons. Stat. §§ 2313 and 2A210**
**(On Behalf of the Pennsylvania State Class)**

4       16.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though

5    fully set forth herein.

6       17.     Plaintiffs Bruce Heise, Michael Romania, Rex Hartman, and William Endress (for

7    the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the

8    Pennsylvania State Class against all Defendants.

9       18.     Defendants are and were at all relevant times "merchant[s]" with respect to motor

10   vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "sellers" of motor vehicles under

11   § 2103(a).

12      19.     With respect to leases, Defendants are and were at all relevant times "lessors" of

13   motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

14      20.     The Class Vehicles are and were at all relevant times "goods" within the meaning

15   of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

16      21.     In connection with the purchase or lease of Class Vehicles, the Defendants

17   provided Plaintiffs and Pennsylvania State Class members with written express warranties

18   covering the repair or replacement of components that are defective in materials or workmanship.

19      22.     Defendants' warranties formed the basis of the bargain that was reached when

20   Plaintiffs and Pennsylvania State Class members unknowingly purchased or leased Class

21   Vehicles that came equipped with the SDM Calibration Defect.

22      23.     However, Defendants knew or should have known that the warranties were false

23   and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the

24   Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they

25   were sold and leased to Plaintiffs and Pennsylvania State Class members.

26      24.     Plaintiffs and Pennsylvania State Class members reasonably relied on the

27   Defendants' express warranties when purchasing or leasing their Class Vehicles.

28

1    25.    Defendants knowingly breached their express warranties to repair defects in

2    materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

3    Defendants also breached their express warranties by providing a product containing defects that

4    were never disclosed to Plaintiffs and Pennsylvania State Class members.

5    26.    Plaintiffs and Pennsylvania State Class members have provided the Defendants

6    with reasonable notice and opportunity to cure the breaches of their express warranties by way of

7    letter sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous

8    public NHTSA complaints and individual lawsuits, as detailed herein.

9    27.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

10    28.    As a direct and proximate result of Defendants' breach of express warranties,

11    Plaintiffs and Pennsylvania State Class members have been damaged in an amount to be

12    determined at trial.

13    **PENNSYLVANIA COUNT III:**
14    **Breach of Implied Warranty of Merchantability**
      **13. Pa. Cons. Stat. §§ 2314 and 2A212**
15    **(On Behalf of the Pennsylvania State Class)**

16    29.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

17    forth herein.

18    30.    Plaintiffs Bruce Heise, Michael Romania, Rex Hartman, and William Endress (for

19    the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the

20    Pennsylvania State Class against all Defendants.

21    31.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

22    vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "sellers" of motor vehicles under

23    § 2103(a).

24    32.    With respect to leases, Defendants are and were at all relevant times "lessors" of

25    motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

26    33.    The Class Vehicles are and were at all relevant times "goods" within the meaning

27    of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

28

1     34.    A warranty that the Class Vehicles were in merchantable condition and fit for the

2     ordinary purpose for which vehicles are used is implied by law pursuant to 13 Pa. Cons. Stat.

3     §§ 2314 and 2A212.

4     35.    The Class Vehicles did not comply with the implied warranty of merchantability

5     because, at the time of sale and at all times thereafter, they were defective and not in

6     merchantable condition, would not pass without objection in the trade, and were not fit for the

7     ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the

8     SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an

9     accident, rendering the Class Vehicles inherently defective and dangerous.

10    36.    Defendants were provided reasonable notice of these issues by way of a letter sent

11    by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual

12    lawsuits, as detailed herein.

13    37.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

14    38.    As a direct and proximate result of Defendants' breach of the implied warranty of

15    merchantability, Plaintiffs and Pennsylvania State Class members have been damaged in an

16    amount to be proven at trial.

17    **27.    South Carolina**

18    **SOUTH CAROLINA COUNT I:**
      **Violations of the South Carolina Unfair Trade Practices Act**
19    **S.C. Code Ann. § 39-5-10 *et seq*.**
      **(On Behalf of the South Carolina State Class)**
20

21    1.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

22    forth herein.

23    2.    Plaintiffs Lisa Gerould and Andrew Lawson, (for the purposes of this count,

24    "Plaintiffs") bring this claim on behalf of themselves and the South Carolina State Class against

25    all Defendants.

26    3.    Defendants and the South Carolina State Class are "persons" within the meaning

27    of S.C. Code § 39-5-10(a).

28

1      4.      Defendants are engaged in "trade" or "commerce" within the meaning of S.C.

2  Code § 39-5-10(b).

3      5.      The South Carolina Unfair Trade Practices Act ("South Carolina UTPA")

4  prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C.

5  Code § 39-5-20(a).

6      6.      In the course of their business, Defendants violated the South Carolina UTPA by

7  knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose

8  material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed

9  above.

10     7.      Specifically, by misrepresenting the Class Vehicles as safe and/or free from

11 defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

12 Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of

13 competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

14 conduct of any trade or commerce, as prohibited by S.C. Code Ann. § 39-5-20(a).

15     8.      Defendants' unfair or deceptive acts or practices, including misrepresentations,

16 concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

17 mislead and create a false impression in consumers, and were likely to and did in fact deceive

18 reasonable consumers, including Plaintiffs and South Carolina State Class members, about the

19 true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value

20 of the Class Vehicles.

21     9.      Defendants' scheme and concealment of the SDM Calibration Defect and true

22 characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiffs

23 and South Carolina State Class members, as the Defendants intended. Had they known the truth,

24 Plaintiffs and South Carolina State Class members would not have purchased or leased the Class

25 Vehicles, or would have paid significantly less for them.

26     10.     Plaintiffs and South Carolina State Class members had no way of discerning that

27 Defendants' representations were false and misleading and/or otherwise learning the facts that

28

1    Defendants had concealed or failed to disclose. Plaintiffs and South Carolina State Class

2    members did not, and could not, unravel Defendants' deception on their own.

3         11.    Defendants had an ongoing duty to Plaintiffs and South Carolina State Class

4    members to refrain from unfair or deceptive practices under the South Carolina UTPA in the

5    course of their business. Specifically, Defendants owed Plaintiffs and South Carolina State Class

6    members a duty to disclose all the material facts concerning the SDM Calibration Defect in the

7    Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the

8    defect from Plaintiffs and South Carolina State Class members, and/or they made

9    misrepresentations that were misleading because they were contradicted by withheld facts.

10        12.    Defendants' violations present a continuing risk to Plaintiffs and South Carolina

11   State Class members, as well as to the general public. Defendants' unlawful acts and practices

12   complained of herein affect the public interest.

13        13.    Plaintiffs and the South Carolina State Class suffered ascertainable loss and actual

14   damages as a direct and proximate result of Defendants' misrepresentations and concealment of

15   and failure to disclose material information.

16        14.    Pursuant to S.C. Code § 39-5-140(a), Plaintiffs and the South Carolina State Class

17   seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, treble

18   damages for willful and knowing violations, punitive damages, and attorneys' fees, costs, and any

19   other just and proper relief available under the South Carolina UTPA.

20                        **SOUTH CAROLINA COUNT II:**
                 **Violations of the South Carolina Regulation of Manufacturers,**
21                         **Distributors, & Dealers Act**
                        **S.C. Code Ann. § 56-15-10 *et seq*.**
22                    **(On Behalf of the South Carolina State Class)**

23

24        15.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

25   forth herein.

26        16.    Plaintiffs Lisa Gerould and Andrew Lawson, (for the purposes of this count,

27   "Plaintiffs") bring this claim on behalf of themselves and the South Carolina State Class against

28   all Defendants.

1      17.     Defendants are "manufacturer[s]" as set forth in S.C. Code Ann. § 56-15-10, as it

2   is engaged in the business of manufacturing or assembling new and unused motor vehicles.

3      18.     Defendants committed unfair or deceptive acts or practices that violated the South

4   Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act"), S.C. Code

5   Ann. § 56-15-30.

6      19.     Defendants engaged in actions which were arbitrary, in bad faith, unconscionable,

7   and which caused damage to the South Carolina State Class and to the public.

8      20.     Defendants' bad faith and unconscionable actions include, but are not limited to:

9   (1) representing that Class Vehicles have characteristics, uses, benefits, and qualities which they

10  do not have, (2) representing that Class Vehicles are of a particular standard, quality, and grade

11  when they are not, (3) advertising Class Vehicles with the intent not to sell them as advertised, (4)

12  representing that a transaction involving Class Vehicles confers or involves rights, remedies, and

13  obligations which it does not, and (5) representing that the subject of a transaction involving

14  Class Vehicles has been supplied in accordance with a previous representation when it has not.

15     21.     Defendants resorted to and used false and misleading advertisements in connection

16  with their business. As alleged above, Defendants made numerous material statements about the

17  safety and reliability of the Class Vehicles that were either false or misleading. Each of these

18  statements contributed to the deceptive context of Defendants' unlawful advertising and

19  representations as a whole.

20     22.     Pursuant to S.C. Code Ann. § 56-15-110(2), Plaintiffs bring this action on behalf

21  of themselves and the South Carolina State Class, as the action is one of common or general

22  interest to many persons and the parties are too numerous to bring them all before the court.

23     23.     The South Carolina State Class is entitled to double their actual damages, the cost

24  of the suit, attorney's fees pursuant to S.C. Code Ann. § 56-15-110. Plaintiffs also seek injunctive

25  relief under S.C. Code Ann. § 56-15-110.

26

27

28

**SOUTH CAROLINA COUNT III:**
**Breach of Express Warranty**
**S.C. Code §§ 36-2-313 and 36-2A-210**
**(On Behalf of the South Carolina State Class)**

24.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

25.     Plaintiffs Lisa Gerould and Andrew Lawson, (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the South Carolina State Class against all Defendants.

26.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under S.C. Code §§ 36-2-104(1) and 36-2A-103(1)(t), and "sellers" of motor vehicles under § 36-2-103(1)(d).

27.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under S.C. Code § 36-2A-103(1)(p).

28.     All South Carolina State Class members who purchased Class Vehicles in South Carolina are "buyers" within the meaning of S.C. Code Ann. § 36-2-103(1)(a).

29.     All South Carolina State Class members who leased Class Vehicles in South Carolina are "lessees" within the meaning of S.C. Code Ann. § 36-2A-103(1)(n).

30.     The Class Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code §§ 36-2-105(1) and 36-2A-103(1)(h).

31.     In connection with the purchase or lease of Class Vehicles, the Defendants provided Plaintiffs and South Carolina State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

32.     Defendants' warranties formed the basis of the bargain that was reached when Plaintiffs and South Carolina State Class members unknowingly purchased or leased Class Vehicles that came equipped with the SDM Calibration Defect.

33.     However, Defendants knew or should have known that the warranties were false and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the

1   Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they

2   were sold and leased to Plaintiffs and South Carolina State Class members.

3         34.    Plaintiffs and South Carolina State Class members reasonably relied on the

4   Defendants' express warranties when purchasing or leasing their Class Vehicles.

5         35.    Defendants knowingly breached their express warranties to repair defects in

6   materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

7   Defendants also breached their express warranties by providing a product containing defects that

8   were never disclosed to Plaintiffs and South Carolina State Class members.

9         36.    Plaintiffs and South Carolina State Class members have provided the Defendants

10   with reasonable notice and opportunity to cure the breaches of their express warranties by way of

11   letter sent by Plaintiffs on August 20, 2021 and numerous public NHTSA complaints.

12         37.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

13         38.    As a direct and proximate result of Defendants' breach of express warranties,

14   South Carolina State Class members have been damaged in an amount to be determined at trial.

15
16                     **SOUTH CAROLINA COUNT IV:**
               **Breach of Implied Warranty of Merchantability**
17                   **S.C. Code §§ 36-2-314 and 36-2A-212**
               **(On Behalf of the South Carolina State Class)**

18         39.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

19   forth herein.

20         40.    Plaintiffs Lisa Gerould and Andrew Lawson, (for the purposes of this count,

21   "Plaintiffs") bring this claim on behalf of themselves and the South Carolina State Class against

22   all Defendants.

23         41.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

24   vehicles under S.C. Code §§ 36-2-104(1) and 36-2A-103(1)(t), and "sellers" of motor vehicles

25   under § 36-2-103(1)(d).

26         42.    With respect to leases, Defendants are and were at all relevant times "lessors" of

27   motor vehicles under S.C. Code § 36-2A-103(1)(p).

28

43.     Plaintiffs and South Carolina State Class members who purchased Class Vehicles in South Carolina are "buyers" within the meaning of S.C. Code Ann. § 36-2-103(1)(a).

44.     Plaintiffs and South Carolina State Class members who leased Class Vehicles in South Carolina are "lessees" within the meaning of S.C. Code Ann. § 36-2A-103(1)(n).

45.     The Class Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code §§ 36-2-105(1) and 36-2A-103(1)(h).

46.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to S.C. Code §§ 36-2-314 and 36-2A-212.

47.     The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

48.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual lawsuits, as detailed herein.

49.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

50.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, South Carolina State Class members have been damaged in an amount to be proven at trial.

**28.     Tennessee**

**TENNESSEE COUNT I:**
**Violations of the Tennessee Consumer Protection Act**
**Tenn. Code Ann. § 47-18-101** *et seq.*
**(On Behalf of the Tennessee State Class)**

1.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

1   2.   Plaintiffs Gary Owens and Stephen Loyd (for the purposes of this count,

2   "Plaintiffs") bring this claim on behalf of themselves and the Tennessee State Class against all

3   Defendants.

4   3.   Tennessee State Class members are "natural persons" and "consumers" within the

5   meaning of Tenn. Code § 47-18-103(2). Defendants are "person[s]" within the meaning of Tenn.

6   Code § 47-18-103(9).

7   4.   Defendants are engaged in "trade" or "commerce" or "consumer transactions"

8   within the meaning Tenn. Code § 47-18-103(9).

9   5.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "unfair or

10   deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code § 47-18-

11   104.

12   6.   In the course of their business, Defendants violated the Tennessee CPA by

13   knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose

14   material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed

15   above.

16   7.   Specifically, by misrepresenting the Class Vehicles as safe and/or free from

17   defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

18   Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of

19   competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

20   conduct of any trade or commerce, as prohibited by Tenn. Code § 47-18-104.

21   8.   Defendants' unfair or deceptive acts or practices, including misrepresentations,

22   concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

23   mislead and create a false impression in consumers, and were likely to and did in fact deceive

24   reasonable consumers, including Plaintiffs and Tennessee State Class members, about the true

25   safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the

26   Class Vehicles.

27   9.   Defendants' scheme and concealment of the SDM Calibration Defect and true

28   characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiffs

1    and Tennessee State Class members, as the Defendants intended. Had they known the truth,

2    Plaintiffs and Tennessee State Class members would not have purchased or leased the Class

3    Vehicles, or would have paid significantly less for them.

4         10.    Plaintiffs and Tennessee State Class members had no way of discerning that

5    Defendants' representations were false and misleading and/or otherwise learning the facts that

6    Defendants had concealed or failed to disclose. Plaintiffs and Tennessee State Class members did

7    not, and could not, unravel Defendants' deception on their own.

8         11.    Defendants had an ongoing duty to Plaintiffs and Tennessee State Class members

9    to refrain from unfair or deceptive practices under the Tennessee CPA in the course of their

10   business. Specifically, Defendants owed Plaintiffs and Tennessee State Class members a duty to

11   disclose all the material facts concerning the SDM Calibration Defect in the Class Vehicles

12   because they possessed exclusive knowledge, they intentionally concealed the defect from

13   Plaintiffs and Tennessee State Class members, and/or they made misrepresentations that were

14   misleading because they were contradicted by withheld facts.

15        12.    Defendants' violations present a continuing risk to Plaintiffs and the Tennessee

16   State Class as well as to the general public. Defendants' unlawful acts and practices complained

17   of herein affect the public interest.

18        13.    Tennessee State Class members suffered ascertainable loss and actual damages as

19   a direct and proximate result of Defendants' misrepresentations and concealment of and failure to

20   disclose material information. Defendants had an ongoing duty to all their customers to refrain

21   from unfair and deceptive practices under the Tennessee CPA. All owners of Class Vehicles

22   suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made

23   in the course of Defendants' business.

24        14.    Pursuant to Tenn. Code § 47-18-109, Plaintiffs and the Tennessee State Class

25   seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, treble

26   damages for willful and knowing violations, pursuant to § 47-18-109(a)(3), punitive damages,

27   and attorneys' fees, costs, and any other just and proper relief to the extent available under the

28   Tennessee CPA.

**TENNESSEE COUNT II:**
**Breach of Express Warranty**
**Tenn. Code Ann. §§ 47-2-313 and 47-2A-210**
**(On Behalf of the Tennessee State Class)**

15.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

16.    Plaintiffs Gary Owens and Stephen Loyd (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Tennessee State Class against all Defendants.

17.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of motor vehicles under § 47-2-103(1)(d).

18.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

19.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

20.    In connection with the purchase or lease of Class Vehicles, the Defendants provided Plaintiffs and Tennessee State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

21.    Defendants' warranties formed the basis of the bargain that was reached when Plaintiffs and Tennessee State Class members unknowingly purchased or leased Class Vehicles that came equipped with the SDM Calibration Defect.

22.    However, Defendants knew or should have known that the warranties were false and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to Plaintiffs and Tennessee State Class members.

23.    Plaintiffs and Tennessee State Class members reasonably relied on the Defendants' express warranties when purchasing or leasing their Class Vehicles.

1   24.   Defendants knowingly breached their express warranties to repair defects in

2   materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

3   Defendants also breached their express warranties by providing a product containing defects that

4   were never disclosed to Plaintiffs and Tennessee State Class members.

5   25.   Plaintiffs and Tennessee State Class members have provided the Defendants with

6   reasonable notice and opportunity to cure the breaches of their express warranties by way of letter

7   sent by Plaintiffs on August 20, 2021 and numerous public NHTSA complaints.

8   26.   Alternatively, any opportunity to cure the breach is unnecessary and futile.

9   27.   As a direct and proximate result of the Defendants' breach of express warranties,

10   Plaintiffs and Tennessee State Class members have been damaged in an amount to be proven at

11   trial.

12   **TENNESSEE COUNT III:**

13   **Breach of Implied Warranty of Merchantability**
     **Tenn. Code Ann. §§ 47-2-314 and 47-2A-212**

14   **(On Behalf of the Tennessee State Class)**

15   28.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

16   forth herein.

17   29.   Plaintiffs Gary Owens and Stephen Loyd (for the purposes of this count,

18   "Plaintiffs") bring this claim on behalf of themselves and the Tennessee State Class against all

19   Defendants.

20   30.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

21   vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of motor vehicles

22   under § 47-2-103(1)(d).

23   31.   With respect to leases, Defendants are and were at all relevant times "lessors" of

24   motor vehicles under Tenn. Code § 47-2A-103(1)(p).

25   32.   The Class Vehicles are and were at all relevant times "goods" within the meaning

26   of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

27

28

1    33.    A warranty that the Class Vehicles were in merchantable condition and fit for the

2    ordinary purpose for which vehicles are used is implied by law pursuant to Tenn. Code §§ 47-2-

3    314 and 47-2A-212.

4    34.    The Class Vehicles did not comply with the implied warranty of merchantability

5    because, at the time of sale and at all times thereafter, they were defective and not in

6    merchantable condition, would not pass without objection in the trade, and were not fit for the

7    ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the

8    SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an

9    accident, rendering the Class Vehicles inherently defective and dangerous.

10    35.    Defendants were provided reasonable notice of these issues by way of a letter sent

11    by Plaintiffs on August 20, 2021 and numerous public NHTSA complaints.

12    36.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

13    37.    As a direct and proximate result of Defendants' breach of the implied warranty of

14    merchantability, Plaintiffs and Tennessee State Class members have been damaged in an amount

15    to be proven at trial.

16                              29.    Texas

17                        TEXAS COUNT I:
                Violations of the Deceptive Trade Practices Act
18                  Tex. Bus. & Com. Code § 17.41, *et seq.*
                     (On Behalf of the Texas State Class)
19

20    1.    Plaintiffs reallege and incorporate by reference all preceding allegations as though

21    fully set forth herein.

22    2.    Plaintiffs Ira Bondsteel, Ric Batten, Larry Paetzold (for the purposes of this count,

23    "Plaintiffs") bring this claim on behalf of themselves and the Texas State Class against all

24    Defendants.

25    3.    Plaintiffs and the Texas State Class are "consumers" pursuant to Tex. Bus. &

26    Com. Code § 17.45(4); Tex. Bus. & Com. Code § 17.41.

27    4.    Defendants are "person[s]" within the meaning of Tex. Bus. & Com. Code

28    § 17.45(3).

1        5.      Defendants engaged in "trade" or "commerce" or "consumer transactions" within

2   the meaning Tex. Bus. & Com. Code § 17.46(a).

3        6.      The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA")

4   prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or

5   commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of

6   action," which means "an act or practice which, to a consumer's detriment, takes advantage of the

7   lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."

8   Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

9        7.      In the course of their business, Defendants concealed and suppressed material facts

10  concerning the Class Vehicles, as detailed above.  Specifically, Defendants misrepresented the

11  Class Vehicles as safe and/or free from defects and failed to disclose and actively concealed the

12  dangers and risk posed by the Class Vehicles and/or the SDM Calibration Defect, including

13  serious injury or death. These acts and practices were unconscionable, and to the Texas Plaintiffs'

14  and Texas State Class members' detriment, took advantage of their lack of knowledge, ability,

15  experience, or capacity to a grossly unfair degree.

16       8.      Defendants thus violated the Act by, at minimum:

17              a.      representing that Class Vehicles have characteristics, uses, benefits, and

18  qualities which they do not have;

19              b.      representing that Class Vehicles are of a particular standard, quality, and

20  grade when they are not;

21              c.      advertising Class Vehicles with the intent not to sell or lease them as

22  advertised.

23  Tex. Bus. & Com. Code Ann. §§ 17.46(5), (7), and (9).

24       9.      Defendants intentionally and knowingly misrepresented material facts regarding

25  the Class Vehicles with intent to mislead Plaintiffs and the Texas State Class.

26       10.     Defendants knew or should have known that their conduct violated the Texas

27  DTPA.

28

1       11.     Plaintiffs and Texas State Class members had no way of discerning that the

2   Defendants' representations were false and misleading and/or otherwise learning the facts that the

3   Defendants had concealed or failed to disclose. Plaintiffs and Texas State Class members did not,

4   and could not, unravel the Defendants' deception on their own.

5       12.     Defendants owed Plaintiffs and the Texas State Class a duty to disclose the safety

6   risks associated with the SDM Calibration Defect, the true nature of the Class Vehicles, because

7   Defendants possessed exclusive knowledge that they were manufacturing, selling, and

8   distributing vehicles throughout the United States that did not perform as advertised; intentionally

9   concealed the foregoing from regulators and Texas State Class members; and/or made incomplete

10  representations about the Class Vehicles' airbag and safety features while purposefully

11  withholding material facts that contradicted these representations.

12      13.     Defendants' concealment of the true characteristics of the Class Vehicles' safety

13  systems was material to Plaintiffs and the Texas State Class.

14      14.     Defendants' unfair or deceptive acts or practices were likely to and did in fact

15  deceive regulators and reasonable consumers, including Plaintiffs and the Texas State Class,

16  about the true safety features of the Class Vehicles, the quality of the Defendants' brands, and the

17  true value of the Class Vehicles.

18      15.     Defendants' violations present a continuing risk to Plaintiffs and the Texas State

19  Class as well as to the general public. Defendants' unlawful acts and practices complained of

20  herein affect the public interest.

21      16.     Plaintiffs and Texas State Class members suffered ascertainable loss and actual

22  damages as a direct and proximate result of Defendants' misrepresentations and concealment of

23  and failure to disclose material information.

24      17.     Pursuant to Tex. Bus. & Com. Code § 17.50, the Texas State Class seeks an order

25  enjoining Defendants' unfair and/or deceptive acts or practices, damages, multiple damages for

26  knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys'

27  fees, costs, and any other just and proper relief available under the Texas DTPA.

28

1     18.     Pursuant to Tex. Bus. & Com. Code Ann. § 17.505, Plaintiffs sent notice letters to

2  Defendants informing them of the issues raised in this count and this Complaint on August 20,

3  2021, as well as numerous public NHTSA complaints and individual lawsuits, as detailed

4  herein.The Texas State Class seeks all damages and relief to which it is entitled.

5                          **TEXAS COUNT II:**

6                          **Breach of Express Warranty**
                           **Tex. Bus. & Com. Code §§ 2.313 and 2A.210**

7                          **(On Behalf of the Texas State Class)**

8     19.     Plaintiffs reallege and incorporate by reference all preceding allegations as though

9  fully set forth herein.

10    20.     Plaintiffs Ira Bondsteel, Ric Batten, Larry Paetzold (for the purposes of this count,

11  "Plaintiffs") bring this claim on behalf of themselves and the Texas State Class against all

12  Defendants.

13    21.     Defendants are and were at all relevant times "merchant[s]" with respect to motor

14  vehicles under Tex. Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and "sellers" of motor

15  vehicles under § 2.103(a)(4)

16    22.     With respect to leases, Defendants are and were at all relevant times "lessors" of

17  motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

18    23.     All Texas State Class members who purchased Class Vehicles are "buyers" within

19  the meaning of Tex. Bus. & Com. Code Ann. § 2.103(a)(1).

20    24.     All Texas State Class members who leased Class Vehicles "lessees" within the

21  meaning of Tex. Bus. & Com. Code Ann. § 2A.103(a)(14).

22    25.     The Class Vehicles are and were at all relevant times "goods" within the meaning

23  of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

24    26.     In connection with the purchase or lease of Class Vehicles, the Defendants

25  provided Plaintiffs and Texas State Class members with written express warranties covering the

26  repair or replacement of components that are defective in materials or workmanship.

27

28

1    27.    Defendants' warranties formed the basis of the bargain that was reached when

2    Plaintiffs and Texas State Class members unknowingly purchased or leased Class Vehicles that

3    came equipped with the SDM Calibration Defect.

4    28.    However, Defendants knew or should have known that the warranties were false

5    and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the

6    Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they

7    were sold and leased to Plaintiffs and Texas State Class members.

8    29.    Plaintiffs and Texas State Class members reasonably relied on the Defendants'

9    express warranties when purchasing or leasing their Class Vehicles.

10    30.    Defendants knowingly breached their express warranties to repair defects in

11    materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

12    Defendants also breached their express warranties by providing a product containing defects that

13    were never disclosed to Plaintiffs and Texas State Class members.

14    31.    Plaintiffs and Texas State Class members have provided the Defendants with

15    reasonable notice and opportunity to cure the breaches of their express warranties by way of letter

16    sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public

17    NHTSA complaints and individual lawsuits, as detailed herein.

18    32.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

19    33.    As a direct and proximate result of Defendants' breach of express warranties,

20    Plaintiffs and Texas State Class members have been damaged in an amount to be proven at trial.

21    **TEXAS COUNT III:**
   **Breach of Implied Warranty of Merchantability**
22    **Tex. Bus. & Com. Code §§ 2.314 and 2A.212**
   **(On Behalf of the Texas State Class)**
23

24    34.    Plaintiffs reallege and incorporate by reference all preceding allegations as though

25    fully set forth herein.

26    35.    Plaintiffs Ira Bondsteel, Ric Batten, Larry Paetzold (for the purposes of this count,

27    "Plaintiffs") bring this claim on behalf of themselves and the Texas State Class against all

28    Defendants.

1      36.     Defendants are and were at all relevant times "merchant[s]" with respect to motor

2  vehicles under Tex. Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and "sellers" of motor

3  vehicles under § 2.103(a)(4)

4      37.     With respect to leases, Defendants are and were at all relevant times "lessors" of

5  motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

6      38.     All Texas State Class members who purchased Class Vehicles are "buyers" within

7  the meaning of Tex. Bus. & Com. Code Ann. § 2.103(a)(1).

8      39.     All Texas State Class members who leased Class Vehicles "lessees" within the

9  meaning of Tex. Bus. & Com. Code Ann. § 2A.103(a)(14).

10     40.     The Class Vehicles are and were at all relevant times "goods" within the meaning

11  of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

12     41.     A warranty that the Class Vehicles were in merchantable condition and fit for the

13  ordinary purpose for which vehicles are used is implied by law pursuant to Tex. Bus. & Com.

14  Code §§ 2.314 and 2A.212.

15     42.     The Class Vehicles did not comply with the implied warranty of merchantability

16  because, at the time of sale and at all times thereafter, they were defective and not in

17  merchantable condition, would not pass without objection in the trade, and were not fit for the

18  ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the

19  SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an

20  accident, rendering the Class Vehicles inherently defective and dangerous.

21     43.     Defendants were provided reasonable notice of these issues by way of a letter sent

22  by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual

23  lawsuits, as detailed herein.

24     44.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

25     45.     As a direct and proximate result of Defendants' breach of the implied warranty of

26  merchantability, Plaintiffs and Texas State Class members have been damaged in an amount to be

27  proven at trial.

28

1          **30.     Utah**

2                    **UTAH COUNT I:**
3          **Violations of the Utah Consumer Sales Practices Act**
           **Utah Code Ann. §§ 13-11-1 *et seq.***
4          **(On Behalf of the Utah State Class)**

5          1.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

6   forth herein.

7          2.     Plaintiff Delana Petersen (for the purposes of this count, "Plaintiff") brings this

8   claim on behalf of herself and the Utah State Class against all Defendants.

9          3.     Plaintiff and Utah State Class members are "persons" under the Utah Consumer

10  Sales Practices Act ("Utah CSPA"), Utah Code § 13-11-3(5). The sales and leases of the Class

11  Vehicles to Plaintiff and Utah State Class members were "consumer transactions" within the

12  meaning of Utah Code § 13-11-3(2).

13         4.     Defendants are "supplier[s]" within the meaning of Utah Code § 13-11-3(6).

14         5.     The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in

15  connection with a consumer transaction." Specifically, "a supplier commits a deceptive act or

16  practice if the supplier knowingly or intentionally: (a) indicates that the subject of a consumer

17  transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits,

18  if it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard,

19  quality, grade, style, or model, if it is not." Utah Code § 13-11-4. "An unconscionable act or

20  practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.

21  Utah Code § 13-11-5.

22         6.     In the course of their business, Defendants violated the Utah CSPA by knowingly

23  and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts

24  regarding the reliability, safety, and performance of the Class Vehicles, as detailed above.

25         7.     Specifically, by misrepresenting the Class Vehicles as safe and/or free from

26  defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

27  Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of

28

competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce, as prohibited by the Utah CSPA.

8.      Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff and Utah State Class members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

9.      Defendants' scheme and concealment of the SDM Calibration Defect and true characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiff and Utah State Class members, as the Defendants intended. Had they known the truth, Plaintiff and Utah State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

10.      Plaintiff and Utah State Class members had no way of discerning that Defendants' representations were false and misleading and/or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiff and Utah State Class members did not, and could not, unravel Defendants' deception on their own.

11.      Defendants had an ongoing duty to Plaintiff and Utah State Class members to refrain from unfair or deceptive practices under the Utah CSPA in the course of their business. Specifically, Defendants owed Plaintiff and Utah State Class members a duty to disclose all the material facts concerning the SDM Calibration Defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the defect from Plaintiff and Utah State Class members, and/or they made misrepresentations that were misleading because they were contradicted by withheld facts.

12.      Defendants' violations present a continuing risk to Plaintiff and Utah State Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1    13.    Plaintiff and Utah State Class members suffered ascertainable loss and actual

2    damages as a direct and proximate result of Defendants' misrepresentations and concealment of

3    and failure to disclose material information. Defendants had an ongoing duty to all their

4    customers to refrain from unfair and deceptive practices under the Utah CSPA. All owners of

5    Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and

6    practices made in the course of Defendants' business.

7    14.    Pursuant to Utah Code Ann. § 13-11-4, Plaintiff and the Utah State Class seeks

8    monetary relief against Defendants measured as the greater of (a) actual damages in an amount to

9    be determined at trial and (b) statutory damages in the amount of $2,000 for each Utah State

10   Class member, reasonable attorneys' fees, and any other just and proper relief available under the

11   Utah CSPA.

12                                     **UTAH COUNT II:**
13                              **Breach of Express Warranty**
                          **Utah Code §§ 70A-2-313 and 70-2A-210**
14                           **(On Behalf of the Utah State Class)**

15   15.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

16   fully set forth herein.

17   16.    Plaintiff Delana Petersen (for the purposes of this count, "Plaintiff") brings this

18   claim on behalf of himself and the Utah State Class against all Defendants.

19   17.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

20   vehicles under Utah Code § 70A-2-104(1) and 70A-2a-103(1)(t), and "sellers" of motor vehicles

21   under § 70A-2-103(1)(d).

22   18.    With respect to leases, Defendants are and were at all relevant times "lessors" of

23   motor vehicles under Utah Code § 70A-2a-103(1)(p).

24   19.    The Class Vehicles are and were at all relevant times "goods" within the meaning

25   of Utah Code §§ 70A-2-105(1) and 70A-2a-103(1)(h).

26   20.    In connection with the purchase or lease of Class Vehicles, Defendants provided

27   Plaintiff and Utah State Class members with written express warranties covering the repair or

28   replacement of components that are defective in materials or workmanship.

1  21. Defendants' warranties formed the basis of the bargain that was reached when

2 Plaintiff and Utah State Class members unknowingly purchased or leased Class Vehicles that

3 came equipped with the SDM Calibration Defect.

4  22. However, Defendants knew or should have known that the warranties were false

5 and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the

6 Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they

7 were sold and leased to Plaintiff and Utah State Class members.

8  23. Plaintiff and Utah State Class members reasonably relied on the Defendants'

9 express warranties when purchasing or leasing their Class Vehicles.

10  24. Defendants knowingly breached their express warranties to repair defects in

11 materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

12 Defendants also breached their express warranties by providing a product containing defects that

13 were never disclosed to Plaintiff and Utah State Class members.

14  25. Plaintiff and Utah State Class members have provided the Defendants with

15 reasonable notice and opportunity to cure the breaches of their express warranties by way of letter

16 sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public

17 NHTSA complaints and individual lawsuits, as detailed herein.

18  26. Alternatively, any opportunity to cure the breach is unnecessary and futile.

19  27. As a direct and proximate result of the Defendants' breach of express warranties,

20 Plaintiff and Utah State Class members have been damaged in an amount to be proven at trial.

**UTAH COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Utah Code §§ 70A-2-314 and 70-2A-212**
**(On Behalf of the Utah State Class)**

21

22

23

24  28. Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

25 forth herein.

26  29. Plaintiff Delana Petersen (for the purposes of this count, "Plaintiff") brings this

27 claim on behalf of herself and the Utah State Class against all Defendants.

28

30.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Utah Code §§ 70A-2-104(1) and 70A-2a-103(1)(t), and "sellers" of motor vehicles under § 70A-2-103(1)(d).

31.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Utah Code § 70A-2a-103(1)(p).

32.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Utah Code §§ 70A-2-105(1) and 70A-2a-103(1)(h).

33.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Utah Code §§ 70A-2-314 and 70A-2a-212.

34.     The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

35.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on August 20, 2021 and numerous public NHTSA complaints.

36.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

37.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Utah State Class members have been damaged in an amount to be proven at trial.

**31.     Virginia**

**VIRGINIA COUNT I:**
**Violations of the Virginia Consumer Protection Act**
**Va. Code Ann. §§ 59.1-196 *et seq.***
**(On Behalf of the Virginia State Class)**

1.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1    2.     Plaintiffs Eric Leeds, Douglas Dye, Debra Knerr, and Ira Nash (for the purposes of

2  this count, "Plaintiffs") bring this claim on behalf of themselves and the Virginia State Class

3  against all Defendants.

4    3.     Defendants and the Virginia State Class are "persons" within the meaning of Va.

5  Code § 59.1-198.

6    4.     Defendants are "supplier[s]" within the meaning of Va. Code § 59.1-198.

7    5.     The Virginia Consumer Protection Act ("Virginia CPA") makes unlawful

8  "fraudulent acts or practices." Va. Code § 59.1-200(A).

9    6.     In the course of their business, Defendants violated the Virginia CPA by

10  knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose

11  material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed

12  above.

13    7.     Specifically, by misrepresenting the Class Vehicles as safe and/or free from

14  defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class

15  Vehicles and/or the SDM Calibration Defect, Defendants engaged in one or more unfair or

16  deceptive business practices prohibited by the Virginia CPA.

17    8.     Defendants' unfair or deceptive acts or practices, including misrepresentations,

18  concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

19  mislead and create a false impression in consumers, and were likely to and did in fact deceive

20  reasonable consumers, including the Plaintiffs and Virginia State Class members, about the true

21  safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the

22  Class Vehicles.

23    9.     Defendants' scheme and concealment of the SDM Calibration Defect in the Class

24  Vehicles were material to the Plaintiffs and Virginia State Class members, as Defendants

25  intended. Had they known the truth, Plaintiffs and Virginia State Class members would not have

26  purchased or leased the Class Vehicles, or would have paid significantly less for them.

27    10.    Plaintiffs and Virginia State Class members had no way of discerning that the

28  Defendants' representations were false and misleading and/or otherwise learning the facts that the

1    Defendants had concealed or failed to disclose. Plaintiffs and Virginia State Class members did

2    not, and could not, unravel the Defendants' deception on their own.

3        11.    Defendants had an ongoing duty to Plaintiffs and Virginia State Class members to

4    refrain from unfair or deceptive practices under the Virginia CPA in the course of their business.

5    Specifically, Defendants owed Plaintiffs and Virginia State Class members a duty to disclose all

6    the material facts concerning the SDM Calibration Defect in the Class Vehicles because they

7    possessed exclusive knowledge, they intentionally concealed the defect from Plaintiffs and

8    Virginia State Class members, and/or they made misrepresentations that were misleading because

9    they were contradicted by withheld facts.

10       12.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles

11   have characteristics, uses, benefits, and qualities which they do not have; representing that Class

12   Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

13   Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

14   a transaction involving Class Vehicles has been supplied in accordance with a previous

15   representation when it has not.

16       13.    Defendants intentionally and knowingly misrepresented material facts regarding

17   the Class Vehicles with intent to mislead the Virginia State Class.

18       14.    Defendants knew or should have known that their conduct violated the Virginia

19   CPA.

20       15.    Defendants' violations present a continuing risk to the Virginia State Class as well

21   as to the general public. Defendants' unlawful acts and practices complained of herein affect the

22   public interest.

23       16.    Virginia State Class members suffered ascertainable loss and actual damages as a

24   direct and proximate result of Defendants' misrepresentations and concealment of and failure to

25   disclose material information. Defendants had an ongoing duty to all their customers to refrain

26   from unfair and deceptive practices under the Virginia CPA. All owners of Class Vehicles

27   suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made

28   in the course of Defendants' business.

17. Pursuant to Va. Code § 59.1-204(A)–(B), the Virginia State Class is entitled to the greater of actual damages or $500 for each Virginia State Class member, attorneys' fees, and costs. Because Defendants' actions were willful, Virginia State Class members should each receive the greater of treble damages or $1,000. *Id.*

**VIRGINIA COUNT II:**
**Breach of Express Warranty**
**Va. Code §§ 8.2-313 and 8.2A-210**
**(On Behalf of the Virginia State Class)**

18. Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

19. Plaintiffs Eric Leeds, Douglas Dye, Debra Knerr, and Ira Nash (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Virginia State Class against all Defendants.

20. Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Va. Code §§ 8.2-104(1) and 8.2A-103(1)(t), and "sellers" of motor vehicles under § 8.2-103(1)(d).

21. With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Va. Code § 8.2A-103(1)(p).

22. The Class Vehicles are and were at all relevant times "goods" within the meaning of Va. Code §§ 8.2-105(1) and 8.2A-103(1)(h).

23. In connection with the purchase or lease of Class Vehicles, the Defendants provided Plaintiffs and Virginia State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

24. Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and Virginia State Class members unknowingly purchased or leased Class Vehicles that came equipped with the SDM Calibration Defect.

25. However, Defendants knew or should have known that the warranties were false and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the

- 274 -

1  Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they

2  were sold and leased to Plaintiffs and Virginia State Class members.

3      26.    Plaintiffs and Virginia State Class members reasonably relied on the Defendants'

4  express warranties when purchasing or leasing their Class Vehicles.

5      27.    Defendants knowingly breached their express warranties to repair defects in

6  materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

7  Defendants also breached their express warranties by providing a product containing defects that

8  were never disclosed to Plaintiffs and Virginia State Class members.

9      28.    Plaintiffs and Virginia State Class members have provided the Defendants with

10  reasonable notice and opportunity to cure the breaches of their express warranties by way of letter

11  sent by Plaintiffs on August 20, 2021 and numerous public NHTSA complaints.

12      29.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

13      30.    As a direct and proximate result of Defendants' breach of express warranties,

14  Plaintiffs and Virginia State Class members have been damaged in an amount to be determined at

15  trial.

16      **VIRGINIA COUNT III:**

17      **Breach of Implied Warranty of Merchantability**
        **Va. Code §§ 8.2-314 and 8.2A-212**

18      **(On Behalf of the Virginia State Class)**

19      31.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

20  forth herein.

21      32.    Plaintiffs Eric Leeds, Douglas Dye, Debra Knerr, and Ira Nash (for the purposes of

22  this count, "Plaintiffs") bring this claim on behalf of themselves and the Virginia State Class

23  against all Defendants.

24      33.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

25  vehicles under Va. Code §§ 8.2-104(1) and 8.2A-103(1)(t), and "sellers" of motor vehicles under

26  § 8.2-103(1)(d).

27      34.    With respect to leases, Defendants are and were at all relevant times "lessors" of

28  motor vehicles under Va. Code § 8.2A-103(1)(p).

35.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Va. Code §§ 8.2-105(1) and 8.2A-103(1)(h).

36.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Va. Code §§ 8.2-314 and 8.2A-212.

37.     The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

38.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on August 20, 2021, as well as numerous public NHTSA complaints and individual lawsuits, as detailed herein.

39.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

40.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and Virginia State Class members have been damaged in an amount to be proven at trial.

**32.     Washington**

**WASHINGTON STATE COUNT I:**
**Violations of the Washington Consumer Protection Act**
**Wash. Rev. Code Ann. § 19.86.010 *et seq.***
**(On Behalf of the Washington State Class)**

1.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2.     Plaintiffs Ashley Dheel and Kara Hummel (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Washington State Class against all Defendants.

3.      Defendants and the Washington State Class are "persons" within the meaning of Wash. Rev. Code § 19.86.010(2).

4.      Defendants engaged in "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.86.010(2).

5.      The Washington Consumer Protection Act ("Washington CPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

6.      In the course of their business, Defendants violated the Washington CPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed above.

7.      Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce, as prohibited by Wash. Rev. Code § 19.86.020.

8.      Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Washington State Class members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

9.      Defendants' scheme and concealment of the SDM Calibration Defect and true characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiffs and Washington State Class members, as the Defendants intended. Had they known the truth, Plaintiffs and Washington State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

1    10.    Plaintiffs and Washington State Class members had no way of discerning that

2    Defendants' representations were false and misleading and/or otherwise learning the facts that

3    Defendants had concealed or failed to disclose. Plaintiffs and Washington State Class members

4    did not, and could not, unravel Defendants' deception on their own.

5    11.    Defendants had an ongoing duty to Plaintiffs and Washington State Class members

6    to refrain from unfair or deceptive practices under the Washington CPA in the course of their

7    business. Specifically, Defendants owed Plaintiffs and Washington State Class members a duty to

8    disclose all the material facts concerning the SDM Calibration Defect in the Class Vehicles

9    because they possessed exclusive knowledge, they intentionally concealed the defect from

10   Plaintiffs and Washington State Class members, and/or they made misrepresentations that were

11   misleading because they were contradicted by withheld facts.

12   12.    Defendants' violations present a continuing risk to Plaintiffs and Washington State

13   Class members, as well as to the general public. Defendants' unlawful acts and practices

14   complained of herein affect the public interest.

15   13.    Washington State Class members suffered ascertainable loss and actual damages

16   as a direct and proximate result of Defendants' misrepresentations and concealment of and failure

17   to disclose material information. Defendants had an ongoing duty to all their customers to refrain

18   from unfair and deceptive practices under the Washington CPA. All owners of Class Vehicles

19   suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made

20   in the course of Defendants' business.

21   14.    Pursuant to Wash. Rev. Code § 19.86.090, the Washington State Class seeks an

22   order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages,

23   and attorneys' fees, costs, and any other just and proper relief available under the Washington

24   CPA. Because Defendants' actions were willful and knowing, Washington State Class members'

25   damages should be trebled.

26

27

28

**WASHINGTON STATE COUNT II:**
**Washington Lemon Law**
**Wash. Rev. Code § 19.118.005 *et seq*.**
**(On Behalf of the Washington State Class)**

15.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

16.     Plaintiffs Ashley Dheel and Kara Hummel (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Washington State Class against all Defendants.

17.     The Washington State Class own or lease "new motor vehicles" within the meaning of Wash. Rev. Code § 19.118.021(12), because these vehicles are self-propelled primarily designed for the transportation of persons or property over the public highways and were originally purchased or leased at retail from a new motor vehicle dealer or leasing company in Washington. These vehicles do not include vehicles purchased or leased by a business as part of a fleet of ten or more vehicles at one time or under a single purchase or lease agreement or those portions of a motor home designated, used, or maintained primarily as a mobile dwelling, office, or commercial space.

18.     Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of Wash. Rev. Code § 19.118.021(8) because it is in the business of constructing or assembling new motor vehicles or is engaged in the business of importing new motor vehicles into the United States for the purpose of selling or distributing new motor vehicles to new motor vehicle dealers.

19.     The Washington State Class are "consumers" within the meaning of Wash. Rev. Code § 19.118.021(4) because they entered into an agreement or contract for the transfer, lease, or purchase of a new motor vehicle, other than for purposes of resale or sublease, during the eligibility period as defined by Wash. Rev. Code § 19.118.021(6).

20.     The Class Vehicles did not conform to their warranties as defined by Wash. Rev. Code § 19.118.021(22), during the "eligibility period," defined by Wash. Rev. Code § 19.118.021(6), or the coverage period under the applicable written warranty because they

1   contained the SDM Calibration Defect. Wash. Rev. Code § 19.118.031. This Defect substantially

2   impaired the use and market value of their motor vehicles.

3        21.    Defendants had actual knowledge of the SDM Calibration Defect during warranty

4   periods. But the SDM Calibration Defect continued to exist throughout this term, as it has not

5   been fixed. Washington State Class members are excused from notifying Defendants of the SDM

6   Calibration Defect because they were already fully aware of the problem and any repair attempt is

7   futile.

8        22.    Defendants have had a reasonable opportunity to cure the SDM Calibration Defect

9   because of its actual knowledge of, creation of, and attempt to conceal the nonconformities, but

10   has not done so as required under Wash. Rev. Code § 19.118.031.

11        23.    For vehicles purchased, the Washington State Class demands a full refund of the

12   contract price, all collateral charges, and incidental costs. Wash. Rev. Code § 19.118.041(1)(b).

13   For vehicles leased, the Washington State Class demands all payments made under the lease

14   including but not limited to all lease payments, trade-in value or inception payment, security

15   deposit, and all collateral charges and incidental costs. The consumer is also relieved of any

16   future obligation to the lessor or lienholder. The Washington State Class rejects an offer of

17   replacement and will retain their vehicles until payment is tendered.

18   **WASHINGTON STATE COUNT III:**
19   **Breach of Express Warranty**
     **Wash Rev. Code §§ 62A.2-313 and 62A.2A-210**
20   **(On Behalf of the Washington State Class)**

21        24.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

22   fully set forth herein.

23        25.    Plaintiffs Ashley Dheel and Kara Hummel (for the purposes of this count,

24   "Plaintiffs") bring this claim on behalf of themselves and the Washington State Class against all

25   Defendants.

26        26.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

27   vehicles under Wash. Rev. Code §§ 62A.2-104(1) and 62A.2A-103(1)(t), and "sellers" of motor

28   vehicles under § 2.103(a)(4).

27.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

28.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

29.     In connection with the purchase or lease of Class Vehicles, Defendants provided Plaintiffs and Washington State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

30.     Defendants' warranties formed the basis of the bargain that was reached when Plaintiffs and Washington State Class members unknowingly purchased or leased Class Vehicles that came equipped with the SDM Calibration Defect.

31.     However, Defendants knew or should have known that the warranties were false and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to Plaintiffs and Washington State Class members.

32.     Plaintiffs and Washington State Class members reasonably relied on the Defendants' express warranties when purchasing or leasing their Class Vehicles.

33.     Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles. Defendants also breached their express warranties by providing a product containing defects that were never disclosed to Plaintiffs and Washington State Class members.

34.     Plaintiffs and Washington State Class members have provided the Defendants with reasonable notice and opportunity to cure the breaches of their express warranties by way of letter sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public NHTSA complaints and individual lawsuits, as detailed herein.

35.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

36.     As a direct and proximate result of the Defendants' breach of express warranties, Plaintiffs and Washington State Class members have been damaged in an amount to be proven at trial.

**WASHINGTON STATE COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**Wash Rev. Code §§ 62A.2-314 and 62A.2A-212**
**(On Behalf of the Washington State Class)**

37.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

38.     Plaintiffs Ashley Dheel and Kara Hummel (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Washington State Class against all Defendants.

39.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Wash. Rev. Code § 62A.2-104(1) and 62A.2A-103(1)(t), and "sellers" of motor vehicles under § 2.103(a)(4).

40.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

41.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

42.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212.

43.     The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

44.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs on August 20, 2021.

45.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

46.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and Washington State Class members have been damaged in an amount to be proven at trial.

### 33.     West Virginia

**WEST VIRGINIA COUNT I:**
**Violations of the West Virginia Consumer Credit and Protection Act**
**W. Va. Code § 46A-1-101 *et seq.***
**(On Behalf of the West Virginia State Class)**

1.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2.     Plaintiff John Hickey (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the West Virginia State Class against all Defendants.

3.     Defendants and the West Virginia State Class are "persons" within the meaning of W. Va. Code § 46A-1-102(31). West Virginia State Class members are "consumers" within the meaning of W. Va. Code §§ 46A-1-102(2) and 46A-1-102(12).

4.     Defendants are engaged in "trade" or "commerce" within the meaning of W. Va. Code § 46A-6-102(6).

5.     The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." W. Va. Code § 46A-6-104.

6.     In the course of their business, Defendants violated the West Virginia CCPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed above.

7.     Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce, as prohibited by W. Va. Code § 46A-6-104.

1    8.    Defendants' unfair or deceptive acts or practices, including misrepresentations,

2 concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to

3 mislead and create a false impression in consumers, and were likely to and did in fact deceive

4 reasonable consumers, including Plaintiff and West Virginia State Class members, about the true

5 safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the

6 Class Vehicles.

7    9.    Defendants' scheme and concealment of the SDM Calibration Defect and true

8 characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiff and

9 West Virginia State Class members, as the Defendants intended. Had they known the truth,

10 Plaintiff and West Virginia State Class members would not have purchased or leased the Class

11 Vehicles, or would have paid significantly less for them.

12    10.    Plaintiff and West Virginia State Class members had no way of discerning that

13 Defendants' representations were false and misleading and/or otherwise learning the facts that

14 Defendants had concealed or failed to disclose. Plaintiff and West Virginia State Class members

15 did not, and could not, unravel Defendants' deception on their own.

16    11.    Defendants had an ongoing duty to Plaintiff and West Virginia State Class

17 members to refrain from unfair or deceptive practices under the West Virginia CCPA in the

18 course of their business. Specifically, Defendants owed Plaintiff and West Virginia State Class

19 members a duty to disclose all the material facts concerning the SDM Calibration Defect in the

20 Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the

21 defect from Plaintiff and West Virginia State Class members, and/or they made

22 misrepresentations that were misleading because they were contradicted by withheld facts.

23    12.    Defendants' violations present a continuing risk to Plaintiff and West Virginia

24 State Class members, as well as to the general public. Defendants' unlawful acts and practices

25 complained of herein affect the public interest.

26    13.    West Virginia State Class members suffered ascertainable loss and actual damages

27 as a direct and proximate result of Defendants' misrepresentations and concealment of and failure

28 to disclose material information. Defendants had an ongoing duty to all their customers to refrain

1  from unfair and deceptive practices under the West Virginia CCPA. All owners of Class Vehicles

2  suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made

3  in the course of Defendants' business.

4      14.    Pursuant to W. Va. Code § 46A-6-106(a), the West Virginia State Class seeks an

5  order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages,

6  and any other just and proper relief available under the West Virginia CCPA.

7      15.    Pursuant to W. Va. Code § 46A-6-106(b), Plaintiffs sent notice letters to

8  Defendants. The West Virginia State Class seeks all damages and relief to which it is entitled.

9                      **WEST VIRGINIA COUNT II:**
                        **West Virginia Lemon Law**
10                      **W. Va. Code § 46A-6A-1 *et seq*.**
                        **(On Behalf of the West Virginia State Class)**
11

12      16.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

13  forth herein.

14      17.    Plaintiff John Hickey (for the purposes of this count, "Plaintiff") brings this claim

15  on behalf of himself and the West Virginia State Class against all Defendants.

16      18.    West Virginia State Class members who purchased or leased the Class Vehicles in

17  West Virginia are "consumers" within the meaning of W. Va. Code § 46A-6A-2(1).

18      19.    Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of W.

19  Va. Code § 46A-6A-2(2).

20      20.    The Class Vehicles are "motor vehicles" as defined by W. Va. Code § 46A-6A-

21  2(4).

22      21.    In connection with the purchase or lease of Class Vehicles, the Defendants

23  provided Plaintiff and West Virginia State Class members with written express warranties

24  covering the repair or replacement of components that are defective in materials or workmanship.

25      22.    Defendants' warranties formed the basis of the bargain that was reached when

26  Plaintiff and West Virginia State Class members unknowingly purchased or leased Class Vehicles

27  that came equipped with the SDM Calibration Defect.

28

1    23.    However, Defendants knew or should have known that the warranties were false

2    and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the

3    Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they

4    were sold and leased to Plaintiff and West Virginia State Class members.

5    24.    Plaintiff and West Virginia State Class members reasonably relied on the

6    Defendants' express warranties when purchasing or leasing their Class Vehicles.

7    25.    Defendants knowingly breached their express warranties to repair defects in

8    materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

9    Defendants also breached their express warranties by providing a product containing defects that

10   were never disclosed to Plaintiff and West Virginia State Class members.

11   26.    Pursuant to W.Va. Code §§ 46A-6A-3(a) and 5(c), Plaintiffs have sent notice

12   letters to Defendants.

13   27.    As a direct and proximate result of the Defendants' breaches of their duties under

14   West Virginia's Lemon Law, West Virginia State Class members received goods whose defect

15   substantially impairs their value. The West Virginia State Class has been damaged by the

16   diminished market value of the vehicles along with the compromised functioning and/or non-use

17   of their Class Vehicles.

18   28.    Defendants have a duty under § 46A-6A-3 to make all repairs necessary to correct

19   the defect herein described to bring the Class Vehicles into conformity with all written warranties.

20   In the event that Defendants cannot affect such repairs, they have a duty to replace each Class

21   Vehicle with a comparable new motor vehicle that conforms to the warranty.

22   29.    As a result of Defendants' breaches, Plaintiff and the West Virginia State Class are

23   entitled to the following:

24   A.    Revocation of acceptance and refund of the purchase price, including, but

25   not limited to, sales tax, license and registration fees, and other reasonable expenses

26   incurred for the purchase of the new motor vehicle, or if there be no such revocation of

27   acceptance, damages for diminished value of the motor vehicle;

28

1         B.     Damages for the cost of repairs reasonably required to conform the motor

2 vehicle to the express warranty;

3         C.     Damages for the loss of use, annoyance or inconvenience resulting from

4 the nonconformity, including, but not limited to, reasonable expenses incurred for

5 replacement transportation during any period when the vehicle is out of service by reason

6 of the nonconformity or by reason of repair; and

7         D.     Reasonable attorney fees.

8                **WEST VIRGINIA COUNT III:**

**Breach of Express Warranty**

9 **W. Va. Code §§ 46-2-313 and 46-2A-210**

**(On Behalf of the West Virginia State Class)**

10

11     30.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

12 fully set forth herein.

13     31.    Plaintiff John Hickey (for the purposes of this count, "Plaintiff") brings this claim

14 on behalf of himself and the West Virginia State Class against all Defendants.

15     32.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

16 vehicles under W. Va. Code § 46-2-104(1) and 46-2A-103(1)(t), and "sellers" of motor vehicles

17 under § 46-2-103(1)(d).

18     33.    With respect to leases, Defendants are and were at all relevant times "lessors" of

19 motor vehicles under W. Va. Code § 46-2A-103(1)(p).

20     34.    The Class Vehicles are and were at all relevant times "goods" within the meaning

21 of W. Va. Code §§ 46-2-105(1) and 46-2A-103(1)(h).

22     35.    In connection with the purchase or lease of Class Vehicles, the Defendants

23 provided Plaintiff and West Virginia State Class members with written express warranties

24 covering the repair or replacement of components that are defective in materials or workmanship.

25     36.    Defendants' warranties formed the basis of the bargain that was reached when

26 Plaintiff and West Virginia State Class members unknowingly purchased or leased Class Vehicles

27 that came equipped with the SDM Calibration Defect.

28

1    37.  However, Defendants knew or should have known that the warranties were false

2 and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the

3 Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they

4 were sold and leased to Plaintiff and West Virginia State Class members.

5    38.  Plaintiff and West Virginia State Class members reasonably relied on the

6 Defendants' express warranties when purchasing or leasing their Class Vehicles.

7    39.  Defendants knowingly breached their express warranties to repair defects in

8 materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

9 Defendants also breached their express warranties by providing a product containing defects that

10 were never disclosed to Plaintiff and West Virginia State Class members.

11    40.  Plaintiff and West Virginia State Class members have provided the Defendants

12 with reasonable notice and opportunity to cure the breaches of their express warranties by way of

13 letter sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous

14 public NHTSA complaints and individual lawsuits, as detailed herein.

15    41.  Alternatively, any opportunity to cure the breach is unnecessary and futile.

16    42.  As a direct and proximate result of the Defendants' breach of express warranties,

17 Plaintiff and West Virginia State Class members have been damaged in an amount to be proven at

18 trial.

19           **WEST VIRGINIA COUNT IV:**
         **Breach of Implied Warranty of Merchantability**

20        **W. Va. Code §§ 46-2-314 and 46-2A-212**
       **(On Behalf of the West Virginia State Class)**

21

22    43.  Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

23 forth herein.

24    44.  Plaintiff John Hickey (for the purposes of this count, "Plaintiff") bring this claim

25 on behalf of himself and the West Virginia State Class against all Defendants.

26    45.  Defendants are and were at all relevant times "merchant[s]" with respect to motor

27 vehicles under W. Va. Code §§ 46-2-104(1) and 46-2A-103(1)(t), and "sellers" of motor vehicles

28 under § 46-2-103(1)(d).

1    46.    With respect to leases, Defendants are and were at all relevant times "lessors" of

2    motor vehicles under W. Va. Code § 46-2A-103(1)(p).

3    47.    The Class Vehicles are and were at all relevant times "goods" within the meaning

4    of W. Va. Code §§ 46-2-105(1) and 46-2A-103(1)(h).

5    48.    A warranty that the Class Vehicles were in merchantable condition and fit for the

6    ordinary purpose for which vehicles are used is implied by law pursuant to W. Va. Code §§ 46-2-

7    314 and 46-2A-212.

8    49.    The Class Vehicles did not comply with the implied warranty of merchantability

9    because, at the time of sale and at all times thereafter, they were defective and not in

10    merchantable condition, would not pass without objection in the trade, and were not fit for the

11    ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the

12    SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an

13    accident, rendering the Class Vehicles inherently defective and dangerous.

14    50.    Defendants were provided reasonable notice of these issues by way of a letter sent

15    by Plaintiffs on August 20, 2021.

16    51.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

17    52.    As a direct and proximate result of Defendants' breach of the implied warranty of

18    merchantability, Plaintiff and West Virginia State Class members have been damaged in an

19    amount to be proven at trial.

20    **34.    Wisconsin**

21    **WISCONSIN COUNT I:**
      **Violations of the Wisconsin Deceptive Trade Practices Act**

22    **Wis. Stat. § 100.18 *et seq.***

23    **(On Behalf of the Wisconsin State Class)**

24    1.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully

25    set forth herein.

26    2.    Plaintiff Greg Douthwaite (for the purposes of this count, "Plaintiff") brings this

27    claim on behalf of himself and the Wisconsin State Class against all Defendants.

28

3.      Wisconsin State Class members are "persons" and members of "the public" under the Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA"), Wis. Stat. § 100.18(1). Wisconsin State Class members purchased or leased one or more Class Vehicles.

4.      Defendants are "person[s], firm[s], corporation[s] or association[s]" within the meaning of Wis. Stat. § 100.18(1).

5.      The Wisconsin DTPA makes unlawful any "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

6.      In the course of their business, Defendants violated the Wisconsin DTPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed above.

7.      Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the SDM Calibration Defect, Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce, as prohibited by Wis. Stat. § 100.18(1).

8.      Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff and Wisconsin State Class members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

9.      Defendants' scheme and concealment of the SDM Calibration Defect and true characteristics of the passenger safety systems in the Class Vehicles were material to Plaintiff and Wisconsin State Class members, as the Defendants intended. Had they known the truth, Plaintiff and Wisconsin State Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

10. Plaintiff and Wisconsin State Class members had no way of discerning that Defendants' representations were false and misleading and/or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiff and Wisconsin State Class members did not, and could not, unravel Defendants' deception on their own.

11. Defendants had an ongoing duty to Plaintiff and Wisconsin State Class members to refrain from unfair or deceptive practices under the Wisconsin DTPA in the course of their business. Specifically, Defendants owed Plaintiff and Wisconsin State Class members a duty to disclose all the material facts concerning the SDM Calibration Defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the defect from Plaintiff and Wisconsin State Class members, and/or they made misrepresentations that were misleading because they were contradicted by withheld facts.

12. Defendants' violations present a continuing risk to Plaintiff and Wisconsin State Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

13. Wisconsin State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Wisconsin DTPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

14. As a direct and proximate result of Defendants' violations of the Wisconsin DTPA, the Wisconsin State Class have suffered injury-in-fact and/or actual damage.

15. The Wisconsin State Class seeks damages, court costs and attorneys' fees under Wis. Stat. § 100.18(11)(b)(2), and any other just and proper relief available under the Wisconsin DTPA.

**WISCONSIN COUNT II:**
**Breach of Express Warranty**
**Wis. Stat. §§ 402.313 and 411.210**
**(On Behalf of the Wisconsin State Class)**

16.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

17.     Plaintiff Greg Douthwaite (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Wisconsin State Class against all Defendants.

18.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Wis. Stat. §§ 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under § 402.103(1)(d).

19.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Wis. Stat. § 411.103(1)(p).

20.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

21.     In connection with the purchase or lease of Class Vehicles, the Defendants provided Plaintiff and Wisconsin State Class members with written express warranties covering the repair or replacement of components that are defective in materials or workmanship.

22.     Defendants' warranties formed the basis of the bargain that was reached when Plaintiff and Wisconsin State Class members unknowingly purchased or leased Class Vehicles that came equipped with the SDM Calibration Defect.

23.     However, Defendants knew or should have known that the warranties were false and/or misleading. Specifically, Defendants were aware of the SDM Calibration Defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to Plaintiff and Wisconsin State Class members.

24.     Plaintiff and Wisconsin State Class members reasonably relied on the Defendants' express warranties when purchasing or leasing their Class Vehicles.

25.     Defendants knowingly breached their express warranties to repair defects in materials and workmanship by failing to repair the SDM Calibration Defect in the Class Vehicles.

1   Defendants also breached their express warranties by providing a product containing defects that

2   were never disclosed to Plaintiff and Wisconsin State Class members.

3         26.    Plaintiff and Wisconsin State Class members have provided the Defendants with

4   reasonable notice and opportunity to cure the breaches of their express warranties by way of letter

5   sent by Plaintiffs on August 20, 2021. Defendants are further on notice due to numerous public

6   NHTSA complaints and individual lawsuits, as detailed herein.

7         27.    Alternatively, any opportunity to cure the breach is unnecessary and futile.

8         28.    As a direct and proximate result of the Defendants' breach of express warranties,

9   Plaintiff and Wisconsin State Class members have been damaged in an amount to be proven at

10  trial.

11                          **WISCONSIN COUNT III:**
                    **Breach of Implied Warranty of Merchantability**
12                          **Wis. Stat. §§ 402.314 and 411.212**
                       **(On Behalf of the Wisconsin State Class)**
13

14        29.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

15  forth herein.

16        30.    Plaintiff Greg Douthwaite (for the purposes of this count, "Plaintiff") brings this

17  claim on behalf of himself and the Wisconsin State Class against all Defendants.

18        31.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

19  vehicles under Wis. Stat. §§ 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under

20  § 402.103(1)(d).

21        32.    With respect to leases, Defendants are and were at all relevant times "lessors" of

22  motor vehicles under Wis. Stat. § 411.103(1)(p).

23        33.    The Class Vehicles are and were at all relevant times "goods" within the meaning

24  of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

25        34.    A warranty that the Class Vehicles were in merchantable condition and fit for the

26  ordinary purpose for which vehicles are used is implied by law pursuant to Wis. Stat. §§ 402.314

27  and 411.212.

28

35.     The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the SDM Calibration Defect, which may cause the airbags and seatbelt to fail to deploy during an accident, rendering the Class Vehicles inherently defective and dangerous.

36.     Defendants were provided reasonable notice of these issues by way of a letter sent on August 20, 2021.

37.     Alternatively, any opportunity to cure the breach is unnecessary and futile.

38.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Wisconsin State Class members have been damaged in an amount to be proven at trial.

## VIII.   PRAYER FOR RELIEF

Plaintiffs, on behalf of himself themselves and all others similarly situated, requests request for the Court to enter judgment against the Defendants, as follows:

a.      An order certifying the proposed Class(es), designating Plaintiffs as the named representatives of the Class(es), designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate, under Fed. R. Civ. P. 23;

b.      An order enjoining the Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles and such other injunctive relief that the Court deems just and proper;

c.      An award to Plaintiffs and Class Members of compensatory, exemplary, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial;

d.      A declaration that Defendants are financially responsible for all Class notice and the administration of Class relief;

1            e.      Costs, restitution, and compensatory damages for economic loss and out-

2 of-pocket costs, multiple damages under applicable states' laws, ; punitive and exemplary

3 damages under applicable law; and disgorgement, in an amount to be determined at trial;

4            f.      Any applicable statutory and civil penalties;

5            g.      An award of costs and attorneys' fees, as allowed by law;

6            h.      An order requiring Defendants to pay both pre- and post-judgment interest

7 on any amounts awarded.

8            i.      Leave to amend this Complaint to conform to the evidence produced at

9 trial; and

10           j.      Such other or further relief as the Court may deem appropriate, just, and

11 equitable under the circumstances.

## IX.    DEMAND FOR JURY TRIAL

13        Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any

14 and all issues in this action triable by a jury.

Dated: ~~October 26~~January 27, ~~2021~~ 2023

Respectfully Submitted,

By: */s/ Nimish R. Desai*
    Richard Heimann (CA Bar # 063607)
    Nimish R. Desai  (CA Bar # 244953)
    **LIEFF CABRASER HEIMANN**
    **& BERNSTEIN, LLP**
    275 Battery St., 29th Fl.
    San Francisco, CA 94111-3339
    Telephone: 415-956-1000
    Facsimile: 415-956-1008
    rheimann@lchb.com
    ndesai@lchb.com

    David S. Stellings (*pro hac vice* ~~*forthcoming*~~)
    Katherine I. McBride (*pro hac vice* ~~*forthcoming*~~)
    Jessica A. Moldovan (*pro hac vice* ~~*forthcoming*~~)
    **LIEFF CABRASER HEIMANN**
    **& BERNSTEIN, LLP**
    250 Hudson Street, 8th Floor
    New York, NY 10013
    Telephone: 212.355.9500
    Facsimile: 212.355.9592
    dstellings@lchb.com
    kmcbride@lchb.com
    jmoldovan@lchb.com

    Roland Tellis (CA Bar #186269)
    David Fernandes (CA Bar #280944)
    Adam Tamburelli (CA Bar #301902)
    **BARON & BUDD, P.C.**
    15910 Ventura Boulevard, Suite 1600
    Encino, California 91436
    Telephone: (818) 839-2333
    Facsimile: (818)-986-9698
    rtellis@baronbudd.com
    dfernandes@baronbudd.com
    atamburelli@baronbudd.com

    Christopher A. Seeger (*pro hac vice* ~~*forthcoming*~~)
    Christopher L. Ayers (*pro hac vice* ~~*forthcoming*~~)
    **SEEGER WEISS LLP**
    55 Challenger Road, 6th Floor
    Ridgefield Park, NJ 07660
    Telephone: (973) 639-9100
    Facsimile: (973) 639-9393
    cseeger@seegerweiss.com
    cayers@seegerweiss.com

Shauna ~~Brie~~ Itri (*pro hac vice ~~forthcoming~~*)
**SEEGER WEISS LLP**
1515 Market Street, Suite 1380
Philadelphia, PA 19102
Telephone: (215) 564-2300
Facsimile: (215) 851-8029
sitri@seegerweiss.com

W. Daniel "Dee" Miles, III (*pro hac vice ~~forthcoming~~*)
H. Clay Barnett, III (*pro hac vice ~~forthcoming~~*)
J. Mitch Williams (*pro hac vice ~~forthcoming~~*)
Rebecca D. Gilliland (*pro hac vice ~~forthcoming~~*)
Dylan T. Martin (*pro hac vice ~~forthcoming~~*)
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C**.
272 Commerce Street
Montgomery, AL 36104
Telephone: (334) 269-2343
Dee.Miles@beasleyallen.com
Clay.Barnett@beasleyallen.com
Mitch.Williams@beasleyallen.com
Rebecca.Gilliland@beasleyallen.com
Dylan.Martin@beasleyallen.com

David M. Birka-White  (CA Bar # 85721)
**BIRKA-WHITE LAW OFFICES**
178 E. Prospect Avenue
Danville, CA 94526
Telephone: (925) 362-9999
dbw@birka-white.com

James E. Cecchi (*pro hac vice ~~forthcoming~~*)
Caroline F. Bartlett (*pro hac vice ~~forthcoming~~*)
~~Jordan M. Steele (*pro hac vice forthcoming*)~~
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile:  (973) 994-1744
jcecchi@carellabyrne.com
cbartlett@carellabyrne.com

~~jsteele@carellabyrne.com~~

— ___Joseph H. Meltzer (*pro hac vice ~~forthcoming~~*)

1  Melissa L. Troutner (*pro hac vice ~~forthcoming~~*)
2  ~~Eric. K. Gerard (*pro hac vice forthcoming*)~~
   ~~Lauren M. McGinley (*pro hac vice forthcoming*)~~
3  **KESSLER TOPAZ**
   **MELTZER & CHECK, LLP**
4  280 King of Prussia Road
   Radnor, PA 19087
5  Telephone: (610) 667-7706
   Facsimile: (610) 667-7056
6  jmeltzer@ktmc.com
   mtroutner@ktmc.com
7
8  ~~egerard@ktmc.com~~
   ~~lmcginley@ktmc.com~~
9
10 Charles E. Schaffer (*pro hac vice ~~forthcoming~~*)
   David C. Magagna Jr. (*pro hac vice ~~forthcoming~~*)
11 **LEVIN, SEDRAN & BERMAN, LLP**
   510 Walnut Street, Suite 500
12 Philadelphia, PA 19106
   cschaffer@lfsblaw.com
13 dmagagna@lfsblaw.com
14
15 E. Powell Miller (*pro hac vice forthcoming*)
   **THE MILLER LAW FIRM, P.C.**
16 950 West University Drive, Suite 300
   Rochester, MI 48307
17 Telephone: (248) 841-2200
   Facsimile: (248) 652-2852
18 epm@millerlawpc.com
19 Jason P. Sultzer, Esq. (*pro hac vice ~~forthcoming~~*)
20 **THE SULTZER LAW GROUP P.C.**
   270 Madison Avenue, Suite 1800
21 New York, NY 10016
   Tel: (845) 483-7100
22 Fax: (888) 749-7747
   sultzerj@thesultzerlawgroup.com
23
24
25
26
27
28

| Summary Report | |
|---|---|
| Title | **compareDocs Comparison Results** |
| Date & Time | 1/27/2023 3:26:21 PM |
| Comparison Time | 43.91 seconds |
| compareDocs version | v5.0.200.14 |

| Sources | |
|---|---|
| Original Document | Amended Complaint - FINAL.DOCX |
| Modified Document | Second Amended Complaint - FILE PREP.docx |

| Comparison Statistics | |
|---|---|
| Insertions | 239 |
| Deletions | 164 |
| Changes | 369 |
| Moves | 52 |
| Font Changes | 0 |
| Paragraph Style Changes | 0 |
| Character Style Changes | 0 |
| TOTAL CHANGES | 824 |
| | |
| | |

| Word Rendering Set Markup Options | |
|---|---|
| Name | LCHB Standard |
| Insertions | |
| Deletions | |
| Moves / Moves | |
| Font Changes | |
| Paragraph Style Changes | |
| Character Style Changes | |
| Inserted cells | |
| Deleted cells | |
| Merged cells | |
| Changed lines | Mark left border. |

| compareDocs Settings Used | Category | Option Selected |
|---|---|---|
| Open Comparison Report after saving | General | Always |
| Report Type | Word | Redline |
| Character Level | Word | False |
| Include Comments | Word | False |
| Include Field Codes | Word | True |
| Flatten Field Codes | Word | True |
| Include Footnotes / Endnotes | Word | True |
| Include Headers / Footers | Word | True |
| Image compare mode | Word | Insert/Delete |
| Include List Numbers | Word | True |
| Include Quotation Marks | Word | False |
| Show Moves | Word | True |
| Include Tables | Word | True |
| Include Text Boxes | Word | True |
| Show Reviewing Pane | Word | True |
| Summary Report | Word | End |
| Detail Report | Word | Separate (View Only) |
| Document View | Word | Print |