Pages 1 - 37

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

James Milstead, et al.,    )
    )
        Plaintiffs,    )
    )
  VS.    )    **NO. 4:21-CV-06338-JST**
    )
General Motors, LLC, et al.,    )
    )
        Defendants.    )
_____  )

Oakland, California
Thursday, October 26, 2023

**TRANSCRIPT OF ZOOM PROCEEDINGS**

**APPEARANCES (VIA ZOOM):**
For Plaintiffs:
                BARON & BUDD, PC
                Encino Plaza
                15910 Ventura Boulevard, Suite 1600
                Encino, California 91436
        BY: **ROLAND TELLIS**
             **ATTORNEY AT LAW**

                SEEGER WEISS, LLP
                55 Challenger Road, 6th Floor
                Ridgefield Park, NJ 07660
        BY: **STEVEN J. DAROCI, II**
             **ATTORNEY AT LAW**

                LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                275 Battery Street, 30th Floor
                San Francisco, CA 94111
                **NIMISH R. DESAI**
             **ATTORNEY AT LAW**

Reported Remotely By:  Stephen W. Franklin, RMR, CRR, CPE
                United States Reporter

```
 1    APPEARANCES (CONT'D):
      For Plaintiffs:
 2                            LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                              250 Hudson Street
 3                            New York, NY 10013
                       BY:   DAVID S. STELLINGS
 4                           ATTORNEY AT LAW

 5    For Defendants:
                              KIRKLAND & ELLIS, LLP
 6                            333 West Wolf Point Plaza
                              Chicago, IL 60654
 7                     BY:   RENEE D. SMITH
                             ATTORNEY AT LAW
 8
                              DYKEMA GOSSETT, LLP
 9                            444 S. Flower Street, Suite 2200
                              Los Angeles, CA 90071
10                     BY:   DEREK S. WHITEFIELD
                             ATTORNEY AT LAW
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PROCEEDINGS

1    <u>Thursday - October 26, 2023</u>                    <u>2:06 p.m.</u>

2                     P R O C E E D I N G S

3                          ---o0o---

4         **THE COURTROOM DEPUTY:**  Your Honor, now calling civil

5    matter 21-6339, James Milstead v. General Motors, LLC, et al.

6    If counsel could please state their appearances for the record

7    starting with counsel for plaintiff.

8              **MR. TELLIS:**  Good afternoon, Your Honor.  It's Roland

9    Tellis with Baron & Budd on behalf of plaintiffs.

10             **MR. STELLINGS:**  Good afternoon, Your Honor.  David

11   Stellings, Lieff Cabraser, also for the plaintiffs.

12             **MR. DESAI:**  Good afternoon.  Nimish Desai with Lieff

13   Cabraser for the plaintiffs.

14             **MR. DAROCI:**  Good afternoon, Your Honor.  Steven

15   Daroci from Seeger Weiss on behalf of the plaintiffs.

16             **MS. SMITH:**  And good afternoon, Your Honor.  Renee

17   Smith on behalf of General Motors.

18             **THE COURT:**  Mr. Whitefield, your microphone is muted

19   I think.

20             **MR. WHITEFIELD:**  Sorry about that, Your Honor.  I

21   knew I'd do that.  I'm Derek Whitefield.  I represent General

22   Motors, as well as Ms. Smith.

23             **THE COURT:**  Some pandemic transitions are harder than

24   others.  We have administrative meetings every day in my

25   chambers over Microsoft Teams.  At least once a week I mute my

PROCEEDINGS

1  microphone by accident, so, but I'm learning.

2          Who will be arguing for the defendant today?

3          **MS. SMITH:**  Your Honor, Renee Smith for General

4  Motors.  I will at least do the beginning of it, and I may have

5  Mr. Whitefield interject sometimes if it's more appropriate for

6  him, if that's acceptable.

7          **THE COURT:**  That's fine.

8          Who will be arguing for the plaintiffs today?

9          **MR. TELLIS:**  Your Honor, Roland Tellis will handle

10 myself, will handle any defect-related issues, and Mr. Daroci

11 will handle any Article III issues.

12         **THE COURT:**  I'm sorry, you said Mr. Desai will handle

13 any ...

14         **MR. TELLIS:**  Mr. Daroci.

15         **THE COURT:**  Okay.  Mr. Daroci.  Okay.  Very good.

16         And Mr. Daroci, am I pronouncing your last name

17 correctly?

18         **MR. DESAI:**  Very impressive, Your Honor.  Perfectly

19 said.

20         **THE COURT:**  I don't know that it rises to the level

21 of impressive, but I'll take "sure" fine.

22         All right.  I'm going to give counsel 25 minutes each

23 to speak.  I always say you don't need to take it all, and

24 usually it's not a good idea, but everyone always does anyway.

25 So we'll see what happens.

PROCEEDINGS

1    Even though it's the defendant's burden, I'm going to

2  let each side have two bites at the apple.  So the defendants

3  will go first, so take as much time as they want as long as

4  it's less than 25 minutes.  Whatever time you haven't used you

5  can devote to a rebuttal argument, and then the same thing will

6  be true for the plaintiffs.

7    And even though Ms. Lee will be keeping time, I also

8  like to do that.

9    Ms. Smith, you have the floor.

10    **MS. SMITH:**  Thank you, Your Honor.  It's nice to have

11  the opportunity to see the Court and our friends on the other

12  side on this case.  It's been a little bit.

13    And from the first-amended complaint in this case,

14  which was filed October 26, 2021, so exactly two years ago

15  today, plaintiffs have lodged a straightforward specific theory

16  of a defect.  Not a plausible theory at least as to their

17  vehicles, as we have argued before, but a specific one, which

18  was a categorical defect where there was a shutoff timer, 45

19  seconds, milliseconds into a crash, that prevented airbags from

20  deploying after that time.  We don't agree that that's

21  necessarily a defect -- we understand Your Honor came to a

22  different conclusion -- but it was a very specific allegation.

23    Now, two years later, plaintiffs have gone from a

24  specific, albeit implausible defect at least as to their

25  vehicle, to a new defect definition or theory that is neither

PROCEEDINGS

1   plausible or meaningful.  It's meaningless.  It's inconsistent

2   with what they need to plead for a defect, it's inconsistent

3   with what is needed to be pled for knowledge, and it's

4   inconsistent with Article III standing.

5           I looked back at our first -- our hearing on that

6   first-amended complaint, and one of the questions Your Honor

7   asked was how much do plaintiffs have to say about this alleged

8   defect to plausibly plead their personal vehicles have it, and

9   you stated it's not sufficient to simply march into federal

10  court and say there is a software defect in these millions of

11  vehicles, and we should get discovery to learn more about it.

12  And we of course agree with that.

13          **THE COURT:**  Ms. Smith, this is not something I said

14  in a written order.

15          **MS. SMITH:**  Correct.

16          **THE COURT:**  This is a comment I made on the bench; is

17  that true?

18          **MS. SMITH:**  Correct, Your Honor.  Yes, yes.

19          And one of the things Your Honor asked the parties is

20  are there some guideposts or guidelines that would apply to all

21  cases and what needs to be pled.  And I think in fairness,

22  neither we nor plaintiffs I think gave you exact guideposts,

23  but I was trying to look at those guideposts to frame the

24  argument in this case.  And while there's probably no checklist

25  for each case, in this case in particular, plaintiffs must, but

1   do not, quote, sufficiently define a defect.  They must, but do

2   not, sufficiently allege that GM had knowledge of this defect

3   as they allege it, knew it was a defect, a safety defect,

4   before they purchased their vehicles.  And because this is a

5   overpayment theory, this is not a personal injury case, they

6   must allege facts sufficient to show that they have standing.

7   And sometimes plaintiffs correctly note sometimes it's referred

8   to in terms of Article III standing, sometimes it's referred to

9   as 12(b)(6), but something more than a feature that was not

10  part of the benefit of the bargain to begin with.

11          So I want to start with the defect is not defined.

12  Plaintiffs' opposition to our brief, to our motion to dismiss

13  this brief takes -- vehemently opposes the idea that they did

14  not allege a specific number in this brief, and they -- and we

15  argued in our opening motion that it's -- there's different

16  phrases, it's premature, it's too soon, et cetera.  And

17  plaintiffs in their opposition said, to be clear, we are saying

18  the defect is anything less than a hundred milliseconds.

19  Again, I don't agree that that is actually necessarily how

20  their complaint reads, but for the sake of this argument let's

21  say that's what the defect is.

22          But by their own allegations, plaintiffs do not plead

23  enough to make that a meaningful number.  Plaintiffs throughout

24  their complaint and their motion to dismiss state timing is

25  critically important to this case.  And it is critically

PROCEEDINGS

1    important to this case.

2            Plaintiffs also throughout their complaint, ECF

3    number 197, and throughout their opposition to the motion to

4    dismiss, and throughout all the complaints and motions to

5    dismiss that have come before it, plaintiffs again and again

6    and again allege that what matters is what happens in a

7    real-world crash.  We agree with that.  The problem with this

8    complaint as it is alleged is we do not know what plaintiffs

9    are alleging occurs in a real-world crash.  We know plaintiffs

10   are alleging there is a cutoff of some kind of a hundred

11   milliseconds, but plaintiffs candidly plead that that is not

12   linear or real time.  So it's not from the first instance until

13   a hundred milliseconds from that.  Instead, it's counted by

14   software time.  And I certainly do not purport to understand

15   how it works, but in general it's not linear.  It's -- it can

16   go backward, forward, and it's because of unique mechanics that

17   I don't understand, and Mr. Whitefield will be able to address

18   any questions better than I on this.

19           But regardless --

20       THE COURT:  If you can go backward you should make a

21   movie of it, because everyone would be very rich.  I don't

22   think that -- I don't think that the -- anyway, but I take your

23   point.

24       MS. SMITH:  No, no.  And if I miss anything,

25   Mr. Whitefield, please tell me.

PROCEEDINGS

1        But my -- the way we -- we were trying to figure out

2   how to show it, and the closest I could think of is, because I

3   watch quite a bit of TV, is you're watching a 30-minute show,

4   but you missed a part, you know.  So you rewind back, and a

5   show that took really 30 minutes took 40 minutes or 50 minutes.

6        **THE COURT:**  Yeah.

7        **MS. SMITH:**  And so something like that.

8        So at the end of the day, because there's all sorts

9   of reasons that adjusts, in a real accident, in a hundred-

10  millisecond cutoff by software time may be 120 in real time.

11  It may be 140.  It may be 180.  We don't know, and it is not

12  alleged what that means in real time.

13       **THE COURT:**  And when you say it may be, do you mean

14  the time between the beginning of the accident, however that's

15  defined, and the deployment of this system could be 180

16  milliseconds, or do you mean something else?

17       **MS. SMITH:**  I'm going to ask Mr. Whitefield to, just

18  because I don't want to misstate it, which I'm worried I'm

19  about to do.

20       **MR. WHITEFIELD:**  So, Your Honor, the way that the

21  software evolved over time, starting back in 1999 they had what

22  was characterized back then as a 45-millisecond cutoff for the

23  Algo S algorithm with the calibration that was used at that

24  time.  So you have both an algorithm in 1999, and you have a

25  calibration with what was alleged to be a cutoff.

PROCEEDINGS

1          As the development of the GM algorithms continued --

2   and we can see this in Mr. Caruso's McCoy expert report, which

3   is in the docket at 197-4, but the software evolved, and the --

4   GM adopted what was called "event progression timers."  EP1 was

5   the way they -- the short version of it.  And initially the way

6   EP1 worked is if you started a crash, let's say you had a curb,

7   a concatenated event, and then that impact was over but you

8   went into a tree, EP1 would count backwards while the crash was

9   no longer happening until the system completely reset or there

10  was something else that happened during the crash.

11          **THE COURT:**  Okay.  Let me stop you there, because I

12  don't want to derail the argument entirely.  I think the

13  sentences of what you said explains what Ms. Smith said a

14  moment ago.

15          **MS. SMITH:**  Thank you.  And thank you,

16  Mr. Whitefield.  Thank you, Your Honor, for indulging me.

17          And so I think -- and I'll wrap up this portion of

18  it, but as a threshold issue we don't know, even if there is a

19  100-millisecond cutoff, we don't know what that means in a

20  real-world accident.  And that matters here, because the whole

21  case is about whether the cutoff is too soon to prevent an

22  airbag from happening in a real-world accident, and plaintiffs

23  just don't allege that is the case here.  And I -- throughout

24  this case from the beginning, one thing that we've all talked

25  about is of course these are incredibly complex issues, complex

PROCEEDINGS

1  software, and there is an issue of, well, how much could

2  plaintiffs allege if they don't have access to whatever went

3  into the code or for other documents, and that's true, but in

4  cases when we're looking at whether you can unlock the doors of

5  discovery, especially here, where plaintiffs are seeking to

6  unlock the doors of discovery from 20 years-worth of vehicles,

7  every single one, every single truck and SUV, is generally

8  there's something amiss to begin with.

9          So, for example, the Court found that plaintiffs had

10  plausibly pled that a 45-millisecond cutoff sufficiently pled a

11  defect, although not in plaintiffs' own vehicles.  And in that

12  case, plaintiffs alleged at that time several incidents where

13  the root cause was attributed to a 45-millisecond cutoff.  They

14  alleged their expert, Mr. Caruso's recollection that he had

15  rallied against a 45-millisecond cutoff and he later served as

16  an expert.

17          There is nothing, nothing alleged, especially nothing

18  alleged before plaintiffs purchased their vehicles, to suggest

19  that this new cutoff, that there's anything wrong with it.

20  There's nothing to suggest that plaintiffs' vehicles, 2010 and

21  2012 model year vehicles, there's nothing to suggest that those

22  vehicles are having some big issue where airbags are not

23  deploying where they should, or that in certain -- or that

24  they're concatenated events, not to point and compare where the

25  vehicles are.  There's just not that first step, even, in this

PROCEEDINGS

1    case to say there's something wrong, regardless of whether

2    there could be for that initial 45.  This new defect, there's

3    nothing there.

4          And one of the things that plaintiffs allege is --

5    excuse me, in their response to the motion to dismiss,

6    plaintiffs allege that it doesn't matter if a consumer would

7    care about, you know, a hundred milliseconds, versus 40

8    milliseconds, versus 45, and that may be true.  Plaintiffs

9    state in their motion to dismiss that what matters is that GM

10   should have disclosed the practical effects of the defect to

11   the consumers, and that ECF 202, at page 21.  But plaintiffs do

12   not allege what the practical effects are in real time.  We

13   don't know what the effects are as alleged, and there's nothing

14   to suggest there is a problem here.

15         The other issue that is affected by the revised

16   definition is the knowledge issue.  Again, the Court could have

17   found that GM could have been aware that people thought 45

18   milliseconds was a defect.  There's nothing suggesting or

19   sufficiently pleading that GM believed or should have believed

20   that this new undefined cutoff was a defect.  Again, there's

21   nothing amiss.  There's no allegation that back in 1999 someone

22   said everything under a hundred is defective.  And one thing --

23   and nor is there anything that plaintiffs allege about what

24   happened after that.  Plaintiffs compare.  They say the auto

25   group or the car group used a longer cutoff, a hundred to 150

PROCEEDINGS

1   milliseconds.  Even if you take that as true, there's not

2   allegations that somebody said anything under that is

3   defective.  All the allegations were about 45.

4        And probably more importantly is the comparison of

5   automobiles to here is based strictly in 1999.  There's no

6   allegation about what GM cars use after that date, aside from

7   there's some just generic information and belief the cars used

8   longer cutoffs in GM and other vehicles, which is not specific

9   enough.

10        **MR. WHITEFIELD:**  May I add to that point, Ms. Smith?

11        Just briefly, Your Honor, plaintiffs in the third-

12   amended complaint at Footnotes 6, 13, 16, 17 and 24 cite to a

13   book by Chan called Fundamentals of Crash Sensing in Automotive

14   Airbag Systems.  At page 26 of that book it says, quote:  A

15   vehicle with a stiff front-end structure, such as a heavy-duty

16   pickup truck, will generate a signal different from that of a

17   passenger car colliding with the same obstacle at the same

18   speed.

19        **THE COURT:**  Is that in the record?

20        **MR. WHITEFIELD:**  It is not in the record other than

21   by way of the references to this book in the footnotes of --

22        **THE COURT:**  I mean, I understand that.  I get that,

23   but -- and someone challenging a complaint can ask the Court to

24   incorporate by reference or take judicial notice of matters --

25   of other parts of matters that have been discussed in the

PROCEEDINGS

1  complaint.

2          So my question -- but my question -- but the thing

3  you just said, that didn't happen before this hearing.

4          **MR. WHITEFIELD:**  It has not, Your Honor, and I'd ask

5  for permission to do that at this late date, because I didn't

6  find this until just in preparation for this hearing.

7          **THE COURT:**  Your opponents are entitled to more

8  notice than that.  I'm going to deny that request.

9          **MR. WHITEFIELD:**  My only point, Your Honor, was just

10  that --

11          **MS. SMITH:**  I'm sorry.

12          **MR. WHITEFIELD:**  -- Ms. Smith was making the point

13  that the plaintiffs say that passenger car times should be

14  relevant here, and cars and trucks are different.

15          **THE COURT:**  The Court's ruling had nothing to do with

16  the merits.

17          **MR. WHITEFIELD:**  Understood.

18          **THE COURT:**  Ms. Smith.

19          **MS. SMITH:**  All right.  And, Your Honor, just to --

20  continuing on the knowledge point is one case that plaintiffs

21  cite in their motion to dismiss opposition is the *Deras v.*

22  *Volkswagen* case.  Which, I hope I'm pronouncing *Deras*

23  correctly.  And we had originally cited that case for the

24  proposition that just because you have a number of reported

25  events doesn't necessarily plausibly allege that a defendant

PROCEEDINGS

1    had sufficient knowledge.  And plaintiffs came back in the

2    motion to dismiss and said -- excuse me, in their opposition to

3    a motion to dismiss it said, notably, in a later opinion

4    regarding these revised allegations, the Court concluded that

5    while, standing alone, the allegations regarding the complaints

6    were insufficient to allege knowledge, taken as a whole and

7    viewed in a light most favorable to plaintiffs, together with

8    the broader record in that case, the allegations regarding

9    knowledge were sufficient.  And that's the *Deras* case with the

10   cite 2019 Westlaw 935130, cited in plaintiffs' opposition, ECF

11   202.

12            And that case actually I think really makes the point

13   here.  In that case, the Court did find there was sufficient

14   knowledge on the amended complaint, but it said simply even

15   alleging that the NHTSA complaints were too high in number,

16   without more it was not sufficient, instead, there were

17   allegations about NHTSA investigations, there were allegations

18   about governmental actions, there were allegations about

19   reports.  And also that case, as I'm sure Your Honor knows

20   better than I, involved sunroofs shattering.  Which, unlike

21   airbags not deploying, which happens, and appropriately happens

22   and is expected to happen and was disclosed in GM's owner's

23   manuals, arguably it is not expected that sunroofs would

24   shatter.

25            So we would just say that the *Deras* opinion I think

PROCEEDINGS

1   is very on point for why they are not sufficient.

2           And then finally, because I want to either reserve

3   time or prove that I won't use all the time, is on the standing

4   issue we cite the *Johnson versus FCA* case in our brief

5   repeatedly, and we do think it is exactly on point here.  But

6   we realize that we are also in the Ninth Circuit, and so one

7   case that I would request perhaps if the Court would indulge

8   and re-look at is *Anderson versus Hyundai Motor Company*, and

9   that cite is 2014 Westlaw 12579305, and I think that is also

10  precisely on point for us in this case.

11          So with that, unless the Court has questions now, I

12  would respectfully reserve the rest of the time.

13          **THE COURT:**  Thanks, Ms. Smith.  You have about five

14  and a half minutes remaining.

15          Mr. Tellis?

16          **MR. TELLIS:**  Thank you, Your Honor.

17          While we're up against zealous advocates, the idea

18  that our complaint contains, quote, nothing to support a

19  plausible defect I think is disingenuous.  I will walk you

20  through the nothingness, Your Honor, in a moment here.  But

21  before I do, I just wanted to start with the guidance Your

22  Honor gave us in the last order you issued on GM's motion to

23  dismiss.

24          Your Honor was clearly troubled that the definition

25  we proposed at that time of a 45-millisecond cutoff was not

PROCEEDINGS

```
1   uniform, because while you accepted it as implemented in 1999,

2   you noted that there were instances in the class period where

3   the cutoffs were deemed to have been 16 milliseconds, 50

4   milliseconds, et cetera, and therefore that 45-millisecond

5   cutoff that we had started with was not uniform across the

6   board.  But in granting us leave to amend, you very clearly

7   noted, quote, it may be, as plaintiffs' opposition suggests,

8   that any cutoff time below a certain threshold would constitute

9   a design defect, end quote.  And so with that guidance and the

10  benefit of a leading automotive expert, we filed a third-

11  amended complaint that very clearly alleges that GM's use of a

12  cutoff below 100 milliseconds in the class vehicles constitutes

13  a design defect.  Anything less than that hundred millisecond

14  cutoff creates a dead zone during which the airbags are

15  foreseeably necessary, but they don't deploy.  It's well

16  defined --

17          THE COURT:  Mr. Tellis, I'm going to use Ms. Smith's

18  argument as an opportunity to frame your response a little bit.

19  I'll just tell you the things that she talked about that I'm

20  hoping you'll address, not immediately, but at some point

21  during your remarks to the Court.

22          Her argument that there is nothing in the complaint

23  to suggest that there's something wrong with the -- with a

24  cutoff of below a hundred milliseconds, in other words, that

25  there's nothing in the complaint that shows that that defect,
```

PROCEEDINGS

1  if there be one, manifests in the real world in any way that

2  actually harms consumers.  That's what I understand that point

3  to be.  And then her point that what everyone might think about

4  the allegations about corporate knowledge, all of them deal

5  with a cutoff of below 45 milliseconds, and there aren't

6  corporate knowledge allegations in the complaint regarding a

7  cutoff of below a hundred milliseconds.

8          Those are the things I hope you'll get to.

9      **MR. TELLIS:**  I will, Your Honor.

10         Let me just go ahead and start with the first one,

11  which is this idea that there's nothing harmful or we haven't

12  alleged, you know, this hundred-millisecond is somewhat

13  arbitrary or speculative.  Clearly not.  It's plausible because

14  there is a factual basis that will allow this Court to

15  reasonably infer that a cutoff of less than a hundred

16  milliseconds is actionable.  Let's walk through those.

17         So we start at paragraphs 4 through 6 where we allege

18  that GM software engineer, Delco Engineering and its manager,

19  Chris Caruso, warned GM about its decision to implement a

20  premature cutoff during crash events of 45 milliseconds, which

21  was reckless and dangerous.  In fact, they insisted that if GM

22  go forward on this path, they give them a release.  We allege

23  that the truck groups ignore Delco, but the car group did not.

24  The car group, in fact, heeded the warning and established a

25  much longer hundred-millisecond cutoff.  So this is evidence

PROCEEDINGS

1    that inside GM there was a disagreement, the cars repeated the

2    advice that were being given by the software engineer and set

3    the cutoff at a hundred milliseconds.

4         We allege that anything less -- this is in

5    paragraph 42 -- anything less than a hundred milliseconds is

6    dangerous, because a typical crash duration for a straight-

7    forward frontal collision lasts approximately 80 to 150

8    milliseconds, roughly twice as long as what the trucks group

9    adopted.  We allege at paragraph 64 that other industries,

10   other manufacturers in the industry use a longer window than GM

11   does, almost twice as long as their 45-millisecond cutoff.

12        And so the trucks group deliberately chose a

13   reckless, premature 45-millisecond cutoff, or let's just say a

14   cutoff less than a hundred milliseconds, which was contrary to

15   their internal advice, there cars groups' actions and industry

16   standards.  I would say the Ninth Circuit hasn't really

17   articulated what one needs to allege to properly allege a

18   defect, but I would suggest that those three data points, what

19   they were getting from their own engineers, what their own cars

20   groups did and what the industry does is sufficient to make the

21   hundred-millisecond cutoff a plausible benchmark.

22        Now, what about the data points that show that

23   that -- that GM was employing less than a hundred-millisecond

24   cutoff throughout the class period?  That's the issue that

25   troubled your Court, Your Honor the first time around.  And we

PROCEEDINGS

1  have several allegations that walk you through the entire

2  18-year period, and I think when read in the light most

3  favorable to the plaintiffs, allow you to draw an inference

4  that that -- that GM was employing a defective and aggressive

5  cutoff for the entire period.

6          We start with Chris Caruso's testimony, where he was

7  at GM and Delco for a six-, seven-year period, 1999 through

8  '06, where he recognized and observed the use of this defective

9  calibration, including when later model years were already in

10  development.  In other words, he's there in 2006.  The 2007 and

11  2008 model year vehicles are already in production.

12         In paragraph 68, we talk about how GM had a practice

13  of setting its calibration on a group-wide basis within the

14  truck group.  In other words, all trucks got the same

15  calibration on the -- the aggressive calibration.  It wasn't

16  that each truck had some examination as to what we should set.

17         We then look at the most recent example of an

18  accident, which was in 2018.  This is detailed through

19  paragraphs 102 through 108 in the case.  This is the McCoy

20  lawsuit, where Mr. Caruso actually examined the software file

21  of that subject vehicle, which was a class vehicle, a 2018

22  Denali, and described seeing cutoffs that were well below the

23  hundred-millisecond threshold.  He found it was defective in an

24  '18 vehicle, and it was a result of a carryover from the Algo

25  software that he had designed years earlier when he was at GM.

PROCEEDINGS

1  So Mr. Caruso observes that the deficient and defective cutoff,

2  the aggressive cutoff of less than a hundred milliseconds, was

3  still being used 19 years after he first warned GM about it.

4        Your Honor found that that allegation, the Caruso-

5  reported inventory, quote, supported an inference that the

6  defect similar to the one in 1999 was installed in all the

7  class vehicles because his report concludes that the trucks

8  group was still doing it.  And then there are a few other data

9  points between the 2018 and the earlier one.  There's 2005, the

10 Motstra (phonetic) lawsuit.  Again, Caruso describes the 45- to

11 50-millisecond cutoff.  There was a 2006 letter that was

12 written by another automotive expert to GM, Sal Fiorello, who

13 describes the flawed deployment thresholds in a 2006 class

14 vehicle.

15       There's the *Greenwood* lawsuit, which has all the

16 hallmarks of a calibration defect in a 2006 vehicle.

17     (Reporter clarification.)

18       **MR. TELLIS:**  I apologize.

19       Greenwood is in paragraph 122.  That involves a model

20 year 2006 vehicle.  We then move to paragraphs 123 through 124,

21 which we talk about a model year 2009 vehicle in the *Woods*

22 lawsuit.  We then go to paragraphs 115 and 116 which talk about

23 a 2014 vehicle in the *Vaith* lawsuit.  We also have allegations

24 about GM's continued use of Delco hardware through 2018,

25 including in the McCoy vehicle.

PROCEEDINGS

1          And so all these sources together, Caruso's testimony

2   at the very beginning and at the very end and all these data

3   points in between, Your Honor, and the group-wide manner in

4   which GM sets its calibration for each vehicle group strongly

5   support the inference in plaintiffs' favor that GM continued to

6   use a defective approach to its calibration software throughout

7   the class period.  And of course the class reps all fall right

8   between those; we've got 2010 to 2012.

9          Now, let me talk about GM's knowledge of the defect

10  or what they knew and when, which was I think the other issue

11  that was raised.

12         First, Your Honor, we know that they intentionally

13  chose this path at the outset.  We know that from Chris

14  Caruso's testimony, that he warned them against it, they

15  ignored him and they implemented it.  That's paragraphs 63 to

16  66.

17         We also know that they've gotten notice from the

18  various crashes that I just went through that the aggressive

19  cutoff that they were employing was causing accidents and

20  incidents.  That is to say, whether they knew that the 16

21  milliseconds or 45 milliseconds or 50 milliseconds, what they

22  knew was the approach they had at the time, which was to set an

23  aggressive cutoff that was less than a hundred milliseconds,

24  contrary to what the cars group was doing, was a problem.

25         And then we cite to the more than 800 complaints to

PROCEEDINGS

1    NHTSA beginning in 1999 and continuing through, by folks who

2    owned class vehicles who would experience frontal crashes with

3    airbags and seatbelt failures.  GM is deemed to have reviewed

4    those under its statutory written obligations.  We cite that in

5    paragraph 128.  In fact, dozens of those descriptions actually

6    say they notified GM of the issue.

7            They describe the symptoms of the calibration

8    problem.  They describe the fact that their airbags and

9    seatbelts failed.  And we're dealing with a defendant here who

10   has superior knowledge over class members, over plaintiffs'

11   counsel.  The idea that they weren't told what the exact

12   calibration setting was in these vehicles is besides the point.

13   What they know is that the strategy that they implemented in

14   1999 and which clearly now continued through 2018 was flawed

15   Lauderdale, and we think, Your Honor, that with those

16   allegations in mind, we're entitled to the inference that they

17   were on notice of this defect.

18           Mr. Daroci can take up Article III if you'd like, or

19   if you have questions for me I'm happy to answer them.

20           **THE COURT:**  I don't have any questions.  Thanks.

21           **MR. DAROCI:**  Thank you, Your Honor.  I'll just

22   address, then, this reference to *Johnson* and later on in

23   *Anderson*.

24           In its most recent motion, just as in its reply brief

25   for its prior motion, GM really relied on this Beecham case, a

PROCEEDINGS

1    Michigan case, *Johnson versus FCA* --

2         (Reporter clarification.)

3         **THE COURT:**  All right.  I'm going to stop the clock

4    for a second so Mr. Daroci can make an attempt to change his

5    microphone.

6         Mr. Daroci, I should also tell you, I'm not sure I

7    see your Article III standing problem here.  I think this is

8    a -- I think this is just a 12(b)(6) motion, and the question

9    of whether the plaintiffs have adequately pled the elements of

10   their claims, that's what's in front of the Court.  I don't see

11   a separate standing issue.  I mean, either -- obviously if they

12   didn't plead a claim, they don't have an injury, so, and they

13   can't be in court.  But I don't think that's necessarily an

14   Article III problem.

15        **MR. DAROCI:**  I think that's right, Your Honor.

16        I mean, it's framed now in the third-amended

17   complaint as a standing issue, but it's really the same

18   argument that's been made twice over now about plaintiffs

19   attempting to plead, you know, a no-injury product liability

20   action and making a claim out of a non-bargained-for safety

21   feature.  That argument's been made twice over now.  The

22   Court's we think properly rejected it both times.

23        And the line of cases, *Birdsong*, *Lassen*, *DuSole*t

24   (phonetic), I don't need to go through them in detail, but I

25   think it suffices to say that in all of those cases that the

PROCEEDINGS

1    Court finds there was a defect, in all of those cases it was

2    plaintiffs arguing for hypothetical non-bargained-for safety

3    features, and that's not really what we have here.  Not only

4    that, in all those cases the alleged defect arose out of misuse

5    or user error.  Whereas here, by contrast, the SDM defect is

6    present in the vehicle regardless of how those vehicles are

7    being operated.

8         So I'll just take a second to discuss *Johnson* and I

9    guess *Anderson*, as well, given GM's emphasis on that case in

10    its most recent motion.  While there is some surface level

11    similarities between that case and this one, there are material

12    differences between the cases that we think negates any of

13    *Johnson's* potential persuasive value here, and we think the

14    Court was spot on in its last order pointing out what those

15    differences were and rejecting GM's attempt to analogize the

16    cases.

17         In the Court's last order, Your Honor noted that in

18    *Johnson*, the district court in Michigan concluded that the

19    plaintiffs' own allegations show that Chrysler in that case did

20    not mislead the plaintiffs.  Whereas here, the Court's already

21    found that the plaintiffs have provided sufficient allegation

22    to conclude that GM did mislead the plaintiffs.  That includes,

23    for example, the omission claim that Your Honor has already --

24         **THE COURT:**  That observation is I would say made in

25    passing because it's not in a court order, but it's in a

PROCEEDINGS

1    footnote.  So I already know about that.  If there are other

2    ways of distinguishing Johnson, that's what I would like to

3    hear from you.

4              **MR. DESAI:**  Sure, Your Honor.

5              In that case, and it goes -- it's related to the, you

6    know, the issue of whether the defendant there mislead the

7    plaintiffs.  But in that case none of the representations made

8    in the brochures or consumer-facing statements by Chrysler said

9    any -- you know, they were consistently -- they were much more

10   transparent than GM here where they said, yeah, the side impact

11   airbags are not going to deploy in all rollover crashes.

12   They'll only deploy as and if necessary.  But, you know, here

13   GM never told consumers that airbags with fail even in the most

14   severe accidents.  So GM's misleading conduct here includes,

15   first, as I mentioned, the omission that this Court's already

16   upheld, as well as the exemplar ads and brochures we point to

17   that fail to mention the SDM defect or the practical effects of

18   that defect whereby the safety system in GM trucks will not

19   activate seatbelts and airbags in a variety of severe frontal

20   crashes.

21             **THE COURT:**  Just as I did with Mr. Tellis, in just a

22   minute whenever that happens, I'm going to say to Ms. Smith,

23   here are the things that Mr. Tellis and Mr. Daroci told me I

24   want you to respond to, and one of the things I'm going to say

25   to her is:  What about the question of what GM told consumers

PROCEEDINGS

```
 1   about these airbags -- I mean, about this SDM system, because I
 2   actually don't remember that and what that is in the complaint,
 3   and it's faster for me to ask one of you than to go find it
 4   myself.  So she's going to have an opportunity to talk about
 5   that.  Do you want to anticipate her argument on that point?
 6   What is she gonna say GM said to its customers about SDM?
 7            MR. DAROCI:  Your Honor, I think what Ms. Smith might
 8   say is that they never made any sort of statement that the
 9   airbags were going to deploy in all crashes.  That's what they
10   say in their motion to dismiss.  And we think that's, you know,
11   a strawman.  Of course there's no bargain here that we're going
12   to purchase cars where the airbags deploy in all accidents.
13   What they said here consistently in their literature was that
14   they will deploy in moderate to severe frontal crashes.  And
15   again, we point out in our complaint, you know, numerous
16   brochures and consumer-facing statements where that's the case.
17            So plaintiffs expected --
18            THE COURT:  I think you've addressed that point.
19            MR. DAROCI:  And then lastly, Your Honor, quickly on
20   Anderson, which Ms. Smith raised at the end of the argument,
21   that's a unique case that we think has no persuasive value
22   given some of the unique factual circumstances of that case.
23   That case dealt with side impact sensors and the location of
24   those sensors on Hyundai vehicles.  The plaintiffs argued that
25   the side impact sensor should be located on the B pillar of a
```

PROCEEDINGS

1  vehicle rather than a cross member in line with the rest of
2  Hyundai vehicles.  And in assessing standing in that case, the
3  Court noted that plaintiffs' position regarding the placement
4  of the sensor was based solely on two studies that Hyundai
5  itself had conducted.  The Court considered those reports and
6  found that not only did they not support plaintiffs'
7  allegation, they really directly contradicted what plaintiffs
8  were saying.  So there, the Court found it didn't need to rely
9  on plaintiffs' pleadings when there was contrary evidence in
10 the record and for that reason found that plaintiffs had not
11 adequately demonstrated that there was any defect in the
12 vehicles.
13         So this is a unique factual circumstance not present
14 in this case that we think, again, negates any persuasive value
15 that that case might have.
16         **THE COURT:**  All right.  I stopped and started
17 Mr. Daroci's time because it was a microphone issue.  I was a
18 little slow to restart it.  I think you're about where
19 Ms. Smith was.  I think your side has about five and a half
20 minutes left, actually.
21         **THE COURTROOM DEPUTY:**  Yes, sir.  That's correct.
22         **THE COURT:**  Is that right?
23         **THE COURTROOM DEPUTY:**  Yes.
24         **THE COURT:**  There we go.  Ms. Lee knows.  I should
25 have just asked her.

PROCEEDINGS

1          Ms. Smith, rebuttal argument.

2          **MS. SMITH:**  Thank you, Your Honor.

3          Let me just start on the *Anderson* issue.  In

4  answering Your Honor's questions, it's not only that GM did not

5  say the airbags would deploy in all accidents.  GM disclosed

6  that they would not.  GM disclosed -- and this is at, for

7  example, in our opening motion, ECF 201, at pages 4 through 5,

8  just some examples, and these are owners' manuals that are

9  quoted and reproduced in our complaint.  They are in the

10 record.

11         Among other things, the manuals advise whether the

12 frontal airbags will deploy or should deploy is not based on

13 how fast your airbag is travel -- excuse me, your vehicle is

14 traveling, but depends largely on what you hit, the direction

15 of impact and how quickly your vehicle slows.  Plaintiffs

16 allege in their complaint -- and this is in the third-amended

17 complaint, paragraph 30, the airbags are not meant to deploy

18 with every impact.  That is disclosed, it is what plaintiffs

19 allege, and it's correct.

20         *And Anderson*, I just want to go back briefly to

21 *Anderson*, which is the -- almost the exact same language was at

22 issue in *Anderson*, where they said, disclosed:  Side airbags

23 are designed to inflate in moderate to severe side collisions.

24 That's almost exactly what GM said, in moderate to severe

25 frontal collisions.  It's almost the exact same.

PROCEEDINGS

1          And *Anderson* -- also just one more point on *Anderson*,

2    which is plaintiffs say all of these cases involve misuse.

3    *Anderson* is just like this case.    *Anderson* is just like this

4    case in where it's when the airbag should go off in an accident

5    and looking back and saying, should there be different things

6    that go into it.  So I'll move on from standing, because I --

7    we hear Your Honor on that position, and I want to respond

8    briefly to what Mr. Tellis said.

9          What Mr. Tellis went through and said here's all the

10   bases of GM's knowledge, literally almost every single one of

11   them either didn't have anything about a time cutoff or went

12   back to the 45-millisecond cutoff.  There is nothing that

13   Mr. Tellis referenced that refers to a hundred-millisecond

14   cutoff aside from the following:

15         One, he refers to automobile, the automobiles using a

16   different cutoff.  Here is the sum and substance of what

17   plaintiffs allege about that in the complaint:

18         First of all, they allege in 1999 that GM cars used a

19   different cutoff.  They don't allege anything else since 1999

20   about the GM cars aside from this.  This is paragraph 64 of the

21   complaint.  GM's own cars group, and on information and belief,

22   other major vehicle manufacturers throughout the industry

23   include a significantly longer window for the SDM to detect a

24   potential accident and deploy the airbags and seatbelts.

25   That's it.  There's no --

PROCEEDINGS

1    **THE COURT:**  Aren't there a series of allegations

2    beginning at approximately paragraph 4 and continuing past

3    paragraph 6, even though that's where Mr. Tellis stopped, that

4    have as their theme that once this 100-millisecond cutoff had

5    been established as a more safe recommendation by one part of

6    the company, that basically the company was thereafter on

7    notice of that cutoff -- and I'm not doing a good job of

8    summarizing the allegations, but my recollection is that the

9    phrase "a hundred-millisecond cutoff" appears more than once in

10    that section in reference to this question.

11    Am I wrong?

12    **MS. SMITH:**  No, you are not wrong.  The phrase "a

13    hundred milliseconds" is used in terms of saying the car group

14    used a longer cutoff in 1999.  And in this version of the

15    complaint they say a hundred milliseconds, in the old version

16    they said 150, but that's it.  There's nothing else aside from

17    the car group in one year used a different cutoff.  There's no

18    allegation that they did in 2010.  There's no allegation it

19    stayed the same.

20    **THE COURT:**  But let me ask you a question, though.

21    I mean, let's say, let's say -- and as always, if

22    you're playing devil's advocate, please.  I may have

23    communicated earlier how I feel about having my off-the-cuff

24    comments quoted back to me at a hearing, but anyway, let's say

25    there's a children's toy, and it's an old-fashioned toy, the

PROCEEDINGS

1    one where you pull the lid off and then fake snakes come

2    springing out, and -- but in this particular manufacturer in

3    the hypothetical decides it would be much more fun if you use

4    real snakes.  So they put that out on the market, and people

5    open the lid and actual venomous snakes come shooting out of

6    the toy.

7              And a report is written inside the company and says,

8    you know, that's really not a good idea.  The venomous snakes

9    have bitten several children, and many of them have needed to

10   be hospitalized as a result of that, so we should not do that

11   anymore.  And the report is written in 1999.  All right?  And

12   the facts don't change.  There's never another report, and

13   nonetheless, the company keeps putting lives snakes in just

14   because they like the publicity and it's actually very

15   profitable.  There's a high markup, because no one else has a

16   product like that.  So they keep doing it.

17             And then at oral argument in 2023 someone says, Your

18   Honor, here's the thing, nothing changed from 1999 other than

19   this one little memo.  I don't know what the question is.

20   That's the hypothetical.

21             **MS. SMITH:**  I'm slightly heartbroken about this

22   whole -- the venomous snakes analogy does not make me feel good

23   about this, but let me tell you what the venomous snake is here

24   is 45 milliseconds.  They don't allege that somebody said

25   everything at that time, and I encourage people to look at the

PROCEEDINGS

1  complaint, that someone said anything less than a hundred

2  milliseconds is a defect.  It was 45, 45, 45, 45.  That's what

3  the issue is, not something that's a hundred percent more than

4  that.

5          THE COURT:  Okay.

6          MS. SMITH:  But I enjoy it, but I'm frightened by the

7  analogy.

8          THE COURT:  All of my analogies in hearings are poor,

9  including that one.

10         Ms. Smith, your time's elapsed.  Actually, it elapsed

11  during my hypothetical, but I needed to hear the answer.

12         Mr. Tellis, what about this point?  Let's keep that

13  part of the conversation going.  Ms. Smith' argument would be,

14  look -- you know, the plaintiffs', essentially the argument's

15  going to be the plaintiffs can't have it both ways.  The Court

16  wouldn't let you have a complaint where you alleged 45

17  milliseconds, but you had a lot of inconsistent other

18  allegations in the complaint.  You -- maybe you read the

19  Court's invitation correctly and you accepted a hundred

20  milliseconds, but there's not an allegation that says there was

21  corporate knowledge of a hundred milliseconds.  There's only

22  corporate knowledge at the level where your complaint was

23  dismissed.

24         Ms. Smith, how did I do summarizing your argument?

25         MS. SMITH:  I thought you did it beautifully, Your

PROCEEDINGS

1   Honor.

2          **THE COURT:**  So Mr. Tellis, Ms. Smith likes my

3   restatement.  What's the response to that?

4          **MR. TELLIS:**  The response is in 1999, Chris Caruso,

5   on the Delco team, warned the trucks group that the threshold

6   they were playing with was dangerous.  When we say the cars

7   groups heeded his advice and implemented the hundred-

8   millisecond cutoff, it's fair to infer from that that they

9   understood that a hundred-millisecond cutoff was appropriate.

10  They intentionally chose to ignore it and implement something

11  less than.

12          This isn't arbitrary.  The car group got the hundred

13  milliseconds from somewhere and implemented it.

14          **THE COURT:**  If I go back -- so this is how all of us

15  make our money.  Especially you; I just decide.

16          But this is really -- you know, we're really sort of

17  dancing on the head of a pin here.  I'd have to get the second

18  amended complaint which I don't have in my binder.  The

19  question is what -- what was communicated.  So if the company

20  says ...

21          I don't want to use so much time.  Let me see if I

22  can cut to the chase.

23          So I hear your argument as GM adopts -- GM adopts a

24  hundred milliseconds for cars.  Then GM adopts 45 milliseconds

25  for trucks.  Then Chris Caruso or people on that team say to

PROCEEDINGS

1    GM, that's too low, and we know that because that's -- let's

2    just say that's too low.  And you're asking the Court -- and

3    that's -- those are the -- that's what the body of pleadings

4    would establish as the history, and you're asking the Court to

5    say, look, you have to read these allegations in the light most

6    favorable to plaintiffs.  We know what GM thought was a safe

7    cutoff because they adopted that for cars, and the fact that

8    they were told it's too low at 45 does not mean that 46 was

9    safe.  You can't read the complaint that way.

10           **MR. TELLIS:**  That's correct.

11           And the other points that we made, which were that

12   there's data out there about how long it takes for an accident

13   to play out, what the other groups are doing, you know, what

14   the other competitors are doing, but the way I see it is we're

15   required to allege knowledge of a defect.  We define the defect

16   as a cutoff of less than a hundred milliseconds.  They clearly

17   know that these trucks have a cutoff of less than a hundred

18   milliseconds.  I feel like we've done what we need --

19           **THE COURT:**  I know that, but the question is not do

20   they know what their own cutoff is; of course they do.  The

21   question is do they know that it's unsafe.  Right?  Would you

22   agree with my characterization of what's at issue?

23           **MR. TELLIS:**  Yes.

24           **THE COURT:**  Okay.

25           **MR. TELLIS:**  Except we've established the fact that a

PROCEEDINGS

1  cutoff of less than a hundred milliseconds is unsafe through

2  countless allegations in this complaint.  I've gone through

3  them.

4          THE COURT:  You keep saying that.  I'll keep telling

5  you that's not what we're talking about right now.

6          MR. TELLIS:  Okay.

7          THE COURT:  We're talking about corporate knowledge

8  of the fact that that cutoff was unsafe.

9          MR. TELLIS:  Oh.  Well, but the reason Chris Caruso

10  told them not to adopt what they were doing was because it was

11  reckless and dangerous.

12          THE COURT:  Does Chris Caruso carry all this weight

13  for you?

14          MR. TELLIS:  Well, Chris Caruso had firsthand

15  knowledge, and he's been an expert --

16          THE COURT:  Mr. Tellis, let me just say to everybody,

17  please answer the Judge's question.  I'm only saying it to you,

18  Mr. Tellis, but I could have said it to everybody earlier.  So

19  I'm going to try again.

20          MR. TELLIS:  Well, I guess I --

21          THE COURT:  No, when I say I'm going to try again

22  means I'm about to talk, so don't talk when I'm talking.

23          MR. TELLIS:  Sorry.

24          THE COURT:  I could feel -- and maybe I better

25  actually stop there, because I can hear the impatience in my

PROCEEDINGS

1   own voice of Mr. Tellis, and that's probably a sign I'm not

2   doing my best work.

3          So everyone's time has elapsed.

4          **MR. TELLIS:**  My only problem is I struggled when you

5   said "carry all the weight."  He's certainly an important

6   component of our case.  I'm sure we will have corroborating

7   testimony from others, but I was caught off --

8          **THE COURT:**  Not at the 12(b)(6) stage you wouldn't.

9          **MR. TELLIS:**  Fair enough.

10         **THE COURT:**  Yeah.  Once again I would say, please

11  keep my actual question in mind.

12         Folks, I'm going to take your motion under

13  submission.

14         **VOICES:**  Thank you, Your Honor.

15      (Proceedings concluded at 3:02 p.m.)

16              ---o0o---

17         <u>**CERTIFICATE OF REPORTER**</u>

18      I certify that the foregoing is a correct transcript

19  from the record of proceedings in the above-entitled matter.

20  DATE:  Friday, February 21, 2025

21

22

23  _____

24     Stephen W. Franklin, RMR, CRR, CPE
       Official Reporter, U.S. District Court

25