DYKEMA GOSSETT LLP
JOHN M. THOMAS, State Bar No. 266842
 JThomas@dykema.com
ABIRAMI GNANADESIGAN, State Bar No. 263375
 AGnanadesigan@dykema.com
444 South Flower Street, Suite 2200
Los Angeles, California 90071
Telephone: (213) 457-1800
Facsimile: (213) 457-1850

KIRKLAND & ELLIS LLP
Renee D. Smith (admitted *pro hac vice*)
Sam Ikard (admitted *pro hac vice*)
Jeremy D. Roux (admitted *pro hac vice*)
renee.smith@kirkland.com
sam.ikard@kirkland.com
jeremy.roux@kirkland.com
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2310
Facsimile: (312) 862-2200

BUSH SEYFERTH PLLC
Justin B. Weiner (admitted *pro hac vice*)
weiner@bsplaw.com
100 West Big Beaver Rd., Ste. 400
Troy, Michigan 48084
Telephone: (248) 822-7851
Facsimile: (248) 822-7851

*Attorneys for General Motors LLC,
General Motors Holdings LLC and
General Motors Company*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| JAMES MILSTEAD, et al., | Case No. 4:21-cv-06338-JST |
| Plaintiffs, | **GENERAL MOTORS LLC'S OPPOSITION TO NON-PARTY APTIV SERVICES US, LLC'S MOTION FOR A PROTECTIVE ORDER [ECF NO. 270]** |
| v. | |
| GENERAL MOTORS LLC, et al, | Honorable Thomas S. Hixson<br>Hearing Date: May 15, 2025<br>Time: 10:00 a.m.<br>Location: Via Zoom |
| Defendants. | |

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................. 3

        A.      The Alleged "SDM Calibration Defect." ........................................................... 3

        B.      The Role Of Aptiv And Its Predecessors. ......................................................... 4

        C.      The Class Vehicles And Aptiv Subpoenas. ....................................................... 7

LEGAL STANDARD ..................................................................................................................... 8

ARGUMENT & AUTHORITIES .................................................................................................... 9

        I.      The Aptiv Materials Are Relevant And Proportional. ...................................... 9

                A.      The Class Vehicle Materials. ............................................................. 9

                B.      Other Materials. ................................................................................ 11

        II.     GM Has Demonstrated Substantial Need For The Aptiv Materials. ................ 12

        III.    Any Burden On Aptiv Does Not Outweigh The Needs Of The Case. .............. 12

CONCLUSION .............................................................................................................................. 14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AngioScore, Inc. v. TriReme Med., Inc.*,
  2014 WL 6706873 (N.D. Cal. Nov. 25, 2014) ................................................................. 8

*In re Apple iPhone Antitrust Litig.*,
  2020 WL 5993223 (N.D. Cal. Oct. 9, 2020) ............................................................ 1, 9, 11, 12

*Beckman Indus., Inc. v. Int'l Ins. Co.*,
  966 F.2d 470 (9th Cir. 1992) .......................................................................................... 13

*Blumberg v. Ambrose*,
  2014 WL 4988380 (E.D. Mich. Oct. 7, 2014) ................................................................ 13

*In re Bridgestone/Firestone, Inc.*,
  288 F.3d 1012 (7th Cir. 2002) ........................................................................................ 10

*Butler v. Porsche Cars N. Am., Inc.*,
  2017 WL 1398316 (N.D. Cal. Apr. 19, 2017) ................................................................ 10

*Chevron Corp. v. Donziger*,
  2013 WL 4536808 (N.D. Cal. Aug. 22, 2013) ................................................................ 11

*Deras v. Volkswagen Grp. of Am., Inc.*,
  2020 WL 940012 (N.D. Cal. Feb. 27, 2020) ............................................................ 2, 9, 11

*In re Ford Motor Co.*,
  86 F.4th 723 (6th Cir. 2023) ............................................................................................ 9

*Grodzitsky v. Am. Honda Motor Co.*,
  2014 WL 718431 (C.D. Cal. Feb. 19, 2014) .............................................................. 1, 10

*Grodzitsky v. Am. Honda Motor Co.*,
  2017 WL 8943159 (C.D. Cal. Oct. 30, 2017), *aff'd*, 957 F.3d 979 (9th Cir. 2020) ........................................................................................................................... 13

*Milstead v. Gen. Motors LLC*,
  2023 WL 4410502 (N.D. Cal. July 6, 2023) ................................................................. 4, 6

*Milstead v. Gen. Motors LLC*,
  2023 WL 7284159 (N.D. Cal. Nov. 3, 2023) ............................................................*passim*

*In re Nissan N. Am., Inc. Litig.*,
  122 F.4th 239 (6th Cir. 2024) ..................................................................................... 9, 10

*In re Path Network, Inc.*,
    2024 WL 4828075 (N.D. Cal. Nov. 18, 2024) .................................................................. 12

*Pereda v. Gen. Motors LLC*,
    2022 WL 19975388 (N.D. Cal. Dec. 9, 2022) ................................................................. 4, 6

*Roy v. X1 Inc.*,
    2024 WL 3159291 (N.D. Cal. June 25, 2024) .................................................................... 9

*Sloan v. Gen. Motors LLC*,
    2020 WL 1955643 (N.D. Cal. Apr. 23, 2020) ................................................................... 10

*Soc. Ranger, LLC v. Facebook, Inc.*,
    2016 WL 11741634 (N.D. Cal. Nov. 4, 2016) .................................................................... 9

*Taylor v. Cnty. of San Bernardino*,
    2024 WL 3915194 (C.D. Cal. May 7, 2024) ..................................................................... 11

**Rules**

Fed. R. Civ. P. 1 .......................................................................................................................... 8

Fed. R. Civ. P. 23 ............................................................................................................... 1, 9, 14

Fed. R. Civ. P. 26 ................................................................................................................ 8, 9, 13

Fed. R. Civ. P. 45 ................................................................................................................ 8, 9, 11

**Other Authorities**

*Air Bags: FAQs*, "Why do air bags sometimes fail to deploy during a crash?,"
    NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., https://www.nhtsa.gov/vehicle-
    safety/air-bags (last visited Apr. 18, 2025) ........................................................................ 3

# INTRODUCTION

This class action lawsuit centers on claims that "millions of GM trucks and SUVs" manufactured over 20 years are defective because the software in the "airbag control unit, also known as the Sensing and Diagnostic Module ('SDM')," is calibrated to "prematurely close the time window to engage airbags and seatbelts in a crash." *Milstead v. Gen. Motors LLC*, 2023 WL 7284159, at *1 (N.D. Cal. Nov. 3, 2023); ECF No. 197, 3d Am. Compl. ("TAC") ¶¶ 1, 3. Plaintiffs allege the software algorithm is calibrated to "create[] a 'dead zone'" that shuts off and prevents airbag deployment too soon "in real world crashes." TAC ¶ 108. This alleged "SDM Calibration Defect" "underlies Plaintiffs' claims," *id.* ¶¶ 108, 168—claims seeking overpayment and other damages for millions of proposed class members who purchased or leased any one of hundreds of different make- and model-year GM trucks or SUVs in California.

GM provides airbag performance specifications, which are only a part of variable and complex and evolving vehicle systems and operating environments. But Aptiv (or its predecessors, Delphi or Delco) supplied the SDM software, developed the algorithms, and set the calibrations for the proposed Class Vehicles here. Aptiv uniquely has possession of documents relevant to (and potentially dispositive of) GM's defenses, including whether Plaintiffs can meet their burden under Rule 23 to show "the question 'is there a defect?' is capable of classwide resolution." *Grodzitsky v. Am. Honda Motor Co.*, 2014 WL 718431, at *5-6 (C.D. Cal. Feb. 19, 2014). GM's subpoena is proportional to the needs of this massive class action case. And any hardship to Aptiv is outweighed by GM's need for these relevant materials for a "fair opportunity to defend and prepare the case." *In re Apple iPhone Antitrust Litig.*, 2020 WL 5993223, at *3 (N.D. Cal. Oct. 9, 2020) (Hixson, M.J.). The Court should deny Aptiv's motion.

*First*, the Aptiv Materials are undeniably relevant. Plaintiffs recognize that airbags are not intended to deploy in all crashes, and airbag deployments in any individual crash are informed by many factors and complex interrelated technical algorithms, sensors, and signals that have evolved over time and vary across vehicles. But Plaintiffs focus their defect claims on alleged timing cutoffs in the software, which they label as the "SDM Calibration Defect." TAC ¶ 7. They allege this singular SDM Calibration Defect "exists in all GM trucks and SUVs" from model year 1999 and

continuing through model year 2018. *Id.* ¶ 167. Plaintiffs avoided dismissal by arguing that a review of the "actual software calibration for the SDM software" (that Aptiv produced for one vehicle in one personal injury lawsuit) created a reasonable inference that similar "cutoffs" exist in all Class Vehicles. *Id.* ¶¶ 106-111; *Milstead*, 2023 WL 7284159, at *3. But Plaintiffs rightly recognized that "[d]iscovery will reveal" whether the alleged defect is present in the software for other Class Vehicles. TAC ¶ 167. The "actual software" information (among other things) is crucial to determine if there are any cutoffs at all and, if so, whether and when they may apply in myriad different crash scenarios. This, in turn, will inform whether Plaintiffs can meet their burden to show which vehicles (if any) have a defect at all—let alone one that is material to a reasonable consumer.

*Second*, the Aptiv Materials are not available from other sources. Aptiv developed the algorithms and set the "multiple calibrations for each vehicle model" at issue here. ECF No. 270-1, D. Nichols Aff. Ex. 1-C at 1. GM does not have possession, custody, or control of those algorithm or calibrations, which are proprietary to and uniquely in the possession of Aptiv. D. Edmunds Decl. ¶¶ 8-10. Chris Caruso is the former Delco employee who advanced this "cutoff" theory in lawsuits against GM for more than a decade. Caruso described the Aptiv Materials as "key documents."[1] Without them, it is not possible to confirm whether alleged timeouts were in effect in specific vehicles or how they may impact deployments in individual crashes. *See* Edmunds Decl. ¶¶ 8-10.

*Third*, any potential burdens on Aptiv neither outweigh GM's need for nor dilute the importance of the Aptiv Materials. Plaintiffs and Aptiv may have agreed to limit production to certain vehicle platforms, ECF No. 270, Mot. at 2-3, but those select platforms only cover about half of the Class Vehicles at issue. Unless Plaintiffs amend their class definition, discovery is not so limited. "[T]he relevance inquiry is easily answered" here; "discovery as to [all the proposed Class Vehicles] is relevant." *See Deras v. Volkswagen Grp. of Am., Inc.*, 2020 WL 940012, at *3 (N.D. Cal. Feb. 27, 2020) (Hixson, M.J). Because "Plaintiffs allege that the [SDMs] in all these [vehicles] are defective," GM's subpoena is "exactly proportional." *Id.* The Court should deny Aptiv's Motion.

---

[1] *See* 4/27/2012 Caruso Rpt. at 5-6, 9, *Nossar v. Gen. Motors LLC*, No. 1:11-cv-02129-RLV (N.D. Ga. Apr. 30, 2012), ECF No. 40-1 (cited in TAC ¶ 94.).

# BACKGROUND

### A.     The Alleged "SDM Calibration Defect."

Airbags are highly effective automobile safety features, but they "are not meant to deploy with every impact." TAC ¶¶ 29-30. In some crashes, "the seatbelt alone will be sufficient for protection." *Id*. In other crashes, airbag deployment may risk doing more harm than good because the occupant ends up positioned too close to the steering wheel. ECF No. 188-1, Caruso *McCoy* Dep. at 172 ("late deployments are not something that's desirable."). The National Highway Traffic & Safety Administration ("NHTSA") explains: "The activation of an air bag in a crash is dependent on several important factors including: the characteristics of the crash (e.g., speed, other vehicles involved, impact direction); the individual vehicle air bag system's design strategy; and the crash sensor locations," and reiterates that "[a]ir bags are not intended to deploy in all crashes."[2] The Owner's Manuals for the Class Vehicles also says that, "[w]hether the frontal airbags will or should deploy is not based on how fast your vehicle is travelling," but instead "depends largely on what you hit, the direction of the impact, and how quickly your vehicle slows down." TAC ¶ 154.

This class action centers on the software algorithm in the SDMs of millions of model year 1999 to 2018 GM trucks and SUVs. As the Court summarized, Plaintiffs allege a defect in the Class Vehicles causes their SDM "to prematurely close the time window to engage airbags and seatbelts in a crash, putting occupants of the Class Vehicles at serious risk. Specifically, the software program that controls the SDM is calibrated to prevent airbag deployment and seatbelt tightening long before the 100 millisecond minimum window reasonably required by real-world crashes." *Milstead*, 2023 WL 7284159, at *1 (citations and quotations omitted). The alleged 100 ms. threshold or cutoff is not measured in linear real time, but instead refers to the software clock, which can count forwards or backwards depending on what the vehicle sensors perceive during a crash. TAC ¶ 40. Thus, calibration values in the software are expressed in "counts" equal to a specific period of real time,

---

[2] *Air Bags: FAQs*, "Why do air bags sometimes fail to deploy during a crash?," NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., https://www.nhtsa.gov/vehicle-safety/air-bags (last visited Apr. 18, 2025).

*e.g.* one count may equal 1.25 milliseconds in real time. *See* ECF No. 197-4, TAC Ex. D, Caruso *McCoy* Rpt. at 18. Plaintiffs allege that once the software clock exceeds a certain number of counts (more than 100 ms in software time), the SDM will prevent frontal airbag deployment "until the SDM detects that the crash has ended completely." TAC ¶ 48.

### B.  The Role Of Aptiv And Its Predecessors.

Aptiv and/or its predecessors Delco Electronics and Delphi Corporation supplied the SDM, created the algorithm, and calibrated for the software (including the software clock) for the proposed Class Vehicles. Edmunds Decl. ¶¶ 7-8. Aptiv's role and related information (the "Aptiv Materials") are intertwined with Plaintiffs' defect theory in multiple ways. Plaintiffs allege a 1999 calibration of "a proposed software program, known originally as ALGO-S" from Delphi included a deployment cutoff of "45 milliseconds, well before a real-world accident could foreseeably require airbag deployment." TAC ¶¶ 59-60. According to former Delphi engineer Chris Caruso—a litigation expert against GM and other automobile manufacturers in numerous lawsuits—his team "refused to release the defective software for use in GM trucks and SUVs until Old GM signed a disclaimer of Delco's liability for the modified calibration," which he claims GM did. *Id.* ¶ 66. (GM has not located such a waiver, and to date, neither Plaintiffs, Caruso, nor Aptiv have produced one.)

Plaintiffs allege the GM trucks and SUV group carried forward this "defective approach to prematurely cut off airbag and seatbelt deployment during crashes at least through model year 2018." *Id.* ¶ 7; *see also id.* ¶ 126. However, the Court twice dismissed this case based on Plaintiffs' failure to plausibly allege the same cut off present in trucks and SUVs from 1999 was also present in named Plaintiffs own model year 2010 and 2012 vehicles. *Milstead v. Gen. Motors LLC*, 2023 WL 4410502, at *6 (N.D. Cal. July 6, 2023); *Pereda v. Gen. Motors LLC*, 2022 WL 19975388, at *7 (N.D. Cal. Dec. 9, 2022). In response, Plaintiffs reprised and expanded allegations based on Caruso's review of "the actual" SDM software *produced by Apti*v in response to *GM's third-party* subpoena in another case to infer that the same defective cutoff existed in multiple Class Vehicles.

Specifically, when serving as a plaintiff expert in individual personal injury lawsuits, Caruso

(who Plaintiffs have described as "an important component of [this] case")[3] referred to "the calibration of the SDM-DS," including "calibration parameter files" as "key documents" he would need to confirm the existence of a design defect in the "sensing algorithm and calibration threshold settings."[4] And it was Caruso's review of documents provided by "Aptiv (crash sensing system supplier)" in *McCoy v. GM*—a personal injury lawsuit involving airbag nondeployment in a 2018 GMC Sierra—that plaintiff alleged showed a deployment cutoff was still in use in 2018 model year vehicles. *See* TAC ¶ 113; ECF No. 197-4, TAC Ex. D, 5/26/2022 Caruso *McCoy* Rpt. at 8, 13. Based on the Aptiv-produced "production parameter files" and "detailed calibration files," Caruso concluded the SDM in the *McCoy* vehicle "utilizes a complex set of algorithms and rules" with threshold end values ranging from 16 milliseconds to 50 milliseconds. *Id.* at 15, 18 (citing Aptiv-produced document bates numbered ASUS 0113933-011963). Caruso testified this document "tells me everything I need to know about what's in the calibration," ECF No. 188-1, Caruso *McCoy* Dep. at 257.[5] In that same *McCoy* case, Caruso disclaimed any belief that GM acted recklessly or with malice with respect to any alleged cutoff; he agreed that GM's engineering team was "sincere in its [earlier 1999] belief that on balance of 45 millisecond EP1 cutoff would prevent more injuries than it cost" and he simply believed that was "prematurely short." *Id.* at 227-229.

The Court here found "Caruso's expert report in *McCoy* supports an inference that a SDM defect similar to that from 1999 was installed in all Class Vehicles because it concluded that 'it appears that [GM trucks Group] is still employing very aggressive stop times' in its software calibrations as of model year 2018"—an inference the Court eventually found sufficient supported

---

[3] ECF No. 266, 10/26/2023 Hr'g Tr. at 36:12-37:7 ("THE COURT: Does Chris Caruso carry all this weight for you?... MR. TELLIS: My only problem is I struggled when you said 'carry all the weight.' He's certainly an important component of our case….")

[4] *See* 4/27/2012 Caruso Rpt. at 5-6, 9, *Nossar v. Gen. Motors LLC*, No. 1:11-cv-02129-RLV (N.D. Ga. Apr. 30, 2012), ECF No. 40-1 (cited in TAC ¶ 94.).

[5] Caruso also highlighted Aptiv-produced Delphi internal presentations about Algo-Front5, the specific crash algorithm in the 2018 GMC Sierra's SDM. ECF No. 197-4, TAC Ex. D, 5/26/2022 Caruso *McCoy* Rpt. at 16; Caruso *McCoy* Dep. at 275-276 (testifying the "event progression chart" from "some of the Delphi documents that were produced" were "important" to his opinions).

a "well-defined and plausible defect" at the pleadings stage. *Milstead v. Gen. Motors LLC*, 2023 WL 4410502, at *6 (N.D. Cal. July 6, 2023); *Milstead*, 2023 WL 7284159, at *5.

The importance of the Aptiv Materials is underscored by the complexity of airbag deployments and software calibrations. Each SDM may contain multiple modes with vehicle-specific calibrations, which may trigger an airbag deployment depending on different conditions specific to the thresholds set for that mode.[6] What Plaintiffs try to distill to a simple number—100 milliseconds or less—is not, in fact, simple. Explaining why requires the technical documentation and information necessary to demonstrate how the crash systems algorithms actually work.

Despite the centrality of the Aptiv Materials to Plaintiffs' defect theory and GM's defenses, GM does not have the Aptiv Materials for the hundreds of different make- and model-year vehicles included in the Plaintiffs' proposed class. Edmunds Decl. ¶¶ 9-10. Thus, since the outset of this lawsuit, the litigants have anticipated and recognized the importance of Aptiv discovery.[7] Plaintiffs' lawyers also served a subpoena on Aptiv (ECF No. 270-1, Nichols Aff. ¶ 7), and their lawyers named Aptiv as a co-defendant in an earlier, now-dismissed, lawsuit involving the same alleged defect here.[8] While GM will search for and produce relevant calibration files in its possession, Aptiv

---

[6] For example, the SDM in the 2018 GMC Sierra 2500 in the *McCoy* case contained an algorithm comprised of three separate algorithms running independently and in parallel, some of which had multiple modes with different event progression timers.

[7] *See, e.g.*, ECF No. 216, 1/30/2024 Joint Case Management Statement at 7 (Pls.' Statement) ("Certain information or documents requested in discovery may be in the possession, custody, or control of Delco Electronics, now Aptiv, and its predecessor or successor entities."); ECF No. 151-1, K. Anderson Decl. ¶ 14 ("Certain documents such as the vehicle-specific calibration files and algorithm definition documents may reside with outside suppliers."); ECF No. 235, 4/12/2024 Joint Case Management Statement ¶ 5 ("GM further anticipates serving discovery on and/or deposing certain third parties, including absent class members, Chris Caruso, and current or former employees of Aptiv (f/k/a Delphi)").

[8] *See Orihuela v. Gen. Motors LLC*, No. 21-cv-16336 (D. N.J. Aug. 31, 2021). Plaintiffs later dismissed the *Orihuela* lawsuit and included claims on behalf of that plaintiff in their First Amended Complaint filed in this Court. ECF No. 12, Am. Compl. ¶ 65. On December 9, 2022, the Court dismissed the claims of Mr. Orihuela and 68 other non-California Plaintiffs based on lack of personal jurisdiction. *Pereda v. Gen. Motors LLC*, 2022 WL 19975388, at *5 (N.D. Cal. Dec. 9, 2022). To date, Plaintiffs have not refiled the claims of Mr. Orihuela or any of the other non-California Plaintiffs in a Court that has personal jurisdiction.

is the designated owner of the calibration and files, and GM does not receive them in the ordinary course. Edmunds Decl. ¶¶ 8-10. And in response to GM's subpoena to Caruso, his lawyers (who are also Plaintiffs' lawyers) pointed GM to "sources other than Caruso, *such as Aptiv*." Weiner Decl. Ex. 1, Caruso Resp. & Objs. (emphasis added).

### C.     The Class Vehicles And Aptiv Subpoenas.

Plaintiffs' complaint alleges that all GM trucks and SUVs from 1999-2018 are defective. However, Plaintiffs have agreed to limit the Class Vehicles to those trucks and SUVs whose SDM was supplied by Aptiv or its predecessors. Notwithstanding this clarification, the number of vehicles is still large. GM identified more than 400 discrete model/model year vehicles. Edmunds Decl. ¶ 5. And Aptiv's declaration suggests that the Class Vehicle population implicates at least 76 different calibrations because there are "multiple calibrations for each vehicle model" and would require an estimated 1.5 hours each and 114 total to locate the responsive calibration files.  ECF No. 270-1, Nichols Aff. Ex. 1-C at 1.

In May 2024, Plaintiffs served a third-party document subpoena on Aptiv. After negotiations that GM was not a party to, Aptiv agreed to limit the scope of production to three platforms—the GMT800, GMT900, and K2XX—covering certain light duty and heavy duty trucks and SUVs. ECF No. 270-1, Nichols Aff. ¶ 7. Aptiv produced 325 documents in response, which covered roughly half of the 400+ make and model-year Class Vehicles.[9] Weiner Decl. ¶ 12. Aptiv completed its productions in response to Plaintiffs' subpoena in December 2024. Mot. at 3.

In January 2025, GM served a subpoena on Aptiv to produce documents responsive to 23 requests. *See* ECF No. 270-1, Nichols Aff. Ex. 1-B. GM seeks standardized technical documents and files for the crash sensing system in the Class Vehicle population that are uniquely within the possession of Aptiv. For example, Aptiv has produced calibration files for certain vehicle models in respond to Plaintiffs' subpoena. But every make and model vehicle has a unique SDM calibration file. Edmunds Decl. ¶¶ 7-8. GM seeks all calibration files for all Class Vehicles to defend against

---

[9] If Plaintiffs amend the proposed class definition to these vehicles, GM would be agreeable to narrowing the scope of its subpoena to Aptiv.

1  Plaintiffs' claim all the Class Vehicles have a uniform and common calibration defect. Given
2  Plaintiffs' reliance on Caruso, who alleged GM's truck group ignored his express warnings unlike
3  the GM cars group, GM also sought materials about these alleged warnings and Caruso's work on
4  deployment thresholds and cutoff timers, including in GM cars and vehicles for other OEMs.

After GM served its subpoena, counsel for Aptiv requested and GM provided clarification on the scope of the vehicle platforms at issue. During a subsequent meet and confer, in response to Aptiv's concerns about the scope of the subpoena, GM agreed to narrow its request as to Caruso's work on other vehicles to five vehicles for other OEMs. Nevertheless, GM explained it could not agree to narrow its requests as to the Class Vehicles because the algorithms and documents needed to understand them are solely in Aptiv's possession and are necessary to defend GM in this lawsuit. Weiner Decl. ¶¶ 5-12. Despite Aptiv's and GM's good-faith efforts to resolve this dispute, they have been unable to reach agreement. On April 7, 2025, Aptiv filed the motion for a protective order against compliance with GM's subpoena in this Court.[10]

The parties thus far have worked cooperatively together in this case and have resolved discovery disputes without Court intervention. This is the first discovery dispute requiring Court assistance to resolve. GM still remains willing to reach a fair and reasonable resolution here, and it looks forward to the Court's direction on the appropriate path forward here given Plaintiffs' claims.

## LEGAL STANDARD

"Rule 45 of the Federal Rules of Civil Procedure governs discovery of non-parties by subpoena," and "Rule 26(b) permits the discovery of any non-privileged material relevant to any

---

[10] Rule 45 states that a motion for a protective order should be filed in the "court for the district where compliance is required" and then transferred to "the issuing court if the person subject to the subpoena consents or if the court finds exceptional circumstances." Fed. R. Civ. P. 45(d)(3)(A), (f). While Aptiv filed its motion in the issuing court rather than the court of compliance (E.D. Mich.), the Court can exercise its "inherent authority" to address "whether the discovery here poses an undue burden on the non-party." *See AngioScore, Inc. v. TriReme Med., Inc.*, 2014 WL 6706873, at *2 (N.D. Cal. Nov. 25, 2014) (ruling on motion where non-party did not move to quash "the subpoena in the proper district in the first instance"). Given Aptiv and GM both consent to "having the dispute decided here," this Court can determine it would not serve the goals of a "just, speedy, and inexpensive determination" to require Aptiv to refile its motion in Michigan when the "court there would likely simply transfer the motion here under Rule 45(f)"—a rule "designed to protect the subpoenaed party." *See id.* (quoting Fed. R. Civ. P. 1.).

party's claim or defense and proportional to the needs of the case, considering factors such as the importance of the issues at stake in the action and whether the burden or expense of the proposed discovery outweighs its likely benefit." *In re Apple*, 2020 WL 5993223, at *3 (quoting Fed. R. Civ. P. 26(b)(1)). "Relevancy, for the purposes of discovery, is defined broadly." *Id.* "'[T]he court must be careful not to deprive a party of discovery that is reasonably necessary to afford a fair opportunity to defend and prepare the case.'" *Id.* (quoting Fed. R. Civ. P. 26 advisory comm. note to 1983 amendments). "Thus, a court determining the propriety of a third-party subpoena balances the relevance of the discovery sought, the requesting party's need, and the potential hardship to the party subject to the subpoena." *Id.*

Rule 45 permits a court to quash or modify a subpoena that "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv). The person moving for protection bears the burden of persuasion, while the party issuing the subpoena must demonstrate that the discovery sought is relevant. *Roy v. X1 Inc.*, 2024 WL 3159291, at *3 (N.D. Cal. June 25, 2024) (Hixson, M.J.); *Soc. Ranger, LLC v. Facebook, Inc.*, 2016 WL 11741634, at *1 (N.D. Cal. Nov. 4, 2016).

## ARGUMENT & AUTHORITIES

### I.   The Aptiv Materials Are Relevant And Proportional.

"The relevance of a discovery request simply has to be measured against the claims that are alleged." *Deras*, 2020 WL 940012, at *3. The Aptiv Materials are plainly relevant.

#### A.   The Class Vehicle Materials.

Discovery about the existence and impact of the alleged uniform SDM Calibration Defect is "obviously relevant" to, among other things, "how common the alleged defect is, which goes to predominance" under Rule 23(b)(3) as well as commonality under Rule 23(a). *See id.* at *3-4; *see also In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239, 247 (6th Cir. 2024) ("Rule 23 demands that the district court grapple with evidence of material changes to the allegedly defective product."); *In re Ford Motor Co.*, 86 F.4th 723, 728-29 (6th Cir. 2023) (finding abuse of discretion where court failed to consider impact of design changes in Rule 23(a) commonality analysis).

*First*, the linchpin of this case is a defect that Plaintiffs "consistently define" "as shutoff times below 100 milliseconds." *Milstead*, 2023 WL 7284159, at *4. Determining whether such a

cutoff exists in all the class vehicle is a threshold issue that cannot be established (or rebutted) without the Aptiv Materials. The Materials are required (among other things) to determine if such a cutoff existed or evolved over time and was different across the proposed Class Vehicles. *See Butler v. Porsche Cars N. Am., Inc.*, 2017 WL 1398316, at *6 (N.D. Cal. Apr. 19, 2017) (denying certification where plaintiffs did not meet their burden to show an alleged undisclosed wiring defect that was "the result of 'a design flaw' was "present in *all* Class Vehicles'"); *Sloan v. Gen. Motors LLC*, 2020 WL 1955643, at *42-43 (N.D. Cal. Apr. 23, 2020) (excluding certain make and model years from certified class definition where evidence showed changes introduced a sufficient variability in proof of the alleged defect).

Aptiv's supporting declaration recognizes there are "multiple calibrations for each vehicle model." Nichols Aff. Ex. 1-C at 1. But this complexity only highlights the importances of access to the Aptiv Materials. Without it, determining whether those multiple calibrations include "cutoffs" of less than 100 ms in software time in any or all Class Vehicles is impossible. *See Grodzitsky*, 2014 WL 718431, at *5-6 (denying class certification where plaintiffs "have not provided evidence supporting the contention that the materials are the same throughout the Class Vehicle window regulators, Plaintiffs have not established that the question "is there a defect?" is capable of classwide resolution."); *In re Nissan*, 122 F.4th at 248 (holding "district court must grapple with [software updates in some vehicle models] to answer whether the existence of a defect can be established in one stroke" and importance of challenged expert opinion to the "commonality inquiry: Does each class vehicle contain the same allegedly deficient braking system, or do different cars have materially different automated brakes?").

Moreover, the Aptiv Materials are necessary to defend against claims that any cutoffs could be defects or pose any safety issues given vehicle-specific environments, modes, inputs and other technological advancements. *See In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1019 (7th Cir. 2002) (reversing certification because it would "not be possible to make a once-and-for-all decision about whether all 60 million tires were defective" because even if "all 67 specifications had three particular shortcomings that led to excess failures," "whether a particular feature is required for safe operation depends on *other* attributes of the tires").

Aptiv does not dispute the relevance of Materials. Rather, it asserts GM's requests are overbroad because they span at least 16 different vehicle platforms and twenty years. Mot. at 4. But the breadth of GM's requests is governed by the claims against it. Plaintiffs make class claims on behalf of the millions of owners or lessees of hundreds of vehicle models built on 16 different platforms over two decades. The discovery burden must "grow[] in proportion to" and remain "generally consistent with the scope of the case." *Deras*, 2020 WL 940012, at *4; *see also Chevron Corp. v. Donziger,* 2013 WL 4536808, at *11 (N.D. Cal. Aug. 22, 2013) (holding third-party subpoena for documents over an 8-year period was not overly broad because the alleged fraudulent scheme was 8 years). Thus, the Aptiv subpoena is proportional to the broad claims against GM.

### B.     Other Materials.

Plaintiffs' claims also squarely implicate Aptiv's algorithm and calibration strategies for GM cars, and vehicles manufactured by other OEMs, including in particular any work by Caruso. Plaintiffs allege that Caruso expressed serious concerns and reservations about GM's requested modifications to ALGO-S so much so that he insisted that GM execute a liability waiver. TAC ¶ 66. Plaintiffs further allege the GM cars group rejected the same modification and insisted on a "materially longer deployment window." *Id.* ¶ 65. And they allege that "other major vehicle manufacturers throughout the industry" similarly "include a significantly longer window." *Id.* ¶ 64. GM's Request Nos. 15-20 and 22 seek Aptiv documents and communications to test the veracity of these claims—all of which go to Plaintiffs' core defect theory that the SDM algorithms in the Class Vehicles are "unreasonably dangerous" and contain a "serious, unjustified, and dangerous safety defect." *Id.* ¶ 49. Such information is plainly relevant. *Deras*, 2020 WL 940012, at *3; *see also In re Apple*, 2020 WL 5993223, at *3 ("Relevancy, for the purposes of discovery, is defined broadly."); *Taylor v. Cnty. of San Bernardino*, 2024 WL 3915194, at *13 (C.D. Cal. May 7, 2024) (holding requests seeking "factual material related to the allegations in this case" sought relevant discovery). And GM has complied with its obligation to "take reasonable steps to avoid imposing undue burden" on Aptiv by agreeing to limit its requests regarding Caruso's work on calibrations for other vehicles to five vehicles. Fed. R. Civ. P. 45(d)(1); Weiner Decl. ¶ 11.

II. **GM Has Demonstrated Substantial Need For The Aptiv Materials.**

GM has a substantial need for the Aptiv Materials. "Determining 'substantial need' requires taking into account the relevance and importance of the material sought, as well as the availability of facts from other sources." *In re Apple*, 2020 WL 5993223, at *3. Both factors tip in GM's favor.

*First,* as discussed above, the Aptiv Materials are both relevant and important. Plaintiffs allege that the defect at issue is within the calibration software in the SDMs—software that Aptiv designed, tested, and placed in the SDMs as GM's supplier. *See, e.g.*, TAC ¶ 40 ("In the Class Vehicles, the software calibration that controls how and when the SDM detects accidents and deploys the safety systems contains a serious defect."). The technical documents requested are critical to rebutting these allegations. *See* Edmunds Decl. ¶ 10 ("The information needed to respond to Plaintiffs' allegations regarding the algorithms and calibrations is in Aptiv's documents, including calibration/parameter files, Product Definition Documents, Software Definition Documents, Algorithm Definition Documents, and other documents. GM does not have these files in the ordinary course."). Plaintiffs likewise repeat Caruso's recollection that he and his team voiced opposition to GM's calibration requests in 1999. It is important that GM discover whether there are any contemporaneous documents or communications substantiating or rebutting Caruso's claims (which Plaintiffs are likely to elicit from Caruso and rely on in fact and/or expert discovery here).

*Second*, GM also has no "meaningful alternative way of obtaining" the Aptiv Materials. *See In re Path Network, Inc.*, 2024 WL 4828075, at *7 (N.D. Cal. Nov. 18, 2024) (finding party has substantial need when it has no "meaningful alternative way of obtaining" the information). As part of the manufacturer-supplier relationship, Aptiv retains possession, custody, and control of various tests, files, and documents, including the calibration files. GM does not set the calibration parameters or have access to the files documenting those parameters or the actual algorithm that Aptiv created for the Class Vehicles or vehicles manufactured by other OEMs. There is no alternative source from which GM can obtain these documents. Edmunds Decl. ¶¶ 7-10.

III. **Any Burden On Aptiv Does Not Outweigh The Needs Of The Case.**

GM has met its burden to show relevance and need, and Aptiv has not demonstrated it will suffer any undue burden or hardship that would outweigh the needs of the case. *In re Apple*, 2020

1  WL 5993223, at *3 (holding that "determining the propriety of a third-party subpoena balances the relevance of the discovery sought, the request party's need, and the potential hardship to the party subject to the subpoena"); Fed. R. Civ. P. 26(b)(1).

Aptiv asserts that responding is unduly burdensome because (1) it will "require approximately 526 hours to search for the requested information" and (2) take over a year based on one employee dedicating one day per week to responding. Mot. at 4-5. Aptiv is a sophisticated company with approximately 141,000 employees as of December 31, 2024. *See* Aptiv PLC, Annual Report (Form 10-K) (Feb. 7, 2025) at 11.[11] While subpoena response necessarily imposes *some* burden, there is no undue burden on Aptiv, notwithstanding that some resources will need to be directed to responding. In fact, GM narrowed the subpoena through a meet and confer process. Aptiv cannot show an undue burden by having only one person respond. Nor does Aptiv's non-party status eliminate discovery duties. This is especially true here. While Aptiv is not a named defendant in this case, it is the supplier of the component central to Plaintiffs' claims; it is not an unrelated party with no interest in the outcome of the litigation.

Aptiv separately argues that responding to the subpoena creates risks that it will "waive objections and fail to produce discoverable documents," and potentially incur sanctions. Mot. at 6-7. GM does not understand this argument. To the extent Aptiv is referring to concerns about inadvertent waiver of privileged materials, the Rule 502(d) Order entered in this case mitigates those concerns. ECF No. 224, Order Approving Stipulated Protective Order ¶ 11. In any event, these hypothetical concerns are insufficient to justify a protective order here. *See Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) ("Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test"); *Blumberg v. Ambrose*, 2014 WL 4988380, at *4 (E.D. Mich. Oct. 7, 2014) (denying motion to quash third party subpoenas where "any allegation of harm at this point is entirely speculative"). None of Aptiv's cited authorities is to the contrary.

---

[11] https://s22.q4cdn.com/336558720/files/doc_financials/2024/ar/2025_Aptiv_Web_AnnualReport.pdf.

\* \* \*

In sum, the scope of reasonable discovery here is commensurate with Plaintiffs' claims, which are "exceptionally broad" by any measure. *See Grodzitsky v. Am. Honda Motor Co.*, 2017 WL 8943159, at *2 (C.D. Cal. Oct. 30, 2017) (denying certification of classes of certain 2000-2011 make and model-years Honda vehicles), *aff'd*, 957 F.3d 979 (9th Cir. 2020). GM has identified no class action certified by any federal court involving an alleged defect across the sweeping scope of vehicles as proposed for class treatment here. GM does not believe Plaintiffs will be able to meet their burden to show common issues predominate or satisfy other Rule 23 requirements needed to certify their proposed classes. However, GM must be able to defend itself against this wildly overbroad case. To the extent the burdens of Plaintiffs' overreach also fall on Aptiv, GM suggests exploring reasonable options, including having Plaintiffs share in Aptiv's cost to produce the documents that GM needs to fairly respond to and defend this lawsuit.

## CONCLUSION

For these reasons, the Court should deny Aptiv's Motion for a Protective Order.

DATED: April 21, 2025

KIRKLAND & ELLIS LLP

By:   */s/ Renee D. Smith*
          RENEE D. SMITH

*Attorney for General Motors LLC, General Motors Holdings LLC, and General Motors Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 21, 2025, I electronically filed the foregoing Memorandum using the CM/ECF system, which will serve notification of such filing to the email of all counsel of record in this action, and also caused the foregoing Memorandum to be served via e-mail on the following counsel for non-party Aptiv Services US, LLC identified on the signature block of Aptiv's Motion (ECF No. 270):

| | |
|---|---|
| Robert E. Davies, Esq.<br>rdavies@daviesllp.com<br>Gregory A. Nelson<br>gnelson@daviesllp.com<br>DAVIES BLAKEMORE LLP<br>P.O. BOX 276148<br>Sacramento, CA 95827<br>Telephone: (916) 510-2400<br>Facsimile: (916) 500-0275 | Jack E. Little Jr., Esq.<br>jack.little@wtllaw.com<br>Jillian M. Perry, Esq.<br>jillian.perry@wtllaw.com<br>WEINSTEIN, TIPPETTS & LITTLE LLP<br>7500 San Felipe, Suite 500<br>Houston, TX 77063<br>Telephone: (713) 244-0800<br>Facsimile: (713) 244-0801 |

                                           */s/ Renee D. Smith*
                                           RENEE D. SMITH